# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------- X

245 PARK MEMBER LLC,                :

           Petitioner,       :

    -against-              :

HNA GROUP (INTERNATIONAL)     :
COMPANY LIMITED,           :

          Respondent.     :

------------------------------------------------------- X

| | |
|---|---|
| INDEX NO. | |
| **VERIFIED PETITION TO CONFIRM ARBITRATION AWARD** | |
| Return Date: | June 10, 2022 |
| Time: | 9:30 a.m. |

Petitioner 245 Park Member LLC ("Petitioner"), by and through its undersigned counsel

Kasowitz Benson Torres LLP ("Kasowitz"), as and for its Verified Petition to Confirm

Arbitration Award against Respondent HNA Group (International) Company Limited

("Respondent"), submitted pursuant to Article 75 of the CPLR, respectfully alleges as follows:

## PRELIMINARY STATEMENT

1.     This Article 75 petition to confirm a final arbitration award arises from the May 5,

2022 issuance of a Final Award, totaling $185,412,763.60, by The Honorable L. Priscilla Hall

(Ret.), a JAMS arbitrator and former Associate Justice of the State of New York Appellate

Division, Second Judicial Department, in favor of Petitioner and against Respondent.

2.     The relief requested herein is straightforward under settled law, and Petitioner

respectfully requests that it be granted as expeditiously as possible to enable Petitioner to

commence all appropriate measures to recover the amounts due and owing as a result of Justice

Hall's carefully reasoned arbitration ruling.

3.     By way of background, Respondent guaranteed certain payment obligations of its

affiliate arising out of Petitioner's desperately needed $148 million investment in a commercial

office tower at 245 Park Avenue in New York City (the "Property"), pursuant to a guaranty (the "Guaranty") that is by its terms "unconditional[], absolute[] and irrevocabl[e]," in which Respondent waived all defenses.  Respondent failed to comply with its payment obligations, forcing Petitioner to initiate an expedited JAMS arbitration to obtain payment from Respondent, in accordance with the expedited enforcement mechanism set forth in the Guaranty's arbitration provision.

4.      In her 35-page Final Award decision, Justice Hall ruled that Petitioner proved each of the three necessary elements on its Guaranty claim and was therefore entitled to payment in the amount of $185,310,077, consisting of $184,557,377.25 related to Petitioner's investment in the Property, $752,700.24 related to Kasowitz's attorneys' fees, and $102,686.11 related to fees incurred by Petitioner in connection with the arbitration.  In her decision, Justice Hall addressed and explicitly rejected each of Respondents' numerous affirmative defenses.  Under Rule 19(j) of the applicable JAMS Streamlined Rules and Procedures, Justice Hall's Final Award became final for purposes of enforcement on May 19, 2022.

5.      In accordance with black-letter law requiring that courts give a high level of deference to arbitration awards, and in the absence of any fact or circumstance that would even remotely provide a ground for modification or vacatur, judgment should be entered in favor of Petitioner confirming Justice Hall's Final Award.

### PARTIES

6.      Petitioner 245 Park Member LLC is a Delaware limited liability company, is an affiliate of SL Green Realty Corp. ("SL Green"), and has an office at c/o SL Green Realty Corp, One Vanderbilt Avenue, New York, New York 10017.

7.      Upon information and belief, Respondent HNA Group (International) Company Limited is a company organized under the laws of Hong Kong, is an affiliate of HNA Group

Case 1:22-cv-05136-JGK   Document 1-1   Filed 06/17/22   Page 4 of 229

Company Ltd., and has a registered office at Suites 3701-09, 37/F Two International Finance

Centre, 8 Finance Street, Central, Hong Kong.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this proceeding pursuant to CPLR 7502 and the

terms of the Guaranty, in which the parties submitted to the jurisdiction of the courts of the City

and County of New York, New York.  *See infra,* Ex. A [Guaranty] § 5.3.

9.      Venue in the County of New York is proper pursuant to CPLR 7502 because the

arbitration award that Petitioner seeks to confirm was issued by an office of JAMS located

within the County of New York; the parties agreed by contract that the arbitration would be held

in the County of New York under New York law; and the arbitration provision in the Guaranty

provides that judgment upon such arbitration award could be entered in any court of competent

jurisdiction.

## BACKGROUND

I.    **Background of the Dispute**

10.     Respondent is a Hong Kong entity and part of a large Chinese conglomerate,

HNA Group Company Ltd.  Previously valued at one time at more than $100 billion, with

interests in aviation, real estate, banking, finance, hospitality and other sectors around the world,

the HNA conglomerate has, according to numerous media reports, been in free-fall for the last

two years: it filed for bankruptcy in China, its founders were imprisoned by Chinese regulators,

many of its trophy assets around the world were sold off, and nearly $10 billion of its funds

apparently were embezzled.

11.     Before HNA unraveled, it bought the Property in May 2017 from Brookfield

Property Partners LP and the New York State Teachers' Retirement System for $2.21 billion,

which at that time was a record price for a Manhattan office tower.  The HNA entities that made

that purchase were Respondents' United States affiliates, including HNA 245 Park Ave JV LLC ("HNA JV Member"), 245 Park JV LLC (the "Company"), 245 Park Ave Mezz C LLC, 245 Park Ave Mezz B LLC, 245 Park Ave Mezz A LLC and 245 Park Avenue Property LLC (collectively "HNA USA").

12.     Shortly after HNA USA purchased the Property, the liquidity needs of the Chinese parent, HNA Group, intensified.  HNA USA therefore turned to Petitioner—an entity owned by SL Green Realty Corp. ("SL Green")—to make a significant and desperately needed equity investment in the Company, given that SL Green is New York City's largest owner of commercial office space, is a well-regarded Class-A property manager, and is an experienced investor in assets similar to the Property.

13.     On or about June 22, 2018, Petitioner made a preferred equity investment, then totaling $148 million, in the Company pursuant to the Amended and Restated Limited Liability Company Agreement, by and among Petitioner and HNA JV Member, which was subsequently amended on November 19, 2018 (the "JV Agreement").  A true and correct copy of the JV Agreement is attached hereto as **Exhibit A**.

14.     Like any sophisticated real estate investor, SL Green insisted that it obtain maximum protection, via an enforceable financial guaranty, to protect its $148 million investment with a highly leveraged Chinese-owned company.  Accordingly, as consideration and express inducement for the $148 million investment in the Company, Petitioner negotiated for and secured substantial contractual rights and protections, including the absolute, unconditional and irrevocable Guaranty, dated November 19, 2018, at issue here, without which SL Green would not have made such a significant investment.  A true and correct copy of the Guaranty is

attached hereto as **Exhibit B**. The parties were each represented by sophisticated counsel in negotiating and entering into the Guaranty.

15.    Under the JV Agreement, Petitioner is entitled to full payment of the "Redemption Amount"—which is the sum of Petitioner's $148 million investment plus a contractually agreed-to return on the investment, and a minimum guaranteed return—by the "Mandatory Redemption Date," specified as no later than June 30, 2022. Ex. A [JV Agreement] § 3.5; *id*. at 18 (definition of "Mandatory Redemption Date"); *id*. at 23 (definition of "Redemption Amount"). Full payment of the Redemption Amount is unconditionally guaranteed under the Guaranty in the event of certain defined events. Petitioner also negotiated for, and obtained in the JV Agreement, consent rights to 43 defined "Major Decisions" of the Company and each of the Subsidiaries. These Major Decisions included "effectuating capital expenditures not provided for in" an agreed-to budget, approving the budget, entering into "any contract pursuant to which the Company will incur an obligation in excess of $100,000 per year," the right to consent to filing for bankruptcy, entering into "any agreement" with any "leasing agent, property manager . . . to render services for the Company or any Subsidiary," "making any amendment or modification to this Agreement or the Certificate of Formation, or to the organizational documents of any Subsidiary," and engaging "accountants, . . . advisors, attorneys . . . or other professionals to render services for the Company or any of its Subsidiaries." Ex. A [JV Agreement] § 4.2; *id.* at 13-17 (definitions (a), (d), (p), (t), (z), (aa), (jj), (nn) and (oo) of "Major Decision").

16.    Making a Major Decision without obtaining Petitioner's consent constituted a "Cause Event" under the JV Agreement, as did filing a petition for bankruptcy. Ex. A [JV Agreement] at 6 (definition (b) of "Cause Event"). The occurrence of a Cause Event accelerated

Case 1.22-cv-05136-JGK Document 1-1 Filed 06/17/22 Page 7 of 229

the date by which the Company must pay the fully guaranteed Redemption Amount from June

30, 2022, to "ten (10) days following the occurrence of any Cause Event." Ex. A [JV

Agreement] at 18.

17.      In the Guaranty, Respondent unconditionally, absolutely and irrevocably

guaranteed to Petitioner payment of the Redemption Amount.  Respondent also unconditionally

waived any common law, equitable, statutory or other right—including 22 specifically

enumerated rights and defenses—it might have had. Ex. B [Guaranty] at §1.3; *see also* Ex. E

[Final Award] at 5.

18.      HNA JV Member, the Company, and certain HNA Subsidiaries made a series of

Major Decisions without Petitioner's knowledge and without seeking, much less obtaining,

Petitioner's consent. Ex. E [Final Award] at 7-8; Ex. D [Petitioner Submission] at 16.  Those

Decisions included filing for bankruptcy under Chapter 11 of the United States Bankruptcy

Code, and engaging professionals to render services for the Company.  Ex. D [Petitioner

Submission] at 16.

19.      These Major Decisions occurred prior to, in connection with, and after the filing

of the improper Chapter 11 bankruptcy petitions, dated October 31, 2021, (the "Bankruptcy").

Each of the Major Decisions, which the Debtors made without Petitioner's consent, constituted

separate Cause Events under the JV Agreement, which accelerated the fully and unconditionally

guaranteed Mandatory Redemption Date to no later than October 27, 2021.  Ex. E [Final Award]

at 15; Ex. D [Petitioner Submission] at 17.

20.      The Company failed to pay the Redemption Amount by October 27, 2021, or on

any other date. Ex. E [Final Award] at 10; Ex. D [Petitioner Submission] at 17.

Case 1:22-cv-05136-JGK   Document 1-1   Filed 06/17/22   Page 8 of 229

21.     Petitioner sent a demand to Respondent for payment of the Redemption Amount on November 19, 2021, in accordance with the Guaranty.  Ex. E [Final Award] at 10; Ex. D [Petitioner Submission] at 18.  A true and correct copy of the demand is attached hereto as **Exhibit C**.

22.     Respondent failed to pay the Redemption Amount in breach of the Guaranty.  Ex. E [Final Award] at 10; Ex. D [Petitioner Submission] at 18.

23.     Petitioner therefore commenced an expedited JAMS arbitration on December 21, 2021 pursuant to the Guaranty's expedited arbitration provision.  The arbitration was captioned *245 Park Member LLC v. HNA Group (International) Company Limited*, JAMS Ref. No. 5425000065 (the "Arbitration").

24.     Pursuant to the Guaranty's arbitration provision and the applicable JAMS Rules, the parties selected Justice Hall to serve as the arbitrator.

25.     The parties made their submissions to Justice Hall on March 31, 2022.  A true and correct copy of Petitioner's Memorandum of Facts and Law in Support of 245 Park Member LLC's Demand for Payment Under Guaranty is attached hereto as **Exhibit D**.

## II.    **The Final Award**

26.     On April 30, 2022, Justice Hall issued the Final Award in favor of Petitioner and against Respondent for "(1) a redemption amount of $184,557,377.25; (2) reasonable attorney's fees and costs of $752,700.24"; and (3) "all fees and disbursements due to JAMS," for a total of $185,412,763.60.  Ex. E [Final Award] at 34-35.  The Final Award was served on all parties via email on May 5, 2022.  A true and correct copy of the Final Award is attached hereto as **Exhibit E.**

27.     In her 35-page decision issuing the Final Award, Justice Hall held that Petitioner demonstrated each of the elements of a claim to collect on a guaranty—*i.e.*, "the existence of the

guaranty, the underlying debt, and the guarantor's failure to perform under the guaranty." *Id*. at 3.

28.     Justice Hall further held that based on the Guaranty and the JV Agreement, Petitioner "establish[ed] the existence of the Guaranty and proof of the underlying debt," *i.e.*, the Redemption Amount, and that "neither of these elements is challenged by the Respondent." Final Award at 3.  As to the third element, Justice Hall held that "[t]hree of the four Major Decisions [Petitioner] submits were made without its authorization, are uncontested by Respondent." *Id.* at 12; *see also id*. at 13-15.

29.     Justice Hall further held that by making these Major Decisions, the Mandatory Redemption Date was accelerated to "no later than October 27, 2021—four days before the [Bankruptcy] filing . . . ." *Id.* at 15.  Petitioner thus demonstrated its *prima facie* case for obtaining payment on the Guaranty.

30.     Justice Hall also rejected each of Respondent's affirmative defenses.  First, Justice Hall held that Respondent's arbitration submission "does not address" three of its defenses—failure to state a claim; the doctrines of waiver, ratification, and estoppel; and the absence of damages.  As a result, Justice Hall ruled that "Respondent has failed to meet its burden of proof" as to those defenses.  *Id.* at 15-16.

31.     *Second*, Justice Hall held that Respondent waived its fraud in the inducement defense concerning all conduct that occurred prior to execution of the Guaranty in light the Guaranty's broad waivers of defenses and decisions of the New York Court of Appeals construing and enforcing what Justice Hall found were "all but 'indistinguishable'" waivers contained in similar guaranties.  *Id.* at 16-22.

32.      *Third*, Justice Hall rejected, for a variety of reasons, Respondent's defense asserting post-execution fraud and/or *in pari delicto* based on the purported mismanagement of the Property by its property manager, which is a corporate affiliate of Petitioner.  *Id.* at 24-30. With respect to both the fraud and *in pari delicto* defenses, Justice Hall held that "Respondent has failed to meet its evidentiary burden on the necessary intentional, bad faith, at least equal fault, and/or mutuality of fault element of its post-execution fraud and/or *in pari delicto* defense."  *Id.* at 28.

33.      As to the fraud claim, Justice Hall ruled that Respondent failed to show any evidence demonstrating the necessary element of material misrepresentation of fact.  More specifically, Justice Hall held:

> Respondent, has not identified a "misrepresentation" or "material omission," which "was false and known to be false" and "made for the purpose of inducing the other party," or any "justifiable reliance of the other party on the misrepresentation or material omission Defendant." [Petitioner] disclosed its relationship to its affiliate property manager, or at a minimum, this relationship was known to Respondent via the Property Management Agreement and JV Agreement.

*Id.* at 29.

34.       As to the *in pari delicto* defense, Justice Hall held that it was waived because Respondent did not plead that defense in its answer.  *Id.* at 29-30.

35.      *Fourth*, Justice Hall rejected Respondent's affirmative defense based on the automatic stay rules that sometimes apply in the bankruptcy context.  As Justice Hall noted, the automatic bankruptcy stay only stays actions against a debtor, and "Respondent concedes that [it] is not a debtor with respect to which such automatic stay currently applies."  *Id.* at 30.

36.      Having found that Petitioner proved its *prima facie* case and having rejected each of Respondent's affirmative defenses, Justice Hall correctly awarded Petitioner: "(1) a

redemption amount of $184,557,377.25; (2) reasonable attorney's fees and costs of $752,700.24"; and (3) "all fees and disbursements due to JAMS." *Id.* at 34-35.

37.     The fees and disbursements Petitioner paid to JAMS totaled $102,686.11.  This amount includes the sum of (a) $69,515.91, which represents all of the JAMS fees incurred by Petitioner in connection with the arbitration, and (b) $33,170.20, which represents Respondent's remaining unpaid JAMS fees that Petitioner paid to facilitate release of the Final Award.  True and correct copies of Petitioner's and Respondent's invoices reflecting these amounts are attached hereto as composite **Exhibit F.**

38.     On May 18, 2022, counsel for Petitioner sent counsel for Respondent a letter demanding payment in full of the Final Award amount, and requested that counsel provide the date and method by which payment would be made.  A true and correct copy of the May 18, 2022 letter is attached hereto as **Exhibit G**.  Respondent responded on May 19, 20202 but did not provide the requested information.

39.     Under JAMS Rule 19(j), the Final Award became final for purposes of enforcement on May 19, 2022.

## <u>FIRST CAUSE OF ACTION</u>
### (Confirmation of Final Award)

40.     Petitioner repeats and realleges each and every allegation set forth in each of the above paragraphs as though set forth fully herein.

41.     Petitioner brings this action seeking confirmation of the Final Award within one year of the date on which the Final Award was issued, which occurred on May 5, 2022.

42.     The Final Award has not been vacated or modified pursuant to CPLR 7511.

Case 1:22-cv-05136-JGK   Document 1-1   Filed 06/17/22   Page 12 of 229

43.     There are no grounds for vacatur or modification of the Final Award, *i.e.*, there has been no violation of a strong public policy, and the Final Award is neither irrational nor clearly exceeds a specifically enumerated limitation on the arbitrator's power.

44.     No previous application has been made for the relief sought herein.

45.     By reason of the foregoing, Petitioner is entitled to an order confirming the Final Award pursuant to CPLR 7510, and entry of judgment thereon pursuant to CPLR 7514.

**WHEREFORE**, Petitioner respectfully requests:

(a)     An order pursuant to CPLR 7510 confirming the Final Award;

(b)     An order pursuant to CPLR 7514 directing entry of judgment based thereon in favor of Petitioner and against Respondent and awarding Petitioner:

(1) $185,412,763.60, which is the amount awarded in the Final Award, pursuant to CPLR 7514;

(2) post-Final Award and post-judgment interest, pursuant to CPLR 5001-5004;

(3) all costs and expenses (including court costs and reasonable attorneys' fees) incurred by Petitioner in connection with the enforcement of the Final Award and judgment, pursuant to Section 1.7 of the Guaranty (*see* Ex. B § 1.7 ("In the event that any Guarantor should breach of fail to timely perform any provisions of this Guaranty, such Guarantor shall . . . pay [Petitioner] all costs and expenses (including court costs and reasonable attorneys' fees) incurred by [Petitioner] in the enforcement hereof or the preservation of [Petitioner's] rights hereunder"); and

(c)   For such other and further relief as this Court may deem just, proper and

equitable.

Dated:  New York, New York              KASOWITZ BENSON TORRES LLP
        May 20, 2022


                                        By: */s/ Mark P. Ressler*
                                          _____
                                          Mark P. Ressler
                                          Paul M. O'Connor III
                                          Jasen Fears
                                          1633 Broadway
                                          New York, New York 10019
                                          Telephone: (212) 506-1700
                                          mressler@kasowitz.com
                                          poconnor@kasowitz.com
                                          jfears@kasowitz.com

                                          Henry B. Brownstein
                                          1399 New York Ave., NW, Ste. 201
                                          Washington, D.C. 20005
                                          Telephone: (202) 760.3400
                                          hbrownstein@kasowitz.com

                                          *Attorneys for Petitioner 245 Park Member
                                          LLC*

## VERIFICATION

STATE OF NEW YORK )
                         ) ss.:
COUNTY OF NEW YORK )

Harrison T. Sitomer, being duly sworn, deposes and says:

I am the Chief Investment Officer of SL Green Realty Corp., which is the indirect parent

company of Petitioner 245 Park Member LLC. I am authorized to sign this Verification on

behalf of 245 Park Member LLC. I have read the foregoing Petition to Confirm Arbitration

Award and know the contents thereof and the same is true as to my personal knowledge, except

for those matters stated to be alleged upon information and belief, and as to those matters, I

believe them to be true.

By: _____

Harrison Sitomer
Chief Investment Officer
SL Green Realty Corp.

Sworn to me this day of May, 2022

GRETCHEN REINHAGEN
Notary Public, State of New York
No. 01RE6309397
Qualified in New York County
Commission Expires Aug. 11, 20__

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

----------------------------------------------------- X

245 PARK MEMBER LLC,           :       INDEX NO.

          Petitioner,          :

                          :       **NOTICE OF VERIFIED PETITION TO**

    -against-               :       **CONFIRM ARBITRATION AWARD**

                          :

HNA GROUP (INTERNATIONAL)   :       Return Date:     June 10, 2022
COMPANY LIMITED,          :       Time:           9:30 A.M.

          Respondent.        :

                          :

----------------------------------------------------- X

      PLEASE TAKE NOTICE,  that upon the accompanying Verified Petition to Confirm

Arbitration Award, together with the exhibits attached thereto, and the accompanying

Memorandum of Law in Support of Verified Petition to Confirm Arbitration Award, Petitioner

245 Park Member LLC ("Petitioner"), by and through its counsel, Kasowitz Benson Torres LLP,

will make an application to this Court at the Motion Support Office Courtroom located in Room

130 at the Courthouse located at 60 Centre Street, New York, New York on June 10, 2022 at

9:30 a.m. or as soon thereafter as counsel may be heard, as follows:

          (a)      For an Order pursuant to CPLR 7510, confirming a Final Award dated

          April 30, 2022, and issued on May 5, 2022 (the "Final Award"), in an arbitration

          captioned *245 Park Member LLC v. HNA Group (International) Company

          Limited*, JAMS Ref. No. 5425000065 (the "Arbitration");

          (b)      For an order directing entry of judgment based thereon in favor of

          Petitioner and against Respondent and awarding Petitioner:

Case 1:22-cv-05136-JGK   Document 1-1   Filed 06/17/22   Page 16 of 229

(1) $185,412,763.60, which is the amount awarded in the Final Award, pursuant to CPLR 7514;

(2) post-Final Award and post-judgment interest pursuant to CPLR 5001-5004;

(3) all costs and expenses (including court costs and reasonable attorneys' fees) incurred by Petitioner in connection with the enforcement of the Final Award and judgment, pursuant to Section 1.7 of the Guaranty; and

(c)     For such other and further relief as this Court may deem just, proper and equitable.

PLEASE TAKE FURTHER NOTICE that, pursuant to CPLR § 403(b), answering papers, if any, must be served upon the undersigned no later than seven (7) days prior to the return date of this petition.

Dated: New York, New York
       May 20, 2022

KASOWITZ BENSON TORRES LLP

By: */s/ Mark P. Ressler*
    Mark P. Ressler
    Paul M. O'Connor III
    Jasen Fears
    1633 Broadway
    New York, New York 10019
    Telephone: (212) 506-1700
    mressler@kasowitz.com
    poconnor@kasowitz.com
    jfears@kasowitz.com

    Henry B. Brownstein
    1399 New York Ave., NW, Ste. 201
    Washington, D.C. 20005
    Telephone: (202) 760.3400
    hbrownstein@kasowitz.com

*Attorneys for Petitioner 245 Park Member LLC*

# EXHIBIT A

*EXECUTION VERSION*

SECOND AMENDED AND RESTATED

LIMITED LIABILITY COMPANY AGREEMENT

OF

245 PARK JV LLC

A Delaware Limited Liability Company

Dated as of November 19, 2018

THE LIMITED LIABILITY COMPANY INTERESTS CREATED BY THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS, AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND SUCH OTHER APPLICABLE SECURITIES LAWS PURSUANT TO EFFECTIVE REGISTRATION OR AN EXEMPTION THEREFROM. IN ADDITION, SUCH INTERESTS MAY NOT BE SOLD, TRANSFERRED, ASSIGNED OR HYPOTHECATED, IN WHOLE OR IN PART, EXCEPT AS PROVIDED IN ARTICLE 11 OF THIS AGREEMENT. ACCORDINGLY, THE HOLDERS OF SUCH INTERESTS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE RISKS OF THEIR RESPECTIVE INVESTMENTS IN SUCH INTERESTS FOR AN INDEFINITE PERIOD OF TIME.

## TABLE OF CONTENTS

<strong>Page</strong>

**Article 1** DEFINITIONS ............................................................................................ 2
    1.1      Definitions ...................................................................................... 2
    1.2      Terms Generally .......................................................................... 26

**Article 2** ORGANIZATION .................................................................................... 27
    2.1      Formation and Continuation ........................................................ 27
    2.2      The Name ..................................................................................... 27
    2.3      Registered Office; Registered Agent; Principal Office; Other Offices ............... 27
    2.4      Purposes ....................................................................................... 27
    2.5      [Intentionally Omitted.] ............................................................... 27
    2.6      Powers of the Company ............................................................... 27
    2.7      Term ............................................................................................. 28

**Article 3** MEMBERSHIP INTERESTS ................................................................... 28
    3.1      Members ....................................................................................... 28
    3.2      No Additional Membership Interests ........................................... 28
    3.3      Preferred Interest; Preferred Equity Return ................................ 29
    3.4      Early Redemption ........................................................................ 29
    3.5      Redemption of Preferred Interest ................................................ 29
    3.6      [Intentionally Omitted.] ............................................................... 29
    3.7      Guaranty....................................................................................... 30
    3.8      Notice Letters .............................................................................. 30
    3.9      Investor's Title Policy ................................................................. 31
    3.10    Access to Company Operating Account ...................................... 31

**Article 4** MANAGING MEMBER; MAJOR DECISIONS..................................... 31
    4.1      Managing Member........................................................................ 31
    4.2      Major Decisions........................................................................... 32
    4.3      Reimbursement ............................................................................ 33
    4.4      Officers or Agents ....................................................................... 33
    4.5      Subsidiaries of the Company ....................................................... 33
    4.6      Specific Covenants of the Owner Member .................................. 34

**Article 5** MEMBER MATTERS ............................................................................... 35
    5.1      Limitation on Member Liability; Indemnification........................ 35
    5.2      Use of Company Property............................................................ 36
    5.3      Meetings ...................................................................................... 36

**Article 6** REPORTING; ANNUAL BUDGETS; BOOKS AND RECORDS; EXPENSES AND
                 OTHER MATTERS................................................................. 37
    6.1      Reporting...................................................................................... 37
    6.2      Annual Business Plans; Annual Budgets...................................... 38
    6.3      Books of Account ........................................................................ 39
    6.4      Expenses ...................................................................................... 39

i

|  | 6.5 | Availability of Books of Account ............................................................ 39 |
|  | 6.6 | Tax Returns and Tax Elections. .............................................................. 39 |
|  | 6.7 | Tax Matters Representative .................................................................... 39 |

**Article 7** CAPITAL CONTRIBUTIONS ........................................................... 41
    7.1    Capital Accounts of the Members; Capital Contributions ...................... 41
    7.2    No Obligation .......................................................................................... 41
    7.3    Additional Capital Contributions ............................................................ 41
    7.4    Capital of the Company .......................................................................... 42

**Article 8** CAPITAL ACCOUNTS ...................................................................... 42
    8.1    Establishment and Determination of Capital Accounts ......................... 42
    8.2    Negative Capital Accounts ..................................................................... 43

**Article 9** DISTRIBUTIONS ............................................................................... 43
    9.1    Distributions Generally ........................................................................... 43
    9.2    Regular Distributions. ............................................................................. 43
    9.3    Distributions Upon a Forced Sale. ......................................................... 45
    9.4    Availability of Distributions ................................................................... 45
    9.5    Withholding ............................................................................................. 45
    9.6    Accounting Principles ............................................................................. 45
    9.7    Cash Management: Reserves .................................................................. 45
    9.8    Management Fee. .................................................................................... 46

**Article 10** ALLOCATIONS ................................................................................ 47
    10.1    Allocations of Net Income and Net Loss Generally ............................. 47
    10.2    Regulatory Allocations ........................................................................... 47
    10.3    Other Special Allocations. ...................................................................... 49
    10.4    Tax Allocations; Code Section 704(c). .................................................. 49

**Article 11** TRANSFER OF MEMBERSHIP INTERESTS ................................ 50
    11.1    Transfers of a Member's Membership Interest. ..................................... 50
    11.2    Right of First Offer. ................................................................................ 52
    11.3    [Intentionally Omitted ........................................................................... 56
    11.4    Forced Sale ............................................................................................. 56
    11.5    Consummation of Transactions. ............................................................. 57
    11.6    Transfer Taxes. ....................................................................................... 65

**Article 12** DISSOLUTION OF THE COMPANY AND WINDING UP ............ 67
    12.1    Dissolution. ............................................................................................. 67
    12.2    Winding Up .............................................................................................. 67
    12.3    Distributions. ........................................................................................... 68

**Article 13** REPRESENTATIONS AND WARRANTIES ................................... 68
    13.1    Representations and Warranties .............................................................. 68

**Article 14** AMENDMENTS ................................................................................ 73

ii

**Article 15** MISCELLANEOUS ................................................................. 73
    15.1      REIT Compliance. ......................................................... 73
    15.2      Further Assurances.......................................................... 74
    15.3      Notices ........................................................................... 75
    15.4      Conflicts of Interest; Transactions with Affiliates............ 76
    15.5      Confidentiality .............................................................. 76
    15.6      Headings and Captions ................................................... 77
    15.7      Counterparts .................................................................. 77
    15.8      Governing Law .............................................................. 77
    15.9      Consent to Jurisdiction .................................................. 77
    15.10    Partition ........................................................................ 77
    15.11    Validity ......................................................................... 78
    15.12    Successors and Assigns .................................................. 78
    15.13    Entire Agreement .......................................................... 78
    15.14    Waivers ......................................................................... 78
    15.15    No Third-Party Beneficiaries ........................................ 78
    15.16    Remedies Not Exclusive ................................................ 78
    15.17    Survival ......................................................................... 78
    15.18    Waiver of Jury Trial ...................................................... 78
    15.19    Recovery of Certain Fees .............................................. 79
    15.20    Existing LLC Agreement ............................................... 79

**EXHIBITS**

Exhibit A: Capital Accounts; Members of the Company
Exhibit B: Initial Budget
Exhibit C: Legal Description
Exhibit D: Mandatory Work
Exhibit E: Tenants and Leases
Exhibit F: Lease Defaults
Exhibit G: Lease Audits/Disputes
Exhibit H: Tenant Deposits
Exhibit I: Outstanding Leasing Costs
Exhibit J: Brokerage Agreements
Exhibit K: Work
Exhibit L: Tenant Arrearages
Exhibit M: Service Contracts
Exhibit N: Assessment Proceedings
Exhibit O: Loan Documents
Exhibit P: Employee Matters
Exhibit Q: Affiliate Agreements
Exhibit R: Organizational Chart
Exhibit S: Transaction Documents
Exhibit T: Form of Promissory Note
Exhibit U: Form of Joinder Agreement
Exhibit V: Prohibited Transferees
Exhibit W Form of Property Management Agreement

NY 247736303v11

Case 1:22-cv-05136-JGK   Document 1-1   Filed 06/17/22   Page 23 of 229

**THIS SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT of 245 PARK JV LLC,** a Delaware limited liability company (the "Company"), dated as of November 19, 2018 (the "Effective Date"), by and between HNA 245 Park Ave JV LLC, a Delaware limited liability company (the "Owner Member" or "Managing Member"), having an office c/o HNA Group North America LLC, 1180 Avenue of the Americas, Suite 1801, New York, NY 10036, as member, and 245 PARK MEMBER LLC, a Delaware limited liability company (the "Investor Member"), having an office at c/o SL Green Realty Corp. 420 Lexington Avenue, 19th Floor, New York, New York 10170, as member.

**W I T N E S S E T H :**

WHEREAS, the Company was formed on April 21, 2017 upon the filing of a Certificate of Formation (as hereinafter defined) pursuant to the Act;

WHEREAS, the Owner Member and the Investor Member entered into that certain Amended and Restated Limited Liability Company Agreement of the Company, dated as of June 22, 2018 (as the same may have been amended, restated and/or modified, the "Existing LLC Agreement")

WHEREAS, the Owner Member currently owns 51.131% of the limited liability company interest of the Company and the Investor Member currently owns 48.869% of the limited liability company interest of the Company;

WHEREAS, on the date hereof, the parties have agreed that the non-negotiable promissory note in the principal amount of $75,000,000 issued and delivered by the Investor Member to the Owner Member, in the form attached hereto as Exhibit T, together with any and all interest accrued thereunder, has been forgiven and cancelled by the Owner Member, as  a reduction of the purchase price consistent with the terms of such note, and returned to the Investor Member and the Investor Member has no further liability thereunder;

Whereas, the amount of the investment of the Investor Member in the Company as of the Effective Date is $148,165,906.41;

WHEREAS, the Owner Member and the Investor Member hereby confirm that, for income tax purposes, the Owner Member and the Investor Member have agreed to treat the purchase by the Investor Member of its 48.869% limited liability company interest in the Company in a manner consistent with that described in Situation 1 of Internal Revenue Service Revenue Ruling 99-5, 1999-1, CB 434; and

WHEREAS, the Members desire to (a) amend and restate the Existing LLC Agreement in its entirety as set forth herein and (b) enter into this Agreement to set forth the terms and provisions governing the ownership and operation of the Company and the respective rights and obligations of the Members with respect thereto.

NOW THEREFORE, in consideration of the mutual promises and covenants contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which

are hereby acknowledged, the Members hereby agree to amend and restate the Existing LLC Agreement as follows:

<h1 style="text-align:center">ARTICLE 1<br>DEFINITIONS</h1>

1.1     <u>Definitions</u>.   As used in this Agreement, the following terms shall have the meanings set forth below, which meanings shall be applicable equally to the singular and plural of the terms defined:

"<u>270-Day Period</u>" has the meaning set forth in <u>Section 11.2(f)</u>.

"<u>Acceptable Terms</u>" has the meaning set forth in <u>Section 11.2(f)</u>.

"<u>Acceptance Notice</u>" has the meaning set forth in <u>Section 11.2(c)</u>.

"<u>Accountants</u>" means the firm of independent certified public accountants selected from time to time by the Members to act as accountants for the Company; it being agreed that any so called "<u>Big Four</u>" accounting firm, Berdon LLP and FTI Consulting are each approved as an Accountant.

"<u>Act</u>" means the Delaware Limited Liability Company Act (6 Del.C. § 18-101, et seq.), or any successor statute thereto.

"<u>Additional Capital Contribution</u>" means, with respect to any Member, a contribution or deemed contribution to the capital of the Company made by such Member after the Effective Date pursuant to Section 7.3 or otherwise.

"<u>Adjusted Capital Account Deficit</u>" means, with respect to any Member, the negative balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, determined after giving effect to the following adjustments: (a) credit to such Capital Account any portion of such negative balance which such Member (i) is treated as obligated to restore to the Company pursuant to the provisions of Section 1.704-1(b)(2)(ii)(c) of the Regulations, or (ii) is deemed to be obligated to restore to the Company pursuant to the penultimate sentence of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and (b) debit from such Capital Account the items described in Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Regulations.

"<u>Adverse Guaranty Event</u>" has the meaning set forth in the definition of Mandatory Redemption Date.

"<u>Affected Gain</u>" has the meaning set forth in <u>Section 10.4(c)</u>.

"<u>Affiliate</u>" means, with respect to any Person, any other Person that directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such Persons. For purposes of this definition, the terms "controls," "is controlled by,"

2

or "is under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an entity, whether through ownership or voting rights, by contract or otherwise.

"Affiliate Transaction" means any transaction between (a) any Member or any of their Affiliates, and/or any of their members, partners or officers, on the one hand, and (b) the Company and/or its Subsidiaries on the other hand.

"Agreement" means this Second Amended and Restated Limited Liability Company Agreement of the Company, as it may hereafter be amended, supplemented or otherwise modified from time to time.

"ALR" has the meaning set forth in Section 11.5(a).

"Annual Budget" means the annual operating expense and capital budget for the Company and its Subsidiaries, which shall be part of the Annual Business Plan.

"Annual Business Plan" means the Company and its Subsidiaries' business plan for any Budget Year, which in all events shall include the Annual Budget for such Budget Year.

"Applicable Federal Rate" means the short term "Applicable Federal Rate" prescribed under Section 1274 of the Code, in effect on the date hereof, compounded annually.

"Applicable Law" means all applicable provisions of (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations or orders of any Governmental Authority, (b) any consents or approvals of any Governmental Authority, and (c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of or agreements with any Governmental Authority.

"Approved Annual Budget" means an Annual Budget, in the form that has received the approval of the Members, or as modified pursuant to Section 6.2 or otherwise in accordance with this Agreement, whether included as part of an Approved Annual Business Plan or otherwise. The Initial Budget shall be deemed to constitute an Approved Annual Budget.

"Approved Annual Business Plan" means an Annual Business Plan that has received approval of the Members, or as modified pursuant to Section 6.2 or otherwise in accordance with this Agreement.  An Approved Annual Budget shall be deemed to constitute an Approved Annual Business Plan with respect to the corresponding Budget Year unless a separate Annual Business Plan receives approval of the Members.

"Asset Management Fee" means the fee payable by the Company to the Owner Member or its designated Affiliate for the oversight of the operations of the Company, the Subsidiaries and the Property, which shall be payable at the rate of $1,000,000 per year, in arrears in equal quarterly installments, from and after the Effective Date until the earliest to occur of (a)

3

the sale of the Property and (b) the occurrence of a Cause Event (subject to the limited right of the Company to effect an MD Default Cure). The first installment of the Asset Management Fee shall be paid, in arrears, on a per diem basis, on December 31, 2018 for the period from the Effective Date through such date. The final installment of the Asset Management Fee shall similarly be prorated on a per diem basis. The Asset Manager shall only have such authority as shall be delegated to it by the Managing Member with the approval of the Investor Member and, in no event, shall the Asset Manager have any greater authority than that conferred upon the Managing Member hereunder. It is agreed and understood that the obligation for the payment of the Asset Management Fee hereunder is and shall remain subject and subordinate to the obligation of the Company for the payment of the Preferred Equity Return and the Net Preferred Equity Investment as and when the same become due and payable hereunder; provided that the Members agree that, if otherwise payable hereunder, the Asset Management Fee shall be payable pursuant to Section 9.2(a)(ii) if all Mandatory Distributions then owing have been paid pursuant to Section 9.2(a)(i).

"Asset Manager" means the Owner Member or its designated Affiliate that is entitled to receive payment of the Asset Management Fee.

"Asset Seller" has the meaning set forth in Section 11.2(c).

"Assignment and Assumption of Contracts" has the meaning set forth in Section 11.5(a).

"Bankruptcy Action" means, with respect to the affected party, (a) the entry of an order for relief under the Bankruptcy Code, (b) the admission by such party of its inability to pay its debts as they mature, (c) the making by it of an assignment for the benefit of creditors, (d) the filing by it of a voluntary petition in bankruptcy or a petition for relief under the Bankruptcy Code or any other applicable federal or state bankruptcy or insolvency statute or any similar law, (e) the appointment of a receiver for the assets of such party, (f) the filing of an involuntary petition seeking liquidation, reorganization, arrangement or readjustment of its debts or any other similar relief under the Bankruptcy Code or any other federal or state insolvency law, or (g) the imposition of a judicial or statutory lien on all or a substantial part of its assets. With respect to a Member, the foregoing definition of Bankruptcy is intended to replace and shall supersede and replace the definition of Bankruptcy set forth in Sections 18-101(1) and 18-304 of the Act.

"Bankruptcy Code" means Title 11 of the United States Code.

"Bipartisan Budget Act" means the amendments to Subchapter C of Chapter 63 of the Code made by the Bipartisan Budget Act of 2015.

"Budget Year" means, with respect to Fiscal Year 2018, the period beginning on the Effective Date and ending on December 31, 2018; and, with respect to each Fiscal Year thereafter, Budget Year means the period beginning on January 1 and ending on December 31 of such year.

4

"<u>Business Day</u>" means any day other than a Saturday, Sunday or a day on which national banking associations are authorized or required to close in New York, New York.

"<u>Capital Account</u>" when used in respect of any Member means the capital account maintained for such Member in accordance with <u>Section 8.1</u>, as said Capital Account may be increased or decreased from time to time pursuant to the terms of this Agreement.

"<u>Capital Contribution</u>" means, with respect to any Member, any cash, cash equivalents or the Gross Asset Value of property contributed or deemed contributed to the Company by such Member in accordance with <u>Article 7</u> or as otherwise expressly provided herein, provided that no Member may contribute cash equivalents or property (as opposed to cash) without the approval of each of the Members.

"<u>Capital Proceeds</u>" means the proceeds received by the Company or any of its Subsidiaries (without duplication) from a Capital Transaction and any reduction in reserves previously established from a Capital Transaction (other than for payment of the items for which the applicable reserve was established), in each case in excess of the sum of (a) the amount actually used to repay indebtedness (principal and interest) secured by any direct or indirect interest in the Property or any other asset directly or indirectly owned by the Company, (b) the actual out-of-pocket costs, charges and expenses incurred in connection with such Capital Transaction, and (c) any reserves established by the Members (including in an Approved Annual Budget) and funded from the proceeds of such Capital Transaction without reduction for any Transfer Taxes imposed in respect of that Capital Transaction to the extent that such reduction would reduce the amount that the Investor Member would be entitled to receive under <u>Section 9.3(i)</u>, <u>(ii)</u> or <u>(iii)</u>.

"<u>Capital Transaction</u>" means any of the following: (a) any sale (including pursuant to <u>Section 11.5(a)</u> or <u>Section 11.5(b)</u>), exchange, insurance award in respect of a casualty (other than business interruption insurance or rental loss insurance), condemnation, ground lease, transfer or other disposition of all or substantially all of the Property or other assets (or any Subsidiary of the Company) in whole or in part, or (b) any financing or refinancing of the Property (or any Subsidiary of the Company (i.e., a mezzanine loan)) in whole or in part.

"<u>Cash Flow Period</u>" means (x) initially, the period commencing on the date hereof and ending on and including December 31, 2018, and (y) thereafter, each subsequent fiscal quarter, except that the Cash Flow Period for the quarter in which the Mandatory Redemption Date occurs shall end on the Mandatory Redemption Date.

"<u>Cause Event</u>" means the occurrence of any of the following: (a) with respect to the Managing Member, (i) any fraud, criminal conduct or willful misconduct by such Person related to or in connection with this Agreement, the other Transaction Documents, the Loan Documents, the transactions contemplated hereby or thereby, the Company, any Subsidiary thereof or the Property, or (ii) such Person enters a plea of no contest to or is convicted of a felony involving moral turpitude; <u>provided</u>, in each case of <u>clause (a)(i)</u> above or this <u>clause (a)(ii)</u>, if, within thirty (30) days of the Managing Member obtaining knowledge of such event, the Managing Member removes the Person who caused the Managing Member to engage in fraud, criminal

5

Case 1:22-cv-05136-JGK   Document 1-1   Filed 06/17/22   Page 28 of 229

conduct or willful misconduct, or to commit a felony involving moral turpitude, as an officer, member or partner of the Managing Member or the Company, as applicable, and reimburses the Companies for all losses actually suffered as a result of the occurrence of any of the foregoing events, then the same shall not result in a Cause Event under this <u>clause (a)</u>; (b) the Managing Member takes or causes any of the Companies to take an action that constitutes a Major Decision without the prior written approval of the Investor Member, which action has more than an immaterial effect on the Investor Member, the Company, any Subsidiary, the Property or any other Company Assets; (c) the Managing Member shall be adjudged bankrupt or insolvent by a court of competent jurisdiction, or an order shall be made by a court of competent jurisdiction for the appointment of a receiver, liquidator, or trustee of the Managing Member for all or substantially all its property by reason of the foregoing, or if a court of competent jurisdiction approves any petition filed against the Managing Member for reorganization, and, in each case, such adjudication or order shall remain in force or unstayed for a period of thirty (30) days; (d) the Managing Member shall take any Bankruptcy Action instituting proceedings for voluntary bankruptcy or shall file a petition seeking reorganization under the Bankruptcy Code, or for relief under any law for relief of debtors, or shall consent to the appointment of a receiver for itself or for all or substantially all its property, or shall make a general assignment for the benefit of its creditors, or shall admit in writing its inability to pay its debts, generally, as they become due, other than in a writing to one or more Lenders; (e) the Owner Member shall fail to reimburse the Investor Member in accordance with <u>Section 11.6</u> for any Transfer Taxes paid by the Investor Member within ten (10) days after the Investor Member's written demand therefor; (f) the participation by the Owner Member or any of its Affiliates in the acquisition of any interest in any Company Loan without a Redemption In Full; or (g) the failure of the Company to distribute to the Investor Member on any Distribution Date an amount equal to the Mandatory Distribution, provided that the Company shall be permitted to cure such Cause Event, not more than two (2) times in any period of twelve (12) consecutive months, by making such Mandatory Distribution not later than the fifth Business Day following the applicable Distribution Date (each, an "<u>MD Default Cure</u>").

"<u>Certificate of Formation</u>" has the meaning set forth in <u>Section 2.1</u>.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.  Any reference herein to a specific section or sections of the Code shall be deemed to include a reference to any corresponding provision of future law.

"<u>Companies</u>" means, collectively, the Company and its Subsidiaries.

"<u>Company</u>" has the meaning set forth in the introductory paragraph.

"<u>Company Assets</u>" means all right, title and interest of the Company, directly or indirectly, in and to all or any portion of the assets of the Company and any property (real, personal, tangible or intangible) or estate acquired by the Company or its Subsidiary in exchange therefor or in connection therewith, including as the context may require the Subsidiaries of the Company and the Property.

6

"Company Loan" means any Indebtedness of the Company or a Subsidiary thereof, including, without limitation, any Mortgage Indebtedness and/or Mezzanine Indebtedness.

"Company Minimum Gain" has the same meaning as "partnership minimum gain" set forth in Sections 1.704-2(b)(2) and 1.704-2(d) of the Regulations.

"Company Operating Account" means the operating account in the name of the Property Manager, as agent for the Office Owner, including any subaccounts thereof.

"Company Operating Account Bank" means the bank at which the Company Operating Account is located.

"Consideration Period" has the meaning set forth in Section 11.2(c).

"Control" as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the day-to-day management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise. A Person shall be deemed to "Control" another notwithstanding that a third party may have the right to participate in "major decisions" customarily granted to institutional investors in commercial real estate joint ventures. The Members agree and acknowledge that the Major Decisions herein satisfy the foregoing criteria.

"Controlled Group" has the meaning set forth in Section 13.1(b)(xv).

"Current Budget Year" means the Budget Year ending on December 31, 2018.

"Current Pay Rate" means a portion of the Preferred Return Rate equal to eight and one-quarter percent (8.25%) per annum.

"Deferred Distribution" means, with respect to a particular Cash Flow Period, the amount equal to the product of (a) the quotient obtained by dividing (i) the product of (y) the Deferred Pay Rate and (z) the Net Preferred Equity Investment, by (ii) 360, and (b) the number of days during such Cash Flow Period, which amount of such Deferred Distribution shall be added to the Net Preferred Equity Investment on the last day of such Cash Flow Period and continue to accrue the Preferred Equity Return, compounded quarterly. By way of example, if, for a given Cash Flow Period, the Deferred Pay Rate equals 2.75% per annum, the Net Preferred Equity Investment equals $146,000,000 and such Cash Flow Period consists of 90 days, then the Deferred Distribution equals $1,003,750, as follows:

$$\frac{(2.75\% \times \$146,000,000)}{360} \times 90 = \$1,003,750$$

"Deferred Pay Rate" shall mean a portion of the Preferred Return Rate equal to two and three-quarters percent (2.75%) per annum. For the avoidance of doubt, from and after the occurrence of a Cause Event (subject to the limited right of the Company to effect an MD Default

7

Cure), the Mandatory Distribution shall be computed by reference to the Preferred Increased Return Rate and the Deferred Pay Rate shall be zero percent (0%).

"Deposit" has the meaning set forth in Section 11.2 (c).

"Depreciation" means, with respect to any Company Asset for any Fiscal Year or other applicable period, the depreciation, depletion, amortization or other cost recovery deduction, as the case may be, allowed or allowable for U.S. federal income tax purposes in respect of such asset for such Fiscal Year or other applicable period; provided, however, that except as otherwise provided in Section 1.704-2 of the Regulations, if there is a difference between the Gross Asset Value (including the Gross Asset Value, as increased pursuant to paragraph (d) of the definition of Gross Asset Value) and the adjusted tax basis of such asset at the beginning of such Fiscal Year or other applicable period, Depreciation for such asset shall be an amount that bears the same ratio to the beginning Gross Asset Value of such asset as the federal income tax depreciation, depletion, amortization or other cost recovery deduction for such Fiscal Year or other applicable period bears to the beginning adjusted tax basis of such asset; provided, however, that if the federal income tax depreciation, depletion, amortization or other cost recovery deduction for such asset for such Fiscal Year or other applicable period is zero, Depreciation of such asset shall be determined with reference to the beginning Gross Asset Value of such asset using any reasonable method selected by the Members.

"Designated Courts" has the meaning set forth in Section 15.9.

"Distribution Date" has the meaning set forth in Section 9.2.  For the avoidance of doubt, the first Distribution Date will be January 7, 2019.

"Effective Date" has the meaning set forth in the Preamble.

"Encumbrance" means any charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"Equity Interests" means, with respect to any Person, any and all shares, interests, participations, rights to purchase, warrants, options, or other equivalents (however designated) of capital stock of a corporation, and any and all equivalent ownership interests in a Person other than a corporation, in each case whether now outstanding or hereafter issued.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Existing LLC Agreement" has the meaning set forth in the Recitals hereof.

8

"Expenses" means, for a given period of time, a sum equal to the aggregate of the expenditures, charges and costs of the Company and its Subsidiaries (to the extent of the Company's allocated share thereof) (but without duplication) for such period of time in accordance with the terms of this Agreement, determined on an accrual basis of accounting, including all amounts added to the Company's reserves in accordance with the terms of this Agreement, pursuant to the loan documents evidencing any Company Loan or to provide for expenditures, charges and costs permitted to be incurred for that period or prior periods that have not yet been incurred. Notwithstanding the foregoing, there shall be excluded from Expenses: (a) all non-cash items such as depreciation; (b) amounts distributed to the Members pursuant to this Agreement (including the Asset Management Fee); (c) all costs, charges and expenses deducted from the proceeds of a Capital Transaction to determine the Capital Proceeds; and (d) any expense, cost or charge to the extent such expense, cost or charge was paid from reserves.

"Fiscal Year" means the fiscal year of the Company, which shall be a calendar year (other than with respect to 2018 for which it shall mean the period of time commencing on the Effective Date and ending on December 31, 2018; provided that, for U.S. federal income tax purposes, upon a termination of the Company under Section 708(b) of the Code, Fiscal Year shall mean the period starting on the day following the end of the last preceding Fiscal Year to the date of such termination.

"Forced Sale" has the meaning set forth in Section 11.4(a).

"Forced Sale Equity Interests" has the meaning set forth in Section 11.4(a).

"Forced Sale Equity Interests Closing Date" has the meaning set forth in Section 11.5(b).

"Forced Sale Membership Interests" has the meaning set forth in Section 11.4(a).

"Forced Sale Membership Interests Closing Date" has the meaning set forth in Section 11.5(c).

"Forced Sale Property" has the meaning set forth in Section 11.4(a).

"GAAP" means generally accepted accounting principles in the United States of America, consistently applied, as of the date of the applicable financial report.

"General Assignment" has the meaning set forth in Section 11.5(a).

"Governmental Authority" means any court, board, agency, commission, office or authority of any nature whatsoever of or for any governmental unit (federal, state, county, district, municipal, city or otherwise), whether now or hereafter in existence.

"Gross Asset Value" means, with respect to any Company Asset, such asset's adjusted basis for U.S. federal income tax purposes, except as follows: (a) the initial Gross Asset Value of any asset contributed by a Member to the Company shall be an amount equal to the agreed

9

gross fair market value of such asset, without reduction for liabilities, as determined by the contributing Member and agreed to by the Members on the date of contribution thereof; (b) if the Members determine that an adjustment is necessary or appropriate to reflect the relative economic interests of the Members, the Gross Asset Values of all Company Assets shall be adjusted in accordance with Sections 1.704-1(b)(2)(iv)(f) and (g) of the Regulations to equal their respective gross fair market values, without reduction for liabilities, as reasonably determined by the Members as of the following times: (i) a Capital Contribution (other than a de minimis Capital Contribution) to the Company by a new or existing Member as consideration for a Membership Interest; (ii) the distribution by the Company to a Member of more than a de minimis amount of Company Assets as consideration for the repurchase or redemption of a Membership Interest; (iii) the liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Regulations; and (iv) the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a partner capacity, or by a new Member acting in a partner capacity or in anticipation of becoming a Member; (c) the Gross Asset Values of Company Assets distributed to any Member shall be the gross fair market values of such assets (taking Section 7701(g) of the Code into account) without reduction for liabilities, as determined by the Members as of the date of distribution; and (d) the Gross Asset Values of Company Assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Sections 734(b) or 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Section 1.704 1(b)(2)(iv)(m) of the Regulations (as set forth in Section 8.1) and clause (f) of the definition of "Net Income" and "Net Loss"; provided, however, that Gross Asset Values shall not be adjusted pursuant to this clause (d) to the extent that the Members determine that an adjustment pursuant to clause (b) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (d). At all times, Gross Asset Values shall be adjusted by any Depreciation taken into account with respect to the Company Assets for purposes of computing Net Income and Net Loss.

"Guaranty" has the meaning set forth in Section 3.7.

"Hazardous Materials" means (i) any "hazardous waste," "solid waste," or "regulated substances" as defined by the Resource Conservation and Recovery Act of 1976 (42 U.S.C. Section 6901 et seq.), as amended from time to time, and regulations promulgated thereunder ("RCRA"); (ii) any "hazardous substance" as defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. Section 9601 et seq.), as amended from time to time, and regulations promulgated thereunder ("CERCLA"), (including petroleum-based products as described therein), (iii) other petroleum and petroleum-based products; (iv) asbestos or asbestos-containing material in any quantity or form, (v) polychlorinated biphenyls; (vi) any such substance or waste identified as such under law; and (vii) any other substance that, by any Hazardous Materials Law, requires special handling in its collection, storage, treatment or disposal; but, in each case, excluding any substances, chemicals, lubricants, refrigerants, cleaning and office supplies that would otherwise constitute or contain Hazardous Materials or solid waste so long as such material is handled, stored, used, and disposed of in accordance with the requirements of applicable Hazardous Materials Laws.

10

"Hazardous Materials Laws" means all Applicable Laws, including RCRA and CERCLA, relating to the handling, storage, existence of or otherwise regulating any hazardous wastes, hazardous substance, toxic substances, radioactive materials, pollutants, chemicals, contaminants or industrial substances or relating to the removal or remediation of any of the foregoing.

"HNA China" has the meaning set forth in Section 3.7(a).

"HNA HK" has the meaning set forth in Section 3.7(a).

"Holdings" has the meaning set forth in Section 9.8.

"Indebtedness" means, with respect to any Person, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all indebtedness of such Person for the deferred purchase price of property or services, (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all reimbursement, payment or similar obligations of such Person under acceptance, letter of credit or similar facilities, (f) all completion guaranties or similar obligations of such Person to the extent that such obligation is required, in accordance with GAAP, to be reflected as a liability on such Person's balance sheet, (g) all indebtedness and obligations referred to in clauses (a) through (f) above guaranteed directly or indirectly by such Person through an agreement (i) to pay or purchase such indebtedness or obligations, (ii) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such indebtedness or obligations or to assure the holder of such indebtedness or obligations against loss in respect of such indebtedness or obligations, (iii) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered), or (iv) otherwise to assure a creditor against loss in respect of such indebtedness or obligations, in each case under this clause (g), to the extent such obligation is required, in accordance with GAAP, to be reflected as a liability on such Person's balance sheet, and (h) all indebtedness and obligations referred to in clauses (a) through (f) above secured by (or for which the holder of such indebtedness or obligations has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness or obligations.

"Indemnitee" has the meaning set forth in Section 5.1(b).

"Initial Budget" means collectively, the current Annual Budget and the Fiscal Year 2019 Annual Budget for the Company and its Subsidiaries in the forms attached as Exhibit B.

"Initial Work Deposit" shall mean the sum of money which has been deposited into the Work Reserve on the Effective Date pursuant to Section 9.7(a).

11

"Investor Member" has the meaning set forth in the Preamble.

"Investor Member Purchaser" has the meaning set forth in Section 11.2(c).

"Investor's Policy" has the meaning set forth in Section 3.9.

"JLL" means Jones Lang LaSalle Americas, Inc.

"Known Brokerage Agreements" has the meaning set forth in Section 13.1(b)(iv).

"Leases" means all existing and future leases, licenses or other occupancy agreements relating to the Property to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound, and modifications or amendments thereof and supplements thereto.

"Leasing Costs" means, collectively, attorneys' fees, leasing commissions, brokerage commissions, rent abatement or other free rent period (other than those (if any) arising in connection with a casualty or condemnation), tenant improvement allowances (including all tenant improvement allowances that a Tenant has the right to draw from the landlord pursuant to any Lease), and/or costs of landlord work that is required to be performed pursuant to a Lease (it being understood that such landlord work shall not include the cost of repairs, maintenance, upkeep or operations that the landlord under the applicable Lease is required to or has the right to perform). Leasing Costs shall also include expenses in respect of so-called "make-ready" expenses incurred to prepare any portion of the Property for potential occupancy. For purposes herein, "make-ready" expenses shall be those customary expenses of a non-specialized nature (including those relating to bathrooms and basic bathroom fixtures, HVAC, base electrical work and mechanical systems work) associated with office buildings of a similar nature to the Property that relate to work that must be completed before a tenant can occupy such space.

"Leasing Reserve" has the meaning set forth in Section 9.7(b).

"Lender" means any lender or servicer of a Company Loan.

"Letters of Credit" has the meaning set forth in Section 11.5(a).

"Licenses and Permits" means, collectively, all licenses, permits, warranties, certificates of occupancy, approvals, dedications, subdivision maps and entitlements issued, approved or granted by the Governmental Authorities in connection with the Office Tower, together with all renewals and modifications thereof.

"Lien" means any mortgage, deed of trust, lien (statutory or other), pledge, hypothecation, assignment, preference, priority, security interest, or any other encumbrance or charge on or affecting the Property or any portion thereof, or any direct or indirect interest therein (including any conditional sale or other title retention agreement, any sale-leaseback, any financing lease having a similar economic effect to any of the foregoing, the filing of any financing statement or other similar instrument under the Uniform Commercial Code or any comparable law of any

12

jurisdiction, domestic or foreign, and mechanics', materialmen's and other similar liens and encumbrances).

"Loan Documents" means any loan agreement executed by the Company or any of its Subsidiaries in connection with a Company Loan, together with all mortgages, security agreements, guarantees and other written instruments, agreements, documents and certificates evidencing or relating to a Company Loan.

"Losses" or "Loss" have the meaning set forth in Section 5.1(b).

"Major Decision" means each of the following with respect to the Companies, to the extent not expressly provided for in an Approved Annual Budget:

■ other than with respect to a Forced Sale (which shall be at the Investor Member's sole discretion in accordance with Article 11), selling, conveying, exchanging, disposing, net leasing or otherwise transferring the Property or any portion thereof, or any direct or indirect interests in the Company or any Subsidiary, whether in a single transaction or in a series of transactions, that will not result in each case in a Redemption In Full, but subject in any case to the right of first offer in favor of the Investor Member under Section 9.2 hereof;

(b)    merging, converting or consolidating the Company or any Subsidiary thereof or changing the ownership structure of the Company and its Subsidiaries; acquiring interests in other Persons, or entering into, or causing any Subsidiary to enter into, any joint ventures or partnerships or profit-sharing arrangements with any other Persons or otherwise approving the consolidation or other similar business combination of the Company or any Subsidiary;

(c)    purchasing or acquiring any land or other real property, personal property (other than in the ordinary course of business) or interest in either, other than the Property;

(d)    effectuating capital expenditures not provided for in the Approved Annual Budget other than to implement another approved Major Decision;

(e)    entering into any Affiliate Transactions, including any amendment or modification to an agreement or other arrangements, or the granting of any material waiver under, or the assignment, extension, termination or cancellation of any agreement or other arrangements with an Affiliate in connection with an Affiliate Transaction, it being acknowledged by the Owner Member that it has approved the execution by Office Owner of the Property Management Agreement, which agreement is an Affiliate Transaction;

(f)    admitting new or substitute members in the Company or any Subsidiary thereof;

(g)    (i) making or refraining from making any material tax election (which, for the avoidance of doubt, shall include any election as to the 704(c) allocation method (except as

13

otherwise set forth in Section 10.4(b))) required or permitted to be made by the applicable entity, (ii) making any decision regarding the reporting of any material transaction on any tax return, (iii) settling any material tax audit, claim or controversy of the Company or any Subsidiary thereof, and (iv) determining the Gross Asset Value of any Company asset;

(h)     admitting or permitting (or causing or permitting any Subsidiary to admit) new or substitute members, shareholders or partners, as applicable, of the Company or any Subsidiary (including, without limitation, Office Owner) or causing the Company to redeem or repurchase all or any Membership Interest of a Member or any membership interest in any Subsidiary or to issue any additional interest in the Company or any Subsidiary, in each case except as otherwise expressly permitted under this Agreement;

(i)     except as expressly permitted under Article 9, making any distributions of Net Cash Flow or Capital Proceeds prior to the Mandatory Redemption Date;

(j)     taking any action that is reasonably likely to adversely affect any Member's (or any of its direct or indirect owners') qualification as a REIT;

(k)     (i) taking any action which, with notice or passage of time, or both, would constitute an "event of default" under the Loan Documents, or (ii) modifying in writing any Loan Documents;

(l)     consummating any financing secured by Company Assets (other than trade payables in the ordinary course of business) or any refinancing of any Company Loan that will not result in a Redemption In Full, making any decision to prepay any Company Loan or extending or renewing any Company Loan;

(m)     the Company or any Subsidiary thereof extending credit, making a loan to any Person or becoming a surety, guarantor, endorser or accommodation endorser for any Person except in connection with negotiating checks or other instruments received by the Company or any Subsidiary thereof or to the extent required under a Lease or an approved Company Loan;

(n)     granting or permitting to exist (other than with respect to Encumbrances of record as of the date hereof and Encumbrances constituting any mechanic's lien which is either released or is being contested in good faith and bonded over, in each case, within thirty (30) days of Owner Member becoming aware of same) an Encumbrance with respect to the Property or other Company Assets, the Company or any Subsidiary thereof; provided that entering into any utility company rights, easements and franchises relating to electricity, water, steam, gas, telephone, sewer or other service or the right to use and maintain pole lines, wires, cables, pipes, boxes and other fixtures and facilities in, over, under and upon the Property shall not constitute a Major Decision;

(o)     performing any act (other than an act required by this Agreement) which would, at the time such act occurred, subject any Member, or any party holding an interest in any Member (a "Constituent"), to personal liability or cause any Member or Constituent, to guarantee

or be deemed to become a guarantor, surety or accommodation party of any obligation or indebtedness of the Company or any Subsidiary unless such Member or Constituent expressly consents in writing to such act;

(p)     approving the Annual Budget and Annual Business Plan or making or approving any change, amendment, waiver, modification or alteration to the Annual Budget or Annual Business Plan, in each case, in any material respect;

(q)     (i) entering into any Lease, (ii) terminating any Lease, (iii) modifying, renewing or extending any Lease in any material respect, or (iv) entering into any Lease which includes any restriction on Transfer by a Member that is permitted under this Agreement or provides for a termination right that is keyed to a Transfer by a Member that is permitted under this Agreement; provided, however, the renewal, extension, expansion or other exercise of a right by a tenant pursuant to an existing Lease shall not constitute a Major Decision;

(r)     drawing down on any letter of credit or any cash security deposit given by a tenant under a Lease or pursuing any other remedies against a tenant;

(s)     other than a Necessary Expense, in any year, making or approving any expenditure or reimbursement that exceeds the lesser of (i) 102% of the amount budgeted in the applicable line item in the applicable Annual Budget, and (ii) $50,000 in excess of the amount budgeted in the applicable line item in the applicable Annual Budget, provided that the Members hereby acknowledge and agree that SLGMC, when serving as Property Manager, is authorized to expend up to 105% of the amount of any budgeted line item without the approval of Office Owner, subject to the availability of cash in the Company Operating Account;

(t)     unless a contract is previously approved by the Members for an expense permitted to be made without their consent or set forth or approved in the Approved Annual Budget, entering into, materially modifying, renewing, extending or terminating (i) any contract pursuant to which the Company will incur an obligation in excess of $100,000 per year, or (ii) any service agreements which are for a term of more than one year and are not cancelable on 30 days' or less prior notice without cause and without payment of a fee or penalty for terminating any such contract or agreement;

(u)     approving any material changes to the existing insurance program of the Company and its Subsidiaries; provided, however, that absent any agreement to the contrary, the insurance program shall comply with the requirements set forth in the Loan Documents;

(v)     instituting, commencing or taking any legal action involving a claim in excess of $1,000,000 (other than actions to seek a reduction in real estate taxes), settling or disposing of any claim (unless covered by insurance) when the settlement amount exceeds $250,000 or confessing any judgment if the judgment amount exceeds $250,000 or involves injunctive relief, any agreement to take or restrict the Company from taking or refraining from taking any such action or an admission of wrongdoing or criminal liability in a legal proceeding;

15

Case 1:22-cv-05136-JGK Document 1-1 Filed 06/17/22 Page 38 of 229

(w)   making or agreeing to make any changes to the zoning or similar legal entitlements of the Property;

(x)   deciding not to repair or rebuild the Property or any improvements on the Property in case of material damage thereto following a casualty event;

(y)   liquidating or dissolving the Company or any Subsidiary thereof;

(z)   filing of any petition, or consenting to the filing of any petition, that would subject the Company or any of its Subsidiaries to any case or proceeding under any federal or state law relating to bankruptcy, insolvency, reorganization or relief of debtors, or admitting in writing by the Company or any of its Subsidiaries of any of their respective inabilities to pay their debts generally as they become due, or the making by the Company or any of its Subsidiaries of a general assignment for the benefit of any of their respective creditors;

(aa)   other than in connection with a transaction that is permitted to be entered into without the Investor Member's consent pursuant to subclause (a) or subclause (l) of this definition because it will result in a Redemption In Full, entering into, modifying or terminating any agreement with any broker, leasing agent, property manager, construction manager, or development manager, to render services for the Company or any Subsidiary, it being acknowledged that the Members have approved the execution and delivery by Office Owner of the Property Management Agreement (as well as a termination thereof in accordance with its terms) and the termination of the Mogull Agreements;

(bb)   determining the amount of reserves in excess of (i) the amount set forth in the Approved Annual Budget for reserves, (ii) the amount set forth in the Approved Annual Budget for expenditures, charges and costs permitted to be incurred for that period or prior periods that have not yet been incurred and (iii) the amount of the Work Reserve contemplated under Section 9.7(a) hereof;

(cc)   any action taken by the Company or a Subsidiary that is outside of the purposes of the Company set forth in Section 2.4, or the purposes of such Subsidiary set forth in the organizational documents of such Subsidiary, as applicable;

(dd)   the giving of any indemnity bond (other than utility company deposits) or surety bond by the Company or any Subsidiary or approving the form of any bond or other form of insurance with respect to a Lien for an amount that exceeds $100,000 that is being contested in good faith by the Company or any Subsidiary;

(ee)   other than in connection with a transaction that is permitted to be entered into without the Investor Member's consent pursuant to subclause (a) of this definition because it will result in a Redemption In Full, giving or granting, directly or indirectly, any options, rights of first refusal, ground leases or other Encumbrances or the Property or any portion thereof;

16

(ff)   purchasing or acquiring any stock, assets (including debt assets), obligations or securities of, or any other interest in, or making a capital contribution to, any other Person (other than purchases of inventory or equipment or other personal property in accordance with the Approved Annual Budget);

(gg)   commingling the funds of the Company or of any Subsidiary with any other Person;

(hh)   the distribution of any property in kind to any Member or any distribution to the Members other than as expressly permitted hereunder;

(ii)    confessing a judgment against the Company;

(jj)    making any amendment or modification to this Agreement or the Certificate of Formation, or to the organizational documents of any Subsidiary;

(kk)   the adoption, execution or amendment of any construction budgets, construction contracts, plans and specifications and consultant contracts, including the identity of any contractors or suppliers party thereto;

(ll)    investigating, preparing and implementing any closure, remediation or actions, and making any other decisions related to any Hazardous Materials Laws or any Hazardous Materials, including, without limitation, introducing or knowingly permitting to be introduced any Hazardous Materials to the Property (or any portion thereof) that were designated as Hazardous Materials at the time (except for lawful introductions thereof);

(mm)  canceling or otherwise forgiving or releasing any claim or debt owed to the Company or any of the Subsidiaries other than the forgiveness of late charges and default interest under any Lease in an amount that does not exceed, in the aggregate, $25,000, that the Managing Member determines, in the good faith exercise of business judgment, is uncollectible;

(nn)   making any change in any method of accounting or auditing practice, or changing, dismissing or engaging accountants, auditors, tax advisors, attorneys, preparers of the tax returns of the Company or any of the Subsidiaries or other professionals to render services for the Company or any of the Subsidiaries;

(oo)   approving or consenting to or causing or permitting any action to be taken or decision to be made by any Subsidiary (including, without limitation, Office Owner) that would be a Major Decision if made by the Company;

(pp)   any other decision or action which requires the approval of both Members as provided elsewhere in this Agreement; or

(qq)   entering into a binding agreement that obligates the Company or any Subsidiary thereof to take any of the actions set forth in clauses (a) through (pp) hereof.

17

"Make Whole Premium" means, subject to the provisions of Section 3.4 hereof that provide for an alternative calculation in the event of the sale of the Property on or prior to October 31, 2019, an amount equal to the Preferred Equity Return that would accrue on the Net Preferred Equity Investment at either (a) the Preferred Return Rate or (b) if such calculation is made at any time after the occurrence of a Cause Event (subject to the limited right of the Company to effect an MD Default Cure), the Preferred Increased Return Rate from the date, prior to June 30, 2022, upon which occurs a Redemption In Full through, and including, June 30, 2022.

"Mandatory Distribution" means, with respect to a particular Cash Flow Period, an amount equal to the product of (a) the quotient obtained by dividing (i) the product of (y) the Current Pay Rate or, after the occurrence of a Cause Event (subject to the limited right of the Company to effect an MD Default Cure), the Increased Preferred Return Rate and (z) the Net Preferred Equity Investment, by (ii) 360, and (b) the number of days during such Cash Flow Period. By way of example, if, for a given Cash Flow Period, a Cause Event has not occurred and the Current Pay Rate equals 8.25% per annum, the Net Preferred Equity Investment equals $146,000,000 and such Cash Flow Period consists of 90 days, then the Mandatory Distribution equals $3,011,250, as follows:

$$\frac{(8.25\% \times \$146,000,000)}{360} \times 90 \quad = \quad \$3,011,250$$

"Mandatory Redemption Date" means the earliest to occur of (a) June 30, 2022; (b) the date that is ten (10) days following the occurrence of any Cause Event; (c) the date that is twenty (20) days after the earlier to occur of (i) rejection by the applicable office of the State Administration of Foreign Exchange of the People's Republic of China ("SAFE") of the application by the guarantors under the Guaranty for the final registration by SAFE of the Guaranty, as required under Section 3.7, and the obligations of HNA China to make full payment of the Guaranteed Obligations (as such term is defined in the Guaranty), in an amount not less than US$200,000,000, to the Investor Member if, as and when required thereunder (the "SAFE Application"), notice of which rejection the Owner Member agrees to provide to the Investor Member within one (1) Business Day of receipt and (ii) December 19, 2018, unless the final registration by SAFE of the Guaranty, as required under Section 3.7, has occurred by such date and evidence of such final registration reasonably acceptable to the Investor Member has been provided to the Investor Member, and (d) the revocation of the registration of the Guaranty with SAFE or the date upon which there becomes effective any change in any law, regulation, governmental policy or protocol observed by SAFE (a "SAFE Change") which has resulted in or is reasonably likely to result in the invalidity of the registration of the Guaranty with SAFE or the unenforceability of the Guaranty or of any arbitration award obtained with respect thereto (any of the events described in this clause (d), an "Adverse Guaranty Event"), unless, within thirty (30) days after such Adverse Guaranty Event, the Owner Member either (i) delivers to the Investor Member a replacement guaranty for the Guaranty, in form and substance and executed by a creditworthy  entity, in all cases acceptable to the Investor Member in its sole discretion, or (ii) causes the Company to effect a Redemption in Full in accordance with the terms and conditions of this Agreement, it being agreed that if any proposed replacement guaranty and/or replacement

18

guarantor is not acceptable to the Investor Member in its sole discretion, then the Owner Member shall continue to have the right to cause the Company to effect a Redemption in Full, as contemplated hereby, provided the same occurs prior to the thirtieth (30th) day after such Adverse Guaranty Event.

"Mandatory Work" means the work to be performed at the Property from and after the Effective Date, which work is more particularly described on Exhibit D attached hereto.

"MD Default Cure" has the meaning set forth in the definition of Cause Event.

"Member" means each of the Owner Member and the Investor Member in its capacity as a member of the Company and any additional Persons hereafter admitted as a member of the Company in accordance with the provisions of this Agreement, for so long as such Person shall be a member of the Company, and "Members" shall mean such Persons, collectively.

"Member Nonrecourse Debt" means "partner nonrecourse debt," within the meaning of Section 1.704-2(b)(4) of the Regulations.

"Member Nonrecourse Debt Minimum Gain" means "partner nonrecourse debt minimum gain" as determined in accordance with Section 1.704-2(i)(3) of the Regulations.

"Member Nonrecourse Deductions" means "partner nonrecourse deductions," within the meaning of Section 1.704-2(i)(2) of the Regulations.

"Membership Interest" means, with respect to any Member, the entire limited liability company interest of that Member in the Company.

"Mezz A" has the meaning set forth in Section 4.2(b).

"Mezz B" has the meaning set forth in Section 4.2(b).

"Mezz C" has the meaning set forth in Section 4.2(b).

"Mezzanine Indebtedness" means principal of, and prepayment fees and premiums, if any, and interest on and all other monetary obligations of every kind or nature (including fees, indemnities and expenses) due on or in connection with any Company Loan, whether outstanding on the date of this Agreement or thereafter created, incurred or assumed and, in each case, secured by a Lien on the Equity Interests of the Company or any Subsidiary thereof.

"Mortgage Indebtedness" means principal of, and prepayment fees and premiums, if any, and interest on and all other monetary obligations of every kind or nature (including fees, indemnities and expenses) due on or in connection with any Company Loan, whether outstanding on the date of this Agreement or thereafter created, incurred or assumed and, in each case, secured by a Lien on any portion of the Property.

19

Case 1:22-cv-05136-JGK   Document 1-1   Filed 06/17/22   Page 42 of 229

"Mogull Agreements" means, collectively, (a) that certain Rental Agency Agreement, dated January 17, 2018, between Office Owner, as owner, and Mogull Realty, Inc., as agent and (b) that certain Brokerage Agreement Letter, dated March 11, 2018, by Mogull Realty, Inc. and accepted and approved by Office Owner.

"Necessary Expenses" means expenses which are required for payment of the following non-discretionary items, in all cases net of reserves established or available therefor in any Approved Annual Budget: (a) real estate taxes to the extent due and payable; (b) insurance premiums due and payable; (c) amounts necessary to remedy or address, as appropriate, an immediate or imminent threat to the health, safety or welfare of any Person on or in the immediate vicinity of the Property or an immediate or imminent threat of physical damage to any part of the Property or any material property in, on, under, within, upon or adjacent to the Property and which could materially affect the Property or cause substantial economic loss to the Company or any of its Subsidiaries (it being agreed that if and to the extent matters under this clause (c) are covered by insurance, the Managing Member shall promptly make application for reimbursement of the same); (d) debt service payments under any Company Loan; and (e) amounts required under Leases for the landlord to perform its obligations thereunder.

"Net Cash Flow" means, for any period, the excess of (a) Revenues during the applicable period over (b) Expenses for such period.

"Net Income" or "Net Loss" means, for each Fiscal Year or other applicable period, an amount equal to the Company's taxable income or loss for such year or period as determined for U.S. federal income tax purposes by the Members, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a) of the Code shall be included in taxable income or loss), adjusted as follows: (a) by including as an item of gross income any tax-exempt income received by the Company; (b) by treating as a deductible expense any expenditure of the Company described in Section 705(a)(2)(B) of the Code (or which is treated as a Section 705(a)(2)(B) expenditure pursuant to Section 1.704-1(b)(2)(iv)(i) of the Regulations), including amounts paid or incurred to organize the Company (unless an election is made pursuant to Section 709(b) of the Code) or to promote the sale of interests in the Company and by treating deductions for any losses incurred in connection with the sale or exchange of Company Assets disallowed pursuant to Section 267(a)(1) or 707(b) of the Code as expenditures described in Section 705(a)(2)(B) of the Code; (c) by taking into account Depreciation in lieu of depreciation, depletion, amortization and other cost recovery deductions taken into account in computing taxable income or loss; (d) by computing gain or loss resulting from any disposition of Company Assets with respect to which gain or loss is recognized for U.S. federal income tax purposes by reference to the Gross Asset Value of such asset rather than its adjusted tax basis; (e) if an adjustment of the Gross Asset Value of any Company Asset which requires that the Capital Accounts of the Members be adjusted pursuant to Sections 1.704-1(b)(2)(iv)(e), (f) and (g) of the Regulations, by taking into account the amount of such adjustment as if such adjustment represented additional Net Income or Net Loss pursuant to Section 10.1; (f) to the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Section 734(b) of the Code is required, pursuant to Section 1.704-1(b)(2)(iv)(m)(4) of the Regulations, to be taken into account in determining Capital Accounts as

20

a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) from the disposition of such asset and shall be taken into account for purposes of computing Net Income or Net Loss; and (g) by not taking into account in computing Net Income or Net Loss items specially allocated to the Members pursuant to Section 10.2.

"Net Preferred Equity Investment" means, as of the date of determination, the Preferred Equity Contribution Amount, plus any Additional Capital Contribution made by the Investor Member, it being agreed that the Investor Member is under no obligation to make any Additional Capital Contributions, less all distributions made to the Investor Member specifically in redemption of the Preferred Equity Contribution Amount. Nothing contained in this definition shall be construed to confer upon the Company the right to redeem all or any portion of the Preferred Member Interest, except in accordance with the express terms and conditions of this Agreement.

"Nonrecourse Deductions" has the meaning set forth in Sections 1.704-2(b)(1) and 1.704 2(c) of the Regulations.

"Nonrecourse Liabilities" has the meaning set forth in Section 1.704-2(b)(3) of the Regulations.

"Non-Proposing Member" has the meaning set forth in Section 4.2.

"Notice" has the meaning set forth in Section 15.3.

"Notice Parties" has the meaning set forth in Section 3.8.

"Objection Notice" has the meaning set forth in Section 6.2(a).

"OFAC" means the U.S. Treasury Department's Office of Foreign Assets Control.

"Office Owner" means 245 Park Avenue Property LLC, a Delaware limited liability company, or any subsequent owner of the fee interest in the Office Tower.

"Office Tower" means the real property and improvements constructed thereon (the "Improvements") constituting the building located at 245 Park Avenue, New York, New York, which real property is more particularly described on Exhibit C.

"Original Guaranty" has the meaning set forth in Section15.17.

"Owner Member" has the meaning set forth in the Preamble.

"Percentage Interest" means, with respect to each Member, the Membership Interest of such Member, expressed as a percentage. The initial Percentage Interests of the Members are set forth on Exhibit A.

21

"Permitted Purpose" means to (a) pay any Necessary Expenses, (b) pay any expenses provided for in an Approved Annual Budget or that have otherwise been approved by the Members, or (c) implement any other Major Decision that has received the approval of the Members.

"Permitted Transferee" means (a) any Member or HNA China and (b) any direct or indirect wholly owned Subsidiary of the applicable Member, HNA China or any combination thereof; provided, however, such Permitted Transferee shall execute a Joinder Agreement if such Permitted Transferee is being admitted to the Company as a Member in connection with the applicable Transfer.

"Person" means any individual, partnership, corporation, limited liability company, trust or other legal entity.

"Preferred Equity Contribution Amount" means the amount of $148,165,906.41.

"Preferred Equity Investment" means the investment in the Company made by the Investor Member in the amount of the Preferred Equity Contribution Amount.

"Preferred Equity Return" means a return on the Net Preferred Equity Investment calculated at the Preferred Return Rate or, following the occurrence of a Cause Event (subject to the limited right of the Company to effect an MD Default Cure), the Preferred Increased Return Rate.

"Preferred Increased Return Rate" means the lesser of (a) twenty percent (20%) and (b) the highest rate permitted by law.

"Preferred Member Interest" means the ownership interest in the Company issued to the Investor Member pursuant to this Agreement, and the rights associated therewith, in consideration of the Preferred Equity Investment.

"Preferred Return Rate" means eleven percent (11%) per annum, compounded quarterly.

"Prohibited Person" means any of the following:  (a) a Person that is listed in the Annex to, or is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing (effective September 24, 2001); (b) a Person that is named as a "specially designated national" or "blocked person" on the most current list published by OFAC at its official website, http://www.treas.gov/offices/enforcement/ofac; (c) a Person that is otherwise the target of any economic sanctions program currently administered by OFAC; or (d) a Person that is owned or controlled by, or acting on behalf of or in active and knowing participation with, any person or entity identified in clause (a), (b) and/or (c) above.

"Prohibited Transferee" means any Person set forth on Exhibit V attached hereto, as such list may be modified from time to time by the Investor Member; provided that (i) such list

may not be modified after a Sale Trigger Notice has been delivered to the Investor Member or (ii) more than once per calendar year commencing with Fiscal Year 2020.

"Project Meeting" has the meaning set forth in Section 5.3.

"Property" means, collectively, the Office Tower and all personal property and other assets of the Companies.

"Property Management Agreement" means that certain Property Management and Leasing Agreement between the Office Owner and SLGMC, in the form attached hereto as Exhibit W, which has been executed and delivered by Office Owner and SLGMC on the date hereof, as the same may be amended, restated, replaced, supplemented or otherwise modified.

"Property Manager" means, as of December 1, 2018, SLGMC. Prior to December 1, 2018, the term Property Manager shall refer to JLL.

"Property Records" means, collectively, (i) all books and records, including property operating statements, specifically relating to the operations of the Property; (ii) all structural reviews, plans, specifications, permits, technical manuals, architectural drawings and engineering, soils, seismic, geologic and architectural reports, environmental reports, studies and certificates pertaining to the Office Tower; and (iii) all lease files relating to the Leases.

"Property Sale Closing Date" has the meaning set forth in Section 11.5(a).

"Records" means the books of account, records and accounts of all operations and expenditures of the Company and other financial records of the Company.

"Redemption Amount" means, as of any date, the sum of (a) the aggregate accrued and unpaid Preferred Equity Return (computed at the then applicable rate and giving effect to any compounding in accordance with Section 3.3), (b) the Net Preferred Equity Investment, (c) the Make Whole Premium, if applicable and (d) any other amounts due and payable to the Investor Member under this Agreement.

"Redemption Date" means the date on which the Redemption In Full occurs.

"Redemption Trigger Event" means, if the Mandatory Redemption Date has occurred, the failure of the Company to effect a Redemption In Full on or prior to the Mandatory Redemption Date.

"Redemption In Full" means the redemption of the entire Preferred Member Interest by payment in full of the Redemption Amount.

"Regulations" means the final or temporary income tax regulations promulgated under the Code, as such regulations may be amended from time to time.

"REIT" has the meaning set forth in Section 15.1.

"Revenues" means, for any given period of time, a sum equal to the aggregate of all amounts actually received by the Company or a Subsidiary thereof (to the extent of the Company's allocated share thereof) during such period (without duplication), determined on an accrual basis of accounting, including: (a) all rents, expense reimbursements, termination fees and other charges received from tenants and other occupants of the Property and otherwise; (b) proceeds of rent insurance and business interruption insurance; (c) all utility or other deposits returned to the Company or a Subsidiary thereof; (d) interest, if any, earned on tenants' security deposits or escrows to the extent unconditionally retained and security deposits to the extent applied pursuant to the provisions of the applicable leases; (e) interest, if any, earned, available and distributed to the Company or to a Subsidiary thereof  (to the extent of the Company's allocated share thereof) on the Company's (or any of its Subsidiaries') reserves or other funds, or on any escrow funds deposited by the Company or a Subsidiary thereof (to the extent of the Company's allocated share thereof) with others or on any loans made by the Company or such Subsidiary; (f) the amount of any released reserves that are not used to pay Expenses (other than reserves established in connection with Capital Transaction the release of which shall constitute Capital Proceeds as provided in the definition thereof); and (g) cash or other receipts (other than revenues from a Capital Transaction) received by the Company or a Subsidiary thereof (to the extent of the Company's allocated share thereof) from any other source. Notwithstanding the foregoing, Revenues shall not include (i) amounts contributed or loaned by the Members to the Company or a Subsidiary thereof pursuant to this Agreement, (ii) each tenant's security deposit and interest thereon, if any, as long as the Company or a Subsidiary thereof has a contingent legal obligation to return that deposit or such interest thereon, (iii) amounts which, although held by the Company, may not be distributed to the Company or a Subsidiary thereof, or by the Company to its Members or by a Subsidiary thereof under Applicable Law or pursuant to the terms of an agreement with a third-party, or (iv) amounts arising from a Capital Transaction.

"ROFO Closing Date" has the meaning set forth in Section 11.2(c)

"ROFO Default" has the meaning set forth in Section 11.2(e).

"SAFE" has the meaning set forth in the definition of Mandatory Redemption Date.

"SAFE Application" has the meaning set forth in the definition of Mandatory Redemption Date.

"SAFE Change" has the meaning set forth in the definition of Mandatory Redemption Date.

"Sale ROFO Price" has the meaning set forth in Section 11.2(a).

"Sale Trigger Notice" has the meaning set forth in Section 11.2(a).

"Securities Act" means the Securities Act of 1933, as amended.

24

"Service Contracts" means all service agreements, maintenance contracts, equipment leasing agreements, construction contracts, or agreements to perform capital projects, license agreements, warranties, guarantees, bonds and other contracts for the provision of labor, services, materials or supplies relating solely to the Property and under which Office Owner is a party thereto (whether by assignment, succession or otherwise), together with all renewals, supplements, amendments and modifications thereof.

"SLG" means SL Green Realty Corp., a Maryland corporation.

"SLGMC" means S.L. Green Management Corp., a New York corporation.

"SLGOP" means SL Green Operating Partnership, L.P., a Delaware limited partnership.

"Standard of Care" has the meaning set forth in Section 4.1.

"Subsidiary" means any entity wholly-owned either directly or indirectly by the Company. "Subsidiaries" shall mean such entities, collectively.

"Tax Items" has the meaning set forth in Section 10.4(a).

"Tax Matters Representative" has the meaning set forth in Section 6.7(a).

"Tenants" means all Persons leasing, licensing, renting or occupying space within the Improvements pursuant to the Leases, but expressly excluding any subtenants, licensees, concessionaires, franchisees or other Persons whose occupancy is derived through such Persons leasing, licensing, renting or occupying space within the Improvements pursuant to Leases.

"Tenant Deposits" means all security deposits (including those in the form of letters of credit) deposited by Tenants with Office Owner, as landlord, or any other Person on Office Owner's behalf, in either case, pursuant to Leases, to the extent the same have not been applied against the obligations of Tenants under such Leases.

"Tenant Notice Letters" has the meaning set forth in Section 11.5(a).

"Third-Party Buyer" has the meaning set forth in Section 11.4(a).

"Third Party Meeting" has the meaning set forth in Section 5.3(b).

"Transaction Documents" means the transaction documents set forth on Exhibit S.

"Transfer" means, with respect to the Membership Interest of any Member, any transfer, sale, pledge, hypothecation, encumbrance, assignment or other disposition, directly or indirectly, through any one or more intermediaries, of all or any portion of or in such Membership Interest or any right to receive proceeds therefrom (whether voluntarily, involuntarily, by operation of law or otherwise).

25

"Transfer Expenses" means, all costs incurred by the Investor Member, the Company (or any Subsidiary) in connection with a Forced Sale, including, without limitation, (a) Transfer Taxes, (b) loan assumption fees related to the Company Loans, (c) the title insurance premium for a title policy not to exceed the cost of the Property in the form of an ALTA 2006 Owner's Policy of Title Insurance with a Standard New York endorsement, (d) the attorneys' fees of the Investor Member and (e) the attorneys' fees of any Lender in connection with an assumption; provided, however, that, except in connection with a sale pursuant to Section 11.2 if the Sale Trigger Notice provides for the payment of such items by the Office Owner or the Asset Seller, as the case may be, in no event shall Transfer Expenses include prepayment premiums or penalties or defeasance costs in connection with any Company Loan.

"Transfer Taxes" means taxes imposed under Article 31 of Chapter 60 the Tax Law of the State of New York and the regulations applicable thereto, as amended from time to time, or Article 21 of Title 11 of the Administrative Code of the City of New York and the regulations applicable thereto, as amended from time to time, including any interest and penalties with respect thereto.

"Work Reserve" has the meaning set forth in Section 9.7(a).

1.2     Terms Generally.   For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)     the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision;

(b)     the words "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation";

(c)     the terms defined in the singular have a comparable meaning when used in the plural and vice versa;

(d)     references herein to "Dollars" and "$" are to United States Dollars;

(e)     references herein to any agreement, document or other written instrument, including this Agreement, shall be a reference to such agreement, document or instrument together with all exhibits, schedules, annexes, attachments and appendices thereto, and in each case as amended, restated or supplemented from time to time in accordance with the terms thereof;

(f)     references herein to any statute, rule or regulation means such statute, rule or regulation as it shall be amended from time to time and shall include any similar successor statute, rule or regulation;

(g)     references herein to any gender includes each other gender; and

Case 1:22-cv-05136-JGK   Document 1-1   Filed 06/17/22   Page 49 of 229

(h)     unless the context otherwise requires, references herein to Articles, Sections, and Exhibits mean the Articles and Sections of, and Exhibits attached to, this Agreement.

## ARTICLE 2
## ORGANIZATION

2.1     Formation and Continuation.  The Company was formed as a Delaware limited liability company under the Act upon the filing of the certificate of formation for the Company (the "Certificate of Formation") with the Secretary of State of the State of Delaware on April 21, 2017.  The rights, powers, duties, obligations and liabilities of the Members (in their respective capacities as such) shall be determined pursuant to the Act and this Agreement.  To the extent that the rights, powers, duties, obligations and liabilities of any Member (in its capacity as such) are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2     The Name.  The name of the Company is "245 Park JV LLC", and all business of the Company shall be conducted in that name or in such other names that comply with Applicable Law as the Members may select from time to time in their discretion.

2.3     Registered Office; Registered Agent; Principal Office; Other Offices.   The registered agent and registered office of the Company required by the Act to be maintained in the State of Delaware shall be person and location set forth in the Certificate of Formation or such other office or Person as may be designated from time to time by the Members and in the manner provided by Applicable Law. The principal office of the Company shall be at 245 Park Avenue, New York, New York 10022, or such place as the Members may designate from time to time in their discretion.

2.4     Purposes.  The purpose of the Company is (a) to directly or indirectly own, manage, operate, improve, finance, refinance, develop, redevelop, construct, renovate, market, lease, sell and otherwise deal with and dispose of the Property and (b) to conduct all activities reasonably necessary or desirable to accomplish the foregoing purposes.  Subject to the provisions of this Agreement, the Company shall have the power and authority to take any and all actions necessary, appropriate, advisable, desirable or incidental to or for the furtherance and accomplishment of the foregoing purposes. Notwithstanding anything herein to the contrary, nothing set forth herein shall be construed as authorizing the Company to possess any purpose or power, or to do any act or thing, forbidden by law to a limited liability company organized under the laws of the State of Delaware.

2.5     [Intentionally Omitted.]

2.6     Powers of the Company.  Subject to the other provisions of this Agreement, including, but not limited to, Section 4.2, the Company (a) may enter into and perform any and all documents, agreements and instruments, all without any further act, vote or approval of any

27

Member, and (b) may authorize any Person (including any Member) to enter into and perform its obligations under any documents on behalf of the Company.

2.7    Term.  The term of the Company commenced on the date of filing of the Certificate of Formation, and shall continue until dissolved in accordance with the terms of this Agreement.

## ARTICLE 3
## MEMBERSHIP INTERESTS

3.1    Members.  (a) As of the date of this Agreement, the Members have made or are deemed to have made Capital Contributions in the amounts set forth opposite such Member's name on Exhibit A and the Members have Capital Accounts in the amount set forth opposite each such Member's name on Exhibit A, and the respective names, mailing addresses and Percentage Interests of the Members shall be as set forth on Exhibit A, as amended from time to time in accordance with the terms of this Agreement.  To the extent that any adjustment of Exhibit A is required pursuant to this Agreement, the Members acknowledge and agree that Exhibit A shall automatically be deemed amended and restated to reflect the correct name and Capital Contributions of each Member in accordance with the Records of the Company without further action by any of the Members and the Managing Member shall, upon request by any Member, prepare and deliver to the Members documentation and evidence of such amendment and restatement; provided, however, for the avoidance of doubt, the Percentage Interests of the Members shall not be adjusted following the making of any Additional Capital Contribution by the Owner Member pursuant to Section 7.3 or otherwise.

(b)    The Members agree that the Capital Contribution of the Investor Member (i.e., the Preferred Equity Investment) in the amount of $148,165,906.41 consists of the following: (a) the original Preferred Equity Investment in the amount of $141,000,000.00 under the Existing LLC Agreement, the redemption of which the Investor Member has agreed to defer until the Mandatory Redemption Date and make a part of its initial Capital Contribution hereunder; (b) $5,532,509.53 consisting of 50% of the Redemption Fee (as defined in the Existing LLC Agreement) in the amount of $11,065,019.06 that would have been payable in full on November 19, 2018 in connection with a Redemption In Full on such date, which portion of the Redemption Fee the Investor Member has agreed to defer until the Mandatory Redemption Date and make a part of its initial Capital Contribution hereunder and (c) a portion of the aggregate accrued and unpaid Preferred Equity Return under the Existing LLC Agreement that would have been payable in full on November 19, 2018 in connection with a Redemption In Full on such date, which portion is in the amount of $1,633,396.88 and which the Investor Member has agreed to defer until the Mandatory Redemption Date and make a part of its initial Capital Contribution hereunder.  The Owner Member agrees and acknowledges that the full amount of such Capital Contribution of the Investor Member will accrue a return from and after the Effective Date at the Preferred Return Rate or the Preferred Increased Return Rate, as applicable, which shall be compounded quarterly, as provided in Section 3.3.

3.2    No Additional Membership Interests.  Except as provided otherwise in this Agreement, the Company shall not issue any additional Membership Interests to any Person.

28

3.3     <u>Preferred Interest; Preferred Equity Return</u>.  The Preferred Equity Return shall accrue on the Net Preferred Equity Investment and shall be compounded quarterly and, as so compounded, shall be paid to the Investor Member pursuant to <u>Article 9</u> or <u>Article 12</u>, as applicable.  It is agreed that the initial compounding of the Preferred Equity Return shall occur on December 31, 2018 (i.e., all accrued and unpaid Preferred Equity Return shall be added to the balance of the Net Preferred Equity Investment on that date) and quarterly thereafter on each March 31, June 30, September 30 and December 31.  The Investor Member shall (a) have the rights and obligations set forth in this Agreement and (b) have no obligation to contribute additional capital or property or to make loans in excess of the Preferred Equity Contribution Amount made, or which are deemed to have been made, to, or in respect of debts, liabilities or other obligations of, the Company.  Upon Redemption In Full, the Investor Member shall have no further rights or obligations hereunder, except for any rights of indemnification or other claims accruing prior to such date or which by their terms survive such redemption.  Notwithstanding the foregoing, if, at any time, any payment or portion thereof made by or for the account of the Owner Member or the Company on account of the outstanding balance of the Preferred Equity Contribution Amount or any other payments due and owing to the Investor Member under this Agreement is set aside by any court or trustee having jurisdiction as a voidable preference, fraudulent conveyance or otherwise as being subject to avoidance or recovery under the provisions of the Bankruptcy Code or under any other applicable federal or state bankruptcy, insolvency or similar law, the Owner Member agrees that, to the fullest extent permitted by Applicable Law, the Preferred Member Interest (x) shall continue and remain in full force and effect, or (y) without further act or instrument, shall be reinstated as a Preferred Member Interest and shall thereafter remain in full force and effect, in either case with the same force and effect as though such payment or portion thereof had not been made and, if applicable, as if such previous termination had not occurred.

3.4     <u>Early Redemption</u>. The Company shall be permitted to effect a redemption of the Preferred Equity Investment, in whole only, prior to the Mandatory Redemption Date.   In the event that any such early redemption shall occur, then (a) except as provided below, in addition to all other amounts due and payable to the Investor Member under this Agreement, the Company shall be obligated to pay and shall pay to the Investor Member the Make Whole Premium and (b) other than in connection with a sale of the Property, the Property Management Agreement with the Property Manager shall remain in effect in accordance with its terms until June 30, 2022. Notwithstanding the foregoing, upon a sale of the Property, in connection with which the Company effects a Redemption In Full as required under this Agreement, the amount of the Make Whole Premium shall be computed by reference to a terminal date of October 31, 2019, rather than June 30, 2022.   For the sake of clarity, it is agreed that no Make Whole Premium shall be payable in connection with the sale of the Property after October 31, 2019.  The provisions of clause (b) above shall survive a Redemption In Full and the Property Manager is an expressly intended third party beneficiary of such provisions.

3.5     <u>Redemption of Preferred Interest</u>.  The Company shall cause the Redemption In Full of the Preferred Member Interest to occur not later than the applicable Mandatory Redemption Date if a Mandatory Redemption Date has occurred.

3.6     [<u>Intentionally Omitted.</u>]

29

3.7    <u>Guaranty</u>.

(a)    Simultaneously with the execution and delivery of this Agreement, HNA Group (International) Company Limited, a non-listed public company incorporated with limited liability and existing under the laws of Hong Kong ("<u>HNA HK</u>"), HNA Group Co., Ltd., a private limited company organized under the laws of the People's Republic of China ("<u>HNA China</u>"), each of which is an owner of certain direct and/or indirect interests in the Owner Member, and the Owner Member have executed and delivered an amended and restated guaranty in favor of the Investor Member (the "<u>Guaranty</u>") guarantying the full and punctual payment of the Redemption Amount and certain other Guaranteed Obligations (as defined in the Guaranty) to the Investor Member. The Owner Member shall take, and shall cause the Company and each of HNA HK and HNA China to take, all actions necessary to ensure the due execution, and legality, validity and enforceability of the Guaranty, including, without limitation, (i) causing the Guaranty to be successfully registered with the applicable Government Authorities (including, without limitation, as described in <u>subsection (b)</u> below) and (ii) providing the Investor Member with certified copies of the board resolutions of the guarantors under the Guaranty approving the execution of the Guaranty under seal where appropriate. In furtherance of the foregoing, the Owner Member agrees to (i) provide to the Investor Member, for its review and reasonable approval prior to the submission thereof, all of the documentation (relating to the Guaranty and this Agreement) that is to be submitted to SAFE as part of the SAFE Application in connection with the registration of the Guaranty and (ii) make any revisions to such documentation that are reasonably requested by the Investor Member to accurately reflect the transaction contemplated by this Agreement and the Guaranty prior to the submission thereof to SAFE. Without limiting the foregoing, the Owner Member further agrees that the Guaranty, as registered with SAFE, will provide for a registered amount of not less than $200,000,000 United States dollars and an expiration date of not earlier than June 30, 2024, it being agreed that the Guaranty itself will not provide for either a maximum liability amount or an expiration date. For the avoidance of doubt, if SAFE fails to register properly, as determined by the Investor Member, in the exercise of its sole, but good faith, discretion, the $200,000,000 amount of the Guaranty and the June 30, 2024 expiration date, then the final registration by SAFE of the Guaranty pursuant to the SAFE Application will not have occurred.

(b)    The Owner Member shall (i) cause the Guaranty to be registered with SAFE in the manner set forth in <u>Section 3.7(a)</u> above and, to the extent required, any other agencies or departments of the government of the People's Republic of China and (ii) provide to the Investor Member, promptly after receipt, evidence of such filing reasonably acceptable to the Investor Member, but, in each case, in no event later than December 19, 2018.

3.8    <u>Notice Letters</u>. Simultaneously with the execution and delivery of this Agreement, the Owner Member has executed and delivered to the Investor Member certain direction letters addressed to the Company Operating Account Bank, the property manager, office leasing agent and retail leasing agent for the Property (collectively, the "<u>Notice Parties</u>") informing the Notice Parties of the Preferred Equity Investment and the Investor Member's rights as further set forth in such direction letters, such letters to be countersigned by the Notice Parties. The Owner Member hereby authorizes the Investor Member to deliver such letters to the foregoing Notice Parties.

30

Case 1:22-cv-05136-JGK   Document 1-1   Filed 06/17/22   Page 53 of 229

3.9 <u>Investor's Title Policy</u>. The Investor Member shall have the right, at any time following the Effective Date, in its sole discretion, to obtain an investor's policy of title insurance (the "<u>Investor's Policy</u>") insuring its Membership Interest in the Company in an amount equal to the Preferred Equity Investment (i.e., $148,165,906.41). Any costs to obtain the Investor's Policy shall be paid by the Company (including the Investor Member's reasonable attorneys' fees in connection with obtaining the Investor's Policy) from cash available in the Company Operating Account. The Owner Member hereby agrees to cooperate in all respects to cause the issuance of the Investor's Policy to the Investor Member, including, without limitation, to execute non-imputation affidavits and any other affidavits or documentation requested by the title company issuing the Investor's Policy.

3.10 <u>Access to Company Operating Account</u>. Upon any failure of the Company to pay any amount due to the Investor Member, including, without limitation, the Mandatory Distributions and the Redemption Amount following a Redemption Trigger Event, amounts due to the Investor Member or for the purpose of obtaining the Investor's Policy in accordance with <u>Section 3.9</u>, the Investor Member, without the approval or signature of the Owner Member or any Affiliate thereof, shall have the right to direct the Company Operating Account Bank or the Property Manager to disburse any funds in the Company Operating Account to the Investor Member in payment of such amounts in accordance with <u>Section 3.9</u> or <u>Article 9</u>, as applicable. Upon the request of the Investor Member, the Owner Member shall execute and deliver to the Investor Member any notices, letters of direction or other documentation reasonably required by the Investor Member in order to effectuate the foregoing.

## ARTICLE 4
## MANAGING MEMBER; MAJOR DECISIONS

4.1 <u>Managing Member</u>. Subject to the provisions of this Agreement, including, but not limited to <u>Section 4.2</u>, the Managing Member shall have the exclusive right, power and authority to manage the day-to-day operations of the Company (including to cause any action or any decision in any Subsidiary of the Company with respect to its day-to-day operations) and to implement the Approved Annual Budget in accordance with the terms hereof and thereof and Applicable Law. The Managing Member shall (a) operate the Company and the Property in accordance with the Approved Annual Budget (unless authorized otherwise pursuant to this Agreement), (b) act in a manner consistent with the terms and conditions of this Agreement, (c) without derogating from the provisions of <u>Section 5.1</u>, manage and operate the Property in compliance with Applicable Law and in accordance with the prevailing standards applicable to managing partners and managing members of entities owning similar Class A real property located in the Borough of Manhattan in the City of New York (the "<u>Standard of Care</u>") and (d) devote such time to the Company and its business as may be prudent, appropriate and necessary to conduct the operations of the Company and its Subsidiaries in an efficient manner and to carry out the Managing Member's responsibilities as set forth herein. Without limiting the generality of the foregoing, but subject to <u>Section 4.2</u>, the Managing Member is hereby authorized to execute and deliver on behalf of the Company and its Subsidiaries any and all documents, contracts, certificates, agreements and instruments, and to take any action of any kind and to do anything and everything the Managing

31

Member deems necessary, desirable or appropriate in accordance with the provisions of this Agreement and the Act.

4.2     Major Decisions.

(a)     Notwithstanding anything to the contrary contained in this Agreement, the approval of each of the Owner Member and the Investor Member shall be necessary for any action constituting a Major Decision, it being understood that neither the Managing Member nor any Member may cause the Company or any Subsidiary to take any action (or permit the Company or any Subsidiary to take an action) in furtherance of any Major Decision without the approval of each of the Owner Member and the Investor Member.  Proposals for any of the Companies to take any action that constitutes a Major Decision shall be made by the Managing Member; provided, however, that the Investor Member shall also have the right to propose, from time to time, the pursuit by the Company and/or the Subsidiaries of any action that constitutes a Major Decision. A Major Decision may be proposed by the Managing Member or the Investor Member, as applicable, by delivering a written notice requesting any such approval of any Major Decision, accompanied by a description in reasonable detail of the matter as to which such approval is requested, to the other Member ("Non-Proposing Member").  The Non-Proposing Member shall communicate by written notice to the Managing Member or the Investor Member, as applicable, its approval or non-approval of any Major Decision described in the notice requesting such approval within thirty (30) days of the date of such written notice.  If the Non-Proposing Member shall affirmatively disapprove, or fail to approve, any proposed Major Decision, then neither the Managing Member nor any Member (nor any other Person) shall cause any of the Companies to take any action to effectuate such proposed Major Decision. For the avoidance of doubt, if the Company does not cause a Redemption In Full to occur on the Mandatory Redemption Date, the approval of each of the Owner Member and the Investor Member shall continue to be necessary for any action constituting a Major Decision until the Company shall cause Redemption In Full to occur; provided, however, for the avoidance of doubt, a Forced Sale shall occur upon a Redemption Trigger Event in accordance with Article 11.

(b)     Notwithstanding anything to the contrary contained in this Agreement, the Members hereby approve as Major Decisions the payments made from the Company Operating Account as described on the settlement statement executed by the Members on the Effective Date, which payments shall be deemed to constitute a series of distributions first, by Office Owner to 245 Park Avenue Mezz A LLC, a Delaware limited liability company ("Mezz A"), second, from Mezz A to 245 Park Avenue Mezz B LLC, a Delaware limited liability company ("Mezz B"), third, from Mezz B to 245 Park Avenue Mezz C LLC, a Delaware limited liability company ("Mezz C"), and fourth, from Mezz C to the Company, and thereafter a payment by the Company to each party identified on  the aforementioned settlement statement.  For clarity, in no event shall any such payment made to, for the benefit of or at the direction of the Investor Member be deemed a distribution to the Investor Member for any purpose of this Agreement, including, but not limited to Article 9.

(c)     The Owner Member acknowledges that the Investor Member may incur certain costs and expenses including, but not limited to, legal fees and disbursements after the

32

Effective Date in connection with obtaining the consent of the Lenders to the Property Management Agreement, the negotiation of subordination agreements with respect thereto and any other matters that are contemplated by the terms of this Agreement to occur after the Effective Date. The Owner Member hereby agrees and acknowledges that the Property Manager is authorized and directed to pay from the Company Operating Account, upon its receipt from the Investor Member of evidence of such costs and expenses reasonably acceptable to the Property Manager, any and all actual out-of-pocket expenses that the Investor Member has incurred in connection herewith and the Members hereby approve the payment of same as a Major Decision. For clarity, in no event shall any such payment made to, for the benefit of or at the direction of the Investor Member be deemed a distribution to the Investor Member for any purpose of this Agreement, including, but not limited to Article 9.

4.3    Reimbursement.  To the extent provided in the Approved Annual Budget, the Company shall reimburse the Members and their Affiliates for the third-party out-of-pocket expenses paid or incurred in connection with the management of the business and affairs of the Company; provided that in no event shall any Member be entitled to reimbursement for employee costs or overhead.

4.4    Officers or Agents.  The Managing Member may, from time to time, appoint officers or agents of the Company who shall exercise such powers and perform such duties as shall be delegated from time to time by the Managing Member, subject to the limitations on the Managing Member's powers and authority as set forth herein. The officers or agents, to the extent of the powers delegated to them by the Managing Member (subject to the limitations on the Managing Member's powers and authority set forth herein), are agents of the Company for the purposes of the Company's business and the actions of the officers or agents taken in accordance with such powers shall bind the Company.  For the avoidance of doubt, no officers or agents, so appointed, shall have any greater rights than those of the Managing Member hereunder and shall be subject to the same restrictions and limitations on their authority as imposed upon the Managing Member hereunder.

4.5    Subsidiaries of the Company.  All of the provisions of this Agreement regarding the management and governance of the Company shall apply to the management and governance of each Subsidiary of the Company, whether any such Subsidiary is managed or controlled directly or indirectly by the Company, as member, manager, partner, stockholder or otherwise.  Any action to be taken by any of such Subsidiaries shall for all purposes hereof be construed as an action taken by the Company and shall be subject to the same rights and limitations granted and imposed on the Members under this Agreement, subject to any additional limitations granted or imposed in the governing documents of such Subsidiary.  Without limiting the generality of the foregoing, and notwithstanding anything contained herein to the contrary, any and all references herein to the Company or any Member taking, causing or directing any action on behalf of a Subsidiary of the Company shall be deemed to refer to the Company causing, or such Member causing the Company to cause, in its capacity as a direct or indirect partner, member or stockholder of such Subsidiary, such action to be taken for and on behalf of such Subsidiary.

33

Case 1:22-cv-05136-JGK Document 1-1 Filed 06/17/22 Page 56 of 229

4.6.     Specific Covenants of the Owner Member

(a)     Mandatory Work.  The Owner Member shall cause Office Owner to cause all of the Mandatory Work to be performed, as required in accordance with Exhibit D attached hereto, in a manner consistent with the quality and character of the Property, free of all liens (other than mechanic's liens being contested in good faith and bonded over or otherwise released within thirty (30) days of Office Owner becoming aware of any such lien), and in compliance in all material respects with all Applicable Law.  For the avoidance of doubt, the failure to so complete the Mandatory Work required hereunder in a timely manner, subject to availability of funds in the Company Operating Account, shall constitute a Cause Event.  The Owner Member acknowledges that the covenant of the Owner Member to so cause the Mandatory Work to be performed as required hereunder was a material inducement to the Investor Member to agree to enter into this Agreement and extend the Mandatory Redemption Date, as provided herein.  The Members hereby agree that, in order to facilitate the performance of the Mandatory Work, the Property Manager shall be fully authorized to perform the Mandatory Work immediately, provided the Property Manager uses commercially reasonable efforts to complete such work in a prudent and professional manner consistent with prevailing industry standards for Class A office buildings located in midtown Manhattan, and subject to the terms of the Property Management Agreement, and the Owner Member shall cause Office Owner to make adequate funds available from the Work Reserve for the performance of the Mandatory Work as and when required by the Property Manager, in all cases subject to the terms hereof.

(b)     Distributions by Subsidiaries.  Notwithstanding anything herein to the contrary, the Owner Member agrees to cause the Company to take all action required (a) to distribute all Net Cash Flow not less frequently than quarterly and to cause each Subsidiary of the Company to distribute all of its available cash (which, for the purposes hereof, shall have a similar meaning to the same term or other term of like meaning or import in each of the operating agreements of each Subsidiary) to its respective sole member not less frequently than quarterly pursuant to its respective operating agreement in effect as of the date hereof and (b) to not (i) maintain reserves (nor permit any Subsidiary to maintain reserves) not expressly permitted hereunder, it being agreed that any reserves required to be maintained under any of the Loan Documents is permitted under this Agreement, or (ii) make distributions other than in the order and priority set forth in operating agreement of each Subsidiary as of the date hereof.

(c)     SAFE Registration.  The Owner Member agrees to and shall, at its or its Affiliates' own cost and expense and not the expense of the Company (i) take all action required to maintain the validity and continued effectiveness of the registration of the Guaranty with SAFE until  the earlier of June 30, 2024 and the indefeasible payment and performance by HNA China of its obligations under the Guaranty and (ii) notify the Investor Member immediately of the occurrence of any SAFE Change of which the Owner Member becomes aware that has or may adversely affect the validity and effectiveness of the registration of the Guaranty with SAFE or the enforceability of the Guaranty or any potential arbitration award that may be obtained by the Investor Member with respect thereto and shall take all action required to restore the validity and effectiveness of such registration of the Guaranty or the enforceability thereof or of any potential arbitration award that may be obtained by the Investor Member with respect thereto.

34

(d)     _Property Management_.  The Members acknowledge that SLGMC is an approved property manager under the Loan Documents, but that the Lenders have approval rights over the form of the property management agreement with SLGMC.  The Members will cooperate in good faith to obtain such approval from the Lenders.  Irrespective of whether such approval is obtained prior to December 1, 2018, the Members acknowledge and agree that Office Owner's obligations for the payment of fees under the Property Management Agreement will commence on December 1, 2018.  The Members agree that SLGMC intends to engage JLL as submanager to facilitate an efficient transition in the management of the Property from JLL to SLGMC.  The Members authorize such engagement of JLL, provided that any fees or reimbursable amounts payable to JLL are paid by SLGMC and such fees or reimbursable amounts are not an expense of Office Owner.

(e)     _Brookfield Account_.  The Owner Member agrees that, within three (3) Business Days after the Effective Date, it shall cause all of the funds on deposit in that certain account maintained at JPMorgan Chase Bank, N.A., designated as Account Number 000000153708505 to be transferred to the Company Operating Account.

## ARTICLE 5
## MEMBER MATTERS

5.1     _Limitation on Member Liability; Indemnification_.

(a)     To the fullest extent permitted by Applicable Law (including the Act), (i) no Member shall be bound by any fiduciary duty to the Company or the Members and (ii) each Member hereby fully, unconditionally and irrevocably waives any right to assert or bring any claim or action against any other Member for breach of fiduciary duty; _provided_ that nothing contained in this Agreement shall release any Member from, or be deemed to limit any Member's liability for, or result in the waiver of any rights by the Company or the Members  with respect to (1) any Member's fraud, bad faith, willful misconduct or gross negligence in the conduct of its rights or obligations under this Agreement, (2) any action by a Member that (A) constitutes a material breach of this Agreement, (B) is outside of the authority granted to such Member pursuant to this Agreement, (3) any act or omission that breaches the Standard of Care or  (4) any act or omission that constitutes a Cause Event.

(b)     The Company shall indemnify and hold harmless the Managing Member, the Members and their Affiliates, as well as their respective officers, directors, equity holders, members, partners, stockholders, other equity holders and employees (each, an "_Indemnitee_"), from and against all losses, claims, damages, expenses (including reasonable attorneys' fees and other legal fees and expenses), judgments, fines, settlements, and other liabilities (collectively, "_Losses,_" and each, a "_Loss_"), to the extent such Losses are not fully reimbursed by insurance, arising directly or indirectly from the ownership, operation, use, maintenance or management of the Property or by reason of its acts or omissions which are for or on behalf of the Company and taken in accordance, or believed in good faith to be in accordance, with such Indemnitee's authority, responsibilities and obligations under this Agreement; _provided_ that the foregoing indemnity shall not apply (i) to claims, actions, suits or proceedings between Members and their

35

Affiliates or (ii) to the extent the same arise out of or result from the criminal conduct, fraud, gross negligence or willful misconduct of such Indemnitee.

   (c) The indemnification and agreement to hold harmless set forth in this <u>Section 5.1</u> is recoverable only out of the Company's net assets and not from the Members.

   (d) To the fullest extent permitted by Applicable Law, each Member shall defend and indemnify the Company, the other Member and the Managing Member against, and shall hold them harmless from, any costs as and when incurred by the Company, the Managing Member or the other Member in connection with or resulting from such indemnifying Member's criminal conduct, fraud, gross negligence or willful misconduct.

   5.2 <u>Use of Company Property</u>.  Except as described herein, no Member shall make use of the property or funds of the Company, or assign its rights to specific Company property, other than Members for the business or benefit of the Company as permitted hereunder.

   5.3 <u>Meetings</u>. (a) The Members agree that it is anticipated that the Property Manager will conduct weekly meetings, on a day and time to be agreed upon by the Members and the Property Manager, relating to all aspects of the ownership and operation of the Property including, but not limited to, property management, leasing, construction projects, marketing, financing and any other concerns of the Investor Member and the Owner Member with respect to the Property (regardless of whether such concerns relate to Major Decisions) (each, a "<u>Project Meeting</u>").  Each Member shall have the right to designate one or more representatives to attend such Project Meetings on its behalf.  The Project Meetings will be held at the offices of the Property Manager either located at the Property or, at the Property Manager's election, at its corporate offices in New York City.  Each Member shall have the right to propose topics for discussion at or in advance of each Project Meeting.  In addition to the regular scheduled Project Meetings, the Investor Member shall have the right to call a meeting with the Managing Member from time to time on not less than forty-eight (48) hours' notice, which notice may be given by telephone or email.

   (b) The Members agree and acknowledge that the Property Manager will coordinate any and all meetings to be conducted with third parties relating to the ownership and operation of the Property including, but not limited to, property management, leasing, construction projects, marketing and financing (each, a "<u>Third Party Meeting</u>").  Each Member shall have the right to attend and participate in each such Third Party Meeting by way of a designated representative.  The Property Manager will be directed to provide the Members with not less than forty-eight (48) hours' notice of each such meeting, which notice may be given by telephone or mail.  Notwithstanding the foregoing, the Managing Member shall have the right to schedule a Third Party Meeting, provided that no such Third Party Meeting shall be held in the absence of a representative of the Investor Member, unless the Investor Member waives in writing (including email) its right to participate in such Third Party Meeting.

36

# ARTICLE 6
## REPORTING; ANNUAL BUDGETS; BOOKS AND RECORDS; EXPENSES AND OTHER MATTERS

6.1     Reporting.

(a)     Monthly Reports.  As soon as reasonably practicable, but no later than the 15th of each month, the Managing Member shall furnish, or cause the Company to furnish (in each case, at the Company's expense), to the other Member the following information:

(i)      a monthly trial balance;

(ii)     a current rent roll;

(iii)    bank account reconciliation; and

(iv)     (A) supporting documentation for all balance sheet accounts classified within "Cash and Cash Equivalents" on the Company's balance sheet, (B) a system generated report of tenant receivables, (C) a system generated report of accounts payable, (D) a system generated general ledger (such general ledger shall be downloaded into MRI or other systems reasonably requested by a Member), (E) a schedule of accrued expenses and (F) supporting documentation for all other balance sheet accounts in excess of $50,000, in each case, at or as of the applicable reporting date.

(b)     Quarterly Reports.  The Managing Member hereby authorizes the Investor Member to obtain directly from the Property Manager copies of any and all reports, budgets, business plans and other materials generated by the Property Manager pursuant to the Property Management Agreement or otherwise at the request of Office Owner.  Copies of any such reports delivered to the Investor Member shall be delivered simultaneously to the Owner Member.

(c)     Audited Financial Statements.  The Managing Member hereby authorizes the Investor Member to obtain directly from the Property Manager copies of any and all annual financial statements, including the audited financial statements prepared by the Accountants.  The Members agree that the financial statements shall be prepared on a GAAP basis.  Copies of any such reports delivered to the Investor Member shall be delivered simultaneously to the Owner Member.

(d)     Lender Reporting and Correspondence.  The Property Manager shall be authorized and directed to (a) deliver to each Member a copy of each financial statement and other periodic report required to be delivered to any agent or lender pursuant to the terms of any Loan Document simultaneously with the delivery of such statement or other report under such Loan Document and (b) promptly deliver to the Members all material correspondence between any of the Companies and the Lenders (including all notices of default and notices of non-compliance and the Companies' response thereto).

37

(e) <u>Access</u>.  Upon request, the Managing Member and the Company shall permit each Member to (i) visit the Property and (ii) examine and review the financial records, books of account, Records and other documents of the Companies, in each case, during normal business hours and upon reasonable notice.

(f) <u>Property Manager Reporting</u>.  At any time SLGMC or any of its Affiliates is the Property Manager, the Property Manager shall prepare and provide the reports contemplated by this <u>Article VI</u> and, provided that the Owner Member has cooperated with SLGMC or its Affiliates and provided the information reasonably requested by them, no failure to prepare and/or provide such reports by the Property Manager shall be deemed a default by the Owner Member hereunder.

6.2     <u>Annual Business Plans; Annual Budgets</u>.

(a)     Prior to the date of this Agreement, the Members have approved the Initial Budget (which shall constitute an Approved Annual Budget and an Approved Annual Business Plan) for the Current Budget Year and calendar year 2019.  The Property Manager will be directed to prepare, for each Budget Year, a proposed Annual Business Plan (including a proposed Annual Budget).  If the Owner Member objects to the proposed Annual Business Plan (including a proposed Annual Budget) or any portion thereof, the Owner Member shall provide to the Property Manager, within twenty (20) days after receipt of the proposed Annual Business Plan (including a proposed Annual Budget), a notice specifying, in reasonable detail, such objections (an "<u>Objection Notice</u>").  After sending an Objection Notice, the Owner Member will work in good faith with the Property Manager to modify the proposed Annual Business Plan (including a proposed Annual Budget) to resolve any disagreements as to the proposed Annual Business Plan (including a proposed Annual Budget) by November 15th prior to the commencement of such succeeding Budget Year.  If the Owner Member fails to send an Objection Notice to the Property Manager within such twenty (20) day period, the Owner Member will be deemed to have irrevocably approved the proposed Annual Business Plan and/or proposed Annual Budget.   If the Owner Member disapproves of any line items contained in the proposed Annual Budget or any amendments thereto, the undisputed portions of the proposed Annual Budget shall be deemed to be adopted and approved.  If, prior to the commencement of any Budget Year, the Owner Member has not approved the amount to be allocated to all line items set forth in the proposed Annual Budget for such Budget Year, then, as to any disputed line items, whether then subject to an Objection Notice or otherwise, the amount budgeted for such line item shall be deemed to be (i) if not a Necessary Expense, an amount equal to 105% of the amount of the corresponding line item in the immediately preceding Budget Year's Approved Annual Budget and (ii) if a Necessary Expense, the actual amount of such Necessary Expense, and such amount shall be controlling until such time as such disputed line item is approved by the Owner Member.

(b)     In addition, at any time after an Annual Business Plan (including an Annual Budget) has been approved by the Members, the Members acknowledge that the Property Manager shall have the right to submit a revised or amended Annual Business Plan or Annual Budget in writing to the Owner Member for approval, in which event Owner Member shall, if it objects to such revision or amendment, work in good faith to resolve any disagreements promptly.

38

6.3    Books of Account.  At all times during the continuance of the Company, the Managing Member shall keep or cause to be kept true and complete books of account in which shall be entered fully and accurately each transaction of the Company and each Subsidiary thereof. Such books of account shall be kept on the basis of the Budget Year in accordance with an accrual method of accounting and shall reflect all Company and Subsidiary transactions in accordance with GAAP.  All expenses incurred in connection with the above shall be borne by the Company.

6.4    Expenses.  Except as otherwise expressly set forth in this Agreement, all expenses incurred in connection with the discharge of Company obligations, including those set forth in Sections 6.1 and 6.3, shall be borne by the Company.

6.5    Availability of Books of Account.  All of the books of account referred to in Section 6.3 and other Records, together with an executed copy of this Agreement and the Certificate of Formation, and any amendments thereto, shall at all times be maintained at the principal office of the Company or such other location as the Managing Member may reasonably determine.

6.6    Tax Returns and Tax Elections.

(a)    The Managing Member shall cause to be prepared and filed (including, at the Managing Member's option, by engaging an Accountant), at the expense of the Company, all required federal, state and local tax returns for the Company on or before the date that such returns are due (including extensions) subject to, in the case of each tax return of the Company relating to a material amount of taxes, the Investor Member's approval (which approval shall not be unreasonably withheld, conditioned or delayed).  The Managing Member shall cause to be furnished a final statement of the Member's distributive share of income, gains, losses, deductions and credits for such Fiscal Year on a Schedule K-1 no later than March 31 following the end of each Fiscal Year of the Company, including any other tax information necessary for the Members to file the tax returns they are reasonably required by Applicable Law to file.  All expenses incurred in connection with the above shall be borne by the Company.

(b)    Except as otherwise expressly provided herein, the Managing Member shall make all applicable elections, determinations and other decisions under the Code (or any other federal or state law), including the deductibility of a particular item of expense and the positions to be taken on the Company's tax return, in each case subject to the Investor Member's consent (which consent shall not be unreasonably withheld, conditioned or delayed). The Members each shall take reporting positions on their respective U.S. federal, state and local income tax returns consistent with the positions determined for the Company.  The Managing Member shall cause the Company to have in effect an election under Section 754 of the Code (and to the extent applicable, analogous elections under state and local laws).  Any accounting, tax preparation or other administrative expenses incurred (or to be incurred) by the Company or its Subsidiaries or the Managing Member as a result of tax basis adjustments under Section 743 of the Code or related provisions shall be borne by the Company.

6.7    Tax Matters Representative.  Except as otherwise expressly provided and subject to Section 11.7(a) herein:

39

(a)     The Managing Member shall serve as the "partnership representative" within the meaning of section 6223(a) of the Code, as amended by the Bipartisan Budget Act and, if and to the extent permitted by an applicable state or local income tax imposed on the Company, as the "partnership representative" or "tax matters partner" or in any other similar capacity for purposes of such state or local income tax imposed on the Company (in each such capacity, the "Tax Matters Representative").  The Tax Matters Representative shall appoint a "designated individual" in accordance with the requirements of Proposed Regulations Section 301.6223 1(b), as applicable.  Subject to the further terms of this Section 6.7, the Tax Matters Representative is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including administrative and judicial proceedings (including any proceedings ongoing as of the Effective Date), subject to the further terms of this Section 6.7, and to expend Company funds for professional services and costs associated therewith. If and to the extent any such proceedings are commenced, the Members agree to cooperate with each other and to do or refrain from doing any and all things reasonably required to conduct such proceedings.  All expenses incurred in connection with any such audit and with any other tax investigation, settlement or review shall be borne by the Company. The Company hereby indemnifies and holds harmless the Tax Matters Representative from and against any claim, loss, expense, liability, action or damage resulting from its acting or its failure to take any action as the Tax Matters Representative of the Company and its Subsidiaries except where the Tax Matters Representative's conduct is determined by a court of competent jurisdiction to be the result of gross negligence, fraud, bad faith or willful misconduct.

(b)     In the event that the Company shall be the subject of an audit by any federal, state or local taxing authority, to the extent that the Company is treated as an entity for purposes of such audit, including administrative settlement and judicial review, the Tax Matters Representative shall (i) notify the Members of any administrative or judicial proceeding with respect to the Company, (ii) furnish the Members with any material correspondence or communication relating to the Company from the Internal Revenue Service or state or local taxing authority received by the Tax Matters Representative, (iii) shall not take any material action relating to the tax affairs of the Company unless such action has been approved by the Members.

(c)     The Tax Matters Representative shall use reasonable efforts to obtain a reduction in any imputed underpayment that may be available to the beneficial owners of any Member pursuant to section 6225 of the Code, as amended by the Bipartisan Budget Act, and Regulations thereunder, including pursuant to section 6225(c)(3) and section 6225(c)(4) of the Code, as  amended by the Bipartisan Budget Act, and Regulations thereunder provided that each Member shall use commercially reasonable efforts to provide the Tax Matters Representative with any information reasonably requested by the Tax Matters Representative and necessary for the Tax Matters Representative to comply with this undertaking and, to the extent possible, the applicable Member shall be entitled to all of the economic benefit associated with any such reduction and shall not bear the economic burden associated with a higher rate or amount of taxes that is attributable to any other Member with respect to any imputed underpayment.

(d)     The Members acknowledge that the Company shall elect the application of section 6226 of the Code, as amended by the Bipartisan Budget Act, for its first taxable year in the

40

Case 1:22-cv-05136-JGK   Document 1-1   Filed 06/17/22   Page 63 of 229

event that it receives a "notice of final partnership adjustment" that would otherwise permit collection from the Company a deficiency of tax, for each relevant year, unless the Tax Matters Representative determines after consultation with the Members that the election under section 6226 of the Code, as amended by the Bipartisan Budget Act, is not in the best interests of the Company or cannot be made in a timely manner, in which case the Company shall not make such election.  This acknowledgment applies to each Member whether or not it owns a Membership Interest in both the reviewed year and the year of the adjustment. The Members covenant to take into account and report any adjustment, determined in accordance with section 6226 of the Code, as amended by the Bipartisan Budget Act, and any Regulations adopted therewith, to their items for the reviewed year and succeeding years prior to the year of adjustment as notified to them by the Tax Matters Representative on behalf of the Company in a statement, in the manner provided in section 6226(b) of the Code, as amended by the Bipartisan Budget Act, for the Company's first taxable year and thereafter if reasonably permitted, whether or not such Member owns a Membership Interest or remains a Member in the year of any such statement.

(e)     Reserved.

(f)     The provisions contained in this <u>Section 6.7</u> shall survive the liquidation, termination and dissolution of the Company, the withdrawal of any Member or the Transfer of any Member's Membership Interest in the Company and Redemption In Full.

## ARTICLE 7
## CAPITAL CONTRIBUTIONS

7.1     <u>Capital Accounts of the Members; Capital Contributions</u>.  On the date hereof, each Member has a Capital Account in the amount set forth opposite its name on <u>Exhibit A</u> under the column "<u>Total Capital Account</u>." The Company shall not issue certificates to the Members representing any of the Membership Interest held by any Member.

7.2     <u>No Obligation</u>.  Neither Member nor the Managing Member shall have any personal liability whatsoever in such Member's capacity as a Member or the Managing Member, whether to the Company, to the other Member, to the creditors of the Company or to any other third-party, for the debts, liabilities, commitments or other obligations of the Company or for any losses of the Company.  Neither Member nor the Managing Member shall be required to lend any funds to the Company or to make any contribution of capital or any other payments to the Company, except as otherwise expressly required by this Agreement.  Neither any loan made, nor any service performed, by any Member to or for the benefit of the Company shall be deemed to constitute a contribution to the capital of the Company for any purpose.

7.3     <u>Additional Capital Contributions</u>.  The Investor Member shall have no obligation to make any Additional Capital Contributions. If the Managing Member reasonably determines that the Company requires additional capital for any Permitted Purpose (and reasonably believes that the funds required to accomplish such Permitted Purpose cannot reasonably be obtained from existing funds or operating activities during the relevant period), then the Managing Member shall send a written notice notifying the Owner Member, with a copy delivered simultaneously to the

Case 1:22-cv-05136-JGK   Document 1-1   Filed 06/17/22   Page 64 of 229

Investor Member, of (i) the relevant Permitted Purpose and (ii) the aggregate amount the Managing Member has determined is required to accomplish such Permitted  Purpose, and, within twenty (20) days of such written notice, the Owner Member shall make an Additional Capital Contribution to the Company in such amount. The Percentage Interests of the Members shall not be adjusted following the making of any Additional Capital Contribution by the Owner Member.  For the avoidance of doubt, the Owner Member shall be required to make a Capital Contribution in payment of any Transfer Expenses in accordance with Article 11 on or prior to the date that the applicable Forced Sale occurs.

7.4     Capital of the Company.  Except as expressly provided for in this Agreement, no Member shall be entitled to withdraw or receive any interest or other return on, or return of, all or any part of its Capital Contribution, or to receive any Company Assets (other than cash) in return for its Capital Contribution.  No Member shall be entitled to make a Capital Contribution to the Company except as expressly authorized or required by this Agreement.

## ARTICLE 8
## CAPITAL ACCOUNTS

8.1     Establishment and Determination of Capital Accounts.  A separate Capital Account shall be established for each Member on the books of the Company initially reflecting an amount identified pursuant to Section 7.1.  Each Member's Capital Account shall be:

(a)     increased by (i) the amount of such Member's Additional Capital Contributions, if any, (ii) such Member's distributive share of Net Income and any items in the nature of income or gain which are specially allocated to such Member pursuant to Section 10.1, and (iii) the amount of any Company liabilities assumed by such Member or which are secured by any asset distributed to such Member; and

(b)     decreased by (i) the amount of cash and the Gross Asset Value of any Company Assets distributed to such Member pursuant to any provision of this Agreement, (ii) such Member's distributive share of Net Losses and any items in the nature of expenses or losses which are specially allocated to such Member pursuant to Section 10.1 and (iii) the amount of any liabilities of such Member assumed by the Company or which are secured by any asset contributed by such Member to the Company.

(c)     The foregoing provisions and any other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Sections 1.704 1(b) and 1.704-2 of the Regulations, and shall be interpreted and applied in a manner consistent with such Regulations.  If the Members shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including debits or credits relating to liabilities which are secured by contributed or distributed assets or which are assumed by the Company or any Member) are computed in order to comply with such Regulations, the Managing Member shall make such modification; provided, that all allocations of Company income, gain, loss and deduction continue to have "substantial economic effect" within the meaning of Section 704(b) of the Code and that no Member is materially adversely affected by any such modification.

42

(d)     A Member that acquires all (or a portion) of a Membership Interest from the other Member, through a Transfer or otherwise, shall succeed to the Capital Account (or portion of the Capital Account) attributable to such Member with respect to such Membership Interest.

8.2     <u>Negative Capital Accounts</u>.  Except as may be required by the Act or any other Applicable Law, no Member shall be required to pay to the Company or any other Member any deficit or negative balance which may exist from time to time in such Member's Capital Account.

**ARTICLE 9**
**DISTRIBUTIONS**

9.1     <u>Distributions Generally</u>.  Each distribution made by the Company, whether derived from operating cash flow or from the sale, exchange or other disposition or financing of all or any portion of any securities or other assets or property, or otherwise derived, shall be made in accordance with this <u>Article 9</u>.  Subject to <u>Section 4.2</u>, the amount available for distribution on each Distribution Date shall be determined by the Managing Member, upon advice from the Property Manager, and shall be subject to the approval of the Investor Member, provided, however, (i) the Investor Member's approval shall not be required for any distribution that would effectuate a Redemption In Full and (ii) under no circumstances shall the Investor Member's disapproval of any distribution that is to be made in a manner that is consistent with the advice provided by SLGMC, as the Property Manager, result in a Cause Event or Redemption Trigger Event.   The amount of the Mandatory Distribution each Cash Flow Period shall be determined by the Investor Member and shall be binding on the Company and the Owner Member absent manifest error.  For the sake of clarity, the Owner Member agrees and acknowledges that, other than the payment of the Asset Management Fee, no distributions or payments of cash of any nature whatsoever will be made to the Owner Member or its Affiliates by the Company or any Subsidiary prior to a Redemption In Full.

9.2     <u>Regular Distributions</u>.

(a)     Commencing with the first calendar quarter following the Effective Date and for each calendar quarter thereafter, and provided that no Redemption Trigger Event has occurred, distributions of all Net Cash Flow of the Company which was not previously distributed in respect of such calendar quarter (or, in the case of the first calendar quarter to commence following the Effective Date, since the Effective Date) shall be made no later than the fifth (5th) day following the end of the applicable calendar quarter, or, if such fifth (5th) day is not a Business Day, on the first Business Day following such fifth (5th) day (such date, the "<u>Distribution Date</u>") in the following order of priority:

(i)     First, to the Investor Member, an amount equal to the Mandatory Distribution with respect to such calendar quarter;

(ii)     Second, to pay the installment of the Asset Management Fee then due and payable to the Asset Manager for such calendar quarter;

43

Case 1:22-cv-05136-JGK   Document 1-1   Filed 06/17/22   Page 66 of 229

(iii)     Third, for deposit into the Work Reserve until such time as there shall have been deposited into the Work Reserve, in the aggregate, from and after the Effective Date, the sum of $20,000,000, including the Initial Work Deposit deposited into the Work Reserve on the Effective Date; and

(iv)     Fourth, the balance, if any, of the Net Cash Flow to be deposited into the Leasing Reserve.

The Members agree, that for the sake of efficiency, the amounts of Net Cash Flow described in clauses (iii) and (iv) that are intended to be deposited into the Work Reserve and the Leasing Reserve, respectively, will actually be retained by the Property Manager, as agent for the Office Owner, and allocated to the appropriate reserve accounts, but will be deemed to have been distributed by Office Owner to Mezz A, by Mezz A to Mezz B, by Mezz B to Mezz C and by Mezz C to the Company and then contributed, in reverse order, by the Company through the Subsidiaries to Office Owner.

(b)     Notwithstanding the foregoing, if a Redemption Trigger Event then exists, then except as set forth in <u>Section 9.3</u>, Net Cash Flow of the Company shall be distributed quarterly, on each Distribution Date, in the following order of priority:

(i)     First, to the Investor Member, until it has received all accrued and unpaid Preferred Equity Return (including any accrued and unpaid Deferred Distributions, compounded in the manner provided in this Agreement), plus a return of the entire amount of the Net Preferred Equity Investment (it being agreed that such distributions shall be first applied to the Preferred Equity Return and then to the Net Preferred Equity Investment);

(ii)     Second, to the Investor Member, all other sums required to be paid to the Investor Member to effect a Redemption In Full; and

(iii)     Third, to the Owner Member.

(c)     <u>Capital Proceeds Distribution</u>.   Capital Proceeds received by the Company, other than in connection with a Forced Sale, shall be distributed to each Member as promptly as practicable following receipt thereof in the following order of priority:

(i)     First, to the Investor Member, until it has received all accrued and unpaid Preferred Equity Return (including any accrued and unpaid Deferred Distributions, compounded in the manner provided in this Agreement), plus a return of the entire amount of the Net Preferred Equity Investment (it being agreed that such distributions shall be first applied to the Preferred Equity Return and then to the Net Preferred Equity Investment);

(ii)     Second, to the Investor Member, all other sums required to be paid to the Investor Member to effect a Redemption In Full; and

(iii)     Third, to the Owner Member.

9.3     <u>Distributions Upon a Forced Sale</u>.  Notwithstanding the foregoing provisions of this <u>Article 9</u>, any Capital Proceeds resulting from a Forced Sale initiated as a result of a Redemption Trigger Event, whether to a Third-Party Buyer or to the Investor Member, received by the Company (and not previously distributed) shall be distributed to each Member, no later than two (2) days following receipt thereof (or, if such 2nd day is not a Business Day, on the first Business Day following such 2nd day) in the following order of priority:

(i)     First, to the Investor Member, until it has received all accrued and unpaid Preferred Equity Return (including any accrued and unpaid Deferred Distributions, compounded in the manner provided in this Agreement);

(ii)     Second, to the Investor Member, on account of the Net Preferred Equity Investment, until the unpaid Net Preferred Equity Investment has been reduced to zero;

(iii)     Third, to the Investor Member, in payment of any other unpaid portion of the Redemption Amount (other than those amounts payable to the Investor Member pursuant to <u>clause (v)</u> below);

(iv)     Fourth, to the Owner Member, until the Owner Member has received an amount equal to $152,213,494 under this <u>clause (iv)</u>; and

(v)     Fifth, 51% to the Owner Member and 49% to the Investor Member.

9.4     <u>Availability of Distributions</u>.  Notwithstanding anything set forth in this <u>Article 9</u>, the payment of the Redemption Amount on the Mandatory Redemption Date is an affirmative and absolute obligation of the Company, irrespective of the sufficiency of funds or of Net Cash Flow or Capital Proceeds.

9.5     <u>Withholding</u>.  Each Member hereby authorizes the Company to withhold from or pay on behalf of or with respect to such Member any amount of federal, state, local or foreign taxes that the Managing Member reasonably determines that the Company is required to withhold or pay with respect to any amount distributable or allocable to such Member pursuant to this Agreement, including any taxes required to be withheld or paid by the Company pursuant to Code Section 1441, Code Section 1442, Code Section 1445 or Code Section 1446.

9.6     <u>Accounting Principles</u>.  Except for such accounting principles set forth herein, all accounting shall be done on a GAAP basis, unless the Members otherwise agree.

9.7     <u>Cash Management: Reserves</u>.  (a) On the date hereof, the Company shall deposit to an account in the name of the Property Manager, as agent for the Office Owner, to pay from time to time the costs of the Mandatory Work as and when performed in accordance with this Agreement, all of the funds remaining in the Company Operating Account on the Effective Date

45

after the payment of all of the transaction costs in connection with this Agreement, as set forth in a settlement statement signed by the Owner Member and the Investor Member (such excess funds, the "Work Reserve"). If the aforementioned account is not established as of the Effective Date, such excess funds will be held in the Owner Operating Account and will be transferred to such account immediately upon its establishment. Except as provided below, the Work Reserve shall not be utilized for any other purpose. On each Distribution Date, there shall be deposited into the Work Reserve, pursuant to Section 9.2(a)(iii), all available Net Cash Flow until there shall have been deposited into the Work Reserve pursuant to said Section 9.2(a)(iii) an aggregate amount which, when added to the Initial Work Deposit, equals $20,000,000. The amounts transferred to the Work Reserve will not be treated as Capital Contributions by the Owner Member to the Company. Upon a Redemption In Full, all remaining funds, if any, in the Work Reserve, shall be promptly disbursed to the Owner Member.

(b) On the date hereof, the Company will establish on account of the Company (the "Leasing Reserve") to pay from time to time Leasing Costs as and when required in accordance with the Leases or otherwise in accordance with this Agreement. The Leasing Reserve shall not be utilized for any other purpose. On each Distribution Date, there shall be deposited into the Leasing Reserve, pursuant to Section 9.2(a)(iv), all available Net Cash Flow. The amounts transferred to the Leasing Reserve will not be treated as Capital Contributions by the Owner Member to the Company. Upon a Redemption In Full, all remaining funds, if any, in the Leasing Reserve, shall be promptly disbursed to the Owner Member.

(c) The Members agree that the Property Manager will be authorized to reallocate funds from the Work Reserve to (i) the Leasing Reserve in order to pay Leasing Costs, following the execution of any Lease at the Property and (ii) to the Company Operating Account in order to pay operating expenses for the Property, including Necessary Expenses, all in accordance with the Approved Annual Budget.

(d) Notwithstanding anything to the contrary contained herein, the Members agree that the Owner Member may cause all or a portion of the funds in the Work Reserve and the Leasing Reserve to be distributed to the Investor Member in connection with effectuating a Redemption In Full.

9.8     Management Fee. Any amounts payable to the Owner Member or any Affiliate of the Owner Member under that certain Management Agreement by and between Office Owner and Jones Lang LaSalle Americas, Inc., dated May 23, 2018, as supplemented by that certain letter agreement by HNA Property Holdings, LLC ("Holdings"), on behalf of Office Owner, dated May 18, 2018 and acknowledged and accepted by Holdings, and as further amended in connection with this Agreement, shall instead be payable to the Company and held or distributed as Net Cash Flow in accordance with this Article 9. The Owner Member shall cause such amounts to be paid directly to the Company and not to any of the Subsidiaries or to any other Affiliate of the Owner Member.

## ARTICLE 10
## ALLOCATIONS

10.1    <u>Allocations of Net Income and Net Loss Generally</u>.  Except as otherwise provided in this Agreement, after giving effect to the special allocations in <u>Section 10.2</u> and <u>Section 10.3</u> and after taking into account the tax treatment of the Preferred Equity Return <u>under Section 10.4(e)</u>, Net Income, Net Loss and, to the extent necessary, individual items of income, gain, credit, loss and deduction of the Company for each Fiscal Year or other applicable period shall be allocated among the Members in a manner that will as nearly as possible cause the Capital Account balance of each Member at the end of such Fiscal Year or other applicable period to equal (i) the amount of the distributions that would be made to such Member pursuant to <u>Section 12.3</u> of the Agreement if the Company were dissolved, its affairs wound up and its assets were sold for cash equal to their Gross Asset Value, taking into account any adjustments thereto for such period, all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the Gross Asset Value of the assets securing such liability), and the net assets of the Company were distributed in full in accordance with <u>Section 12.3</u> to the Members immediately after making such allocations, minus (ii) such Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain and the amount, if any and without duplication, that the Member would be obligated to contribute to the capital of the Company, all computed immediately prior to the hypothetical sale of assets.

10.2    <u>Regulatory Allocations</u>.  Notwithstanding any other provision of this Agreement, the following allocations shall be made prior to any other allocations under this Agreement and in the following order of priority:

(a)    <u>Minimum Gain Chargeback</u>.  Except as otherwise provided in Section 1.704-2(f) of the Regulations, if there is a net decrease in Company Minimum Gain for any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain to the extent required by Section 1.704-2(f) of the Regulations. The items to be so allocated shall be determined in accordance with Sections 1.704 2(f) and (i) of the Regulations. This <u>Section 10.2(a)</u> is intended to comply with the minimum gain chargeback requirement in said section of the Regulations and shall be interpreted consistently therewith. Allocations pursuant to this <u>Section 10.2(a)</u> shall be made in proportion to the respective amounts required to be allocated to each Member pursuant hereto.

(b)    <u>Member Minimum Gain Chargeback</u>.  Except as otherwise provided in Section 1.704-2(i)(4) of the Regulations, if there is a net decrease in Member Nonrecourse Debt Minimum Gain during any Fiscal Year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain, determined in accordance with Section 1.704-2(i)(5) of the Regulations, shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to that Member's share of the net decrease in the Member Nonrecourse Debt Minimum Gain to the extent and in the manner required by Section 1.704-2(i) of the Regulations. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and (j)(2) of the Regulations. This <u>Section 10.2(b)</u> is intended to comply with the

47

minimum gain chargeback requirement with respect to Member Nonrecourse Debt contained in said section of the Regulations and shall be interpreted consistently therewith. Allocations pursuant to this Section 10.2(b) shall be made in proportion to the respective amounts required to be allocated to each Member pursuant hereto.

(c)    Qualified Income Offset.    If a Member unexpectedly receives any adjustments, allocations or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Regulations, and such Member has an Adjusted Capital Account Deficit, items of Company income (including gross income) and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit as quickly as possible as required by the Regulations. This Section 10.2(c) is intended to constitute a "qualified income offset" under Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

(d)    Nonrecourse Deductions.    Nonrecourse Deductions, if any, for any Fiscal Year or period shall be allocated to the Members pro rata in accordance with their Percentage Interests.

(e)    Member Nonrecourse Deductions.    Member Nonrecourse Deductions for any Fiscal Year or other applicable period with respect to a Member Nonrecourse Debt shall be specially allocated to the Member that bears the economic risk of loss for such Member Nonrecourse Debt (as determined under Sections 1.704-2(b)(4) and 1.704-2(i)(1) of the Regulations).

(f)    Section 754 Adjustment. To the extent an adjustment to the adjusted tax basis of any asset of the Company pursuant to Section 734(b) of the Code or Section 743(b) of the Code is required, pursuant to Section 1.704-1(b)(2)(iv)(m) of the Regulations, to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated among the Members in a manner consistent with the manner in which each of their respective Capital Accounts are required to be adjusted pursuant to such section of the Regulations.

(g)    Gross Income Allocation. If any Member has an Adjusted Capital Account Deficit at the end of any Fiscal Year which is in excess of the sum of (i) the amount such Member is obligated to restore pursuant to any provision of this Agreement, and (ii) the amount such Member is deemed obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible; provided, that an allocation pursuant to this Section 10.2(g) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit in excess of such sum after all other allocations provided for in this Article 10 have been made as this Section 10.2(g) were not in the Agreement.

10.3     <u>Other Special Allocations</u>. Notwithstanding <u>Section 10.1</u>, any Company deductions that are attributable to the payment of the Preferred Equity Return for any Fiscal Year or applicable period shall be allocated to the Owner Member.

10.4     <u>Tax Allocations; Code Section 704(c).</u>

(a)     <u>Items of Income or Loss</u>.  Except as is otherwise provided in this <u>Article 10</u>, for U.S. federal income tax purposes, an allocation of Company Net Income or Net Loss to a Member shall be treated as an allocation to such Member of the same share of each item of income, gain, loss, deduction and item of tax-exempt income or Section 705(a)(2)(B) expenditure (or item treated as such expenditure pursuant to Section 1.704-1(b)(2)(iv)(i) of the Regulations) ("<u>Tax Items</u>") that is taken into account in computing Net Income or Net Loss.

(b)     <u>Precontribution Gain, Revaluations</u>.   With respect to any contributed property held by the Company as of the Effective Date, the Company shall use the traditional method contained in the Regulations promulgated under Section 704(c) of the Code to take into account any variation between the adjusted basis of such asset and the fair market value of such asset as of the time of the contribution; <u>provided</u> that, with respect to any property contributed to the Company after the Effective Date, the Company shall use any method contained in the Regulations promulgated under Section 704(c) of the Code selected by the Members. Each Member hereby agrees to report income, gain, loss and deduction on such Member's U.S. federal income tax return in a manner consistent with the method used by the Company. If any asset has a Gross Asset Value which is different from the Company's adjusted basis for such asset for U.S. federal income tax purposes because the Company has revalued such asset pursuant to Section 1.704-1(b)(2)(iv)(f) of the Regulations, the allocations of Tax Items shall be made in accordance with the principles of Section 704(c) of the Code and the Regulations and the methods of allocation promulgated thereunder as selected by the Members.

(c)     <u>Section 1245/1250 Recapture</u>. Subject to <u>Section 10.4(b)</u> above, if any portion of gain from the sale of Company assets is treated as gain which is ordinary income by virtue of the application of Sections 1245 or 1250 of the Code or is gain described in Section 1(h)(1)(D) of the Code ("<u>Affected Gain</u>"), then such Affected Gain shall be allocated among the Members in the same proportion that the depreciation and amortization deductions giving rise to the Affected Gain were allocated. This <u>Section 10.4(c)</u> shall not alter the amount of Net Income (or items thereof) allocated among the Members, but merely the character of such Net Income (or items thereof).

(d)     <u>Excess Nonrecourse Liability Safe Harbor</u>. Pursuant to Section 1.752 3(a)(3) of the Regulations, solely for purposes of determining each Member's proportionate share of the "<u>excess nonrecourse liabilities</u>" of the Company (as defined in Section 1.752-3(a)(3) of the Regulations), the Members' respective interests in Company profits shall be equal to the Members' respective Percentage Interests.

(e)     <u>Guaranteed Payments</u>. Any payments of any amount of the Preferred Equity Return, whether a distribution pursuant to <u>Article 9</u> or <u>Section 12.3</u> upon dissolution of the

49

Company, or under any other provision, shall be treated as guaranteed payments under Section 707(c) of the Code.

## ARTICLE 11
## TRANSFER OF MEMBERSHIP INTERESTS

11.1    Transfers of a Member's Membership Interest.

(a)    No Transfer of a Membership Interest, in whole or in part, shall be permitted without the consent of the Member whose Membership Interest is not being Transferred, except as set forth in this Article 11.  Notwithstanding anything to the contrary set forth in this Agreement, none of the following Transfers shall require the consent of any Member, but shall be subject to the further provisions of this Article 11:

(i)    an indirect Transfer by an owner of the Owner Member of up to (and including) 49%, in the aggregate, whether in one or a series of Transfers, of the Owner Member's Membership Interests; provided that (a) the Owner Member must maintain Control over voting and consent rights with respect to its interest in the Company in connection with and at all times following any such Transfer and the transferee shall have no right to participate in the management or operations of the Company or any decision or consent right of the Owner Member, (b) not less than twenty (20) days' prior written notice is given to the Investor Member, which notice shall include the name and address of such proposed transferee; (c) such Transfer is not made to a Prohibited Person, (d) the Owner Member provides to the Investor Member, prior to effecting such Transfer, all such information that the Investor Member reasonably requires regarding the proposed transferee; (e) the Owner Member shall not make any Transfer of any direct interest in the Company; (f) the Owner Member has demonstrated to the reasonable satisfaction of the Investor Member that the Owner Member has (or will have as the result of the proposed Transfer) funds in an amount sufficient to pay all Transfer Taxes due and payable in connection with such Transfer; and (g) the Owner Member pays or causes to be paid all Transfer Taxes due and payable in connection with any such Transfer (including any Transfer Taxes attributable to the initial sale to the Investor Member of its Membership Interest), it being agreed that under no circumstances shall any Transfer Taxes in connection with such Transfer be payable by the Investor Member, the Company or any Subsidiary in connection with such Transfer of interests in the Owner Member;

(ii)    one or more Transfers by the Investor Member of its entire Membership Interest (but the Investor Member shall not make any partial direct Transfer of its Membership Interest) or by the owners of the Investor Member of any direct or indirect interest in such Membership Interest; provided that (a) the Investor Member must maintain Control over its interest in the Company in connection with and at all times following any such Transfer; (b) such Transfer is not made to a Prohibited Person; (c)  the Investor Member shall not make any

Case 1:22-cv-05136-JGK   Document 1-1   Filed 06/17/22   Page 73 of 229

Transfer of any direct interest in the Company; and (d) to the extent such Transfer results in the imposition of a Transfer Tax as a result of the "aggregation" of such Transfer with the Transfer of the Membership Interest of another Member, including the Transfer of any indirect interest therein, each of the Members whose aggregated interests were Transferred (directly or indirectly) shall pay the Transfer Taxes attributable to the Transfer of its Membership Interest; provided, however, that nothing in this <u>Section 11(a)(ii)(d)</u> shall be construed to limit the limitations, requirements and indemnification contained in <u>Section 11</u>.  The provisions of this <u>Section 11(a)(ii)(d)</u> shall survive the termination of this Agreement;

(iii)    without limiting clause (ii) above, any Transfer, either in one or a series of transactions, of any direct or indirect legal or beneficial interest in SLG or SLGOP, and/or any rights, distributions, profits or proceeds relating thereto, including by way of any merger, consolidation, amalgamation, sale, or other Transfer of any kind of any stock, limited or general partnership interests, limited liability company interests, trust certificates or other similar evidences of ownership of legal or beneficial interests, as the case may be, of SLG or SLGOP or any of their respective subsidiaries;

(iv)    any sale of all or substantially all of the assets of SLG or SLGOP to any Person; and

(v)    any current or additional borrowing or financing by or other indebtedness of any nature of SLG or SLG OP and/or any direct or indirect holder of a legal or beneficial interest therein shall be permitted without the consent of any Member and, for the purposes of this sentence, "<u>indebtedness</u>" of a Person shall be deemed to include (1) any indebtedness or liability of such Person (including amounts for borrowed money and indebtedness in the form of mezzanine debt and preferred equity); (2) obligations evidenced by bonds, debentures, notes, or other similar instruments; (3) obligations for the deferred purchase price of property or services (including trade obligations); (4) obligations under letters of credit; (5) obligations under acceptance facilities; (6) all guaranties, endorsements and other contingent obligations to purchase, to provide funds for payment, to supply funds, to invest in any Person or entity, or otherwise to assure a creditor against loss; and (7) obligations secured by any liens, whether or not the obligations have been assumed.

(b)    Notwithstanding anything to the contrary set forth in this Agreement, no Transfer of an interest in the Owner Member or the Investor Member shall be permitted (i) in the case of the Owner Manager, at any time or (ii) in the case of the Investor Member, prior to the occurrence of a Cause Event only, in each case, (y) if such Transfer would violate any Loan Document, or (z) if such Transfer is to a Prohibited Person or Prohibited Transferee.  Any attempted Transfer or other disposition in violation of this <u>Section 11.1</u> shall be void ab initio.

51

11.2    <u>Right of First Offer</u>.

(a)    Subject to the terms and conditions of this <u>Section 11.2</u>, if at any time after the Effective Date the Owner Member desires to (a) cause the Company to sell or otherwise dispose of the Company Assets or (b) cause the Company to cause Office Owner to sell or otherwise dispose of the Property, whether in one or a series of transactions, the Owner Member shall notify the Investor Member of same in writing (the "<u>Sale Trigger Notice</u>"), which notice shall contain the proposed purchase price (the "<u>Sale ROFO Price</u>") for the Company Assets or the Property, which must be payable  in cash only (which shall be limited to that portion thereof that exceeds the outstanding principal balances of the Company Loans, if the same are to be assumed) as well as the other economic terms and conditions and other material conditions which the Owner Member would be prepared to accept, including, but not limited to, terms relating to the allocation of expenses associated with the prepayment, defeasance or assumption of the Company Loans. Notwithstanding any other provision in this Agreement, the Owner Member shall not have the unilateral right, without the Investor Member's consent, to cause the Company to sell or otherwise dispose of the Company Assets or to cause Office Owner to sell or otherwise dispose of the Property, unless and until the Owner Member has first issued a Sale Trigger Notice and otherwise complied with this <u>Section 11.2</u>.

(b)    The Sale Trigger Notice shall constitute the Owner Member's offer to permit the Company to cause a sale of the Company Assets or the Office Owner to sell the Property to the Investor Member or its designee for the Sale ROFO Price, in which event the Company (or Office Owner) will pay the costs of consummating the sale of the Property customarily borne by sellers of real property in New York, New York, including, but not limited to, Transfer Taxes  and other liabilities relating to the Company Assets or the Property and, to the extent set forth in the Sale Trigger Notice, the other fees and expenses payable under the Company Loans.

(c)    The Investor Member shall have thirty (30) days (the "<u>Consideration Period</u>") in which to determine whether to accept or reject the offer to acquire the Company Assets or the Property on the terms set forth in the Sale Trigger Notice.  Within the Consideration Period, the Investor Member shall have the right to deliver to the Owner Member a notice rejecting the offer or a notice (the "<u>Acceptance Notice</u>") stating its desire to purchase the Company Assets or the Property, as applicable.  If the Investor Member fails to deliver the Acceptance Notice within the Consideration Period, then the Owner Member may, or may cause the Company (or Office Owner) to sell to an unaffiliated third party, in accordance with <u>Section 11.2(f)</u> of this Agreement, the Company Assets or the Property, as applicable.  Simultaneously with the delivery of any such Acceptance Notice, the Investor Member shall deliver to a national title company selected by the Investor Member, as escrow agent pursuant to an escrow agreement containing escrow provisions reasonably satisfactory to the Owner Member and the Investor Member, a deposit (the "<u>Deposit</u>") in an amount equal to five percent (5%) of the portion of the Sale ROFO Price applicable to the Owner Member's Percentage Interest.  The Investor Member shall be deemed to have rejected the offer if the Investor Member fails to deliver both an Acceptance Notice and the Deposit within the Consideration Period.  If the Investor Member timely gives the Acceptance Notice and tenders the Deposit, and the Investor Member desires to assume the Loans, the Investor Member shall promptly commence and diligently pursue the seeking of Lenders' consent to the same.  If the

52

Case 1:22-cv-05136-JGK   Document 1-1   Filed 06/17/22   Page 75 of 229

Investor Member timely gives the Acceptance Notice and tenders the Deposit (time being of the essence with respect thereto) then, within sixty (60) days from and after receipt of the Acceptance Notice and the Deposit which period shall be subject to extension, at the option of the Investor Member, if needed to obtain the consent of the Lenders to the assumption of the Loans, but in no event to a date that is more than ten (10) Business Days after receipt of the consents of all Lenders (as used in this Section 11.2, the "ROFO Closing Date"), the Investor Member or an entity designated by the Investor Member (the Investor Member or such designee, as applicable, the "Investor Member Purchaser") shall purchase from the Office Owner or the seller of the Company Assets ("Asset Seller"), and the Office Owner or Asset Seller shall sell to the Investor Member Purchaser, the Company Assets or the Property for the Sale ROFO Price, subject to the further terms and conditions hereof.

(d)     On the ROFO Closing Date:

(i)     The Office Owner or Asset Seller shall deliver to the Investor Member Purchaser a duly executed and acknowledged deed or other applicable instrument of transfer, as the case may be, together with all other necessary and appropriate Transfer Tax and related conveyance forms, conveying the Company Assets or the Property to the Investor Member Purchaser free and clear of all liens and encumbrances other than the Permitted Encumbrances (as defined in the Loan Documents) and any other Encumbrances approved in writing by, or not requiring the approval of, the Investor Member pursuant to the terms of this Agreement;

(ii)     The Investor Member Purchaser shall pay the Sale ROFO Price (less (A) the sum of the Deposit plus any interest accrued thereon, as adjusted by the credits and apportionments herein set forth and (B) the outstanding balance of the Company Loans assumed by the Investor Member Purchaser) to Office Owner or the Asset Seller, as applicable, in immediately available funds by federal funds wire transfer;

(iii)     Office Owner or the Asset Seller shall (y) pay to the applicable Governmental Authorities, all transfer, gains, stamp or similar taxes due in connection with the conveyance of the Company Assets or the Property and other costs and expenses of effecting the conveyance customarily paid by sellers of real property in New York, New York, but in any case consistent with the terms of the Sale Trigger Notice and (z) distribute to the Company (directly or through one or more Subsidiaries, as applicable) any amounts remaining after payment of the amounts described in the preceding clause (y);

(iv)     if, after the sale of the Property or the Company Assets, Office Owner or Asset Seller owns no other property, the Company's accountant shall close the books of Office Owner or the Asset Seller as of the ROFO Closing Date, and all items which are customarily apportioned in the sale of assets comparable to the Property or the Company Assets shall be apportioned between Office Owner or the Asset Seller and the Investor Member Purchaser as of 11:59 PM (EST) on the day preceding the ROFO Closing Date in accordance with the customs and practices usual in transactions involving assets comparable to the Property or the Company Assets in New York, New York;

(v)     the Company shall distribute the sums received by it under clause (iii)(z) above in the manner set forth in <u>Section 9.2</u> of this Agreement; and

(vi)     the Company shall execute or cause to be executed all amendments to fictitious name, limited liability company or similar certificates necessary to reflect the termination of Office Owner or Asset Seller, if applicable, or as may otherwise be required by Applicable Law.

(e)     If an Acceptance Notice is given and a Deposit made in a timely manner, and Office Owner or Asset Seller shall default in its obligation to close the sale of the Property or the Company Assets as contemplated by this <u>Section 11.2</u> on the ROFO Closing Date, time being of the essence with respect thereto, then the Investor Member may seek specific performance of the Owner Member or Office Owner's obligations or terminate the subject transaction (in which case the Investor Member Purchaser shall be entitled to recover and retain the Deposit, together with all interest accrued thereon, and the Owner Member shall have no right to object thereto, and the Owner Member shall be prohibited from sending another Sale Trigger Notice for a period of six (6) months following such default without the Investor Member's consent), provided, however, that if specific performance is unavailable because the Owner Member has caused the Property to be sold to a third party, then, in addition to the return of the Deposit, the Investor Member shall be permitted to seek recovery of its damages and the Owner Member shall reimburse the Investor Member Purchaser for its documented, out-of-pocket costs and expenses incurred in connection with the proposed purchase, including reasonable attorneys' fees. If an Acceptance Notice is given and a Deposit made in a timely manner, and the Investor Member Purchaser shall default in its obligation to close such purchase on the ROFO Closing Date (a "<u>ROFO Default</u>"), (a) the Investor Member Purchaser shall have no further rights under this <u>Section 11.2</u> following such ROFO Default, and (b) the Owner Member may, notwithstanding anything to the contrary contained herein, at any time thereafter and without the Investor Member's consent or being required to offer the Company Assets or the Property to the Investor Member, cause the Company to cause Office Owner or Asset Seller to consummate a sale of the Property or the Company Assets to any unaffiliated third party designated by the Owner Member upon terms and conditions, including, without limitation, a price, as determined in the sole discretion of the Owner Member; provided that no such sale of the Property or the Company Assets shall be permitted unless a Redemption In Full is effected contemporaneously with the consummation of such sale.

(f)     If the Investor Member fails to deliver an Acceptance Notice to the Owner Member and make the Deposit (or affirmatively waives in writing its right to do so) on or before the expiration of the Consideration Period, the Owner Member shall be permitted to consummate a sale of the Property or the Company Assets to an unaffiliated third party within two hundred seventy (270) days (the "<u>270-Day Period</u>") following expiration of the Consideration Period for a gross purchase price (without deduction for any brokerage or similar fees payable in connection with such sale) which is not less than 99% of the Sale ROFO Price, and is otherwise on the same terms and conditions as (or terms and conditions that are not more favorable to the prospective purchaser than) the terms and conditions set forth in the Sale Trigger Notice provided to the Investor Member (collectively, the "<u>Acceptable Terms</u>"), pursuant to a contract of sale containing such representations and warranties and other terms and conditions as are customarily contained

54

in an arm's-length contract of sale with an unrelated third party, but without direct or indirect recourse to the Investor Member.  If the Company does not cause Office Owner or the Asset Seller to, or if the Owner Member does not, as applicable, (a) enter into a contract of sale within one hundred twenty (120) days of the expiration of the Consideration Period during which the Investor Member failed to deliver an Acceptance Notice to the Owner Member and make the Deposit, and (b) conclude the sale of the Property or the Company Assets, as applicable, within the 270-Day Period, then the Owner Member may not thereafter cause the sale or other disposition of the Property, or the Company Assets without again giving a Sale Trigger Notice to the Investor Member pursuant to Section 11.2(a), in which event all of the provisions hereof shall again be applicable.  For  the purposes of determining whether such proposed sale to an unaffiliated third party is on Acceptable Terms, the Members agree that terms which relate solely to monetary obligations will be considered in the aggregate so that, as long as the net dollars payable by the proposed third party purchaser are not less than 99% of the net dollars that would have been payable by the Investor Member as a purchaser under this Section 11.2, then solely as respects the monetary obligations of the third party purchaser, such sale will be deemed to be  on Acceptable Terms.

(g)     In the event that it is possible to reduce or avoid certain transaction costs (e.g., Transfer Taxes) or obtain other favorable treatment by structuring the sale of the Property to the Investor Member Purchaser in a manner that differs from that described in this Section 11.2 (e.g., the sale by the Owner Member of its entire Membership Interest to the Investor Member Purchaser), then the Members agree to cooperate  in good faith to so restructure the transaction involving the sale of the Property or the Company Assets, provided that the costs of such restructuring shall be borne by the Members in the same proportion as the benefits realized by them.

(h)     The Members agree that, in the event of the sale to the Investor Member Purchaser of the Property or the Company Assets pursuant to this Section 11.2, the Investor Member shall have the right to assume, or cause its designees to assume, the Company Loans, subject to the approval, if required, of the Lenders.  If the Investor Member so elects to assume, or cause its designee to assume, the Company Loans, and the consent of the Lenders is required, then the Members agree to cooperate in all respects to cause the Company Loans to be assumed in connection with any sale under this Section 11.2; provided, however, if any Lender does not approve any such assumption, then unless the Investor Member elects to terminate the subject transaction and recover the Deposit, as set forth below, such Company Loans shall be prepaid or defeased, as applicable, in accordance with the applicable Loan Documents at the expense of the party that is to bear such costs in accordance with the Sale Trigger Notice.  The Owner Member and its Affiliates, as well as the Company and the Subsidiaries, shall execute and deliver all documentation reasonably necessary or desirable (as determined by the Investor Member) to cause the prepayment, defeasance or assumption, as applicable, of the Company Loans; provided, however, neither the Owner Member nor any of its Affiliates shall be required to execute any additional guaranties or indemnities  not customarily required in such transactions to cause any such prepayment, defeasance or assumption. The Owner Member agrees and acknowledges that the Members shall use commercially reasonable efforts to cause the release of any guarantors under

55

the Company Loans upon any such prepayment, defeasance or assumption, but that any such release is not a condition precedent to any purchase and sale under this <u>Section 11.2</u>; provided that the Investor Member shall be obligated to indemnify the Owner Member or any of its Affiliates with respect  to any liabilities that arise from and after such assumption under  any guaranties or indemnities given by such guarantors under the Loan Documents and not so released (including any additional guaranties or indemnities required to be given in connection with such prepayment, defeasance or assumption), to the extent such liabilities are attributable solely to the actions of Investor Member Purchaser or its Controlled Affiliates.  Any assumption fees, prepayment fees or other fees payable in connection with any assumption, prepayment or defeasance shall be the responsibility of the party obligated to bear the same pursuant to the Sale Trigger Notice.  If the Lenders reject the request for their consent or fail to respond timely to such request, the Investor Member shall have the right to either consummate the purchase of the Property or the Company Assets without assuming the Loans or (ii) terminate the subject transaction by notice to the Owner Member, whereupon the Deposit shall be returned immediately to the Investor Member or its designee.

11.3     [Intentionally Omitted].

11.4     <u>Forced Sale</u>.

(a)     Upon the occurrence of any Redemption Trigger Event, without the requirement of any action from either Member, but subject to the further provisions of this <u>Section 11.4</u>, one of the following transactions shall occur (each, a "<u>Forced Sale</u>"):

(i)     the Company shall sell the Property and the other Company Assets to the Investor Member or a third-party buyer (a "<u>Third-Party Buyer</u>");

(ii)     the Company shall sell the direct or indirect Equity Interests in the Subsidiaries of the Company which own the Property and the other Company Assets (such interests, the "<u>Forced Sale Equity Interests</u>") to the Investor Member or a Third-Party Buyer; or

(iii)     the Owner Member shall sell to the Investor Member its entire Membership Interest (the "<u>Forced Sale Membership Interests</u>"; the Property and the Company Assets, the Forced Sale Equity Interests or the Forced Sale Membership Interests, as applicable, the "<u>Forced Sale Property</u>");

provided, however, the Investor Member shall, in its sole and absolute discretion, control which of the foregoing options shall occur automatically, including, but not limited to, whether the Forced Sale Property, in the event of option (i) or (ii) above, will be sold to a Third-Party Buyer or to the Investor Member.

(b)     Any Forced Sale shall take place on such terms and conditions (including, without limitation, the identity of the purchaser, sale price for the Forced Sale Property, required seller representations and indemnities and the timing of closing) as the Investor Member shall

56

Case 1:22-cv-05136-JGK   Document 1-1   Filed 06/17/22   Page 79 of 229

determine in its sole and absolute discretion.  The Owner Member acknowledges and agrees that the Investor Member may consider any factors that the Investor Member determines in its sole discretion are relevant to its determination of the sale price of the Forced Sale Property including, without limitation, (i) the Preferred Equity Investment, (ii) any Company Loans and any prepayment, defeasance, assumption or transfer costs payable in connection therewith and (iii) broker fees and other customary transaction costs.  Owner Member further acknowledges that, by virtue of the Investor Member's ownership of an extensive portfolio of Class A properties in New York City, the Investor Member is uniquely suited to conduct any possible sale of the Forced Sale Property and to determine the terms and conditions for such sale.  The Forced Sale shall proceed notwithstanding any breach of this Agreement by the Owner Member.

11.5    <u>Consummation of Transactions</u>.

(a)    If, pursuant to <u>Section 11.4</u> hereof, the Forced Sale is a sale of the Property and other Company Assets, on the date on which the Property and other Company Assets are sold pursuant to the terms hereof (the "<u>Property Sale Closing Date</u>"), the Company, Office Owner and the Investor Member or the Third-Party Buyer, as applicable, shall deliver, or cause to be delivered, the items set forth below:

(i)    subject to <u>Section 11.5(d)</u>, Office Owner shall deliver the following items to the Investor Member (or its designee) or Third-Party Buyer, as applicable, all duly executed and acknowledged, where applicable:

(A)    a customary bargain and sale deed without covenants against grantor's acts with respect to the Office Tower, duly executed and acknowledged by Office Owner;

(B)    a counterpart of a customary assignment of leases (the "<u>ALR</u>") with respect to the Leases, duly executed by Office Owner;

(C)    customary tenant notice letters (the "<u>Tenant Notice Letters</u>"), if applicable, duly executed by Office Owner;

(D)    the Tenant Deposits, if any, held by Office Owner in the form of cash, either (i) in the form of a cashier's check issued by a bank reasonably acceptable to the Investor Member or Third-Party Buyer, as applicable, or (ii) as part of an adjustment to the purchase price for the Forced Sale Property.  In the event one or more Tenant Deposits are in the form of a letter of credit, then Office Owner shall deliver each such original letter of credit with all amendments thereto (collectively, the "<u>Letters of Credit</u>"), together with documentation providing for such Letters of Credit to be transferred or assigned to the Investor Member or Third-Party Buyer, as applicable;

57

Case 1:22-cv-05136-JGK   Document 1-1   Filed 06/17/22   Page 80 of 229

(E)     a counterpart of a customary assignment and assumption of contracts (the "Assignment and Assumption of Contracts") with respect to the Service Contracts, duly executed by Office Owner;

(F)     customary notice to service providers, if applicable, duly executed by Office Owner;

(G)     a counterpart of a customary general assignment (the "General Assignment"), duly executed by Office Owner;

(H)     a customary title affidavit reasonably acceptable to a national title insurance company, which shall include in the case of a sale to the Investor Member or its Affiliate, a non-imputation affidavit and supporting indemnity from a creditworthy entity acceptable to the title insurance company;

(I)     evidence of authority, good standing (if applicable) and due authorization to consummate the sale of the Office Tower and including such additional facts as may be needed to enable a nationally recognized title insurance company to omit all exceptions regarding Office Owner's standing, authority and authorization from a title insurance policy;

(J)     a bill of sale with respect to all personal property comprising the Property and owned by Office Owner, duly executed by Office Owner;

(K)     a certificate certifying that Office Owner is not a "foreign person" as defined in Section 1445 of the Code; and

(L)     any other affidavit, document or instrument (other than undertakings, indemnities and other documents and instruments required to remove title exceptions) reasonably requested by a nationally recognized title insurance company issuing a title insurance policy in connection with the purchase of the Property and other Company Assets contemplated hereunder including, without limitation, corporate authorizations, pursuant to the terms of this Agreement or Applicable Law in order to effectuate the transfer of title to the Office Tower, and such other instruments, documents, certificates and affidavits as are customarily delivered in a sale of real estate in New York City.

(ii)    Reserved;

58

(iii)    the Company shall deliver (or cause to be delivered by the applicable Subsidiaries of the Company) the following items to the Investor Member (or its designee) or Third-Party Buyer, as applicable, all duly executed and acknowledged, where applicable:

(A)    a New York State Real Estate Transfer Tax Return (TP-584);

(B)    a New York City Real Property Transfer Tax Return (NYC-RPT);

(C)    a New York State Real Property Transfer Report with respect to the Property (RP-5217 NYC);

(D)    evidence of authority, good standing (if applicable) and due authorization to consummate the sale of the Property and Company Assets and including such additional facts as may be reasonably requested by the title insurance company engaged in connection therewith to enable a national title insurance company to omit all exceptions regarding such entity's standing, authority and authorization from a title insurance policy;

(E)    all original or, if originals are unavailable, complete copies of the Licenses and Permits, the Leases, the Property Records and the Service Contracts in the Company's or its Subsidiaries' possession or control;

(F)    all keys and combinations (if applicable) to the Improvements which are in the Company's or its Subsidiaries' possession or control; and

(G)    such other instruments, documents, certificates and affidavits as are customarily delivered in a sale of properties.

(iv)    the Company shall obtain from the Investor Member (or its designee) or the Third-Party Buyer, as applicable, the following items:

(A)    a counterpart of the ALR with respect to the Leases, duly executed by the Investor Member (or its designee) or the Third-Party Buyer, as applicable;

(B)    a counterpart of the Assignment and Assumption of Contracts with respect to the Service Contracts, duly executed by the Investor Member (or its designee) or the Third-Party Buyer, as applicable;

59

Case 1:22-cv-05136-JGK   Document 1-1   Filed 06/17/22   Page 82 of 229

(C)  a counterpart of the General Assignment, duly executed by the Investor Member (or its designee) or the Third-Party Buyer, as applicable;

(D)  a New York State Real Estate Transfer Tax Return (TP-584), duly executed by the Investor Member (or its designee) or the Third-Party Buyer, as applicable;

(E)  a New York City Real Property Transfer Tax Return (NYC-RPT), duly executed by the Investor Member (or its designee) or the Third-Party Buyer, as applicable; and

(F)  a New York State Real Property Transfer Report (Form RP-5217NYC) with respect to the Property, duly executed by the Investor Member (or its designee) or the Third-Party Buyer, as applicable;

(v)  the Company or its Subsidiaries, as applicable, shall obtain from the Investor Member (or its designee) or the Third-Party Buyer, as applicable, the purchase price for the Property and other Company Assets in immediately available funds, which  recipient of such funds shall simultaneously deliver to the Owner Member (and the Investor Member in the case of a Forced Sale to a Third-Party Buyer) the amount that the Owner Member (and the Investor Member in the case of a Forced Sale to a Third-Party Buyer) would receive on liquidation of the Company if all other liabilities of the Members, the Company and the Subsidiaries which relate to the Property and other Company Assets being sold were discharged and the Company were liquidated and all assets of the Company were distributed in accordance with the provisions of Article 12.

(vi)  the Owner Member shall pay from its own funds, and not the funds of the Company, the Transfer Expenses, if any, due in connection with the sale of the Property and other Company Assets;

(vii)  as of the Property Sale Closing Date, all items of revenue and expense which are customarily apportioned in the sale of properties comparable to the Property shall be apportioned between the Company and its Subsidiaries, on the one hand, and the Investor Member (or its designee) or the Third-Party Buyer, as applicable, on the other hand, as of 11:59 p.m. on the day preceding the Property Sale Closing Date in accordance with the customs and practices usual in transactions involving properties comparable to the Property (provided that such apportionment shall be without duplication of any items taken into account in calculating the purchase price for the Forced Sale Property) with items allocated to the Company and the Subsidiaries for the period prior to 11:59 p.m. on the day preceding the Property Sale Closing Date to be further apportioned between the Investor Member

and the Owner Member in proportion to their respective Percentage Interests, but subject to the provisions of Section 9.4; and

(b)     If, pursuant to Section 11.4 hereof, the transaction is a sale of Forced Sale Equity Interests, on the date on which the Forced Sale Equity Interests are sold pursuant to the terms hereof (the "Forced Sale Equity Interests Closing Date"), the Company and/or any applicable Subsidiaries and the Investor Member (or its designee) or the Third-Party Buyer, as applicable, shall deliver, or cause to be delivered, the following:

(i)     subject to Section 11.5(e), the applicable Subsidiaries shall deliver or cause to be delivered to the Investor Member (or its designee) or the Third-Party Buyer, as applicable:

(A)     one or more duly executed and acknowledged instruments of assignment conveying the Forced Sale Equity Interests in the applicable Company Subsidiary;

(B)     a New York State Real Estate Transfer Tax Return (TP-584); and

(C)     a New York City Real Property Transfer Tax Return (NYC-RPT).

(ii)     the Company or its Subsidiaries, as applicable, shall obtain from the Investor Member (or its designee) or the Third-Party Buyer, as applicable, the purchase price for the Forced Sale Equity Interests in immediately available funds, which recipient of such funds shall simultaneously deliver to the Owner Member (and the Investor Member in the case of a Forced Sale to a Third-Party Buyer) the amount that the Owner Member (and the Investor Member in the case of a Forced Sale to a Third-Party Buyer) would receive on liquidation of the Company if all other liabilities of the Members, the Company and the Subsidiaries which relate to the Property and other Company Assets being sold were discharged and the Company were liquidated and all assets of the Company were distributed in accordance with the provisions of Article 12.

(iii)     as of the Forced Sale Equity Interests Closing Date, all items of revenue and expense which are customarily apportioned in the sale of properties comparable to the Property shall be apportioned between the Company and the Subsidiaries, on the one hand, and the Investor Member (or its designee) or the Third-Party Buyer, as applicable, on the other hand, as of 11:59 p.m. on the day preceding the Forced Sale Equity Interests Closing Date in accordance with the customs and practices usual in transactions involving properties comparable to the Property (provided that such apportionment shall be without duplication of any items taken into account in calculating the purchase price for the Forced Sale Equity Interests) with items allocated to the Company and the Subsidiaries for the period

prior to 11:59 p.m. on the day preceding the Forced Sale Equity Interests Closing Date to be further apportioned between the Investor Member and the Owner Member in proportion to their respective Percentage Interests, but subject to <u>Section 9.4</u>.

(iv)    the Owner Member shall pay from its own funds, and not the funds of the Company, the Transfer Expenses, if any, due in connection with the conveyance of the Forced Sale Equity Interests;

(v)    the Company shall execute all amendments to fictitious name, limited liability company or similar certificates necessary to reflect the transaction;

(vi)    the Owner Member shall execute and deliver a customary title affidavit reasonably acceptable to a national title insurance company, which shall include, in the case of a sale to the Investor Manager or its Affiliate, a non-imputation affidavit and supporting indemnity from a creditworthy entity acceptable to the title insurance company; and

(vii)    the Company and the Subsidiaries shall execute such other instruments, documents, certificates and affidavits as are customarily delivered in a sale of membership interests of Delaware limited liability companies.

(c)    If, pursuant to <u>Section 11.4</u> hereof, the transaction is a sale of Forced Sale Membership Interests, on the date on which the Forced Sale Membership Interests are sold pursuant to the terms hereof (the "<u>Forced Sale Membership Interests Closing Date</u>"), the Owner Member and the Investor Member shall deliver, or cause to be delivered, the items set forth below:

(i)    the Owner Member shall deliver to the Investor Member (or its designee(s)), as applicable:

(A)    a duly executed and acknowledged instrument of assignment conveying the Forced Sale Membership Interests, free and clear of all Liens, which instrument shall contain surviving representations given by the Owner Member concerning due organization and authority of the Owner Member, the Company and the Subsidiaries and the absence of Liens on the Forced Sale Membership Interests (other than those Liens arising under this Agreement) and shall contain an indemnification from the Owner Member in favor of the Investor Member (or its designee(s)) with respect to any loss, liability, cost or expense (including reasonable attorneys' fees) the Investor Member may incur by reason of any breach of such representations;

62

          (B)    a New York State Real Estate Transfer Tax Return (TP-584); and

          (C)    a New York City Real Property Transfer Tax Return (NYC-RPT).

(ii)    the Owner Member shall obtain from the Investor Member (or its designee) the purchase price for the Forced Sale Membership Interests in immediately available funds;

(iii)    the Company shall close the books of the Company on the Forced Sale Membership Interests Closing Date, and all items of Company revenue and expense which are customarily apportioned in the sale of properties comparable to the Property shall be apportioned between the Owner Member and the Investor Member as of 11:59 p.m. on the day preceding the Forced Sale Membership Interests Closing Date in accordance with the customs and practices usual in transactions involving properties comparable to the Property (provided that such apportionment shall be without duplication of any items taken into account in calculating the purchase price for the Forced Sale Membership Interests), with items allocated to the period prior to 11:59 p.m. on the day preceding the Forced Sale Membership Interests Closing Date to be further apportioned between the Owner Member and the Investor Member in proportion to their respective Percentage Interests;

(iv)    unless otherwise agreed to by the Owner Member and the Investor Member, Net Income and Net Loss (and other relevant items referred to in Article 11) for the Fiscal Year in which the Forced Sale Membership Interests Closing Date occurs shall be allocated between Owner Member and the Investor Member by closing the books of the Company as of the Forced Sale Membership Interests Closing Date;

(v)    the Owner Member shall pay from its own funds, and not the funds of the Company, the Transfer Expenses, if any, due in connection with the sale of Forced Sale Membership Interests;

(vi)    the Owner Member shall discharge all Liens affecting its Membership Interest (other than those Liens arising under this Agreement);

(vii)    the Members shall execute all amendments to fictitious name, limited liability company or similar certificates and any other instruments or documents necessary to reflect, if applicable, the withdrawal of the Owner Member from the Company, transfer of all bank accounts, contracts, deposits, accounts or other items in the control of the Owner Member, if any, to the Investor Member (or its designee, or as may otherwise be required by Applicable Law) and shall execute such other instruments, documents, certificates and affidavits as are customarily

delivered in a sale of membership interests of Delaware limited liability companies; and

(viii)   a customary title affidavit reasonably acceptable to a national title insurance company, which shall include a non-imputation affidavit and supporting indemnity from a creditworthy entity acceptable to the title insurance company.

(d)   The Members agree to cooperate in all respects to cause the Company Loans to be assumed in connection with any Forced Sale; provided, however, if any Lender does not approve any such assumption, then such Company Loan shall be prepaid or defeased, as applicable, in accordance with the applicable Loan Documents. The Owner Member and its Affiliates, as well as the Company and the Subsidiaries, shall execute and deliver all documentation necessary or desirable (as determined by the Investor Member in its sole discretion) to cause the prepayment, defeasance or assumption, as applicable, of the Company Loans; provided, however, neither the Owner Member nor any of its Affiliates shall be required to execute any additional guaranties or indemnities to cause any such prepayment, defeasance or assumption. The Owner Member agrees and acknowledges that the Members shall use commercially reasonable efforts to cause the release of any guarantors under the Company Loans upon any such prepayment, defeasance or assumption, but that any such release is not a condition precedent to any Forced Sale and neither the Investor Member nor any Third-Party Buyer shall have any obligation to (i) cause any such release of any guarantors or (ii) indemnify the Owner Member or any of its Affiliates with respect to any guaranties or indemnities given by such guarantors under the Loan Documents. Any assumption fees, prepayment fees or other fees payable in connection with any assumption, prepayment or defeasance shall be the responsibility of the Company. The Investor Member shall have the right to consider any such fees in its determination of the sale price for the Forced Sale Property or Forced Sale Equity Interests, as applicable.

(e)   The Owner Member agrees to cooperate in all respects with the Investor Member in order to effectuate any Forced Sale and, in connection therewith, the Owner Member shall execute for itself and, as the Managing Member on behalf of the Company and any Subsidiaries (including the Office Owner, if applicable), any all documents necessary or desirable (as determined by the Investor Member in its sole discretion) to be executed by such parties in order to effectuate such Forced Sale. The Investor Member is hereby granted an irrevocable power of attorney, coupled with an interest, to execute and deliver any such documentation on behalf of the Owner Member and its Affiliates, the Company and/or the Subsidiaries, as the case may be, and any and all such documentation so executed by the Investor Member shall be binding on the Owner Member and its Affiliates, the Company and/or such Subsidiaries, as applicable. Any third party including, without limitation, any title company, is authorized to rely upon the execution and delivery of all such documentation by the Investor Member on behalf of the Owner Member and its Affiliates, the Company and/or the Subsidiaries as the duly authorized action of the Owner Member and its Affiliates, the Company and/or the Subsidiaries. Without limiting the generality or scope of the foregoing grant of an irrevocable power of attorney in favor of the Investor Member, and in furtherance thereof, the Owner Member, on behalf of itself, its Affiliates, the Company and each of the Subsidiaries, hereby agrees that the Investor Member, acting through any officer or authorized signatory thereof, shall be fully, unconditionally and irrevocably

64

authorized to execute, acknowledge and deliver, on behalf of the Owner Member, its Affiliates, the Company and each Subsidiary, as an authorized signatory of each thereof, any and all documentation that it determines to be required or desirable to effectuate a Forced Sale. Any third party including, without limitation, any title insurance company, is authorized to rely upon the execution and delivery of all such documentation by such authorized signatory on behalf of the Owner Member, its Affiliates, the Company and each Subsidiary. The Owner Member agrees and acknowledges that the granting of the foregoing power of attorney to the Investor Member is a material inducement to the Investor Member to enter into this transaction without which the Investor Member would not make such investment.

(f)      In the event of a Forced Sale, any obligations of the Company and/or its Subsidiaries to deliver, or cause to be delivered, the items set forth in Section 11.5 (whether done by the Company and/or its Subsidiaries or the Investor Member through its power of attorney, as set forth in this Agreement) is to occur immediately and take immediate effect, regardless of whether the consent of any Lender(s), to the extent required, has been obtained. Upon the occurrence of a Redemption Trigger Event, the Investor Member is entitled to exclusive, complete and full operational control of the Property, including, but not limited to, property management and leasing activity, and can take any action of any kind to do anything and everything it deems necessary, desirable or appropriate to operate and manage the Property and otherwise in accordance with the provisions of this Agreement. The Owner Member agrees to facilitate and cooperate with such immediate transfer of managerial and operational control, including while any request for the consent of any Lender(s) is pending.

11.6    Transfer Taxes.

(a)      The Owner Member shall indemnify, protect, defend and hold harmless the Investor Member and the Company from and against any and all claims, demands, liabilities, costs, expenses and other amounts arising from any obligation or assessment for the payment of Transfer Taxes, including but not limited to (i) Transfer Taxes paid by the Investor Member in accordance with the provisions of Section 11.6(d) and (ii) Transfer Taxes payable in connection with any Transfer of a direct or indirect interest in the Membership Interest of the Owner Member, and any and all costs, expenses, and other amounts (including, without limitation, reasonable attorneys' fees and disbursements) that may be due and payable in connection with any audit (including any written inquiry), examination, administrative or judicial proceeding, or other matter in connection with the Preferred Equity Investment, whether due on the Effective Date or at a later time, in each case, to the extent such Transfer Taxes arise from any Transfer that occurs prior to or upon a purchase or other acquisition by the Investor Member Purchaser pursuant to Section 11.2, except to the extent that the Sale Trigger Notice obligates the transferee to pay Transfer Taxes.

(b)      The Owner Member shall indemnify, protect, defend and hold harmless the Investor Member and the Company from and against any and all claims, demands, liabilities, costs, expenses and other amounts arising from any obligation or assessment for the payment of Transfer Taxes in respect of a Forced Sale or any Transfer of any direct or indirect interest in the Owner Member's Membership Interest, and any and all costs, expenses, and other amounts (including, without limitation, reasonable attorneys' fees and disbursements) that may be due and payable in

Case 1:22-cv-05136-JGK   Document 1-1   Filed 06/17/22   Page 88 of 229

connection with any audit (including any written inquiry), examination, administrative or judicial proceeding, or other matter in connection with a Forced Sale, to the extent necessary to ensure that the Investor Member receives all amounts to which it is entitled under Section 9.5; provided, however, that if the Investor Member decides to pay such Transfer Tax due in connection with the foregoing on behalf of the Owner Member, the Investor Member shall provide the Owner Member written notice of such decision at least two (2) Business Days prior to its payment of the Transfer Tax, but such payment by the Investor Member shall not relieve the Owner Member of its indemnification and related obligations hereunder.

(c)     The Owner Member shall indemnify, protect, defend and hold harmless the Investor Member and the Company from and against any and all claims, demands, liabilities, costs, expenses and other amounts arising from any obligation or assessment for the payment of Transfer Taxes in respect of a Redemption In Full, and any and all costs, expenses, and other amounts (including, without limitation, reasonable attorneys' fees and disbursements) that may be due and payable in connection with any audit (including any written inquiry), examination, administrative or judicial proceeding, or other matter, in each case, that is imposed in connection with a Redemption In Full;

(d)     If either (i) within ten (10) Business Days of the entry of a final non-appealable regulatory or judicial determination that Transfer Tax is due in connection with the Preferred Equity Investment, the Owner Member fails to pay such Transfer Tax in full and provide evidence reasonably satisfactory to the Investor Member of such payment, or (ii) the Investor Member reasonably determines (based on the advice of outside transfer tax counsel) that, as a result of a Transfer Tax audit, claim or controversy, there is a material risk that either the Property (or a portion thereof) or the Investor Member's Membership Interest (or a portion thereof) may be seized or made subject to a lien or other encumbrance, the Investor Member shall have the right to pay such Transfer Tax on behalf of the Owner Member; provided, however, that if the Investor Member decides to pay such Transfer Tax due to the foregoing, the Investor Member shall provide the Owner Member written notice of such decision at least two (2) Business Days prior to its payment of the Transfer Tax, but such payment by the Investor Member shall not relieve the Owner Member of its obligations hereunder.

(e)     Notwithstanding anything to the contrary in this Agreement, the Owner Member shall control, and make any decisions regarding, any audit, examination, administrative or judicial proceeding or other matter pertaining to any Transfer Tax in connection with the Preferred Equity Investment (including any Transfer Tax described in Section 11.6(b) and Section 11.6(c)); provided, however, that the Owner Member shall (i) notify the Investor Member of any administrative or judicial proceeding or other matter pertaining to any Transfer Tax with respect to the Preferred Equity Investment, (ii) furnish the Investor Member with any and all correspondence or communication relating to any Transfer Tax in connection with the Preferred Equity Investment received from any state or local taxing authority, and (iii) consult with the Investor Member prior to settling any material tax audit, claim or controversy relating to any Transfer Tax in connection with the Preferred Equity Investment; provided, further, that no such settlement shall require the Investor Member to take any position that would be prohibited by applicable law.

66

(f)      The provisions of this Section 11.6 shall survive the termination of this Agreement.

**ARTICLE 12**
**DISSOLUTION OF THE COMPANY AND**
**WINDING UP**

12.1    <u>Dissolution</u>.

(a)      The Company shall be dissolved and its affairs shall be wound up only upon the first to occur of the following:

(i)      the written consent of the Members;

(ii)     the entry of a decree of judicial dissolution under Section 18-802 of the Act; and

(iii)    the disposition of all of the Company Assets and the collection of all amounts derived from such disposition and the satisfaction of contingent liabilities of the Company or its Subsidiaries in connection with such disposition.

(b)      Except as provided in this Agreement, no Member shall have the right (i) to withdraw or resign as a Member of the Company, (ii) to redeem or otherwise require redemption of its Membership Interest in the Company or any part thereof or (iii) to the fullest extent permitted by Applicable Law, to dissolve itself voluntarily.

(c)      Notwithstanding any other provision of this Agreement, any Bankruptcy Action taken by or on behalf of a Member shall not cause the Member to cease to be a member of the Company and, upon the occurrence of such an event, the business of the Company shall continue without dissolution.

12.2    <u>Winding Up</u>.  In the event of the dissolution of the Company pursuant to <u>Section 12.1(a)</u>, the Members shall wind up the Company's affairs.

(a)      Upon dissolution of the Company and until the filing of a certificate of cancellation as provided in the Act, the Members, in accordance with this Agreement, or a liquidating trustee, as the case may be, shall, in the name of, and for and on behalf of, the Company, continue to act as such and shall make all decisions relating to the conduct of any business or operations during the winding up period and to the sale or other disposition of Company Assets, including to prosecute and defend suits, whether civil, criminal or administrative, gradually settle and close the Company's business, dispose of and convey the Company Assets, discharge or make reasonable provision for the Company's liabilities, liquidate all Company Assets and distribute to the Members in accordance with <u>Section 12.3</u> any remaining cash of the Company, all without affecting the liability of Members and without imposing liability on any liquidating trustee.

67

(b)     Upon the completion of winding up of the Company, the Members or a liquidating trustee, as the case may be, as an authorized person shall file a certificate of cancellation of the Certificate of Formation in the Office of the Secretary of State of the State of Delaware as provided in the Act and any other similar certificates of cancellation or termination required to discontinue its status as a legal entity or its authorization to do business in the states in which it is qualified to do so.  The existence of the Company as a separate legal entity shall continue until cancellation of the Certificate of Formation as provided in the Act.

12.3     <u>Distributions</u>.  Upon dissolution of the Company, the expenses of liquidation and the Company's liabilities and obligations to creditors (including obligations to Members, if any, other than liabilities for distributions) shall be paid, or reasonable provisions shall be made for payment thereof, in accordance with Applicable Law, from cash on hand or from the liquidation of Company properties.  After payment or provision for payment of all expenses of liquidation and liabilities and obligations of the Company, remaining cash of the Company shall be distributed to the Members, in accordance with <u>Section 9.2</u> or <u>Section 9.3</u> as applicable.  There shall be no distribution of Company Assets other than cash, and all such Company Assets other than cash shall be liquidated upon a dissolution of the Company.  The Members hereby acknowledge and agree that they have no right, title or interest to the Company's name and the goodwill attached thereto.

## ARTICLE 13
## REPRESENTATIONS AND WARRANTIES

13.1     <u>Representations and Warranties</u>.

(a)     Each Member hereby represents and warrants to the other Member as of the Effective Date that:

(i)     such Member is a corporation, limited liability company or limited partnership, as the case may be, duly organized, validly existing and in good standing under the laws of the state of its incorporation or formation, as applicable;

(ii)     such Member has the requisite corporate, partnership or limited liability company power and authority, as applicable, to enter into this Agreement and perform the terms of this Agreement;

(iii)     such Member has duly executed and delivered this Agreement; the execution and delivery of this Agreement, and the consummation of the transactions contemplated hereby, have been duly authorized and no other corporate, partnership, limited liability company or other action on the part of such Member or any of its shareholders, partners or members is necessary in order to permit such Member to consummate the transactions contemplated hereby;

(iv)     this Agreement constitutes the valid and binding obligation of such Member, enforceable in accordance with its terms as the same may be limited, however, by applicable insolvency, bankruptcy, fraudulent conveyance, fraudulent

68

Case 1:22-cv-05136-JGK   Document 1-1   Filed 06/17/22   Page 91 of 229

transfer, reorganization, moratorium, or other laws affecting creditors' rights generally or by general principles of law or equity; and

(v)     neither such Member nor, to such Member's knowledge, any Affiliate of such Member is, or has been determined by the U.S. Secretary of the Treasury to be acting on behalf of, a Prohibited Person, or has otherwise been designated as a Person (i) with whom an entity organized under the laws of the United States (or a state thereof) is prohibited from entering into transactions or (ii) from whom such an entity is prohibited from receiving money or other property or interests in property.  In addition, neither such Member nor, to such Member's knowledge, any Affiliate of such Member is located in, or operating from, a country subject to U.S. economic sanctions administered by OFAC.

(b)     The Owner Member hereby represents and warrants to the Investor Member as of the Effective Date that:

(i)     Exhibit E is a true, correct and complete list of (1) all of the Tenants of and Leases affecting the Office Tower in force and effect, (2) each Lease, if any, which has been executed but is not yet in effect and (3) all of the guaranties under which a guarantor has guaranteed an obligation of a Tenant under any Lease in force and effect.  There are no leases or occupancy agreements affecting the Office Tower which are in force and effect and under which Office Owner is the lessor (or lessee) (whether by privity of estate or privity of contract) other than the Leases set forth on Exhibit E.  Copies of the Leases set forth on Exhibit E have been provided or made available to Investor Member, all of which are true, correct and complete in all material respects.  Except as otherwise set forth in Exhibit F, (i) Office Owner has not sent or received any written notice of default with respect to any Leases where such default has not been cured prior to the date hereof, (ii) Office Owner is not in default with respect to any of the Leases in any material respect, (iii) no Tenant is in default under any of the Leases in any material respect and (iv) no Tenant has provided written notice of its intent to terminate the applicable Lease or otherwise vacate all or any portion of the leased premises under the applicable Lease, in any such case which notice has not been revoked or otherwise withdrawn prior to the date hereof.  Office Owner has not assigned its interest under the Leases to any third party (other than to the current mortgagee of the Property).  Except as set forth on Exhibit G, there are currently no ongoing audits by any Tenant, and no Tenant is currently contesting such Tenant's obligation to pay any escalation rents;

(ii)     Exhibit H is a true, correct and complete list of all Tenant Deposits, including all interest accrued, presently held by or on behalf of Office Owner with respect to the Leases.  Except as set forth on Exhibit H, no such Tenant Deposit has been applied to cure any Tenant's default;

69

Case 1:22-cv-05136-JGK   Document 1-1   Filed 06/17/22   Page 92 of 229

(iii)     Except as set forth in <u>Exhibit I</u> there are no unpaid Leasing Costs currently outstanding or that may be due and payable in the future with respect to any Lease currently or previously in effect;

(iv)     The brokerage agreements that are listed on <u>Exhibit J</u> are the only brokerage agreements relating to the Property that the Owner Member or any Affiliate of Owner Member has in its possession and under which a brokerage commission could become payable thereunder from and after the Effective Date (such brokerage agreements being collectively referred to herein as the "<u>Known Brokerage Agreements</u>"). The Owner Member has delivered or made available to the Investor Member prior to the date hereof true, correct and complete copies of the Known Brokerage Agreements. There are no brokerage commissions that may hereafter become payable by Office Owner in connection with the Leases that are currently in effect except to the extent that (i) such brokerage commissions become due and payable pursuant to the Known Brokerage Agreements, or (ii) such brokerage commissions are in an amount that is customary for comparable office buildings in midtown Manhattan and are payable to brokers that are identified in the respective Leases in connection with a Tenant's exercise of a renewal option or expansion option that in either case is currently set forth in the applicable Lease.

(v)     Except as set forth in <u>Exhibit K</u>, there is no construction work, tenant improvement work or other capital project currently being performed by or on behalf of Office Owner at the Office Tower, and Office Owner has heretofore performed all work that the applicable Lease requires the landlord thereunder to perform;

(vi)     (A) No Tenant's rent has been collected for more than one month in advance and (B) <u>Exhibit L</u> is a true, correct and complete tenant arrearage schedule as of the date set forth thereon;

(vii)     Other than this Agreement, there is no agreement in force and effect whereby Office Owner has agreed to sell, or has provided to any Person, an option or right to purchase, all or any part of the Property or any direct or indirect interest in the Property, and, to the Owner Member's knowledge, no third party has any such right or option;

(viii)     <u>Exhibit M</u> is a true, correct and complete list of the Service Contracts in effect. Copies of the Service Contracts executed by Office Owner and listed on Exhibit M have been provided to Investor Member and are true, correct, and complete in all material respects. Each of the Service Contracts is in full force and effect in accordance with its terms. Neither Office Owner nor any property manager of the Property has received or delivered any written notice of any material defaults under any Service Contract which have not been cured or waived in writing;

(ix)     None of the Companies has received from any Governmental Authority any written notice which has not been cured that the Property is not in

70

compliance with any Hazardous Materials Laws and there are no proceedings with respect to the Property by or before any Governmental Authority currently pending or, to the Owner Member's knowledge, threatened, alleging any non-compliance with any Hazardous Materials Laws.  Copies of the most current engineering and environmental reports relating to the Property commissioned by and in the possession of the Owner Member or any of the Subsidiaries have been delivered or made available to the Investor Member, all of which copies are true, correct and complete in all material respects;

(x)     Except as disclosed in Exhibit N neither the Owner Member nor Office Owner nor any Affiliate of either has commenced any pending proceeding to decrease the assessed valuation of the Property;

(xi)     There are no pending or, to the Owner Member's knowledge, threatened condemnation or eminent domain proceedings affecting any part of the Property;

(xii)     Exhibit O is a true, correct and complete list of all Loan Documents in effect as of the date hereof.  Neither the Owner Member nor Office Owner (nor any Affiliate of either of them) has received written notice from any Lender of any default, or event that with the passage of time or giving of additional notice would constitute a default, under the Loan Documents, which remains uncured;

(xiii)     The Owner Member has delivered or made available to the Investor Member true, correct and complete copies of all certificates of insurance evidencing property and casualty insurance policies and liability insurance policies that the Owner Member or any of the Companies currently maintains with respect to the Property. Such insurance policies are fully paid for or are paid for in installments and such payments, as applicable, are current and such insurance policies are in full force and effect.  Neither the Owner Member nor any of the Companies has received any written notice(s) that any such insurance policies will be cancelled or are not valid, outstanding and enforceable policies, in any such case which notice has not been cured, waived, revoked or otherwise withdrawn prior to the date hereof;

(xiv)     Neither the Owner Member nor any of the Companies has taken any Bankruptcy Action;

(xv)     Other than the employees (the "Employees") as set forth in Exhibit P, there are no building service employees (including those defined as "building service employees" under the Displaced Building Service Workers Protection Act of the City of New York, section 22-505 of the Administrative Code of New York) or security officers employed at the Property in connection with the operation or maintenance of the Property.  Exhibit P sets forth certain information with respect to the Employees employed in connection with the operation or maintenance of the Property (including designating whether such Employees are union or non-union

71

Case 1:22-cv-05136-JGK   Document 1-1   Filed 06/17/22   Page 94 of 229

personnel and setting forth their current wages, vacation pay, welfare and other fringe benefits, positions and employer), and is true and correct in all material respects. Each of the Employees is employed by the property manager at the Property or a third-party contractor thereof. No Employees are employed by the Owner Member, any of the Companies or any trades or businesses within the controlled group that includes the foregoing (as defined in Sections 414(b) and -(c) of the Code) (the "Controlled Group") and the Controlled Group does not and has not sponsored, established or maintained any employee benefit plans within the prior six years. None of the assets of the Owner Member, any Controlled Group member, or any trades or businesses within the controlled group that includes the foregoing (as defined in Sections 414(b) and 414(c) of the Code) is subject to a lien arising under ERISA or, in so far as it relates to an "employee benefit plan" as defined in Section 3(3) of ERISA;

(xvi)   Except for the collective bargaining agreements and other labor union contracts relating to the union employees identified on Exhibit P, true, correct and complete copies of which have been delivered to the Investor Member, none of the Employees are subject to any collective bargaining agreement or other employment contract. To the Owner Member's knowledge, the payment of all wages, employment compensation insurance, health and pension fund contributions and other fringe benefits, payroll taxes and other compensation with respect to the Employees is current and neither Office Owner nor its property manager has received or delivered written notice of default under any collective bargaining agreements and other labor union contracts or employment agreement set forth in Exhibit P or under applicable law, which remains uncured. Except as set forth in Exhibit P, there is not, and has not been in the past two years, any strike or material grievance, claim of material unfair labor practices or other material labor dispute with respect to the Property; and to the Owner Member's knowledge, there is no pending (or threatened in writing) litigation alleging any violation of any federal or state or local law, or of any collective bargaining agreement, in connection with the Employees or any union representing the Employees. To the Owner Member's knowledge, no union organizing or decertification activities are currently underway or threatened and no such activities have occurred within the two years preceding the Effective Date. The Owner Member and, to the Owner Member's knowledge, the Office Owner's property manager, have not implemented any closing or layoff of Employees that was not in compliance with the WARN Act or comparable state statute;

(xvii)   Except as set forth in Exhibit Q, there are no agreements or other arrangements for furnishing to the Company or any Subsidiary of any goods or services by, the Owner Member or any Affiliate or constituent member thereof; the Owner Member agrees that, if there exist any such Affiliate Agreements with the Owner Member or any of its Affiliates, the Owner Member will cause all such

NY 247736303v11

Case 1:22-cv-05136-JGK   Document 1-1   Filed 06/17/22   Page 95 of 229

Affiliate Agreements to be terminated immediately after the Effective Date at no cost or expense to the Investor Member, the Company or any of its Subsidiaries; and

(xviii)   Exhibit R is a true, complete and correct organizational chart for the Companies.

(xix)   The Initial Budget is a true, correct and complete copy of the annual budget for the Property and the Companies.

(xx)   The Management Agreement by and between Office Owner and Jones Lang LaSalle Americas, Inc., dated May 23, 2018, as supplemented by that certain letter agreement by HNA Property Holdings, LLC, on behalf of Office Owner, dated May 18, 2008, has not been further amended, modified or supplemented and will expire on November 30, 2018, in accordance with its terms, and will thereafter be of no further force or effect.

(xxi)   The Mogull Agreements have not been amended, modified or supplemented and will expire on January 16, 2019 in accordance with their terms and will thereafter be of no further force or effect.

## ARTICLE 14
## AMENDMENTS

This Agreement may be amended, supplemented or otherwise modified only by a written instrument signed by all the Members.

## ARTICLE 15
## MISCELLANEOUS

15.1   REIT Compliance.

(a)   The Managing Member acknowledges that, as of the date hereof, certain of the Members or certain direct or indirect members of the Members are qualified or intend to qualify as a real estate investment trust as defined in Section 856 of the Code (a "REIT"). Accordingly, notwithstanding anything to the contrary contained herein and to the extent of the availability of Company funds (provided that the Managing Member shall promptly provide notice of any unavailability of Company funds to the Members), the Managing Member shall use commercially reasonable efforts to (i) manage and operate the Company and its Subsidiaries such that the nature of its assets and gross revenues (as determined pursuant to Section 856(c)(2), (3) and (4) of the Code) would permit the Company to qualify as a REIT under Section 856 of the Code and (ii) cause the Company to avoid any "net income from prohibited transactions" under Section 857(b)(6) of the Code (in the case of the Company, determined as if the Company were a REIT but without regard to Sections 856(c)(6) and (7) of the Code). The Managing Member shall take or refrain from taking, as the case may be, such actions as are reasonably requested by any Member to protect the status of such Member or the direct or indirect owner or owners of such Member as

73

a REIT, but the Managing Member shall not be charged with making independent determinations as to the qualification or status of any Person as a REIT.  In furtherance of the foregoing, the Managing Member shall use commercially reasonable efforts to not cause the Company or any of its Subsidiaries to: (A) invest any excess funds in any investment that would not be treated as cash, cash items, or government securities for purposes of Section 856(c) of the Code; (B) enter into any lease with any Person that will result in a rental payment to the lessor that is dependent in whole or in part on the net income or profits of any lessee or sublessee; (C) enter into any lease for any Property or any portion thereof pursuant to which any rents attributable to personal property constitute more than 15% of the aggregate rents received in connection with such lease within the meaning of Section 856(d)(1)(C) of the Code; (D) enter into any lease, contract, agreement, or other arrangement as a result of which the Company would receive or accrue, or would be deemed to receive or accrue, (directly or indirectly) with respect to the Property "impermissible tenant service income" within the meaning of Section 856(d)(7) of the Code in excess of one half of one percent of all income from the Property (as if the Company were a REIT); or (E) enter into any agreement under which the Company or any Subsidiary thereof would receive, directly or indirectly, any income from the manager of a Property.  Notwithstanding the foregoing, the Managing Member shall not be deemed to have breached the foregoing provisions of this <u>Section 15.1</u> (and shall have no liability or be subject to any remedy under this Agreement) with respect to any specific actions taken by the Managing Member at the written direction of, or with the prior written approval of the Investor Member.  The Investor Member shall be deemed to have provided such written consent with respect to all leases, contracts, agreements, and other arrangements that are in place with respect to the Property as of the Effective Date.

(b)	If there shall be an amendment or modification to the Code or other relevant rules after the date of this Agreement that adversely impacts the REIT status of any Member or a direct or indirect owner of any Member as a result of the activities of the Company and its Subsidiaries, then the Managing Member shall cooperate reasonably with the Members and shall exercise commercially reasonable efforts to effectuate solutions or "<u>workarounds</u>" to address any reasonable REIT qualification concerns of such Member or its affiliates arising out of any such amendment or modification following written notification thereof by such Member.

(c)	The Company shall clearly and timely identify, pursuant to Section 1221(a)(7) of the Code and the Regulations thereunder, any hedging transaction entered into with respect to indebtedness incurred by the Company or its Subsidiaries, and the Managing Member shall, on behalf of the Company, provide a copy of such identification to the Members.

(d)	The Members agree to provide the Managing Member with such information as may reasonably be necessary for the Managing Member to comply with this <u>Section 15.1</u>.

15.2	<u>Further Assurances</u>.  Each party to this Agreement agrees to execute, acknowledge, deliver, file and record such further certificates, amendments, instruments and documents, and to do all such other acts and things, as may be required by Applicable Law or as, in the reasonable judgment of the Members, may be necessary or advisable to carry out the intent and purpose of

74

this Agreement, provided the same shall result in no increased liability or obligations (other than to a de minimis extent) or decreased rights (other than to a de minimis extent).

     15.3   <u>Notices</u>.  All notices, consents, approvals, waivers or other communications (each, a "<u>Notice</u>") required or permitted hereunder, except as herein otherwise specifically provided, shall be in writing and shall be:  (a) delivered personally or by commercial messenger; (b) sent via a recognized overnight courier service; or (c) sent by registered or certified mail, postage pre-paid and return receipt requested, in each case so long as such Notice is addressed to the intended recipient thereof as set forth below:

          If to the Owner Member:

          HNA 245 Park Ave JV LLC
          c/o HNA Group North America LLC
          1180 Avenue of the Americas, Suite 1801
          New York, New York 10036
          Attention:  Duan Wang

          with copies to:

          White & Case
          1221 Avenue of the Americas
          New York, New York 10020-1095
          Attention:  Francis Zou, Esq. and Steven M. Lutt, Esq.

          If to the Investor Member:

          c/o SL Green Realty Corp.
          420 Lexington Avenue, 19th Floor
          New York, New York 10170
          Attention:  Andrew W. Mathias

          with a copy to:

          c/o SL Green Realty Corp.
          420 Lexington Avenue, 19th Floor
          New York, New York 10170
          Attention:  Andrew S. Levine
          with copies to:

          Greenberg Traurig, LLP
          200 Park Avenue
          New York, NY 10166
          Attention: Gary S. Kleinman, Esq.

Any party may change its address specified above by giving each party Notice of such change in accordance with this Section 15.3. Any Notice shall be deemed given upon actual receipt (or refusal of receipt). The attorney for a party shall be entitled to give Notice on behalf of such party; any such Notice so given shall have the effect of being from the party that the attorney represents.

15.4  Conflicts of Interest; Transactions with Affiliates. (a) Each Member and its Affiliates may engage or invest in any other activity or Person, or possess any interest therein, independently or with others, whether or not in competition with the Companies. Furthermore, none of the Members, nor their respective Affiliates or any other Person employed by, related to or in any way affiliated with any such Person, shall have any duty or obligation to disclose or offer to the Company or any Member, or obtain for the benefit of the Company or any Member, any other activity or Person or interest therein, and none of the Company, any Member, any creditor of the Company or any other Person having any interest in the Company shall have any claim, right or cause of action against any Member or any Affiliate of any Member, or any other Person employed by, related to or in any way affiliated with any such Person, by reason of any direct or indirect investment or other participation, whether active or passive, in any such activity or Person or any interest therein. Owner Member hereby acknowledges that Investor Member or its Affiliates own interests in, manage and/or act as leasing agent for other properties in the same commercial property market as the Property which may be competitive with the Property, and that continuation of such management, leasing and/or ownership shall not serve as the basis of any claim against, or result in any liability to, Investor Member or its Affiliates.

(b)  The Owner Member acknowledges that the Investor Member and the Property Manager are Affiliates, but are distinct legal entities. The Owner Manager agrees that, notwithstanding such relationship between the Investor Member and the Property Manager, the Owner Member will not seek to assert any claim against the Investor Member under this Agreement that relates to any action taken by the Property Manager or any action that the Property Manager fails to take, whether or not the same constitutes a breach by the Property Manager under the Property Management Agreement.

15.5  Confidentiality. Except as may be required by law or in connection with any court or administrative proceeding, neither the Owner Member nor any of its agents or designees shall issue or cause the publication of any press release or other public announcement, or cause, permit or suffer any disclosure of any nature which sets forth the existence or terms of the transactions contemplated hereby. Nothing in this Agreement shall in any way restrict the Investor Member or the Owner Member or any of their respective beneficial owners from complying with any applicable financial or securities laws reporting requirements or processes, the requirements of any securities exchanges, any regulatory requirements, or Applicable Law, GAAP or other generally accepted accounting procedures, provided, however, that any proposed disclosure by the Owner Member shall be subject to the prior written approval of the Investor Member, which approval shall not be unreasonably withheld or conditioned, and the Investor Member agrees to respond promptly to any request for its consent hereunder. In addition, the Investor Member shall have the right to issue a press release at any time with respect to this transaction; provided that the Investor Member shall provide a draft of such press release to the Owner Member reasonably in advance

76

of the issuance thereof and the Investor Member shall include any reasonable comments provided by the Owner Member to the Investor Member on a timely basis. Notwithstanding anything herein to the contrary, the Owner Member shall not issue any press release or other public announcement regarding this Agreement nor the transactions contemplated herein.

15.6    <u>Headings and Captions</u>.  All headings and captions contained in this Agreement and the table of contents hereto is inserted for convenience only and shall not be deemed a part of this Agreement.

15.7    <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one Agreement. Delivery of an executed counterpart of a signature page to this Agreement by telecopier or by email with a pdf or similar attachment shall be effective as delivery of an original executed counterpart of this Agreement.

15.8    <u>Governing Law</u>.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO CONFLICT OF LAW PROVISIONS THEREOF.

15.9    <u>Consent to Jurisdiction</u>.  To the fullest extent permitted by law, each party hereto hereby irrevocably consents and agrees, for the benefit of each party, that any legal action, suit or proceeding against it with respect to its obligations, liabilities or any other matter under or arising out of or in connection with this Agreement, shall be brought in any city, state or federal court located in the Borough of Manhattan, The City of New York (the "<u>Designated Courts</u>"), and hereby irrevocably accepts and submits to the jurisdiction of the Designated Courts (and of the appropriate appellate courts) of each such Designated Court with respect to any such action, suit or proceeding. Each party hereto also hereby irrevocably consents and agrees, for the benefit of each other party, that any legal action, suit or proceeding against it shall be brought in any Designated Court, and hereby irrevocably accepts and submits to the exclusive jurisdiction of each such Designated Court with respect to any such action, suit or proceeding. Each party hereto waives any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions, suits or proceedings brought in any such Designated Court and hereby further waives and agrees not to plead or claim in any such Designated Court that any such action, suit or proceeding brought therein has been brought in an inconvenient forum. Each party agrees that (i) to the fullest extent permitted by law, service of process may be effectuated hereinafter by mailing a copy of the summons and complaint or other pleading by certified mail, return receipt requested, at its address set forth above and (ii) all Notices that are required to be given hereunder may be given by the attorneys for the respective parties.

15.10    <u>Partition</u>.  The Members hereby agree that no Member nor any successor-in-interest to any Member shall have the right to have the Company Assets partitioned, or to file a complaint or institute any proceeding at law or in equity to have the Company Assets partitioned, and each Member, on behalf of himself, his successors, representatives, heirs and assigns, hereby waives any such right.

Case 1:22-cv-05136-JGK   Document 1-1   Filed 06/17/22   Page 100 of 229

15.11   <u>Validity</u>.  Every provision of this Agreement is intended to be severable.  The invalidity and unenforceability of any particular provision of this Agreement in any jurisdiction shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

15.12   <u>Successors and Assigns</u>.  This Agreement shall be binding upon the parties hereto and their respective successors, executors, administrators, legal representatives, heirs and legal assigns and shall inure to the benefit of the parties hereto and, except as otherwise provided herein, their respective successors, executors, administrators, legal representatives, heirs and legal assigns. No Person other than the parties hereto and their respective successors, executors, administrators, legal representatives, heirs and permitted assigns shall have any rights or claims under this Agreement.

15.13   <u>Entire Agreement</u>.  This Agreement, including the Exhibits hereto and thereto, supersedes all prior agreements among the parties with respect to the subject matter hereof and contains the entire Agreement among the parties with respect to such subject matter.

15.14   <u>Waivers</u>.  No Waiver of any provision hereof by any party hereto shall be deemed a waiver by any other party nor shall any such waiver by any party be deemed a continuing waiver of any matter by such party.

15.15   <u>No Third-Party Beneficiaries</u>.  This Agreement is not intended and shall not be construed as granting any rights, benefits or privileges to any Person not a party to this Agreement. Without limiting the generality of the foregoing, no creditor of the Company shall have any right whatsoever to require any Member to contribute capital to the Company.

15.16   <u>Remedies Not Exclusive</u>.  Except as otherwise expressly provided herein, any remedies herein contained for breaches of obligations hereunder shall not be deemed to be exclusive and shall not impair the right of any Member to exercise any other right or remedy, whether for damages, injunction or otherwise.

15.17   <u>Survival</u>.  The representations, warranties, agreements and covenants by each Member shall survive the Effective Date.

15.18   <u>Waiver of Jury Trial</u>.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER THIS AGREEMENT, INCLUDING ANY PRESENT OR FUTURE MODIFICATION HEREOF OR (B) IN ANY WAY CONNECTED OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT (AS NOW OR HEREAFTER MODIFIED) OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION IS NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND

THE COMPANY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF ANY RIGHT THEY MIGHT OTHERWISE HAVE TO TRIAL BY JURY.

15.19   Recovery of Certain Fees.   In the event a party hereto files any action or suit or arbitration against another party hereto by reason of any breach of any of the covenants, agreements or provisions contained in this Agreement, then in that event the prevailing party shall be entitled to recover from the other party all reasonable attorneys' fees and costs resulting therefrom. For purposes of this Agreement, the term "attorneys' fees" or "attorneys' fees and costs" shall mean all court costs and the fees and expenses of counsel to the parties hereto, which may include printing, photocopying, duplicating and other expenses, air freight charges, and fees billed for law clerks, paralegals and other Persons not admitted to the bar but performing services under the supervision of an attorney, and the costs and fees incurred in connection with the enforcement or collection of any judgment obtained in any such proceeding.  The provisions of this Section 15.20 shall survive the entry of any judgment, and shall not merge, or be deemed to have merged, into any judgment.

15.20   Existing LLC Agreement.  The Members acknowledge and agree that, as a result of the execution and delivery of this Agreement, the Members have no further obligations or liabilities under the Existing LLC Agreement, all such obligations and liabilities having been superseded by the provisions of this Agreement.  Notwithstanding the foregoing, the Members agree that, in the event that a Mandatory Redemption Date shall occur under clause (c) of the definition thereof, the obligations of the Owner Member, the Company and its Subsidiaries under or relating to the Existing LLC Agreement, which are the subject of Guaranteed Obligations under and as defined in the Guaranty delivered in connection with the Existing LLC Agreement (the "Original Guaranty") shall be deemed revived and the Original Guaranty shall apply thereto.

*[THE REMAINDER OF THIS PAGE WAS INTENTIONALLY LEFT BLANK]*

79

**IN WITNESS WHEREOF**, the parties have entered into this Second Amended and Restated Limited Liability Company Agreement as of the date first set forth above.

**HNA 245 PARK AVE JV LLC**,
a Delaware limited liability company, as the
Owner Member and the Managing Member

By: _____
Name: Chen Chao
Title: Authorized Signatory

[SIGNATURES FOLLOW ON NEXT SUCCEEDING PAGE]

[Signature Page to Second Amended and Restated Limited Liability Company Agreement of 245 Park JV LLC]

**245 PARK MEMBER LLC,**
a Delaware limited liability company, as the
Investor Member

By: _____

Name: Andrew S. Levine
Title:   Executive Vice President

[Signature Page to Second Amended and Restated Limited Liability Company Agreement of 245 Park JV LLC]

# EXHIBIT B



## AMENDED AND RESTATED GUARANTY

THIS AMENDED AND RESTATED GUARANTY (this **"Guaranty"**), dated as of November 19, 2018 is made by HNA 245 PARK AVE JV LLC, a Delaware limited liability company, having an office at c/o HNA Group North America LLC, 1180 Avenue of the Americas, Suite 1801, New York, New York 10036 ("**HNA Member**"), HNA GROUP (INTERNATIONAL) COMPANY LIMITED, a company organized under the laws of Hong Kong, having its registered office at Suites 3701-09, 37/F., Two International Finance Centre, 8 Finance Street, Central, Hong Kong ("**HNA International**") and HNA GROUP CO., LTD., a company organized under the laws of the People's Republic of China, having an office at Floor 25, HNA Building, No. 7 Guoxing Avenue, Meilan District, Haiokou City, China ("**HNA Group**"; and together with HNA Member and HNA International, collectively, "**Guarantors**", and each individually, "**Guarantor**"), jointly and severally, in favor of 245 PARK MEMBER LLC, a Delaware limited liability company (together with its successors and assigns, "**SLG**") having an office at c/o SL Green Realty Corp. 420 Lexington Avenue, 19th Floor, New York, New York 10170.

## RECITALS:

WHEREAS, SLG and HNA Member entered into that certain Amended and Restated Limited Liability Company Agreement of 245 Park JV LLC, a Delaware limited liability company ("**245 Park JV**"), dated as of June 22, 2018 (the "**Original JV Agreement**"), pursuant to which, among other things, SLG was admitted as a special member in 245 Park JV with a preferred return on a portion of its membership interest in the amount of $141,000,000 (such amount of $141,000,000, as such amount may have been subsequently increased pursuant to the JV Agreement (as defined below), being referred to herein as the "**Preferred Equity Investment**") all in accordance with the terms and provisions of the Original JV Agreement;

WHEREAS, simultaneously with the execution of the Original JV Agreement, the Guarantors entered into that certain Guaranty, dated as of June 22, 2018, in favor of SLG (the "**Original Guaranty**"), and thereafter HNA Group completed a registration of the Original Guaranty (the "**Original SAFE Registration**") on or about July 11, 2018 with the State Administration of Foreign Exchange of the People's Republic of China ("**SAFE**");

WHEREAS, SLG and HNA Member have agreed to extend the term of the Preferred Equity Investment until June 30, 2022 subject to the terms and provisions of that certain Second Amended and Restated Limited Liability Company Agreement of 245 Park JV, dated as of the date hereof (the "**JV Agreement**"), which JV Agreement amends and restates the Original JV Agreement in its entirety;

WHEREAS, it is a condition precedent to the effectiveness of the JV Agreement and SLG's obligation to extend the term of the Preferred Equity Investment that Guarantors enter into this Guaranty which amends and restates the Original Guaranty in its entirety, subject to Section 5.13 hereof; and

WHEREAS, each Guarantor is the owner of certain direct and/or indirect interests in 245 Park JV and will derive substantial direct and indirect benefit from the extension of the term of the Preferred Equity Investment and the transactions contemplated by the JV Agreement.

NOW, THEREFORE, as an inducement to SLG to execute and deliver the JV Agreement and to extend the term of the Preferred Equity Investment as aforesaid, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, each Guarantor hereby amends and restates the Original Guaranty, subject to Section 5.13 hereof, as follows:

# ARTICLE 1

## NATURE AND SCOPE OF GUARANTY

**1.1** **Defined Terms**. All capitalized terms not herein defined shall have the respective meanings ascribed thereto in the JV Agreement.

**1.2** **Guaranteed Obligations**. Subject to the terms of this Section 1.2, each Guarantor hereby unconditionally, absolutely and irrevocably, as a primary obligor and not merely as a surety, guarantees to SLG the punctual and complete payment in full (and not merely the collectability) of and shall pay or cause to be paid to SLG (i) the full amount of the Redemption Amount if, as and when the Redemption Amount becomes due and payable by 245 Park JV to SLG pursuant to the JV Agreement, (ii) all costs, expenses, losses, liabilities, obligations, debts, damages, diminutions in value, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement, punitive damages, foreseeable and unforeseeable consequential damages, of whatever kind or nature (including, but not limited to, attorneys' fees and other costs of defense) that arise by reason of or are in any way related to (A) the appointment of a receiver, liquidator or trustee for HNA Member, 245 Park JV, or the Guarantors, or any of them, as the case may be; (B) the adjudication as bankrupt or insolvent of HNA Member, 245 Park JV, or the Guarantors, or any of them, as the case may be; (C) the filing of any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, by or against, consented to, or acquiesced in by, HNA Member, 245 Park JV, or the Guarantors, or any of them, as the case may be; (D) the filing of any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, by or against any Affiliate of HNA Member or any Affiliate of the Guarantors, or any of them, as the case may be, which HNA Member or the Guarantors, or any of them, and/or their respective controlled Affiliates, directly or indirectly, consents to, aids, solicits, supports or otherwise cooperates in or colludes to cause such filing; (E) by reason of any interference by HNA Member or the Guarantors or any of their Affiliates with the exercise of remedies by SLG and/or its Affiliates under the Transaction Documents (an "**Interference Action**"); or (F) any proceeding for the dissolution or liquidation of HNA Member or any Guarantor; and (iii) the Transfer Expenses, if, as and when the Transfer Expenses become due and payable by HNA Member pursuant to the JV Agreement (the Guarantor's aforesaid obligations are collectively referred to herein as the "**Guaranteed Obligations**"). In no event shall the Guarantors be responsible for any of the events that are described in clauses (A) through (G) above to the extent attributable to SLG or any Affiliate of SLG filing any petition for bankruptcy, reorganization or arrangement in respect of 245 Park JV pursuant to federal bankruptcy law, or any similar federal or state law. For the avoidance of doubt, the amount of the Guaranteed Obligations shall not be limited to any specific liability amount and this Guaranty shall terminate only upon the indefeasible payment and performance of the Guaranteed Obligations; provided, however, the SAFE Registration Amendment shall be subject to the terms and conditions set forth in Article 4 hereof.

**1.3** **Unconditional and Absolute Guaranty**.

(a)  Guarantors covenant and agree (i) that this is a guaranty of payment and not merely of collection and (ii) to fulfill and pay the Guaranteed Obligations, in each case, regardless of any law, statute, rule, regulation, decree or order now or hereafter in effect in any jurisdiction affecting or purporting to affect in any manner any of such terms or the rights or remedies of SLG with respect thereto.

(b)  Any payment or payments made by any Guarantor or any other Person or received or collected by SLG from any Guarantor by virtue of any action or proceeding or any other set-off or appropriation or application following a default in respect of the Guaranteed Obligations, including, without limitation, the failure of 245 Park JV to effect a Redemption in Full on or prior to the Mandatory Redemption Date, may be applied by SLG in redemption of the Preferred Equity Investment or in satisfaction of such indebtedness, obligations and liabilities in such order as SLG may determine.

(c)    Each Guarantor hereby consents and agrees to each of the following, and agrees that the liability of Guarantors under this Guaranty shall not be affected, released, terminated, discharged or impaired, in whole or in part, by, and SLG may proceed to exercise any right or remedy hereunder irrespective of, and Guarantors irrevocably and unconditionally waive any common law, equitable, statutory or other rights which Guarantors might possess as a result of or in connection with, any or all of the following:

(i)    any lack of genuineness, regularity, validity, legality or enforceability, or the violability of, all or any portion of the JV Agreement, or any other agreement or instrument relating to the Preferred Equity Investment;

(ii)    the failure of SLG to exercise or to exhaust any right or remedy or take any action against any Guarantor, including, without limitation, any indulgence, forbearance or compromise granted or given by SLG to any Guarantor;

(iii)    any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Guaranteed Obligations, the JV Agreement or any other Transaction Documents between HNA Member, SLG and/or 245 Park JV, or any other parties, pertaining to the Guaranteed Obligations or any failure of SLG to notify any Guarantor of any such action;

(iv)    any change in the time, manner or place of payment of all or any portion of the Preferred Equity Investment or Preferred Return to SLG now existing or hereafter coming into existence and arising from, by reason of or in any way relating to any of the terms, covenants, conditions and agreements of the JV Agreement, or any extensions of time for payment, whether in whole or in part, of the terms of the JV Agreement on the part of 245 Park JV to be paid, performed or observed, as applicable;

(v)    any amendment or waiver of, or any assertion or enforcement or failure or refusal to assert or enforce, or any consent or indulgence granted by SLG with respect to a departure from, any term of the JV Agreement, including, without limitation, the waiver by SLG of any default, or the making of any other arrangement with, or the accepting of any compensation or settlement or compromise from, 245 Park JV;

(vi)    any failure or delay of SLG to exercise, or any lack of diligence in exercising, any right or remedy with respect to the JV Agreement, any other Transaction Document or this Guaranty;

(vii)    any dealings or transactions between SLG and HNA Member, whether or not Guarantors shall be parties to or cognizant of the same;

(viii)    any other guaranty or any indemnity now or hereafter executed by Guarantors, or any of them, or any other guarantor or any indemnitor or the release of any other guarantor or any indemnitor from or the failure of any other Person to assume liability for the payment, performance or observance of the obligations of 245 Park JV of any of the terms of the JV Agreement on the part of 245 Park JV to be paid, performed or observed whether by operation of law or otherwise;

(ix)    any rights, powers or privileges SLG may now or hereafter have against any Person or collateral in respect of the Preferred Equity Investment;

(x)    SLG's consent to any assignment by HNA Member of its Membership Interest in 245 Park JV;

(xi)    any other circumstance which might in any manner or to any extent constitute a defense available to Guarantors, or vary the risk of Guarantors, or might otherwise constitute a legal or equitable discharge or defense available to a surety or guarantor, whether similar or dissimilar to the foregoing (other than the defense of payment);

(xii)    any change, restructuring or termination of the limited liability company structure or existence of 245 Park JV not otherwise permitted by and accomplished in accordance with the requirements contained in the JV Agreement;

(xiii)    the exercise of any right or remedy under the JV Agreement, or the taking of any action to enforce the same including, but not limited to, a Forced Sale of the Property or the Forced Sale Equity Interests or the Forced Sale Membership Interests, or the acquisition by SLG or an Affiliate thereof, of the Forced Sale Property (provided, however, that if SLG shall acquire the Forced Sale Property pursuant to the exercise of its remedies under the JV Agreement, then, unless there shall have occurred (A) a Bankruptcy Action of or with respect to any of the Guarantors, HNA Member, 245 Park JV or any of the Subsidiaries and/or (B) an Interference Action, the Guaranteed Obligations shall not include payment of the Redemption Amount);

(xiv)    the insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of 245 Park JV, HNA Member, Guarantors or any of them or any other party at any time liable for the payment of all or part of the Preferred Equity Investment, the Preferred Return, the Redemption Fee or the Guaranteed Obligations; or any dissolution of 245 Park JV, HNA Member or any Guarantor, or any sale, lease or transfer of any or all of the assets of 245 Park JV, HNA Member or any Guarantor, or any of them, or any changes in the members or partners of the 245 Park JV or any members of HNA Member;

(xv)    to the maximum extent permitted by applicable law, the invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations, the Preferred Equity Investment, the Preferred Return, the Redemption Fee, the JV Agreement or other Transaction Documents, for any reason whatsoever, including, without limitation, the fact that (A) the Guaranteed Obligations, or any part thereof, exceeds the amount permitted by law, (B) the act of creating and/or modifying the Preferred Member Interest is ultra vires, (C) the officers or representatives (1) executing the JV Agreement or any other documents, (2) accepting the Preferred Equity Investment, or (3) issuing and/or modifying the Preferred Member Interest, acted in excess of their authority, (D) the Preferred Equity Return violates applicable usury laws, (E) 245 Park JV has valid defenses, claims or offsets (whether at law, in equity or by agreement) which render the Preferred Equity Investment, the Preferred Return or the Redemption Fee wholly or partially uncollectible from 245 Park JV, (F) the creation of the Preferred Member Interest, or repayment of the Preferred Equity Investment, Preferred Return or the Redemption Fee or the execution, delivery and performance of any document or instrument creating or evidencing the foregoing, is illegal, uncollectible or unenforceable, (G) the unenforceability of any of the remedies of SLG under the JV Agreement including, but not limited to, the right to consummate a Forced Sale, whether to a third-party or to SLG, as Investor Member, or to an Affiliate thereof, or (H) the JV Agreement or any of the other the documents related thereto have been forged or otherwise are irregular or not genuine or authentic, it being agreed that Guarantors shall remain liable under this Guaranty regardless of whether 245 Park JV, HNA Member or any other Person be found not liable to repay the Preferred Equity Investment or any part thereof for any reason;

(xvi)    any full or partial release of the liability of HNA Member or 245 Park JV for the obligations of 245 Park JV, or any part thereof, or of any Guarantor or any other Person now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform or assure the payment of the Preferred Equity Investment, the Preferred Return and/or

the Redemption Fee or any part thereof, it being recognized, acknowledged and agreed by Guarantors that any Guarantor, or all of them, may be required to pay the Guaranteed Obligations in full without assistance or support of any other Person, and, as against SLG, Guarantors have not been induced to enter into this Guaranty on the basis of a contemplation, belief, understanding or agreement that other Persons will be liable to pay or perform the Guaranteed Obligations, or that SLG will look to other Persons to pay or perform the Guaranteed Obligations;

(xvii) any existing or future right of offset, claim or defense of HNA Member against 245 Park JV, SLG, or any other Person, or against payment of the Preferred Equity Investment, the Preferred Equity Return and/or the Redemption Fee or to otherwise effect a Redemption in Full (whether such right of offset, claim or defense arises in connection with the Preferred Equity Investment or the transactions creating the Preferred Member Interest or otherwise);

(xviii) the reorganization, merger or consolidation of HNA Member, 245 Park JV or any Guarantor into or with any other Person;

(xix) the fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the Guaranteed Obligations, or any part thereof, shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by Guarantors that Guarantors are not entering into this Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectability or value of any of the collateral for the Guaranteed Obligations;

(xx) any release, surrender, exchange, subordination, deterioration, waste, loss or impairment (including without limitation negligent, willful, unreasonable or unjustifiable impairment) of any of the property or security at any time existing in connection with, or assuring or securing payment of, all or any part of the Guaranteed Obligations;

(xxi) any payment by 245 Park JV or HNA Member to SLG held to constitute a preference under bankruptcy laws, or if for any reason SLG is required to refund such payment or pay such amount to 245 Park JV or HNA Member or someone else; or

(xxii) any other action taken or omitted to be taken with respect to the Preferred Equity Investment, the JV Agreement, or the Guaranteed Obligations, whether or not such action or omission prejudices Guarantors or increases the likelihood that Guarantors will be required to pay the Preferred Equity Investment and the Guaranteed Obligations pursuant to the terms hereof;

whether occurring before or after any default, and with or without further notice to or assent from Guarantors, it being the unambiguous and unequivocal intention of Guarantors that Guarantors shall be obligated to fulfill the Guaranteed Obligations and all liabilities under this Guaranty, notwithstanding any occurrence, circumstance, event, action or omission whatsoever, whether contemplated or uncontemplated, and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and satisfaction of the Guaranteed Obligations.

(d) This Guaranty shall continue to be effective or be reinstated, as the case may be, and the rights of SLG hereunder shall continue with respect to, any Guaranteed Obligation (or portion thereof) at any time paid by or on behalf of 245 Park JV which shall thereafter be required to be restored or returned by SLG upon the insolvency, bankruptcy or reorganization of 245 Park JV, or for any other reason, all as though such Guaranteed Obligation (or portion thereof) had not been so paid or applied.

**1.4** **Payment By Guarantors**. If all or any part of the Guaranteed Obligations shall not be paid when due pursuant to the JV Agreement and this Guaranty, whether at demand or otherwise, Guarantors shall, upon demand by SLG, and without presentment, protest, notice of protest, notice of non-payment or any notice whatsoever, pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to SLG at SLG's address as set forth herein. Such demand(s) may be made at any time coincident with or after the time for payment of all or part of the Guaranteed Obligations, and may be made from time to time with respect to the same or different items of Guaranteed Obligations, provided, however, that any amounts due with respect to Guaranteed Obligations, other than the costs of enforcement of the JV Agreement, this Guaranty and/or the other Transaction Documents, the obligation for the payment of which shall survive a Redemption in Full, shall no longer be due and payable hereunder or be deemed Guaranteed Obligations to the extent 245 Park JV has indefeasibly effected a Redemption in Full with respect to the Preferred Member Interest pursuant to the JV Agreement. Demands hereunder shall be deemed made, given and received in accordance with the notice provisions hereof.

**1.5** **No Duty To Pursue Others**. It shall not be necessary, in order to enforce the obligations of Guarantors hereunder, for SLG (and each Guarantor hereby waives any rights which such Guarantor may have to require SLG) to (a) institute suit or exhaust its remedies against HNA Member or 245 Park JV under the JV Agreement with respect to the Guaranteed Obligations or any other person, (b) enforce SLG's rights against any collateral which shall ever have been given to secure the Guaranteed Obligations, (c) enforce SLG's rights against any other guarantors of the Guaranteed Obligations, (d) join HNA Member or any others liable on the Guaranteed Obligations in any action seeking to enforce this Guaranty, or (e) resort to any other means of obtaining payment of the Guaranteed Obligations.

**1.6** **Waivers**. Each Guarantor agrees to the provisions of the JV Agreement, and hereby expressly waives notice of the following:

(a) notice of acceptance of this Guaranty and of any change in the financial condition of 245 Park JV;

(b) any requirement of promptness, diligence, presentment, protest, notice of dishonor, notice of default, notice of acceptance, demand and all other actions or notices that may otherwise be required on SLG's part in connection with the Guaranteed Obligations and/or this Guaranty;

(c) any demand for payment under this Guaranty except as otherwise expressly provided in this Guaranty to the contrary;

(d) the right to interpose all substantive and procedural defenses of the law of guaranty, indemnification and suretyship, except the defense of prior payment by 245 Park JV or any other surety of the Guaranteed Obligations;

(e) all rights and remedies accorded by applicable law to guarantors or sureties generally, including, without limitation, any extension of time conferred by any law now or hereafter in effect;

(f) the right to trial by jury in any action or proceeding of any kind arising on, under, out of or by reason of or relating, in any way, to this Guaranty or the interpretation, breach or enforcement hereof;

(g) the right to interpose any setoff or counterclaim (other than compulsory counterclaims) of any nature or description in any action or proceeding arising hereunder or with respect to this Guaranty;

(h)     any right or claim of right to cause a marshaling of the assets of 245 Park JV or to cause SLG to proceed against 245 Park JV and/or any collateral or security held by SLG at any time or in any particular order;

(i)     any defense based on the failure to make any Guarantor a defendant in any action under the JV Agreement or any other Transaction Document;

(j)     any rights which any Guarantor may have to require SLG, in order to enforce the obligations under this Guaranty, to (i) institute suit or exhaust its remedies against 245 Park JV or others liable for repayment of the Preferred Equity Investment, the Preferred Equity Return, the Redemption Fee or the Guaranteed Obligations, (ii) join the 245 Park JV or any others liable for the Guaranteed Obligations in any action seeking to enforce this Guaranty, or (iii) resort to any other means of obtaining payment of the Guaranteed Obligations; and

(k)     notice of (i) acceptance of this Guaranty, (ii) any amendment of the JV Agreement or extension of time for repayment of the Preferred Equity Investment, the Preferred Return and/or the Redemption Fee (iii) the execution and delivery by 245 Park JV and SLG of any documents arising in connection with the Preferred Equity Investment, (iv) the occurrence of any Redemption Event of Default, (v) SLG's transfer or disposition of the Guaranteed Obligations, or any part thereof, (vi) protest, proof of non-payment or default by 245 Park JV, or (vii) any other action at any time taken or omitted by SLG, and, generally, all demands and notices of every kind in connection with this Guaranty or any documents or agreements evidencing, securing or relating to any of the Guaranteed Obligations.

**1.7     Payment of Expenses**. In the event that any Guarantor should breach or fail to timely perform any provisions of this Guaranty, such Guarantor shall, within ten (10) days after demand by SLG, pay SLG all costs and expenses (including court costs and reasonable attorneys' fees) incurred by SLG in the enforcement hereof or the preservation of SLG's rights hereunder. The covenant contained in this Section 1.7 shall survive the payment and performance of the Guaranteed Obligations.

**1.8     Effect of Bankruptcy**. In the event that, pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief law, or any judgment, order or decision thereunder, SLG must rescind or restore any payment, or any part thereof, received by SLG in satisfaction of the Guaranteed Obligations, as set forth herein, any prior release or discharge from the terms of this Guaranty given to any Guarantor by SLG shall be without effect, and this Guaranty shall remain in full force and effect. Without limiting the foregoing, neither the obligation of any Guarantor to perform or to make payment in accordance with this Guaranty nor any remedy for the enforcement thereof shall be impaired, modified, changed, stayed, released or limited in any manner by any impairment, modification, change, release, limitation or stay of the liability of 245 Park JV or its estate in bankruptcy or any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the Bankruptcy Act or other statute or from the decision of any court interpreting any of the same. No Guarantors obligations hereunder shall be discharged except by such Guarantor's performance of such obligations and then only to the extent of such performance.

**1.9     Waiver of Subrogation, Reimbursement and Contribution**. Notwithstanding anything to the contrary contained in this Guaranty, each Guarantor hereby unconditionally and irrevocably waives, releases and abrogates any and all rights it may now or hereafter have under any agreement, at law or in equity (including, without limitation, any law subrogating any Guarantor to the rights of SLG), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from HNA Member or any other party liable for payment of any or all of the Guaranteed Obligations for any payment made by any Guarantor under or in connection with this Guaranty or otherwise until indefeasible payment in full of the Guaranteed Obligations.

## ARTICLE 2

## REPRESENTATIONS AND WARRANTIES

To induce SLG to enter into the JV Agreement, each Guarantor represents and warrants to SLG as follows:

**2.1** <u>Execution</u>. This Guaranty has been duly executed and delivered by each Guarantor together with a certified true copy of the board resolution, or the shareholder resolution if required by its articles of association, of each of the Guarantors approving this Guaranty and authorizing the execution of this Guaranty by its authorized representative(s) under seal (where appropriate) for and on behalf of each Guarantor.

**2.2** <u>Benefit</u>. Each Guarantor is an Affiliate of 245 Park JV and has received, or will receive, substantial direct or indirect benefit from the giving of this Guaranty and the consummation of the transactions described in the JV Agreement.

**2.3** <u>Familiarity and Reliance</u>. Each Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of HNA Member and 245 Park JV and is familiar with the value of any and all collateral intended to be created as security for the payment of the Guaranteed Obligations; however, no Guarantor is relying on such financial condition or the collateral as an inducement to enter into this Guaranty.

**2.4** <u>No Representation By SLG</u>. Neither SLG nor any other party has made any representation, warranty or statement to any Guarantor in order to induce any Guarantor to execute this Guaranty.

**2.5** <u>Guarantors' Financial Condition</u>. As of the date hereof, and after giving effect to this Guaranty and the contingent obligation evidenced hereby, each Guarantor is, and will be, solvent within the meaning of the United States Bankruptcy Code or any other applicable law, code or regulation, and has and will have assets which, fairly valued, exceed its obligations, liabilities (excluding contingent liabilities) and debts, and has and will have property and assets sufficient to satisfy and repay such obligations and liabilities. All financial statements of each Guarantor heretofore delivered to SLG are true and correct in all material respects and fairly present the financial condition of such Guarantor as of the respective dates thereof, and no materially adverse change has occurred in the financial conditions reflected therein since the respective dates thereof. None of the aforesaid financial statements or any certificate or statement furnished to SLG by or on behalf of any Guarantor in connection with the transactions contemplated hereby, and none of the representations and warranties in this Guaranty contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained therein or herein not misleading.

**2.6** <u>Legality</u>. Each Guarantor represents that it is duly organized, validly existing and good standing under the laws of the jurisdiction of its formation, and each Guarantor has all requisite power and authority to execute, deliver and perform this Guaranty and to consummate the transactions contemplated hereby. The execution, delivery and performance by each Guarantor of this Guaranty and the consummation of the transactions contemplated hereunder do not, and will not, violate, contravene or conflict with any law, statute, regulation, order, writ, injunction or decree of any court or governmental body, agency or other instrumentality applicable to any Guarantor, or result in a breach of any terms, conditions or provisions of, or constitute a default (or an event which with notice or lapse of time or both would constitute a default) under, or result in the breach of, any pledge, indenture, mortgage, deed of trust, charge, lien, or any contract, agreement or other instrument to which any Guarantor is a party or, is applicable to such Guarantor. This Guaranty is a valid, legal and binding obligation of each Guarantor and is enforceable in accordance with

Case 1:22-cv-05136-JGK Document 1-1 Filed 06/17/22 Page 113 of 229

its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights.

**2.7** <u>**Consents**</u>. All consents, approvals, orders or authorizations of, or registrations (other than the SAFE Registration Amendment (as hereinafter defined)), declarations or filings with, all Governmental Authorities (collectively, the "**Consents**") that are required in connection with the valid execution, delivery and performance by each Guarantor of this Guaranty have been obtained and Guarantors agree that all Consents required in connection with the carrying out or performance of any of Guarantors' obligations under this Guaranty will be obtained when required.

**2.8** <u>**Litigation**</u>. There are no actions, suits or proceedings at law or in equity, pending or, to each Guarantor's knowledge, threatened against or affecting any Guarantor or which involve or might involve the validity or enforceability of this Guaranty or which might materially adversely affect the financial condition of any Guarantor or the ability of any Guarantor to perform any of its obligations under this Guaranty. No Guarantor is in default beyond any applicable grace or cure period with respect to any order, writ, injunction, decree or demand of any Governmental Authority which might materially adversely affect the financial condition of such Guarantor or the ability of such Guarantor to perform any of its obligations under this Guaranty.

**2.9** <u>**Solvency**</u>. No Guarantor is insolvent and the execution hereof does not render any of the Guarantors insolvent and (ii) no bankruptcy or insolvency proceedings are pending or contemplated by or, to the knowledge of each Guarantor, any Guarantor.

**2.10** <u>**Survival. All representations and warranties made by Guarantors herein shall survive the execution hereof**</u>.

## ARTICLE 3

## SUBORDINATION OF CERTAIN INDEBTEDNESS

**3.1** <u>**Subordination of All Guarantor Claims**</u>. As used herein, the term "***Guarantor Claims***" shall mean all debts and liabilities, if any, of HNA Member to Guarantor, whether such debts and liabilities now exist or are hereafter incurred or arise, or whether the obligations of HNA Member thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or liabilities be evidenced by note, contract, open account, or otherwise, and irrespective of the Person or Persons in whose favor such debts or liabilities may, at their inception, have been, or may hereafter be created, or the manner in which they have been or may hereafter be acquired by such Guarantor. The Guarantor Claims shall include without limitation all rights and claims of any Guarantor against 245 Park JV or HNA Member (arising as a result of subrogation or otherwise) as a result of such Guarantor's payment of all or a portion of the Guaranteed Obligations, including, without limitation, any right of reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of SLG against either 245 Park JV or HNA Member, whether or not such claim, remedy or right arises in equity or under contract, state or common law, including, without limitation, the right to take or receive from either 245 Park JV or HNA Member, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right. During any time that amounts are due and owing pursuant to this Guaranty, Guarantor shall not receive or collect, directly or indirectly, from 245 Park JV, HNA Member or any other party any amount upon the Guarantor Claims.

**3.2** <u>**Claims in Bankruptcy**</u>. In the event of receivership, bankruptcy, reorganization, arrangement, debtor's relief, or other insolvency proceedings involving any Guarantor as debtor, SLG shall have the right to prove its claim in any such proceeding so as to establish its rights hereunder and receive directly from the receiver, trustee or other court custodian dividends, distributions and payments which would otherwise be payable upon Guarantor Claims. Guarantors hereby assign such dividends and

payments to SLG. Should SLG receive, for application against the Guaranteed Obligations, any such dividend or payment which is otherwise payable to Guarantor, and which, as between SLG and such Guarantor, shall constitute a credit against the Guarantor Claims, then upon payment to SLG in full of the Guaranteed Obligations, such Guarantor shall become subrogated to the rights of SLG to the extent that such payments to SLG on the Guarantor Claims have contributed toward the liquidation of the Guaranteed Obligations, and such subrogation shall be with respect to that proportion of the Guaranteed Obligations which would have been unpaid if SLG had not received dividends or payments upon the Guarantor Claims.

**3.3** **Payments Held in Trust**. Notwithstanding anything to the contrary in this Guaranty, in the event that any Guarantor shall receive any funds, payments, claims or distributions which are prohibited by this Guaranty, such Guarantor agrees to hold in trust for SLG an amount equal to the amount of all funds, payments, claims or distributions so received, and agrees that it shall have absolutely no dominion over the amount of such funds, payments, claims or distributions so received except to pay such funds, payments, claims and/or distributions promptly to SLG, and such Guarantor covenants promptly to pay the same to SLG.

**ARTICLE 4**

**COVENANTS**

(a)     As used in this Article 4, the following terms shall have the respective meanings set forth below:

(i)     "*GAAP*" shall mean generally accepted accounting principles, consistently applied.

(ii)     "*Liquid Assets*" shall mean the liquid assets of a Guarantor in the form of cash, readily marketable securities traded on a national exchange or on the National Association of Securities Dealers Automatic Quotations (NASDAQ), obligations of the United States of America, or guaranteed by the United States of America, corporate debt securities traded on a national exchange, such Guarantor's cash in partnerships in which such Guarantor is a partner (but only to the extent that such cash is available for distribution to such Guarantor and unencumbered), and such other investments as may be acceptable to SLG in its sole discretion.

(iii)     "*Net Worth*" shall mean, as of a given date, (x) the total assets of a Guarantor (excluding the value of such Guarantor's direct and indirect interests in Officer Owner and the Office Tower) as of such date less (y) such Guarantor's total liabilities as of such date, as reflected on such Guarantor's consolidated financial statements and as determined in accordance with GAAP or a generally accepted international standard that corresponds to GAAP that is so certified by an accounting firm based in the jurisdiction of the applicable Guarantor that is both nationally recognized in the jurisdiction of the applicable Guarantor and generally recognized by institutions transacting business in international capital markets.

(b)     Until all of the Guaranteed Obligations have been paid in full, (i) HNA International shall maintain a Net Worth in excess of $5,000,000,000 and shall maintain Liquid Assets in excess of $20,000,000, and (ii) HNA Group shall maintain a Net Worth in excess of $10,000,000,000 and shall maintain Liquid Assets in excess of $1,100,000,000.

(c)     No Guarantor shall sell, pledge, mortgage or otherwise transfer any of its assets, or any interest therein, on terms materially less favorable than would be obtained in an arms-length transaction.

(d)     No Guarantor shall, at any time while a default in the payment of the Guaranteed Obligations has occurred and is continuing, either (i) enter into or effectuate any transaction with any Affiliate which would reduce the Net Worth of such Guarantor or (ii) sell, pledge, mortgage or otherwise transfer to any Person any of such Guarantor's assets, or any interest therein.

(e)     Each Guarantor undertakes to (i) prepare for (or have prepared), execute and deliver all information, documentation and forms to all Governmental Authorities, which are required by such Governmental Authorities for the following ("**Governmental Approvals**"): (i) any required registration with and approval of this Guaranty with the Governmental Authorities; (ii) take all actions that are necessary or desirable to cause such Guarantor to secure the Government Approvals; and (iii) to keep SLG reasonably and regularly apprised of the status of such Government Approvals and to furnish SLG with copies of all notices and or correspondence relevant thereto.

Without limiting the foregoing, HNA Group undertakes to register the terms of this Guaranty with SAFE in the form of an amendment to the Original SAFE Registration in order that (i) the final registration by SAFE of the obligations of HNA Group to make full payment to SLG of the Guaranteed Obligations if, as and when required hereunder is obtained, with such registered obligations being in the amount of $200,000,000 United States dollars, but such amount shall not constitute a limitation on the obligations of Guarantors hereunder and (ii) such registration provides for a registered amount of not less than $200,000,000 United States dollars, subject to the foregoing qualifications, and an expiration date of not earlier than June 30, 2024, which date shall not constitute a fixed date for expiration of Guarantors' liabilities under this Guaranty, it being agreed that there shall be no such fixed expiration date (all of the foregoing, collectively, the "**SAFE Registration Amendment**"). In furtherance of the foregoing, Guarantors agree to (i) provide to SLG, for its review and reasonable approval prior to the submission thereof, all of the documentation (relating to this Guaranty and the JV Agreement) that is to be submitted to SAFE as part of the SAFE Registration Amendment and (ii) make any revisions to such documentation that are reasonably requested by SLG to accurately reflect the transaction contemplated by this Guaranty and the JV Agreement prior to the submission thereof to SAFE. For the avoidance of doubt, if SAFE fails to register properly, as determined by SLG (in the exercise of its sole, but good faith discretion), the $200,000,000 United States dollars amount of this Guaranty and the June 30, 2024 expiration date, then the registration by SAFE of the SAFE Registration Amendment will not have occurred. Guarantors agree to and shall, at their own cost and expense and not the expense of 245 Park JV or SLG, (i) take all action required to maintain the validity and continued effectiveness of the registration of this Guaranty with SAFE until the earlier of June 30, 2024 and the indefeasible payment and performance by the Guarantors of the Guaranteed Obligations and (ii) notify SLG immediately of the occurrence of any SAFE Change that any Guarantor becomes aware of that has or may adversely affect the validity and effectiveness of the SAFE Registration Amendment with SAFE or the enforceability of this Guaranty or any potential arbitration award that may be obtained by SLG with respect thereto and shall take all action reasonably required to restore the validity and effectiveness of such SAFE Registration Amendment or the enforceability hereof or of any potential arbitration award that may be obtained by SLG with respect hereto. If the SAFE Registration Amendment is not completed by December 19, 2018, or such amendment is timely obtained, but then a SAFE Change subsequently occurs, then, in either case, SLG shall be permitted to exercise immediately all of its rights and remedies under the JV Agreement and this Guaranty, including, without limitation, requiring that 245 Park JV effect a Redemption In Full or conduct a Forced Sale (as defined in the JV Agreement) in the absence of a Redemption In Full all in accordance with the JV Agreement.

## ARTICLE 5

## MISCELLANEOUS

**5.1     Waiver**. No failure to exercise, and no delay in exercising, on the part of SLG, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any

other or further exercise thereof or the exercise of any other right. The rights of SLG hereunder shall be in addition to all other rights provided by law. No modification or waiver of any provision of this Guaranty, nor consent to departure therefrom, shall be effective unless in writing and no such consent or waiver shall extend beyond the particular case and purpose involved. No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand.

**5.2    Notices**. All notices, consents, approvals and requests required or permitted hereunder (a "*Notice*") shall be given in writing and shall be effective for all purposes if either hand delivered with receipt acknowledged, or by a nationally recognized overnight delivery service (such as Federal Express), or by certified or registered United States mail, return receipt requested, postage prepaid, or by facsimile and confirmed by facsimile answer back, in each case addressed as follows (or to such other address or Person as a party shall designate from time to time by notice to the other party): If to SLG: c/o SL Green Realty Corp., 420 Lexington Avenue, New York, New York 10170, Attention: Andrew S. Levine, Esq., Facsimile: (646) 293-1356; with a copy to: Greenberg Traurig, LLP, 200 Park Avenue, New York, New York 10166, Attention: Gary S. Kleinman, Esq., Facsimile: (212) 805-9406; if to HNA Member, HNA Group or HNA International: c/o HNA Group North America LLC, 1180 Avenue of the Americas, Suite 1801, New York, New York 10036, Attention:  Duan Wang, Facsimile: (212) 631-9996; with a copy to White & Case LLP, 1221 Avenue of the Americas, New York, New York 10020, Attention: Francis Zou, Esq. and Steven M. Lutt, Esq., Facsimile: (212) 354-8113. SLG shall send additional copies of any Notice that is directed to HNA Member, HNA International or HNA Group to (i) HNA Group (International) Company Limited, 26/F, Three Pacific Place, 1 Queen's Road East, Hong Kong, Attention: Chief Financial Officer, Telecopier: +852 2529 9595, and (ii) HNA Group Co., Ltd., HNA Building, 7 Guoxing Road, Haikou City, Hainan Province, China, Post code: 570203, Attention: Chief Financial Officer, Telecopier +86 898 6887 5312 (with the understanding that SLG's aforesaid notices to the addresses as described in clause (i) and clause (ii) are not required to accomplish effective Notice to HNA Member, HNA International and HNA Group for purposes hereof). A notice shall be deemed to have been given: in the case of hand delivery, at the time of delivery; in the case of registered or certified mail, three (3) Business Days after deposit in the mail; or in the case of overnight delivery, upon the first attempted delivery on a Business Day; or in the case of facsimile, upon sender's receipt of a machine generated confirmation of successful transmission.

**5.3    Governing Law**. This Guaranty shall be governed by, and construed in accordance with, the substantive laws of the State of New York. With respect to enforcement of the parties' agreement to arbitrate any disputes or any awards granted by the arbitrator, in each case, pursuant to Section 5.4, each Guarantor and SLG, by acceptance of this Guaranty, irrevocably, (a) agrees that any suit, action or other legal proceeding arising out of or relating to this Guaranty may be brought in a court of record in the City and County of New York or in the Courts of the United States of America located in the Southern District of New York, (b) consents to the jurisdiction of each such court in any such suit, action or proceeding and (c) waives any objection which it may have to the laying of venue of any such suit, action or proceeding in any of such courts and any claim that any such suit, action or proceeding has been brought in an inconvenient forum. Each Guarantor and SLG, by acceptance of this Guaranty, irrevocably consents to the service of any and all process in any such suit, action or proceeding by service of copies of such process to such party at its address provided in the introductory paragraph hereof. Nothing in this Section 5.3, however, shall affect the right of either party to serve legal process on the other in any other manner permitted by law or affect the right of either party to bring any suit, action or proceeding against the other or its property in the courts of any other jurisdictions.

**5.4    Arbitration**. In the event of any dispute under this Guaranty, such dispute shall be submitted to final and binding arbitration in New York, New York, administered by JAMS in accordance with JAMS Streamlined Arbitration Rules and Procedures, as in effect at that time, by an arbitrator with at least ten years of experience in matters relating to real estate operating companies owning properties similar

to the Property and located in Manhattan. Each party shall submit to such arbitrator its position on each matter in dispute and any applicable materials that it desires that such arbitrator consider in making its determination within seven Business Days following the appointment of the arbitrator. Such arbitrator shall consider only the materials submitted to it for resolution. Each party shall cooperate with JAMS and with the other parties in scheduling the arbitration proceedings so that a final non-appealable award is rendered within 30 calendar days after submission thereof to arbitration, and any notice requirements under Paragraph 14(b) of the JAMS Streamlined Arbitration Rules and Procedures or otherwise may be shortened by such arbitrator in its discretion. The non-prevailing party in such arbitration shall pay all fees and disbursements due to JAMS and the arbitrator as well as the reasonable costs and expenses (including reasonable attorneys' fees and disbursements) of the prevailing party incurred in connection with such arbitration. The arbitrator shall be (i) a disinterested and impartial person and (ii) selected in accordance with Paragraph "12(c)" *et seq.* of the JAMS Streamlined Arbitration Rules and Procedures. Such arbitrator shall be bound by the provisions of this Guaranty and by Applicable Law and shall select the position proposed by a party for each disputed item (and no other position), which, in his or her opinion, would be consistent with applicable legal requirements, not adversely affect the REIT qualification or any reasonable REIT qualification concern of such party or its Affiliates and is more consistent with the prevailing practices for similar entities owning Class A office buildings in Manhattan, and shall notify the parties of its determination. Any decision rendered by such arbitrator with respect to any matter in dispute shall be final, conclusive and binding upon the parties and may be entered and enforced in any court having jurisdiction over any party hereto.

**5.5** **Invalid Provisions**. If any provision of this Guaranty is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Guaranty, such provision shall be fully severable and this Guaranty shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Guaranty, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Guaranty, unless such continued effectiveness of this Guaranty, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

**5.6** **Amendments**. This Guaranty may be amended only by an instrument in writing executed by the party or an authorized representative of the party against whom such amendment is sought to be enforced.

**5.7** **Joint and Several**. All obligations of each Guarantor hereunder are joint and several with those of any other guarantor or surety for all or any part of the Guaranteed Obligations. If there is more than one Guarantor under this Guaranty, all agreements, conditions, covenants and provisions hereof shall be the joint and several liability of each Guarantor. The invalidity or unenforceability of this Guaranty against any Guarantor(s) for any reason whatsoever will not under any circumstance affect the validity or enforceability of this Guaranty against any other Guarantor.

**5.8** **Headings**. Section headings are for convenience of reference only and shall in no way affect the interpretation of this Guaranty.

**5.9** **Recitals**. The recital and introductory paragraphs hereof are a part hereof, form a basis for this Guaranty and shall be considered prima facie evidence of the facts and documents referred to therein.

**5.10** **Counterparts**. To facilitate execution, this Guaranty may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature of, or on behalf of, each party appear on each counterpart. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Guaranty to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto. Any signature

page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.

**5.11** **Rights and Remedies**. If Guarantors become liable for any indebtedness owing to SLG or any Affiliate of SLG, by endorsement or otherwise, other than under this Guaranty, such liability shall not be in any manner impaired or affected hereby and the rights of SLG hereunder shall be cumulative of any and all other rights that SLG or its Affiliates may ever have against Guarantors. The exercise by SLG of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.

**5.12** **Electronic Signature**. A party's transmission of an executed counterpart hereof by electronic means shall be deemed to be effective delivery hereof. If a party so delivers an executed counterpart hereof by electronic means, then such party shall promptly deliver an original counterpart hereof to the other party (with the understanding, however, that the failure of such party to do so shall not impair the enforceability hereof against such party that so delivered a counterpart hereof by electronic means).

**5.13** **Effectiveness**. Notwithstanding anything to the contrary set forth herein, this Guaranty shall amend and restate the Original Guaranty only upon, and automatically without any further documentation after, the receipt of the SAFE Registration Amendment. Unless and until the SAFE Registration Amendment is obtained, the Original Guaranty (and the Original SAFE Registration) shall remain in full force and effect and the Guarantors and SLG shall continue to have all of their respective obligations, rights and remedies thereunder.

*[balance of page intentionally left blank]*

**IN WITNESS WHEREOF**, each Guarantor has executed this Guaranty as of the day and year first above written.

<u>**HNA MEMBER**</u>:

**HNA 245 PARK AVE JV LLC**,
a Delaware limited liability company

By: _____
     Name:  Chen Chao
     Title:
          Authorized Signatory

[Signatures Continue on Next Page]

[Signature Page to Amended and Restated Guaranty]

Case 1:22-cv-05136-JGK   Document 1-1   Filed 06/17/22   Page 120 of 229



**HNA INTERNATIONAL**:

SEALED with the COMMON SEAL of          )
**HNA GROUP (INTERNATIONAL)**          )
**COMPANY LIMITED**          )
and signed by _____*Guo Ke*_____          )
for and on its behalf in the presence of:          )
          )
_____*Mary Xue*_____

By: _____

Name: Guo Ke
Title: Director



[Signatures Continue on Next Page]

[Signature Page to Amended and Restated Guaranty]

**HNA GROUP**:

SEALED with the COMPANY SEAL/公章 of
**HNA GROUP CO., LTD.**,
a company organized under the laws
of the People's Republic of China,
and signed by _Du Liang_
for and on its behalf in the presence of
_WANG, Jinbin_

By: _____
Name: Du Liang
Title: CFO

[Signature Page to Amended and Restated Guaranty]

# EXHIBIT C

## KASOWITZ BENSON TORRES LLP

1633 BROADWAY

NEW YORK, NEW YORK 10019

(212) 506-1700

FAX: (212) 506-1800

ATLANTA

HOUSTON

LOS ANGELES

MIAMI

NEWARK

SAN FRANCISCO

SILICON VALLEY

WASHINGTON DC

Mark P. Ressler
Direct Dial: (212) 506-1752
Direct Fax: (212) 835-5052
MRessler@kasowitz.com

November 19, 2021

By Facsimile and Federal Express

HNA Group (International) Company Limited
c/o HNA Group North America LLC
1180 Avenue of the Americas, Suite 1801
New York, New York 10036
Attn: Duan Wang
Facsimile: (212) 631-9996

> RE:   That certain Amended and Restated Guaranty (the "Guaranty"), dated as of
> November 19, 2018, made by HNA 245 Park Ave JV LLC, a Delaware limited
> liability company ("HNA Member"), HNA Group (International) Company
> Limited, a company organized under the laws of Hong Kong ("HNA International")
> and HNA Group Co., Ltd., a company organized under the laws of the People's
> Republic of China ("HNA Group"), jointly and severally, in favor of 245 Park
> Member LLC, a Delaware limited liability company ("SLG") and delivered in
> connection with that certain Second Amended and Restated Limited Liability
> Company Agreement of 245 Park JV LLC, a Delaware limited liability company,
> between HNA Member and SLG, dated as of November 19, 2018 (the "JV
> Agreement")

Dear Mr. Wang:

We are counsel to SLG in connection with certain matters arising in connection with the
JV Agreement. We write with respect to the Guaranty given by HNA International to SLG as an
inducement to SLG to execute and deliver the JV Agreement. Capitalized terms used herein and
not otherwise defined shall have the meanings set forth in the JV Agreement and the Guaranty.

As you know, HNA Member filed a voluntary petition for bankruptcy in the United States
Bankruptcy Court for the District of Delaware on October 31, 2021 (the "Bankruptcy Filing"),
which, among other events that occurred, is a Cause Event under the terms of the JV Agreement
triggering the Mandatory Redemption Date. Pursuant to the JV Agreement, it shall constitute a
"Cause Event" if HNA Member "shall take any Bankruptcy Action instituting proceedings for

**KASOWITZ BENSON TORRES LLP**

Duan Wang
Page 2

voluntary bankruptcy or shall file a petition seeking reorganization under the Bankruptcy Code, or for relief under any law for relief of debtors, or shall consent to the appointment of a receiver for itself or for all or substantially all of its property, or shall make a general assignment for the benefit of creditors, or shall admit in writing its ability to pay its debts, generally, as they become due, other than in a writing to one or more Lenders."

Pursuant to the terms of the JV Agreement, the Mandatory Redemption Date is the date that is ten (10) days following the occurrence of any Cause Event. The Bankruptcy Filing was filed by HNA Member on October 31, 2021, and therefore the Company was required to cause the Redemption in Full of the Preferred Member Interest not later than November 10, 2021 (i.e. 10 days after the Bankruptcy Filing) in accordance with Section 3.5 of the JV Agreement.

HNA Member has failed to cause a Redemption in Full of the Preferred Member Interest on or before November 10, 2021. As a consequence of such failure, SLG hereby demands, in accordance with Section 1.2 of the Guaranty, that HNA International pay or cause to be paid to SLG the full amount of the Redemption Amount plus all costs, losses, fees, and expenses of whatever kind or nature (including, but not limited to, attorneys' fees and other costs of defense, all of which are not yet subject to determination and therefore may subsequently be included in a revised calculation of the Redemption Amount) incurred by SLG as a result of the Bankruptcy Filing in the amount of $181,720,147.11. Such amount may be paid in accordance with the wire instructions attached hereto as **Exhibit A**.

Nothing contained in this Letter is intended to create or constitute a waiver, modification, relinquishment or forbearance of any of SLG's rights and remedies, all of which rights and remedies are hereby expressly retained and reserved.

Sincerely,

*/s/ Mark P. Ressler*

Mark P. Ressler

cc: White & Case LLP
1221 Avenue of the Americas
New York, New York 10020
Attention: Francis Zou, Esq. and Steven M. Lutt, Esq
Facsimile No.: (212) 354-8113

HNA Group (International) Company Limited
26/F, Three Pacific Place
1 Queen's Road East

**KASOWITZ BENSON TORRES LLP**

Duan Wang
Page 3

Hong Kong
Attention:  Chief Financial Officer
Facsimile No.:  +852 2529 9595

HNA Group Co., Ltd.
HNA Building
7 Guoxing Road
Haikou City
Hainan Province
China
Post Code: 570203
Attention: Chief Financial Officer
Facsimile No.:  +86 898 6887 5312

**EXHIBIT A**

SLG WIRE INSTRUCTIONS



# WIRE INSTRUCTIONS

# FOR

# SL GREEN MANAGEMENT LLC – STRUCTURED FINANCE

:

**BANK NAME:**      Bank of America Merrill Lynch
**BANK ADDRESS:**      101 S. Tryon St.
Charlotte, NC  28255

**SWIFT CODE:**      BOFAUS3N
**WIRE ABA:**      ██████████
**ACH ABA:**      ██████████

**ACCOUNT NAME:**      SL Green Management LLC – Structured Finance
**ACCOUNT NUMBER:**      ██████████

# EXHIBIT D

## JUDICIAL ARBITRATION AND MEDIATION SERVICES

245 PARK MEMBER LLC,

                    Claimant,

            -against-

HNA GROUP (INTERNATIONAL)
COMPANY LIMITED,

                    Respondent.

JAMS Ref. No. 5425000065

Hon. L. Priscilla Hall, Ret.
Arbitrator

## MEMORANDUM OF FACTS AND LAW IN SUPPORT OF 245 PARK MEMBER, LLC'S DEMAND FOR PAYMENT UNDER GUARANTY

KASOWITZ BENSON TORRES LLP
Mark P. Ressler
Paul M. O'Connor III
Henry B. Brownstein
Jasen Fears
1633 Broadway
New York, New York 10019

March 31, 2022

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................... 1

BACKGROUND ....................................................................................... 5

   I.   Respondent's HNA Affiliates Require Significant Investment From Claimant ............... 5

   II.   The Relevant Contracts Protecting Claimant's Significant Investment ........................... 7

      A.   The Joint Venture Agreement ................................................................. 8

      B.   The Unconditional, Absolute and Irrevocable Guaranty ............................. 10

      C.   The Property Management Agreement And Leasing Agreement ................................ 14

   III.   Multiple Cause Events Occurred Prior To, In Connection With,  And After Commencement Of The Bankruptcy ................................................... 16

   IV.   Respondent Failed To Pay The Guaranteed  Obligations Within 10 Days Upon Demand……………… ........................................................................... 18

ARGUMENT ........................................................................................... 18

   I.   Respondent Owes The Guaranteed Obligations Under Section 1.3 of the Guaranty ....... 19

   II.   Respondent Has Waived All Defenses to Payment ........................................... 25

      A.   Respondent Generally Waived All Applicable Defenses ............................. 25

      B.   Respondent's Specific Affirmative Defenses Are Meritless ........................... 27

   III.   Respondent Owes Claimant Its Costs And Expenses Incurred  In Connection With Enforcing the Guaranty ..................................................................... 43

CONCLUSION ......................................................................................... 44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*136 Field Point Circle Holding Co., LLC v. Invar Int'l Holding, Inc.*,
   644 F. App'x 10 (2d Cir. 2016) ...............................................26

*172 Madison (NY) LLC v. NMP Grp., LLC*,
   41 Misc. 3d 1208(A), 977 N.Y.S.2d 668 (N.Y. Sup. Ct. 2013)...............................25

*A.H. Robins Co., Inc. v. Piccinin*,
   788 F.2d 994 (4th Cir. 1986) ...............................................27

*Bakis v. Levitin*,
   3 Misc. 3d 1110(A), 787 N.Y.S.2d 676 (N.Y. Sup. Ct. 2004)...............................21

*Bank of Montreal v. Bailey*,
   No. 91 CIV. 0218, 1992 WL 8342 (S.D.N.Y. Jan. 14, 1992)...............................29

*Brad H. v. City of New York*,
   17 N.Y.3d 180 (2011) ...............................................18

*In re C.W. Mining Co.*,
   422 B.R. 746 (B.A.P. 10th Cir. 2010), *aff'd,* 641 F.3d 1235 (10th Cir. 2011),
   *aff'd, In re C.W. Mining Co.*, 641 F.3d 1235 (10th Cir. 2011) ...............................43

*Cargill Soluciones Empresariales, S.A. de C.V., SOFOM, ENR v. Farallon*,
   146 A.D.3d 439 (1st Dep't 2017) ...............................................44

*Castaldi v. Syosset Cent. Sch. Dist.*,
   No. 2018-10967, 2022 WL 610027 (2d Dep't Mar. 2, 2022)...............................31, 32

*Citibank, N.A. v. Plapinger*,
   66 N.Y.2d 90 (1985) ...............................................33, 34

*Cmty. Nat. Bank v. Hollis Care Grp., Inc.*,
   155 A.D.3d 604 (2d Dep't 2017) (Hall, J.)...............................24

*Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch,
   Pierce, Fenner & Smith Inc.*,
   188 F.3d 31 (2d Cir. 1999)...............................26, 42

*Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A. v. Navarro*,
   25 N.Y.3d 485 (N.Y. 2015) ...............................19, 20, 27

*Cronos Grp. Ltd. v. XComIP, LLC*,
   156 A.D.3d 54 (1st Dep't 2017) ...............................................34

ii

*Daniel v. Croman Real Estate, Inc.*,
No. 151775/14, 2014 WL 6708477 (N.Y. Sup. Ct. Nov. 26, 2014) ....................................28

*DiBuono v. Abbey, LLC*,
95 A.D.3d 1062 (2d Dep't 2012) (Hall, J.)..........................................................................32

*DuBow v. Century Realty, Inc.*,
172 A.D.3d 622 (1st Dep't 2019) .........................................................................................33

*Excelsior Cap., LLC v. Superior Broad. Co.*,
101 A.D.3d 670 (2d Dep't 2012) (Hall, J.)..........................................................................24

*Fairway Prime Est. Mgmt., LLC v. First Am. Int'l Bank*,
99 A.D.3d 554 (1st Dep't 2012) ..........................................................................19, 34, 38, 41

*Hamilton Cap. VII, LLC, I v. Khorrami, LLP*,
48 Misc. 3d 1223(A), 22 N.Y.S.3d 137 (N.Y. Sup. Ct. 2015)................................................21

*Hilgendorff v. Hilgendorff*,
241 A.D.2d 481 (2d Dep't 1997) ........................................................................................35

*HSH Nordbank AG v. UBS AG*,
95 A.D.3d 185 (1st Dep't 2012) ..........................................................................................37

*ImagePoint, Inc. v. JPMorgan Chase Bank, Nat. Ass'n*,
27 F. Supp. 3d 494 (S.D.N.Y. 2014).....................................................................................35

*Indep. Bank v. Valentine*,
113 A.D.3d 62 (2d Dep't 2013) ...........................................................................................28

*JPMorgan Chase Bank, N.A. v. Bauer*,
92 A.D.3d 641 (2d Dep't 2012) (Hall, J.)............................................................................24

*JPMorgan Chase Bank, N.A. v. KB Home*,
740 F. Supp. 2d 1192 (D. Nev. 2010) ..................................................................................31

*Kanterakis v. Minos Realty I, LLC*,
40 Misc. 3d 1221(A), 977 N.Y.S.2d 667 (N.Y. Sup. Ct. 2013).............................................36

*Midland Bank, N.A. v. Idar Gem Distributors, Inc.*,
133 A.D.2d 525 (4th Dep't 1987) ........................................................................................38

*Moody v. Amoco Oil Co.*,
734 F.2d 1200 (7th Cir. 1984) .............................................................................................43

*N. Fork Bank v. Computerized Quality Separation Corp.*,
62 A.D.3d 973 (2d Dep't 2009) ...........................................................................................31

*NYAHSA Servs., Inc. Self Ins. Tr. v. People Care Inc.*,
45 Misc. 3d 1225(A), 2014 WL 6889704 (N.Y. Sup. 2014) ..................................................34

*NYSOS Assocs., LLC v. Ottomanelli*,
49 Misc. 3d 60 (N.Y. App. Term. 2015)...............................................................................44

*Porter v. Home Depot U.S.A., Inc.*,
No. 12-CV-4595 NGG CLP, 2015 WL 128017 (E.D.N.Y. Jan. 8, 2015) .............................40

*Provident Bank v. Joyce*,
111 A.D.3d 913 (2d Dep't 2013) (Hall, J.)............................................................................24

*In re PWM Property Management LLC, et al.*,
No. 21-1788, 21-1814, 21-1827, 21-92-MN (D. Del.), Dkt. Nos. 3, 6, 7, 14,
16, 17, 33..............................................................................................................................23

*In re PWM Property Management LLC, et al.*,
No. 21-BK-11445 (MFW) (D. Del.), Dkt. No. 12 .............................................................17, 23

*RCG LV Debt IV Non-Reit Assets Holdings, LLC v. Ringel*,
54 Misc. 3d 1205(A), 50 N.Y.S.3d 28 (N.Y. Sup. Ct. 2016)................................................25

*Red Tulip, LLC v. Neiva*,
44 A.D.3d 204 (1st Dep't 2007) ...........................................................................................30

*Salameno v. Rawlings*,
No. 19CIV4442PGGBCM, 2021 WL 1085521 (S.D.N.Y. Mar. 22, 2021) ...........................30

*San Diego Cty. Emps. Ret. Ass'n v. Maounis*,
749 F.Supp.2d 104 (S.D.N.Y. 2010)....................................................................................33

*Tchrs. Ins. & Annuity Ass'n of Am. v. Butler*,
803 F.2d 61 (2d Cir. 1986)...................................................................................................27

*UBS Com. Mortg. Tr. 2007-FL1 v. Garrison Special Opportunities Fund L.P.*,
33 Misc. 3d 1204(A), 938 N.Y.S.2d 230 (N.Y. Sup. Ct. 2011)............................................25

*In re United Health Care Org.*,
210 B.R. 228 (S.D.N.Y. 1997)..............................................................................................27

*VNB New York, LLC v. Y.M. Intercontinental Gem Corp.*,
154 A.D.3d 903 (2d Dep't 2017) ..........................................................................................19

*World Ambulette Transportation, Inc. v. Kwan Haeng Lee*,
161 A.D.3d 1028 (2d Dep't 2018) .........................................................................................18

Claimant 245 Park Member LLC ("Claimant") hereby submits its memorandum of facts and law in support of its demand for "punctual and complete payment in full" against respondent HNA Group (International) Company Limited ("Respondent"), as Guarantor, pursuant to the Amended and Restated Guaranty dated November 19, 2021 (the "Guaranty").

## PRELIMINARY STATEMENT

This arbitration arises from Respondent's failure to comply with its obligations, as Guarantor, to pay Claimant almost $190 million in "Guaranteed Obligations" due and owing pursuant to the Guaranty. Respondent and two of its affiliates, part of Chinese conglomerate HNA Group (collectively, "HNA"), entered into the Guaranty to ensure that Claimant, an affiliate of real estate company SL Green Realty Corp. ("SLG"), would make a desperately needed investment of $148 million in a marquee commercial office tower at 245 Park Avenue in New York City (the "Property"). The purpose of the Guaranty was to ensure Claimant is repaid on its investment in the event HNA engaged in certain specified actions that might jeopardize Claimant's investment. If HNA engaged in those actions, the Guaranty unambiguously provides that Respondent "unconditionally, absolutely and irrevocably, as a primary obligor … guarantees to SLG the punctual and complete payment in full" of various amounts related to, among other things, SLG's investment, along with legal fees and expenses arising from HNA's actions. Underscoring the ironclad nature of Respondent's payment obligations, the Guaranty repeatedly and unambiguously states that Respondent—a sophisticated global corporation, represented by a global law firm—"irrevocably and unconditionally" waives its rights to refuse or otherwise contest payment.

There is no dispute that HNA actions triggering Respondent's payment obligations occurred. Those trigger events included, among other things, the filing of a voluntary petition for bankruptcy by Respondent's affiliates, HNA 245 Park Ave JV LLC and its subsidiaries and

affiliates, in the District of Delaware on October 31, 2021 (the "Bankruptcy"), and the appointment of so-called "Independent Agents" for the purpose facilitating the Bankruptcy. Upon learning that the trigger events occurred, Claimant demanded, on November 19, 2021, that Respondent pay its "Guaranteed Obligations," totaling almost $190 million, consisting of amounts related to SLG's investment and expenses.  In flagrant breach of the Guaranty, Respondent not only refused to honor its clear contractual obligation and pay, but has dragged out these arbitration proceedings through months of expensive and time-consuming delay tactics.

It is important to note that the Guaranty is a standard contract frequently used by sophisticated commercial parties.  In the context of high-value commercial real estate transactions, it is common for a party such as HNA, which bought the Property for $2.21 billion in May 2017, to guaranty payment obligations in connection with a capital infusion.  HNA was particularly eager to obtain an investment from SLG, New York City's largest owner of office real estate, that has long been regarded as one of the country's leading Real Estate Investment Trusts, or REITs.  As a condition to making the investment in an HNA affiliate, SLG sought to protect itself against a variety of risks—including that its new HNA joint venture partner would go bankrupt or engage in other conduct that could jeopardize SLG's investment.

Given the inherent volatility, from a geopolitical perspective, of investing with Chinese companies, it was particularly important to SLG that the Guaranty be in place to safeguard its investment.  The entire point of the Guaranty, after all, was to ensure that SLG, an investor in the Property, could obtain sure and rapid recovery from a guarantor if the trigger events took place.  Those trigger events related to scenarios—such as the bankruptcy of HNA entities, or

HNA making decisions on key matters without SLG's consent—that could jeopardize SLG's investment.

Confirming the validity of SLG's concerns, HNA began to unravel within a few years of SLG's investment.  Formerly valued at more than $100 billion, HNA went into a free-fall:  it filed for bankruptcy in China; its founders were imprisoned by Chinese regulators; many of its trophy assets around the world were sold off; and nearly $10 billion of its funds were embezzled.  Knowing that its collapse could provide SLG with certain rights, HNA sought to strip SLG of those rights by putting the Property into bankruptcy, along with two out of the three HNA affiliates who are Guarantors under the Guaranty, and by making key decisions without SLG's consent.  Respondent, however, is not in bankruptcy, and, as a Guarantor under the Guaranty, it bears joint and several liability to pay Claimant the $190 million that is due and owing in Guaranteed Obligations.

The issues presented by Claimant's demand for payment under the Guaranty are straightforward, as the Guaranty's plain language could not be more definitive.  Claimant has clearly met the three elements to recover under an "unconditional and absolute" guaranty such as the Guaranty here:  there is a valid guaranty and there is an underlying amount that is due, owing and immediately payable thereunder, and the guarantor failed to pay.  As to the Guaranty's validity, Respondent and its attorneys separately represented to Claimant that the Guaranty is valid, and, to remove any doubt, Respondent explicitly waived any invalidity defense in the Guaranty itself.  In addition to an invalidity defense, Respondent waived "irrevocably and unconditionally any common law, equitable or statutory or other rights"— including 22 specifically enumerated rights and defenses, along with "any [] circumstance which might in any manner or to any extent constitute a defense available to Guarantors."  As to

3

the underlying amount owed, the Guaranteed Obligations is a defined term in the Guaranty and comprises the amounts Claimant is entitled to recover. As to Respondent's breach, there is no dispute that Respondent has not paid the "Guaranteed Obligations."

Notwithstanding that (i) Respondent "unconditionally, absolutely and irrevocably" guaranteed payment of the Guaranteed Obligations to Claimant, (ii) the trigger events giving rise to "punctual and complete payment in full" have occurred, and (iii) Respondent broadly waived "irrevocably and unconditionally" any and all defenses, Respondent refuses to pay. Instead, it asserts five affirmative defenses, all of which are waived, baseless and frivolous. As demonstrated below, Respondent's defense based on the Bankruptcy Code's automatic stay provision fails because Respondent is not a debtor in the Delaware bankruptcy proceeding and the Bankruptcy Court did not extend the automatic stay to this arbitration. Respondents' other affirmative defenses are either not affirmative defenses at all (such as failure to state a claim), have been expressly waived in the Guaranty (such as fraudulent inducement), or have no basis in fact or law (such as fraud or *in pari delicto*).

It is difficult to imagine a clearer and less controversial contractual obligation to pay than Respondent's obligation to pay Claimant the Guaranteed Obligations. A massive and sophisticated multinational conglomerate, HNA, secured a much-needed cash infusion from a top real estate company, SLG. To safeguard its investment in the Property, SLG insisted that HNA provide the protections set forth in the Guaranty, including the immediate payment of certain amounts in the event certain specified events occurred, without regard to any of the defenses that might otherwise theoretically be available to HNA. Those events, including HNA's bankruptcy, did occur, triggering Claimant's right to obtain immediate payment. Accordingly, Claimant respectfully requests that Your Honor enter judgment in its favor,

awarding Claimant (i) all of the Guaranteed Obligations, totaling more than $190 million and rising, that are now due and payable, (ii) all of the Guaranteed Obligations that will be due and payable in the future, including all legal fees, costs and expenses it will incur on an ongoing basis in connection with the Bankruptcy, and  (iii) all legal fees, costs and expenses it will incur in this arbitration, and on an ongoing basis, to enforce the Guaranty.

## **BACKGROUND**

### I.     **Respondent's HNA Affiliates Require Significant Investment From Claimant**

HNA's United States affiliates—HNA 245 Park Ave JV LLC ("HNA JV Member"), 245 Park JV LLC (the "Company"), 245 Park Ave Mezz C LLC, 245 Park Ave Mezz B LLC, 245 Park Ave Mezz A LLC and 245 Park Avenue Property LLC (collectively "HNA USA")— acquired the Property in May 2017, paying $2.21 billion to Brookfield Property Partners LP and the New York State Teachers' Retirement System.[1]  At the time, the purchase was one of the most expensive ever for a Manhattan building, and was hailed by real estate analysts as an indication "that the Chinese appetite for New York real estate—and trophy assets—is still there."[2]  A 1.7 million-square-foot skyscraper well positioned near Grand Central Station, the Property was viewed by observers as a future source of "synergistic revenue" for HNA, whose main source of business had been operating Hainan Airlines in China.[3]

HNA USA initially owned the Property alone:  HNA JV Member is the 100% owner of the Company, which in turn was the 100% indirect owner of the Property.[4]  The Company's subsidiaries, which include other direct and indirect owners of the Property, are special purpose vehicles that financed the acquisition of the Property ("HNA Subsidiaries").[5]  The Subsidiaries

---

[1] Affirmation of Mark Ressler, sworn to on March 31, 2022 ("Ressler Aff."), Ex. 14 [First Day Aff.].
[2] Ressler Aff., Ex. 8 [China Daily article].
[3] *Id*.
[4] Affidavit of Harrison Sitomer, sworn to on March 31, 2022 ("Sitomer Aff."), ¶ 5.
[5] Sitomer Aff. ¶ 6.

Case 1:22-cv-05136-JGK   Document 1-1   Filed 06/17/22   Page 139 of 229

are: 245 Park Ave Mezz C LLC, 245 Park Ave Mezz B LLC, 245 Park Ave Mezz A LLC and

245 Park Avenue Property LLC.[6]

Shortly after HNA USA acquired the Property, however, the Chinese parent entity,

HNA Group, required a significant amount of additional capital.[7]  As reported in the press, only

eight months after buying the Property, "HNA Group Co., the once-voracious hunter of global

trophy assets, is seeking to sell more than $6 billion in properties worldwide as pressure

intensifies for the Chinese conglomerate to speed up disposals so it can repay its debts."[8]  But

while HNA shed other real estate assets to come up with cash, it did not seek to sell the

Property.  Rather it sought to use the Property as an alternative source of liquidity by offering a

preferential equity position to an investor.  As HNA's global liquidity needs became more

acute, it turned to SLG to make that investment, given that SLG is New York City's largest

owner of commercial office space, is a well-regarded Class-A property manager, and is an

experienced investor in assets similar to the Property with the financial resources to fund the

investment quickly.[9]  On or about June 22, 2018, Claimant made a preferred equity investment

in the Company then totaling $148 million.[10]  The ownership structure after Claimant's

investment is reflected as follows:

---

[6] Sitomer Aff. ¶ 6.
[7] Sitomer Aff. ¶ 7.
[8] Ressler Aff., Ex. 7 [Bloomberg article].
[9] Sitomer Aff. ¶ 8.
[10] Sitomer Aff. ¶ 7; *id.*, Ex. 1 [JV Agreement] § 3.1(b).



## II.    The Relevant Contracts Protecting Claimant's Significant Investment

Like any sophisticated real estate investor, SLG insisted that it obtained maximum

protection, via a financial guaranty, given that it was investing $148 million with a highly

leveraged Chinese-owned company.  HNA Group, headquartered in Haikou, Hainan, China,

began as a regional Chinese airline and grew to own large stakes in Hilton Hotels, Deutsche

Bank, Virgin Australia and others, and, at its height, employed 400,000 people around the world

and was valued at over $100 billion.[11]  And completely validating SLG's insistence that it have

an ironclad guaranty to backstop its investment, HNA Group is now being dismantled, spiraling

downward as its founders remain in Chinese prisons, its trophy assets are being sold off as if in

a fire sale and nearly $10 billion of its funds have been siphoned away.[12]

---

[11]  Ressler Aff., Ex. 9 [Stevenson article].
[12]  *See* Ressler Aff., Exs., 9, 10 [Bradsher article].

Accordingly, as consideration and express "inducement" for the $148 million preferred equity investment in the Company, SLG negotiated for and secured substantial contractual rights and protections, including the absolute, unconditional, and irrevocable Guaranty at issue here, without which SLG would not have made such a significant investment.[13]  Again, lest there be any doubt as to the fact that the Guaranty was critical to SLG making the $148 million investment, the Guaranty itself explicitly states that having Respondent and the other HNA Guarantors assume absolute and unconditional payment obligations was "an inducement" to Claimant to enter into the JV Agreement and make its investment in the Property.[14]

### A.     The Joint Venture Agreement

In connection with Claimant's equity investment in the Company, on or about June 22, 2018, Claimant and HNA JV Member entered into the Amended and Restated Limited Liability Company Agreement, which was subsequently amended on November 19, 2018 (the "JV Agreement").[15]

**Mandatory Distributions.**  Under the JV Agreement, Claimant is entitled to preferred quarterly distributions, defined as "Mandatory Distributions."[16]  The parties agreed that distributions of the Mandatory Distribution could come from any source: "operating cash flow [from the Property] or from the sale, exchange or other disposition of financing of all or any portion of any securities or other assets or property, or otherwise derived."[17]

**Redemption Amount.**  Separate from Mandatory Distributions, Claimant is also entitled to full payment of the "Redemption Amount" by the "Mandatory Redemption Date,"

---

[13] Sitomer Aff. ¶ 10; *see also id.*, Ex. 2 [Guaranty].
[14] Sitomer Aff., Ex. 2 [Guaranty] at 1 ("Recitals").
[15] Sitomer Aff. ¶7, Ex. 1 [JV Agreement].
[16] Sitomer Aff., Ex. 1 [JV Agreement] § 9.2; *id* at 18 (definition of "Mandatory Distribution").
[17] *Id.* § 9.1.

specified as no later than June 30, 2022.[18]  The Redemption Amount is defined in the JV

Agreement as:

> "Redemption Amount" means, as of any date, the sum of (a) the
> aggregate accrued and unpaid Preferred Equity Return (computed
> at the then applicable rate and giving effect to any compounding
> in accordance with Section 3.3), (b) the Net Preferred Equity
> Investment, (c) the Make Whole Premium, if applicable and (d)
> any other amounts due and payable to the Investor Member under
> this Agreement.[19]

In plain English, the Redemption Amount is essentially the sum of the Claimant's $148 million

investment plus a contractually agreed-to return on the investment, and a minimum guaranteed

return.[20]  The "Preferred Equity Return" referenced in part (a) is the return component, the "Net

Preferred Equity Investment" referenced in part (b) is the investment component, and the "Make

Whole Premium" referenced in part (c) is the guaranteed minimum return component.[21]  Each is

discussed in greater detail below.

HNA JV Member agreed that "the payment of the Redemption Amount on the

Mandatory Redemption Date is an ***affirmative and absolute obligation of the Company***,

irrespective of the sufficiency of funds or of Net Cash Flow [from the Property] or Capital

Proceeds."[22]

**Consent rights to Major Decisions.**  Under the JV Agreement, to further protect its

investment, Claimant negotiated for, and obtained, consent rights to 43 defined "Major

Decisions" of the Company and each of the Subsidiaries.  These Major Decisions include

"effectuating capital expenditures not provided for in" an agreed-to budget, approving the

---

[18] Sitomer Aff., Ex. 1 [JV Agreement] § 3.5; *id*. at 18 (definition of "Mandatory Redemption Date"); *id*. at 23
(definition of "Redemption Amount").
[19] Sitomer Aff., Ex. 1 [JV Agreement] at 23(definition of "Redemption Amount").
[20] Sitomer Aff. ¶ 25.
[21] Sitomer Aff. ¶ 25.
[22] Sitomer Aff., Ex. 1 [JV Agreement] § 9.4 (emphasis added).

9

budget, entering into "any contract pursuant to which the Company will incur an obligation in excess of $100,000 per year," the right to consent to **filing for bankruptcy**, entering into "any agreement" with any "leasing agent, property manager . . . to render services for the Company or any Subsidiary," "making any amendment or modification to this Agreement or the Certificate of Formation, or to the organizational documents of any Subsidiary," and engaging "accountants, . . . advisors, attorneys . . . or other professionals to render services for the Company or any of its Subsidiaries."[23]

Making a Major Decision without the consent of Claimant constitutes a "Cause Event" under the JV Agreement.[24]  Filing a petition for bankruptcy is also a "Cause Event" under the JV Agreement.[25]  The occurrence of a Cause Event accelerates the date by which the Company must pay the Redemption Amount from June 30, 2022, to "ten (10) days following the occurrence of any Cause Event."[26, 27]

### B.    The Unconditional, Absolute and Irrevocable Guaranty

Claimant entered into the Guaranty with three separate HNA entities:  Respondent, HNA JV Member and HNA Group Co. Ltd. (collectively, the "HNA Guarantors").[28]  The

---

[23] Sitomer Aff., Ex. 1 [JV Agreement] § 4.2; *id*. at 13-17 (definitions (a), (d), (p), (t), (z), (aa), (jj), (nn) and (oo) of "Major Decision").

[24] Sitomer Aff., Ex. 1 [JV Agreement] at 6 (definition (b) of "Cause Event").

[25] Sitomer Aff., Ex. 1 [JV Agreement] at 6 (definition (d) of "Cause Event").

[26] Sitomer Aff., Ex. 1 [JV Agreement] at 18 (definition of "Mandatory Redemption Date").

[27] The Company's failure to pay the full Redemption Amount by the accelerated Mandatory Redemption Date is a "Redemption Trigger Event," which provides additional protection to Claimant in connection with its investment.  Among other things, a Redemption Trigger Event rearranges the payment waterfall such that Claimant receives all excess cash flows, not just the Mandatory Distribution amount, until the Redemption Amount is paid in full.  Sitomer Aff., Ex. 1 §§ 9.2(a), 9.2(b).  Also upon a Redemption Trigger Event, Claimant "is entitled to exclusive, complete and full operational control of the Property," and HNA JV Member agreed "to facilitate and cooperate with such immediate transfer of managerial and operational control . . . ."  *Id*. § 11.5(f).  And, Claimant has "Forced Sale" rights that "shall occur automatically," and "without the requirement of any action from either Member."  *Id*. § 11.4(a).  As part of its Forced Sale rights, Claimant can, at its sole option, choose to buy either the Property, the Company's direct and indirect equity interests in the Subsidiaries, or HNA JV Member's interest in the Company.  *Id*. §§ 11.4(a), 11.4(b).

[28] Sitomer Aff., Ex. 2 [Guaranty].

Guaranty expressly provides that "as an inducement to [Claimant] to execute and deliver the JV Agreement and to extend the term of the Preferred Equity Investment . . . , and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, each Guarantor" agreed to the terms of the Guaranty.[29]

### i.       Respondent And The Other HNA Guarantors Agree To Guaranteed Obligations That Are Unconditional, Absolute And Irrevocable

Pursuant to the Guaranty, the HNA Guarantors "unconditionally, absolutely and irrevocably" guaranteed to Claimant "the punctual and complete payment in full (and not merely the collectability) of and shall pay or cause to be paid" the "Guaranteed Obligations."[30] The Guaranteed Obligations are defined, in relevant part, as: (i) "the full amount of the Redemption Amount, if, as and when the Redemption Amount becomes due and payable by [HNA JV Member under the JV Agreement]," and (ii) "all costs, expenses, losses, liabilities, obligations [and] debts . . . of whatever kind or nature (including, but not limited to, attorneys' fees and other costs of defense) that arise by reason of or are in any way related to . . . (C) the filing of any petition for bankruptcy . . . by or against, consented to or acquiesced in by, HNA Member, [the Company], or the Guarantors."[31]

### ii.      Respondent And The Other HNA Guarantors Waive Their Rights And Defenses

As part of the "unconditional, absolute and irrevocable" nature of the Guaranty, each of the HNA Guarantors agreed that "the liability of Guarantors under this Guaranty shall not be affected, released, terminated, discharged or impaired, in whole or in part, by, and [Claimant] may proceed to exercise any right or remedy hereunder irrespective of, and Guarantors

---

[29] *Id*. at 1 ("Recitals").
[30] *Id*. § 1.2.
[31] *Id*. § 1.2.

11

irrevocably and unconditionally waive any common law, equitable, statutory or other right which Guarantor might possess as a result of or in connection with, any or all of" 22 rights and defenses (the "Waived Rights and Defenses").[32]  The Waived Rights and Defenses include, as relevant here:

> (i)   any lack of genuineness, regularity, validity, legality or enforceability, or violability of . . . any [] agreement or instrument related to the Preferred Equity Interest;

> (iii)   any renewal, extension, increase, modification, alteration or rearrangement of all or any part of . . . the JV Agreement;

> (iv)   any change in the time . . . of payment of all or any portion of the Preferred Equity Investment or Preferred Return to Claimant;

> (xi)   any [] circumstance which might in any manner or to any extent constitute a defense available to Guarantors . . . ;

> (xiv)   the insolvency, bankruptcy, arrangement, adjustment, . . . or lack of power of [the Company or] HNA [JV] Member . . .;

> (xv)   to the maximum extent permitted by applicable law, the invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations, the Preferred Equity Investment, the Preferred Return, the Redemption Fee, the JV Agreement . . . for any reason whatsoever, including without limitation . . . (E) [the Company] has valid defenses, claims or offsets (whether at law, in equity or by agreement) which render the Preferred Equity Investment, the Preferred Return or the Redemption Fee wholly or partially uncollectible from [the Company] . . . (G) the unenforceability of any remedies of [Claimant] under the JV Agreement . . .;

> (xvi)   any full or partial release of the liability of HNA [JV] Member [or the Company] for the obligations of the [the Company], or any part thereof . . . to pay, perform or assure the payment of the Preferred Equity Investment, the Preferred Return and/or the Redemption Fee or any part thereof . . .;

---

[32] *Id.* § 1.3.

(xvii)   any existing or future right of offset, claim or defense of HNA [JV] Member against [the Company], [Claimant] . . . or against payment of the Preferred Equity Investment, the Preferred Equity Return and/or the Redemption Fee or to otherwise effect a Redemption in Full . . .; or

(xxii)   any other action taken or omitted to be taken with respect to the Preferred Equity Investment, the JV Agreement, or the Guaranteed Obligations . . . .[33]

The HNA Guarantors further assured Claimant that it was their "unambiguous and unequivocal intention . . . that Guarantors shall be obligated to fulfill the Guaranteed Obligations and all liabilities under this Guaranty." *Id* § 1.3.

Finally, the HNA Guarantors agreed that if they failed to pay the Guaranteed Obligations within 10 days after demand, they would "pay [Claimant] all costs and expenses (including court costs and reasonable attorneys' fees) incurred by [Claimant] in the enforcement hereof or the preservation of [Claimant's] rights hereunder."[34]

### iii.   Respondent And Its Counsel Confirm In Writing The Validity And Enforceability Of The Guaranty

On November 19, 2018, Respondent executed an Officer's Certificate, which attached a true and correct copy of its Certificate of Incorporation, current Business Registration Certificate, Articles of Association, Certificate of Continuing Registration, Register of Directors and, most relevant here, board minutes approving the Guaranty.[35]

In the board minutes, the directors of Respondent resolved, among other things, that:

(i)   entering into the Guaranty was "commercially beneficial, in the best interests of the [Respondent] and for proper purposes," such that Respondents' directors "approved, confirmed and ratified [it] in all respects."; and

---

[33] *Id*. § 1.3.
[34] *Id*. § 1.7.
[35] Sitomer Aff., Ex. 3.

(ii)    any of the Directors was authorized to sign the Guaranty "with the intent to bind the Company . . . ."[36]

Also on November 19, 2018, Respondent's lawyers at White & Case LLP ("White & Case") provided Claimant and SLG with a legal opinion under Hong Kong law in connection with Respondent's obligations under the Guaranty (the "White & Case Legal Opinion"), confirming its enforceability.[37]  The White & Case Legal Opinion stated that, under Hong Kong law, among other things, (i) Respondent had the capacity to enter into the Guaranty and to perform thereunder, (ii) the execution of the Guaranty was duly authorized and not in violation Hong Kong law, (iii) Respondent duly executed the Guaranty,  (iv) the choice of New York law in the Guaranty "will be recognized and given effect by a Hong Kong court . . .", (v) "the Hong Kong court will recognize and give effect to the agreement to arbitrate" in the Guaranty, and (vi) any award following an arbitration [pursuant to the Guaranty] could be enforceable through Hong Kong courts . . . ."[38]

### C.    The Property Management Agreement And Leasing Agreement

Prior to HNA's purchase of the Property in May 2017 and through September 2018, Newmark Knight Frank ("Newmark") was the leasing agent for the Property.[39]  In or about September 2018, prior to Claimant's investment, Cushman & Wakefield, Inc. had been the leasing agent for the Property, and Jones Lang LaSalle Inc. ("JLL") became the property manager of the Property.[40]  As additional protection for its investment, however, Claimant ensured that one of its affiliates became the exclusive management and leasing agent for the Property.[41]

---

[36] Sitomer Aff., Ex. 3 at p. 32 of the PDF, §§ 4(a), 4(d).
[37] Sitomer Aff., ¶ 15, Ex. 4.
[38] Sitomer Aff., Ex. 4 at 2-3.
[39] Sitomer Aff. ¶ 16.
[40] Sitomer Aff. ¶ 16; see also id., Ex. 6 [Management Agreement] § 8.1; Ex. 5 [CW Termination Notice].
[41] Sitomer Aff. ¶ 17.

Accordingly, on or about November 19, 2018, SLG Management entered into the
Property Management and Leasing Agreement (the "Management Agreement") with the HNA
Subsidiary that is the direct owner of the Property (the "Owner").[42]  Under the Management
Agreement, SLG Management is the "exclusive management agent for the Property," "the
exclusive leasing agent for the Property," and is "responsible for the day-to-day management,
maintenance and operation of the Property."[43]

The term of the Management Agreement is co-extensive with the Mandatory
Redemption Date under the JV Agreement, *i.e.*, "through June 30, 2022."[44]  The Management
Agreement can terminate earlier due to SLG Management's "Material Breach" or "PM Bad
Act," defined as an act of fraud or willful misconduct or misappropriating funds.[45]  In the event
of a Material Breach, however, SLG Management is afforded written notice and 30-to-90-day
cure rights.[46]  Similarly, the Owner has no right to terminate the Management Agreement for
either a Material Breach or a PM Bad Act if SLG Management takes certain remedial steps to
cure such breach.[47]

The Owner has never invoked the Management Agreement's termination procedures
because of any alleged misconduct by SLG Management, including breach, fraud or any other
improper action.[48]

---

[42] Sitomer Aff., Ex. 6 [Management Agreement].
[43] *Id*. §§ 2, 3.
[44] *Id*. §§ 13.1, 13.5.
[45] *Id*. § 13.2.
[46] *Id*.
[47] *Id*.
[48] Sitomer Aff. ¶ 20.

15

### III.    Multiple Cause Events Occurred Prior To, In Connection With, And After Commencement Of The Bankruptcy

Beginning in the second half of October 2021, HNA JV Member, the Company and the

HNA Subsidiaries (collectively, the "Debtors") made a series of Major Decisions without

Claimant's knowledge and without seeking, much less obtaining, Claimant's consent.[49]  These

Major Decisions occurred prior to, in connection with, and after the commencement of the

Bankruptcy, and included, among other things, the following:

a. **Filing for Bankruptcy, Modifying Agreements, And Hiring Additional Professionals.**  On October 31, 2021, the Debtors: (i) removed their Independent Managers, (ii) filed petitions for bankruptcy under Chapter 11 of the Bankruptcy Code, (iii) filed a motion to reject the Management Agreement in the Bankruptcy without ever claiming a "Material Breach" or "PM Bad Act" thereunder, (iv) engaged Young Conaway Stargatt & Taylor, LLP to act as local counsel for the Bankruptcy, (v) engaged MS Advisory Partners LP to act as restructuring advisor, and (vi) engaged Omni Agent Solutions to act as claims and noticing agent and administrative advisor, all as covered by definitions (t), (z), (aa),  (nn) and (oo) of Major Decision.[50]

b. **Hiring Agents And Modifying Agreements.**  On October 29, 2021, the Debtors appointed two so-called "Independent Agents" for $20,000 a month each for the sole purpose of facilitating the Bankruptcy filing, thereby "engaging . . . professionals to render services for the Company [and] its Subsidiaries," modifying the Joint Venture's organizational documents, and entering into contracts for more than $100,000 in compensation per year as set forth in definitions (t), (jj), (nn) and (oo) of Major Decision.[51]

c. **Hiring a Chief Restructuring Officer.**  On October 25, 2021, the Debtors hired a Chief Restructuring Officer, thereby "engaging . . . professionals to render services for the Company [and] its Subsidiaries" as set forth in definitions (nn) and (oo) of Major Decision.[52]

d. **Hiring Lawyers.**  On or before October 17, 2021, the Debtors engaged White & Case as restructuring counsel, thereby "engaging . . . professionals to render services for the Company [and] its Subsidiaries" as set forth in definitions (nn) and (oo) of "Major Decision."[53]  *See* Ressler Aff., Ex. 2 at 20:12-21 (testifying that "debtor's

---

[49] Sitomer Aff. ¶ 21.

[50] Sitomer Aff., Ex. 1 [JV Agreement] at 13 *et seq*. (Definition of Major Decision); Ressler Aff., Ex. 3, Ex. 4.

[51] Sitomer Aff., Ex. 1 [JV Agreement] at 13 *et seq*. (Definition of Major Decision); Ressler Aff., Ex. 5 [MTD Transcript] at 70:21 -71:10.

[52] Sitomer Aff., Ex. 1 [JV Agreement] at 17; Ressler Aff., Ex. 5 [MTD Transcript] at 18:6-13.

[53] Sitomer Aff., Ex. 1 [JV Agreement] at 17; Ressler Aff., Ex. 5 [MTD Transcript] at 19:10-14.

representative" "from White & Case, Mr. Greg Pesce," first contacted him "October 17, [2021]").[54]

Each of these Major Decisions, which the Debtors made without Claimant's consent, constituted separate Cause Events, all distinct from and independent of the filing of the Bankruptcy petition itself.  The first Cause Event—hiring White & Case no later than October 17, 2021—accelerated the Mandatory Redemption Date to no later than October 27, 2021, *i.e.*, four days before the Bankruptcy.[55]  The other Cause Events accelerated the Mandatory Redemption Date to no later than November 10, 2021.[56]

The Company failed to pay the Redemption Amount by October 27, 2021, or on any other date.[57]

Claimant retained the following law firms in connection with the Bankruptcy:  Willkie Farr & Gallagher LLP, as lead counsel; Morris, Nichols, Arsht & Tunnell LLP, as local counsel; Cole Schotz, P.C., as advisory counsel; Kasowitz Benson Torres LLP ("Kasowitz"), as advisory counsel; and Greenberg Traurig LLP, as advisory counsel.[58]  Claimant has incurred legal fees, costs and expenses in connection with the Bankruptcy and, because the Bankruptcy is ongoing, Claimant will continue to incur such legal fees, costs and expenses.

---

[54] Mr. Gregory F. Pesce is among the White & Case attorneys listed on the Debtors' Bankruptcy petition as the "proposed counsel to Debtors and Debtors-in-Possession."  *See, e.g.*, *In re PWM Property Management LLC, et al.*, No. 21-BK-11445 (MFW) (D. Del.), Dkt. No. 12 at 14.

[55] Sitomer Aff., Ex. 1 [JV Agreement] at 5-6 (definition of "Cause Event"), at 18 (definition of "Mandatory Redemption Date").

[56] *Ibid.*

[57] Sitomer Aff. ¶ 26.

[58] Sitomer Aff. ¶ 29; Affirmation of Rachel Strickland, dated March 31, 2022 ("Strickland Aff."), ¶ 2; Affirmation of Robert Dehney, dated March 31, 2022 ("Dehney Aff."), ¶ 2; Affirmation of Mark Ressler, dated March 31, 2022 ("Ressler Aff."), ¶ 8; Affirmation of Gary Kleinman, dated March 31, 2022 ("Kleinman Aff.") ¶ 2; Affirmation of Ryan T. Jareck, dated March 31, 2022 ("Jareck Aff.") ¶ 2.

### IV. Respondent Failed To Pay The Guaranteed Obligations Within 10 Days Upon Demand

Claimant retained Kasowitz in connection with the enforcement of, and the preservation of Claimant's rights under, the Guaranty.[59]  Kasowitz sent a demand for payment of the Guaranteed Obligations to Respondent on November 19, 2021 in accordance with the Guaranty.[60]  Respondent failed to pay the Guaranteed Obligations in breach of the Guaranty.[61]

Claimant has incurred legal fees, costs and expenses in connection with seeking to enforce the Guaranty ("Arbitration Fees"), and, because the arbitration is ongoing, Claimant will continue to incur Arbitration Fees.

As of the date of this filing, Claimant has been invoiced for legal fees, costs and expenses in connection with the Bankruptcy and this arbitration in excess of $4,690,000.[62]

## ARGUMENT

It is well-settled under New York law that an unambiguous contract, such as the Guaranty, will be enforced according to its terms.[63]  *See, e.g., Brad H. v. City of New York*, 17 N.Y.3d 180, 185 (2011) ("A written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties").  "[A] court should determine the intent of the parties from within the four corners of the contract without looking to extrinsic evidence to create ambiguities." *World Ambulette Transportation, Inc. v. Kwan Haeng Lee*, 161 A.D.3d 1028, 1032 (2d Dep't 2018) (quoting *Hoeg Corp. v. Peebles Corp.*, 153 A.D.3d 607, 608 (2d Dep't 2017)).

---

[59] Sitomer Aff. ¶ 30.
[60] Ressler Aff., Ex. 1.
[61] Sitomer Aff. ¶ 27.
[62] *See* p. 23, *infra*.
[63] The Guaranty is governed by New York law.  *See* Sitomer Aff., Ex. 2 [Guaranty] § 5.3. Unless otherwise noted, all cited cases apply New York law, and all emphasis is added.

18

## I.    <u>Respondent Owes The Guaranteed Obligations Under Section 1.3 of the Guaranty</u>

As to its payment obligations, it is difficult to imagine a contract that is more clear and less ambiguous than the Guaranty.  All Claimant must show to enforce an "absolute and unconditional" guaranty, such as the one at issue here, is that the guaranty is valid, there is an underlying amount that is owed and the guarantor has failed to perform under the guaranty.  *See Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A. v. Navarro*, 25 N.Y.3d 485, 492 (N.Y. 2015) ("*Cooperatieve*") (party seeking to enforce guaranty must prove "the existence of the guaranty, the underlying debt and the guarantor's failure to perform under the guaranty"); *VNB New York, LLC v. Y.M. Intercontinental Gem Corp.*, 154 A.D.3d 903, 905 (2d Dep't 2017) (affirming summary judgment enforcing "absolute and unconditional" guaranty where plaintiff proved a guaranty, the underlying debt, and the guarantor's failure to perform under the guaranty).  Claimant has shown each of these elements.

*First*, the validity of the Guaranty cannot be questioned.  Indeed, Respondent's directors, through the board minutes, and lawyers, through the White & Case Legal Opinion, confirmed the Guaranty's validity and enforceability at the time Respondent executed it.[64]  And, the Guaranty itself states that Respondent's payment obligations are "unconditional[], absolut[e], and irrevocabl[e],"[65] and that Respondent waived any defense based on, among other things, (i) "any lack of genuineness, regularity, validity, legality or enforceability, or violability of . . . any [] agreement or instrument related to the Preferred Equity Interest," including the Guaranty,[66] and (ii) "the JV Agreement or any of the other the documents related thereto have been forged or otherwise are irregular or not genuine or authentic...."[67]  *See also generally* Sitomer Aff.,

---

[64] *See* Sitomer Aff., Exs. 3, 4.
[65] Sitomer Aff., Ex. 2 [Guaranty] § 1.2.
[66] *Id*. § 1.3(c)(i).
[67] *Id*. § 1.3(c)(xv)(H).

Ex. 2 § 1.3(c)(xi) (waiving any "circumstance which might in any manner or to any extent constitute a defense available to Guarantors"). New York courts have held that where guaranties provide that they are "absolute and unconditional irrespective of . . . any other circumstance which might otherwise constitute a defense," such as the Guaranty at issue here, the guarantor is precluded from asserting a defense as to the existence of a valid underlying debt. *Cooperatieve*, 25 N.Y.3d at 494–95 (internal quotation marks omitted). As a result, the Guaranty's validity is beyond dispute.

*Second*, there is no dispute that Respondent failed to pay the underlying amounts due and owing—*i.e.*, the Guaranteed Obligations—including (i) the Redemption Amount under the JV Agreement, and (ii) Claimant's legal fees and expenses, in connection with the Bankruptcy, now totaling more than $4,000,000 (the "Bankruptcy Fees").[68]

**Redemption Amount.** As shown above, the Redemption Amount became due because Respondent's affiliates triggered Cause Events by making numerous Major Decisions without Claimant's consent including filing the Bankruptcy.[69] The Cause Events accelerated the Mandatory Repayment Date to no later than November 10, 2021.[70]

As explained above, the Redemption Amount is defined as sum of (a) the accrued and unpaid Preferred Equity Return; (b) the Net Preferred Equity Investment; and (c) the Make Whole Premium.

Clause (a): Preferred Equity Return. Pursuant to the JV Agreement, the applicable Preferred Equity Return prior to a Cause Event is 11% per annum, compounded quarterly,

---

[68] Sitomer Aff. ¶ 26; *See also* Strickland Aff. ¶ 3, Ex. 1; Dehney Aff. ¶ 3, Ex. 1; Ressler Aff. ¶ 8, Ex. 1; Kleinman Aff. ¶ 3, Ex. 1; Jareck Aff. ¶ 3, Ex. 1.
[69] Sitomer Aff. ¶ 12; Ex. 1 [JV Agreement] §1.1.
[70] Sitomer Aff., Ex. 1 [JV Agreement] §1.1.

which is defined as the "Preferred Return Rate."[71]  Following a Cause Event, the applicable rate of return on the investment increases to the lesser of 20% and the highest rate permitted by law, which is defined as the "Preferred Increased Return Rate."[72]  The 20% rate is the applicable rate here because it is the lesser of the two rates.[73]  Although the earliest Cause Event occurred no later than October 17, 2021, Claimant has assumed conservatively, for purposes of calculating the Redemption Amount, that the earliest Cause Event occurred on October 31, 2021.  Accordingly, the applicable rate of return from the date of Claimant's investment (November 19, 2018) to the date of the Cause Event (October 31, 2021) is 11% per annum, compounded quarterly, and the applicable rate of return from the day after Cause Event (November 1, 2021) to the date of this submission (March 31, 2022) is 20%.  The total accrued but unpaid Preferred Equity Return thus equals $27,564,930.52.[74]

Clause (b): Net Preferred Equity Investment.  The "Net Preferred Equity Return" is equal to the amount of Claimant's initial investment, plus any additional capital contributions made by Claimant, less distributions made to Claimant in redemption of the investment.[75]  Since Claimant made its initial investment on November 19, 2018, Claimant neither made a capital contribution nor received any redemptions. [76]  Accordingly, the "Net Preferred Equity

---

[71] *Id*. at 22 (definition of "Preferred Return Rate").

[72] *Id*. at 22 (definition of "Preferred Increased Return Rate").

[73] New York's usury laws do not apply here because they apply only to loans, not investments such as Claimant's investment in the Company.  *See Hamilton Cap. VII, LLC, I v. Khorrami, LLP*, 48 Misc. 3d 1223(A), 22 N.Y.S.3d 137, at *14 n.14 (N.Y. Sup. Ct. 2015) ("usury laws only apply to loans, not investments"); *Bakis v. Levitin*, 3 Misc. 3d 1110(A), 787 N.Y.S.2d 676 , at *4 (N.Y. Sup. Ct. 2004) ("Inasmuch as usury laws apply only to loans and forebearances, and not to investments (General Obligations Law § 5–501[1][2]), if the transaction is not a loan there can be no usury, regardless of how[] unconscionable the contract may be.").

[74] Sitomer Aff. ¶39-40.

[75] Sitomer Aff. ¶ 41; Sitomer Aff., Ex. 1 [JV Agreement] at 21 (definition of "Net Preferred Equity Return").

[76] Sitomer Aff. ¶ 41.

Investment" referenced in clause (b) of the definition of Redemption Amount equals Claimant's initial $148,165,906.41 investment. [77]

Clause (c): Make Whole Premium.  The Make Whole Premium is a guaranteed minimum return (either at the 11% or 20% return rate—or a combination thereof—described above) that is owed if the Redemption Date is prior to June 30, 2022.[78]  It is defined in relevant part as "an amount equal to the [applicable return rate] that would accrue on the Net Preferred Equity Investment . . . from the date, prior to June 30, 2022, upon which occurs a Redemption in Full through, and including, June 30, 2022." [79]  The Make Whole Premium ensures that Claimant will receive a minimum return on its investment for the entire period of investment absent a Cause Event (*i.e.*, November 19, 2018 through June 30, 2022), regardless of an early repayment of the investment.  Therefore, any judgment here must account for the Make Whole Premium because if Respondent were to pay a judgment tomorrow with the return accruing through March 31, 2022 only, Claimant would be deprived of the additional three months of investment return—*i.e.*, sums that are recoverable under the Guaranty.  The applicable rate of return is 20%, *i.e.*, the "Preferred Increased Return Rate," due to the Cause Events.  The total Make Whole Premium equals $8,826,540.32.[80]

Thus, the Redemption Amount as of March 31, 2022 is calculated as follows:

---

[77] Sitomer Aff. ¶ 41
[78] Sitomer Aff., Ex. 1 [JV Agreement] at 18 (definition of "Make Whole Premium").
[79] *Id*.
[80] Sitomer Aff. ¶ 42.

| | | |
|---|---|---|
| (a) | Preferred Equity Return | |
| | (i) Unpaid Preferred Return Rate 11% (11/19/18-10/31/21) | $13,819,290.70 |
| | (ii) Unpaid Preferred Increased Return Rate 20% (11/1/21-3/31/22) | $13,751,639.82 |
| (b) | Net Preferred Equity Investment | $148,165,906.41 |
| (c) | Make Whole Premium (4/1/22-6/30/22) | $8,826,540.32 |
| | **Total** | **$184,557,377.25** |

**Bankruptcy Fees.** The Bankruptcy has been a massive, hard-fought proceeding, with billions of dollars at stake. For its part, SLG is involved in the Bankruptcy in three different capacities: equity investor, property manager, and lender to one of the HNA Subsidiaries. Over the last five months, SLG has made numerous filings, including, among others, legal briefs in connection with a motion to dismiss, an opposition to Debtors' motion to reject the Management Agreement, an appeal of the Bankruptcy Court's decision with respect to both of the foregoing, and briefs objecting to Debtors' retention of certain professionals.[81] As a result, SLG was forced to retain multiple law firms described above, whose Bankruptcy Fees to Claimant are as follows[82]:

| | |
|---|---|
| Willkie Farr & Gallagher LLP | $3,118,234.70 |
| Morris, Nichols, Arsht & Tunnell LLP | $426,675.05 |
| Cole Schotz, P.C. | $381,111.35 |
| Kasowitz Benson Torres LLP | $752,700.24 [83] |
| Greenberg Traurig LLP | $12,301.50 |
| Total | $4,691,022.84 |

*Finally*, there is no question that Respondent has not paid the Guaranteed Obligations.[84]

---

[81] *In re PWM Property Management LLC, et al.*, No. 21-BK-11445 (MFW) (D. Del.), Dkt. Nos. 78, 113, 269, 307, 324, 338, 431; *see also In re PWM Property Management LLC, et al.*, No. 21-1788, 21-1814, 21-1827, 21-92-MN (D. Del.), Dkt. Nos. 3, 6, 7, 14, 16, 17, 33.

[82] *See* Strickland Aff. ¶ 3, Ex. 1; Dehney Aff. ¶ 3, Ex. 1; Ressler Aff. ¶ 8, Ex. 1; Kleinman Aff. ¶ 3, Ex. 1; Jareck Aff. ¶ 3, Ex. 1.

[83] The Kasowitz fees include legal fees and expenses incurred in connection with both the Bankruptcy and this arbitration.

[84] Sitomer Aff. ¶ 27; Ex. 1 [JV Agreement]

Under the plain terms of the Guaranty, Claimant is therefore entitled to a judgment enforcing Respondent's "absolute and unconditional" obligation to tender "punctual and complete payment in full" of these Guaranteed Obligations.[85]  *See Cmty. Nat. Bank v. Hollis Care Grp., Inc.*, 155 A.D.3d 604, 605 (2d Dep't 2017) (Hall, J.) (affirming summary judgment for breach of guarantees, awarding plaintiff approximately $3 million and rejecting defenses because none concerned the validity of the note or guarantees); *Provident Bank v. Joyce*, 111 A.D.3d 913, 913–14 (2d Dep't 2013) (Hall, J.) (affirming summary judgment on complaint to enforce personal guaranty where plaintiff established that defendant defaulted on credit agreement it had entered into with the plaintiff and that defendant failed to comply with his obligation as guarantor on that credit agreement); *JPMorgan Chase Bank, N.A. v. Bauer*, 92 A.D.3d 641, 641 (2d Dep't 2012) (Hall, J.) (affirming summary judgment for breach of personal guaranty and rejecting defendant's "bald assertion of forgery" to contest the authenticity of his signature); *Excelsior Cap., LLC v. Superior Broad. Co.*, 101 A.D.3d 670, 671 (2d Dep't 2012) (Hall, J.) (in case involving personal guaranty, affirming approximately $25 million judgment).

Respondents' assertion (Answer at 4) that the filing of the Bankruptcy cannot constitute a Cause Event in light of the Bankruptcy Code's automatic stay is nonsense.  As a threshold matter, that assertion is immaterial as Claimant has proven the existence of many other Cause Events prior to the filing of the Bankruptcy.  In any event, filing for bankruptcy is a Cause Event under the JV Agreement,[86] and is a common triggering event under guaranties.  "The legitimacy of such common arrangements is not subject to question under any theory of

---

[85] Respondent may to try to raise issues about the reasonableness of these fees. While fees are more than reasonable, however, "reasonableness" is not an express requirement of the Guaranty precisely to avoid that type of time-consuming debate in connection with an arbitration that is meant to be expedited. Claimant's evidence – sworn attorney statements and summary invoices – is more than sufficient under the Guaranty.

[86] Sitomer Aff., Ex. 1 [JV Agreement] at 6 (definition (d) of "Cause Event").

commercial law." *UBS Com. Mortg. Tr. 2007-FL1 v. Garrison Special Opportunities Fund L.P.*, 33 Misc. 3d 1204(A), 938 N.Y.S.2d 230, at *6 (N.Y. Sup. Ct. 2011); *see also RCG LV Debt IV Non-Reit Assets Holdings, LLC v. Ringel*, 54 Misc. 3d 1205(A), 50 N.Y.S.3d 28, at *9 (N.Y. Sup. Ct. 2016) (finding bankruptcy filing triggered "full recourse against the Guarantors" under guaranty); *172 Madison (NY) LLC v. NMP Grp., LLC*, 41 Misc. 3d 1208(A), 977 N.Y.S.2d 668, at *2 (N.Y. Sup. Ct. 2013) (finding guarantor obligated to pay "Guaranteed Obligations" due to debtor's filing for bankruptcy and finding "without exaggeration that the Guaranty was intended to apply to the exact circumstance currently confronting" plaintiff). Moreover, Guarantor is not a debtor and as such the automatic stay has no applicability to its obligations. *See* Section II.B.i., *infra*.

## II.   Respondent Has Waived All Defenses to Payment

Notwithstanding that Respondent "unconditionally, absolutely and irrevocably" guaranteed payment to Claimant and broadly waived "irrevocably and unconditionally any common law, equitable or statutory or other rights" in connection with the 22 Waived Rights and Defenses—including "any [] circumstance which might in any manner or to any extent constitute a defense available to Guarantors"[87]— Respondent nevertheless asserts five so-called affirmative defenses.[88]   Each lacks any basis in fact or law, and each should be rejected.

### A.      Respondent Generally Waived All Applicable Defenses

The Guaranty imposes broad obligations on Respondent to tender payment and equally broad waivers of defenses to payment.  In fact, Respondent, part of a sophisticated multinational conglomerate with holdings in the aviation, transportation, insurance, banking, financial, real

---

[87] Sitomer Aff., Ex. 2 [Guaranty] §§ 1.3(a), 1.3(c).
[88] *See* Answer, at Defense No. 1 (bankruptcy code requires stay of arbitration), No. 2 (failure to state a claim), No. 3 (waiver, ratification and estoppel), No. 4 (Unclean hands and fraud), and No. 5 (absence of actual damages).

estate, hospitality and other sectors, guaranteed payment "regardless of any law, statute, rule,

regulation, decree or order now or hereafter in effect in any jurisdiction affecting or purporting

to affect in any manner any of such terms or the rights or remedies of SLG with respect

thereto."[89]  As if that were not enough, the Guaranty also contains even broader and more

sweeping waivers of the Waived Rights and Defenses, including "any other circumstance which

might in any manner or to any extent constitute a defense available to Guarantors."[90]  And for

the avoidance of doubt, the Guaranty further emphasizes that it is "the unambiguous and

unequivocal intention of Guarantors that Guarantors shall be obligated to fulfill the Guaranteed

Obligations and all liabilities under this Guaranty, notwithstanding any occurrence,

circumstance, event, action or omission whatsoever, whether contemplated or uncontemplated,

and whether or not otherwise or particularly described herein."[91]

These kinds of broad and sweeping waivers in absolute and unconditional guarantees are

routinely recognized, permitted and strictly enforced under longstanding New York law.  *See*

*136 Field Point Circle Holding Co., LLC v. Invar Int'l Holding, Inc.*, 644 F. App'x 10, 12 (2d

Cir. 2016) ("As to the Guaranty, broad, sweeping and unequivocal language in an absolute and

unconditional guaranty generally forecloses any challenge to the enforceability and validity of

the documents which establish defendant's liability for payments arising under the underlying

agreement, as well as to any other possible defense to his liability for the obligations.") (internal

quotations and alterations omitted); *Compagnie Financiere de CIC et de L'Union Europeenne*

*v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 188 F.3d 31, 35 (2d Cir. 1999) ("Absolute and

unconditional guaranties have in fact been found to preclude guarantors from asserting a broad

---

[89] Sitomer, Ex. 2 [Guaranty] § 1.3(a).
[90] Sitomer, Ex. 2 [Guaranty] § 1.3(c)(xi).
[91] Sitomer, Ex. 2 [Guaranty] § 1.3.

range of defenses under New York law."); *Cooperatieve*, 25 N.Y.3d at 488 (rejecting defense

that plaintiff's unlawful conduct invalidated the underlying debt because, even if true, the

guaranty waived "any [] circumstance which might otherwise constitute a defense available to,

or a discharge of, the Seller or a guarantor").

**B.** **Respondent's Specific Affirmative Defenses Are Meritless**

In addition to these broad waivers that must be enforced under New York law, each of

Respondent's affirmative defenses fails for separate specific reasons.

**i.** **Respondent has no defense under the Bankruptcy Code**

Respondent's request for a stay under the Bankruptcy Code is frivolous. The automatic

stay, as set forth in section 362 of the United States Bankruptcy Code, extends automatically

only to *debtors*. *See Tchrs. Ins. & Annuity Ass'n of Am. v. Butler*, 803 F.2d 61, 66 (2d Cir.

1986) ("It is well-established that stays pursuant to § 362(a) are limited to debtors and do not

encompass non-bankrupt co-defendants."). As a matter of law, Respondent, as a non-debtor,

cannot avail itself of the Bankruptcy Code's protections simply because it is an affiliate of the

Debtors. In limited circumstances, the Bankruptcy Court may extend the stay to certain related

parties for cause, which has not occurred here. *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994

(4th Cir. 1986); *In re United Health Care Org.*, 210 B.R. 228 (S.D.N.Y. 1997). The Debtors

here have not sought to extend the stay to apply to this arbitration, and they would have

absolutely no basis to do so. In fact, if the Debtors were to seek such relief in Bankruptcy

Court, they would obviously fail given the absence of any cause whatsoever to extend the

stay. *See Tchrs. Ins. & Annuity Ass'n of Am.*, 803 F.2d at 65 (A bankruptcy court "cannot

extend to efforts made in bad faith by non-bankrupt co-defendants in order to escape from the

liability imposed by an adverse district court judgment."). Accordingly, Respondent's argument

that the stay should extend to this arbitration has no legal basis and must be rejected.

ii. **Respondent has no basis to assert that
Claimant failed to state a claim**

Failure to state a claim is not an affirmative defense and must be dismissed.  *See Daniel
v. Croman Real Estate, Inc.*, No. 151775/14, 2014 WL 6708477, at *3 (N.Y. Sup. Ct. Nov. 26,
2014) ("Since the Court has dismissed all of defendants' other affirmative defenses, the First
Affirmative Defense for failure to state a cause of action is dismissed.").  In any event, as shown
above, Claimant has not only stated but has in fact proven its claim for recovery on the
Guaranty.

iii. **Respondent's defenses under the doctrine of waiver,
ratification and estoppel are unsubstantiated and baseless**

Respondent's affirmative defense based on Claimant's purported conduct—waiver,
ratification and estoppel—are totally unsubstantiated in the Answer.  This alone is grounds for
dismissal of these defenses under both applicable JAMS rules and New York law.  *See* JAMS
Rule 7(a) (Any affirmative defense "shall include a short statement of its factual basis" and
"[n]o claim, remedy, counterclaim or affirmative defense will be considered by the Arbitrator in
the absence of such prior notice to the other Parties."); *Indep. Bank v. Valentine*, 113 A.D.3d 62,
64–65 (2d Dep't 2013) (rejecting defense where guarantor "did not allege or produce evidence
in admissible form sufficient to raise a triable issue of fact as to a bona fide defense such as
waiver, estoppel, bad faith, fraud, or oppressive or unconscionable conduct on the part of the
plaintiff").

These defenses also fail because Respondent waived them in the Guaranty.  Respondent
waived defenses related to: (i) "**any** . . . **waiver** of, or any assertion or enforcement or failure or
refusal to assert or enforce, or **any consent** or indulgence granted by [Claimant] with respect to

the departure from, any term of the JV Agreement"[92]; (ii) "any failure or delay of [Claimant] to exercise, or ***any lack of diligence*** in exercising, any right or remedy with respect to the JV Agreement . . . or this Guaranty"[93]; (iii) "any dealings . . . between [Claimant] and HNA Member"[94]; and (iv) "any other circumstance which might in any manner or to any extent constitute a defense available to Guarantors"[95]. This "extensive language relinquishing defenses [in the Guaranty] precludes the assertion of waiver and estoppel defenses as a matter of law." *See Bank of Montreal v. Bailey*, No. 91 CIV. 0218, 1992 WL 8342, at *2 (S.D.N.Y. Jan. 14, 1992).

### iv. Respondent's defense based on unclean hands or *in pari delicto* and fraud are legally and factually baseless

In its Answer, Respondent initially asserted an affirmative defense of "the Doctrine of Unclean Hands and Fraud." Answer at 6. In the following weeks, seeking to delay this expedited arbitration and nearly grind it to a halt, Respondent submitted multiple letters in this proceeding confirming that this defense was a desperate effort destined to fail. From one Respondent letter to the next, the nature and rationale of this defense morphed and shape-shifted; to the extent it is even intelligible, it appears to be a mishmash of unclean hands and *in pari delicto*. As for a "fraud" defense, it is unclear if Respondent is actually asserting one, and, if so, what facts could conceivably support it—even after Respondent submitted a letter in this matter purporting to explain it.[96] In any event, Respondent's various and utterly confusing formulations of a purported unclean hands / *in pari delicto* / fraud defense all fail because, as a matter of law, they are not legally or factually cognizable, even putting aside the fact that

---

[92] Sitomer Aff., Ex. 2 [Guaranty] § 1.3(c)(v).
[93] *Id*. § 1.3(c)(vi).
[94] *Id.* § 1.3(c)(vii).
[95] *Id*. § 1.3(c)(xi).
[96] Ressler Aff. Ex., 12 [Respondent's March 10 Letter].

Respondent waived all defenses, including these, in the Guaranty. Not for nothing did Your Honor already express skepticism toward Respondent's "fraud" defense" in its March 22, 2022 Decision on Scheduling ("Decision")[97]. Respondent's "fraud" defense is another desperate litigation ploy that should be summarily rejected.

*Unclean Hands.* Respondent's unclean hands defense, which Respondent asserted initially, has no legal merit. Under well-established New York law, the equitable defense of unclean hands is not a valid legal defense to avoid payment of damages under the Guaranty. *See Salameno v. Rawlings*, No. 19CIV4442PGGBCM, 2021 WL 1085521, at *17 n.10 (S.D.N.Y. Mar. 22, 2021) ("an equitable defense [of unclean hands] does not apply to claims that 'seek damages in an action at law'") (citation omitted). Further, in the Guaranty, Respondent waived any defense based on "any [] circumstance which might in any manner or to any extent constitute a defense available to Guarantors, … or might otherwise constitute a legal or equitable discharge or defense." Again, New York courts have held that the defense of unclean hands is barred by absolute and unconditional guaranties. *See Red Tulip, LLC v. Neiva*, 44 A.D.3d 204, 206, 209–10 (1st Dep't 2007) (finding that "all of [defendant's] defenses and counterclaims [including unclean hands] . . . are barred by the guaranty," where the guaranty absolutely, unconditionally and irrevocably waived the defendant's right to assert "any defense, set-off, counterclaim or cross claim of any nature whatsoever with respect to this guaranty").

*In Pari Delicto.* Over the course of the past three months, Respondent appears to have conceded that its unclean hands defense is not viable and has pivoted to a different defense. Respondent now appears to contend that what it meant but failed to plead in its answer was

---

[97] Ressler Aff., Ex. 13 [Decision] at 14 (determining that Respondent's pre-submission explanations have "not raised a sufficient inference of fraud to avoid the expedited arbitration process the parties agreed to in the Guaranty").

actually a defense based on the *in pari delicto* doctrine, which it claimed is used

"interchangeably" with unclean hands.[98]  By failing to include the *in pari delicto* defense in its

answer, however, it is waived.  *See Castaldi v. Syosset Cent. Sch. Dist.*, No. 2018-10967, 2022

WL 610027, at *2 (2d Dep't Mar. 2, 2022) (affirmative defense not asserted in answer waived).

  In any event, even if it was not waived because it was not pleaded, *in pari delicto* fares

no better than unclean hands.  In the Guaranty, Respondent "irrevocably and unconditionally

waive[d] any common law, equitable, statutory or other right which Guarantor might possess as

a result of or in connection with" the 22 Waived Rights and Defenses, including "any []

circumstance which might in any manner or to any extent constitute a defense available to

Guarantors."[99]  Such a broad waiver of defense is perfectly permissible under New York law,

which recognizes that such a waiver necessarily includes the *in pari delicto* defense.  *See*

*JPMorgan Chase Bank, N.A. v. KB Home*, 740 F. Supp. 2d 1192, 1204 (D. Nev. 2010) (denying

motion for leave to add *in pari delicto* defense as futile because "the Guarantees expressly

waived any defense or counterclaim whatsoever") (applying New York law).[100]

  ***Fraud.***  To skirt around its waiver of the *in pari delicto defense* and the fact that New

York courts permit that defense (meritless here, in any event) to be waived, Respondent claims

that it is "inextricably intertwined" with its fraud defense in that the misconduct that supports

the *in pari delicto* defense also includes the misrepresentations and omissions that constitute

fraud, namely: (1) pre-execution misrepresentations and omissions made to induce Respondent

and certain of its affiliates to enter into the agreements; and (2) and post-execution

---

[98] Ressler Aff., Ex. 11 [Respondent February 1 Letter] at 1, n.2.
[99] Stenier Aff., Ex. 2 [Guaranty] § 1.3(xi).
[100] Waiver of the *in pari delicto* defense is "***not*** against public policy and will be enforced in the absence of fraud or negligence in the disposition of collateral." *N. Fork Bank v. Computerized Quality Separation Corp.,* 62 A.D.3d 973, 974 (2d Dep't 2009) (emphasis added).

misrepresentations and misconduct concerning the performance under the various contracts.[101] As shown below, any *in pari delicto* defense based on these highly confusing fraud theories must be rejected.

### a. Respondent Waived Any Fraudulent Inducement Defense

Respondent's fraudulent inducement theory is as follows:

> In entering into the JV Agreement, PMA and Guaranty, Claimant made material misrepresentations and omissions to the Company and Respondent that it would aggressively perform its obligations under the JV Agreement, PMA, and Guaranty, including finding a replacement tenant for [Major League Baseball ("MLB")] because of its commitment to its investment in the Property.[102]

Putting aside that Respondent does not set forth with particularity any facts describing the purported misrepresentations and omissions (because there are none)—indeed, Claimant is not a party to the Management Agreement and thus has no obligations under it—such a theory is untenable and invalid given the Guaranty's specific no-waiver clauses, the Management Agreement and controlling New York law.

The Guaranty states specifically that Claimant "made [no] representation, warranty or statement to any Guarantor in order to induce any Guarantor to execute this Guaranty."[103]  The Management Agreement likewise provides that [t]here are no representation, agreements, arrangements or understanding, oral or written, among the parties hereto ***relating to the management of the Property***, which are not fully expressed."[104]  These specific no-representation clauses preclude as a matter of law any defense based on fraud in the inducement.  *See DiBuono v. Abbey, LLC,* 95 A.D.3d 1062, 1064–65 (2d Dep't 2012) (Hall, J.)

---

[101] Ressler Aff., Ex. 12 [Respondent March 10 Letter] at 2-3.
[102] *Id*. at 2.
[103] Sitomer Aff., Ex. 2 [Guaranty] § 2.4.
[104] Sitomer Aff., Ex. 6 [Management Agreement] § 23.

(provision that "no representations or warranties, whether expressed or implied, had been made

regarding the condition of the demised premises" barred fraud claim); *DuBow v. Century*

*Realty, Inc.,* 172 A.D.3d 622 (1st Dep't 2019) (holding that "no representations" clause barred

fraud claim); *San Diego Cty. Emps. Ret. Ass'n v. Maounis*, 749 F.Supp.2d 104, 121 (S.D.N.Y.

2010) ("Given the sophistication of [the plaintiff] and its investment advisor, and the clear,

unambiguous language of the non-reliance provisions at issue, the Court finds Plaintiff's

purported reliance on statements made before the execution of the Subscription Agreement to

be unreasonable as a matter of law.").

Significantly, where, as here, sophisticated parties waived defenses in the context of an

absolute and unconditional guaranty, the Court of Appeals has definitively held that a guarantor

cannot assert a fraudulent inducement defense, regardless of the specificity of any no-reliance

clause and other waivers of rights in the guaranty.  *See Citibank, N.A. v. Plapinger*, 66 N.Y.2d

90, 95 (1985) ("Though not the explicit disclaimer present in *Danann,* the substance of

defendants' guarantee forecloses their reliance on the claim that they were fraudulently induced

to sign the guarantee by the banks' oral promise of an additional line of credit.").  The Court of

Appeals reasoned:

> It is unrealistic in such circumstances to expect an express
> stipulation that defendants were not relying on a separate oral
> agreement to fund an additional multimillion dollar line of credit,
> when they themselves have denominated their obligation
> unconditional, and have reinforced that declaration by their
> agreement that the "absolute and unconditional" nature of their
> guarantee was "irrespective of (i) any lack of validity . . .of the . .
> . Restated Loan Agreement . . . or any other agreement or
> instrument relating thereto", or "(vii) any other circumstance
> which might otherwise constitute a defense" to the guarantee.

*Id*.  In the face of the explicit waivers contained in the guaranty at issue, to permit a guarantor to

claim fraud in the inducement "would in effect condone defendants' own fraud in 'deliberately

misrepresenting [their] true intention when putting their signatures to their 'absolute and unconditional' guarantee." *Id*.

The *Plapinger* reasoning applies with equal force here. New York law does not permit Respondent to dodge the absolute and unconditional nature of the Guaranty by asserting a fraud-in-the-inducement defense.

### b. Respondent's Defense Based On A Fraud In The Performance Theory Fails Because It Is Duplicative of A Breach Of Contract Defense, Which Respondent Waived

Respondent's assertion that Claimant somehow perpetrated a fraud in its performance following execution of the Guaranty, by "intentionally failing to obtain a replacement tenant to trigger the Forced Sale provision and gain control of the Property and/or funds from HNA under the Guaranty,"[105] is a bizarre conspiracy theory that fails as a matter of law.

New York courts have long recognized that "fraud in the performance" theories are barred as duplicative of breach of contract claims. *See e.g.*, *Cronos Grp. Ltd. v. XComIP, LLC*, 156 A.D.3d 54, 62 (1st Dep't 2017) ("[A] fraud claim is not stated by allegations that simply duplicate . . . a claim for breach of contract, enhanced only by conclusory allegations that the pleader's adversary made a promise while harboring the concealed intent not to perform it."); *Fairway Prime Est. Mgmt., LLC v. First Am. Int'l Bank*, 99 A.D.3d 554, 557 (1st Dep't 2012) (dismissing fraud claim as duplicative of the claim for breach of contract where the "promise concerned the performance of the contract itself"); *NYAHSA Servs., Inc. Self Ins. Tr. v. People Care Inc.*, 45 Misc. 3d 1225(A) , 2014 WL 6889704, at *10 (N.Y. Sup. 2014) ("However, the remaining non-inducement allegations of fraud rely upon essentially the same allegations of misconduct as the breach of contract claim, encompass the same period of time and demand an

---

[105] Ressler Aff., Ex. 12 [Respondent March 10 Letter] at 3.

identical measure of damage…. Under the circumstances, the non-inducement component of the fraud claim must be dismissed as duplicative.") (internal citation omitted).  Respondent's counsel acknowledged as much during the March 11, 2022 oral argument before Your Honor by stating that Respondent was not asserting a "fraud in the performance defense" (despite having done so in its letter from the day before) because, as counsel had to acknowledge, it was a matter of "black letter law" that such defenses are duplicative of a breach of contract.

Accordingly, Respondent's *in pari delicto* defense based on fraud-in-the-performance following the Guaranty is merely a breach of contract defense, which is meritless and has been waived in any event.  An *in pari delicto defense* based on a breach of contract theory fails as a matter of law where, as here, the contract is "lawful on its face and there is no implication that it was entered into with fraudulent design, provided the promisee does not require the aid of the illegal transaction to make out his case."  *Hilgendorff v. Hilgendorff*, 241 A.D.2d 481, 482 (2d Dep't 1997) (internal citation omitted) (rejecting *in pari delicto* defense in connection with claim for breach of settlement agreement that was lawful on its face); *see also ImagePoint, Inc. v. JPMorgan Chase Bank, Nat. Ass'n*, 27 F. Supp. 3d 494, 515 (S.D.N.Y. 2014) (rejecting *in pari delicto* defense where defendant "points to no fraud or illegality in the contract between [defendant] and [plaintiff]").

As shown above, Respondent cannot show that the Guaranty is unlawful on its face or was entered into to perpetrate a fraud.  To the contrary, the Guaranty, by its terms, was entered into as "a condition precedent" and an express inducement to SLG entering into the Joint Venture Agreement and making its equity investment in the Property.[106]  SLG insisted on the Guaranty to safeguard its investment—an objective that proved warranted and justified when,

---

[106] Sitomer Aff., Ex. 2 [Guaranty] at 1 (Whereas Clause).

Case 1:22-cv-05136-JGK Document 1-1 Filed 06/17/22 Page 169 of 229

less than a year after SLG's investment, HNA started to unravel.[107] In the Guaranty, Respondent and the other HNA Guarantors waived any defense based on the Guaranty's purported invalidity, and Respondent's directors and legal counsel took pains to represent to and assure Claimant that the Guaranty was valid "commercially beneficial, in the best interests of the [Respondent] and for proper purposes," and fully enforceable. Respondent's fraud defense is legally invalid and should be rejected.

### c. Respondent Does Not Otherwise State A Fraud Claim

Finally, even if Respondent's fraud and *in pari delicto* defenses were not waived and/or barred as a matter of law (and they absolutely are), they should still be rejected because Respondent does not come close to pleading, much less proving, the essential elements of a fraud claim. "The essential elements of a cause of action sounding in fraud are a misrepresentation or a material omission of fact which was false and known to be false by the defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." *Kanterakis v. Minos Realty I, LLC*, 40 Misc. 3d 1221(A), 977 N.Y.S.2d 667 (N.Y. Sup. Ct. 2013).

Respondent's most complete explanation of its ever-shifting "fraud" theory appeared in a prior letter submitted by Respondent in this proceeding. In that letter, Respondent asserted that the "underlying facts of [its] fraud and in pari delicto defenses were articulated in the Company's Bankruptcy. These filings reveal that Claimant, SLG Manager and SLG Realty were desperate to take control of the Property, were deeply conflicted prior to entering into the JV Agreement and Property Management and Leasing Agreements, bargained for an unusual position of control in the JV Agreement and PMA, and intentionally failed to secure any

---

[107] Ressler Aff. Ex. 7 [Bloomberg Article].

material commercial office tenants (including a replacement tenant for MLB during their three-year tenure as property manager."[108]

None of these allegations even remotely support a fraud defense. As a threshold matter, a defense based on Claimant's affiliation was waived in the Guaranty.[109] Moreover, Claimant did not make, and could not have made, any misrepresentation regarding its affiliation with SLG Management because that affiliation was well-known to Respondent and HNA, fully disclosed in the JV Agreement, which is specifically referenced throughout the Guaranty, and expressly waived as a defense.[110] When Claimant made its $148 million investment in the Property, Respondent's co-guarantor and HNA affiliate (i) acknowledged in writing that Claimant and the Property Manager were affiliates, and (ii) expressly agreed not "to assert any claim against [Claimant] . . . that relates to any action taken by the Property Manager or any action the Property Manager fails to take . . . ."[111] This explicit disclaimer of a known possible conflict of interest between Claimant and SLG Management precludes Respondent from establishing justifiable reliance as a matter of law. *See HSH Nordbank AG v. UBS AG*, 95 A.D.3d 185, 205–06 (1st Dep't 2012) (dismissing fraud claim because it was unreasonable for plaintiff to rely on representation concerning a contemplated alignment of interest in light of disclosures in deal documents).

Respondent's additional complaint that Claimant "bargained for an unusual position of control in the JV Agreement and the PMA" is entirely irrelevant, and in any event it was disclosed in full in the JV Agreement. As Your Honor recognized in the Decision, "[h]ere,

---

[108] Ressler Aff., Ex. 12 [Respondent's March 10 Letter] at 2.
[109] *See, e.g.*, Sitomer Aff., Ex. 2 [Guaranty] §§ 1.3(xi), (xxii).
[110] Sitomer Aff., Ex. 2 at 1 (third "WHEREAS" clause), § 1.2 (guarantying payment of the Redemption Amount, "pursuant to the JV Agreement.").
[111] Sitomer Aff., Ex. 1 [JV Agreement] § 15.4(b).

there is nothing to indicate that the parties were anything other than sophisticated commercial transactors who were represented by counsel and had equal opportunity and bargaining power in negotiating the JV Agreement."[112]

Respondents' failure to meet the elements of fraud is of course fatal to any purported fraud claim. *See Midland Bank, N.A. v. Idar Gem Distributors, Inc.*, 133 A.D.2d 525, 526 (4th Dep't 1987) ("A false representation as to a material fact is necessary to sustain a claim for fraud.").

Claimant cannot anticipate every argument that Respondent will throw against the wall in its own submission to somehow support a fraud defense. But it is important to emphasize that Claimant has already refuted three falsehoods Respondent has asserted over the past few months in its effort to delay this expedited arbitration.

*First*, Respondent has asserted that SLG Management directed MLB to one of SL Green's other properties. This is false. MLB is currently at 1271 Avenue of the Americas, which is not an SLG-owned or managed property.[113]

*Second*, Respondent has suggested that by granting the Debtors' motion to reject the Management Agreement, the Bankruptcy Court somehow endorsed Respondent's fraud theory. This was also false. None other than the HNA Debtors' own counsel readily acknowledged during oral argument on that motion that "the issue of whose fault it was that there was no new tenant in the building is not an issue the Court needs to determine in connection with today's motion . . . . [T]hose aren't issues for today."[114] There can be no doubt that had there been a good faith basis to accuse SLG Management of purported fraud, the HNA entity that owns the

---

[112] Ressler Aff., Ex. 13 [Decision] at 13.
[113] Sitomer Aff. ¶ 32.
[114] Ressler Aff., Ex. 15 at 10:9-22.

Property would have done so.  Had there actually been an SLG Management fraud scheme, or even an SLG Management breach of contract, then the HNA owner would of course have invoked the Management Agreement's copious termination procedures.  That the HNA Owner never saw fit to avail itself of the Management Agreement's termination provisions confirms that its purported "fraud" defense is an after-the-fact, made-for-litigation concoction.

*Finally*, as a factual matter, Respondent's "fraud" defense—the allegation that SLG Management deliberately avoided finding a replacement tenant for MLB—is not just implausible but an assault on common sense.  The three Property managers prior to SLG Management taking over—Newmark, JLL and Cushman & Wakefield—also failed to replace MLB as a tenant.  SLG Management's work in managing the Property was at all times appropriately diligent, resourceful, proactive, and transparent—a fact acknowledged by HNA itself.  President of HNA Group North America LLC, Daniel Chen, was so impressed by and grateful for SLG's stewardship of the Property as property manager that he offered the following effusive praise to SLG's CEO, Marc Holiday on February 26, 2020: "Overall SL Green has done excellent work in managing 245 Park Ave, including . . . achieving 92% occupancy rate despite market slowdown"; "SL Greens' real estate professionalism and expertise are unparalleled in this market"; and "we [are] appreciative and value [] the working relationship that was developed between the two firms during the past few years.."[115]  That HNA's senior executive felt compelled to heap emphatic praise and gratitude on SLG for managing the Property with notable distinction, including during a particularly challenging real estate climate, confirms that HNA's current accusation that SLG perpetrated a 4-year long fraud is an obvious made-for-litigation ploy.

---

[115] Sitomer Aff., Ex. 7 [HNA Email].

Mr. Chen's ringing endorsement of SLG's management of the Property was well-founded. MLB announced its intention not to renew its lease in October 2016—two years *before* SLG Management became the manager of the Property.[116] The prior managers and agents of the Property—*i.e.*, Newmark, Cushman Wakefield and JLL— are other well-established New York City property managers and agents that could not secure a replacement tenant. Faced with the COVID pandemic that ravaged the New York City commercial real estate market in 2020-21, SLG Management creatively repurposed the vacant MLB space by leasing a portion of it as "swing space" for Houlihan Lokey, Inc., while its office space (also located in the Property) was being renovated.[117] SLG also secured and executed various leases that account for 449,970 square feet of office space and has otherwise maintained over a 90% occupancy rate.[118] The bottom line is that SLG did not, and would not, put the SL Green reputation in jeopardy by deliberately starving the Property of tenants to trigger Claimant's Forced Sale rights.

### v.        Respondent's final defense, based on the purported absence of actual damages, is not viable

As with failure to state a claim, the "absence of actual damages" is not an affirmative defense, and must be dismissed. *See Porter v. Home Depot U.S.A., Inc.*, No. 12-CV-4595 NGG CLP, 2015 WL 128017, at *4 (E.D.N.Y. Jan. 8, 2015) ("damages [is] not [an] affirmative defense[] but rather [is a] required element[] of Plaintiff's claim"). In any event, as shown above, Claimant has suffered actual damages in the form of the Bankruptcy and the Redemption Amount.

---

[116] Ressler Aff., Ex. 14 [Meghji Decl.] ¶ 10.
[117] Sitomer Aff. ¶ 34.
[118] Sitomer Aff. ¶ 34.

Respondent's suggestion (Answer at 4 n.2) that Claimant has not suffered damages because the Bankruptcy's automatic stay prohibited the Company from paying the Redemption Amount is legally and factually wrong.

*First*, as shown, Claimant has undeniably suffered Bankruptcy Fees, regardless of Respondent's meritless allegations concerning the payment of the Redemption Amount.

*Second*, in the Guaranty, Respondent waived the ability to raise a defense based on the Company's inability to pay the Redemption Amount based on the automatic stay. Specifically, Respondent waived defenses in connection with "the insolvency, ***bankruptcy***, arrangement, adjustment, . . . ***or lack of power of [the Company]*** . . . ."[119] Other of the Waived Rights and Defenses also preclude Respondent from using the Bankruptcy stay as a defense to payment under the Guaranty, such as:

(iii)  any . . . modification, alteration or rearrangement of all or any part of . . . the JV Agreement;

(iv)  any change in the time . . . of payment of all or any portion of the Preferred Equity Investment or Preferred Return to Claimant [which are the components of the Redemption Amount];

(xv)  . . . the invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations, the Preferred Equity Investment, the Preferred Return, the Redemption Fee, the JV Agreement . . . for any reason whatsoever, including without limitation . . . (E) [the Company] has valid defenses, claims or offsets (whether at law, in equity or by agreement) which render the Preferred Equity Investment, the Preferred Return or the Redemption Fee wholly or partially uncollectible from [the Company] . . . (G) the unenforceability of any remedies of [Claimant] under the JV Agreement . . .;

(xvi)  any full or partial release of the liability of HNA [JV] Member [or the Company] for the obligations of the [the Company], or any part thereof . . . to pay, perform or assure

---

[119] Sitomer Aff., Ex. 2 [Guaranty] § 1.3(c)(xiv) (emphasis added).

the payment of the Preferred Equity Investment, the Preferred Return and/or the Redemption Fee or any part thereof . . .;

(xvii)   any existing or future right of offset, claim or defense of HNA [JV] Member against [the Company], . . . or against payment of the Preferred Equity Investment, the Preferred Equity Return and/or the Redemption Fee or to otherwise effect a Redemption in Full . . .; or

(xxii)   any other action taken or omitted to be taken with respect to the Preferred Equity Investment, the JV Agreement, or the Guaranteed Obligations . . . .[120]

These waivers preclude Respondent from relying on the Bankruptcy stay as a defense to payment. *See also Compagnie Financiere de CIC*, 188 F.3d at 33-37 (upholding a guaranty even though underlying obligation of debtor had been discharged in bankruptcy) (collecting cases).

   *Third*, the timing of the first known Cause Event was such that the Redemption Amount became due **before** the automatic stay was triggered. More specifically, the first Cause Event occurred when the Debtors retained White & Case as restructuring counsel, which was no later than October 17, 2021, 14 days before the Bankruptcy filing.[121] Under the Guaranty, HNA's conduct in hiring White & Case was a Major Decision for which Claimant's consent was required.[122] But in breach of the Guaranty, HNA neither sought nor obtained SLG's consent, such that the Redemption Amount became due ten days after White & Case was retained, on October 27, 2021—four days **before** the Bankruptcy-related automatic stay was triggered. Accordingly, even assuming for the sake of argument that the automatic stay somehow prohibited Respondent, as a non-Debtor, from paying the Redemption Amount (which is, to be

---

[120] *See, e.g., id.* § 1.3(c).
[121] Ressler Aff., Ex 2 at [Meghi Tr.] 20:12-21.
[122] Sitomer Aff., Ex. 1 [JV Agreement] at 17 (definition (nn) and (oo) of "Major Decision").

sure, an absurd argument), the Company's obligation to tender payment of the Redemption Amount was triggered *before* the Bankruptcy filing.

*Finally*, even assuming *arguendo* that the Redemption Amount only became due while the automatic stay was in place (which was not the case), and that Respondent did not waive this defense (which they did), the Redemption Amount was "due and payable" under the Guaranty as a matter of law, notwithstanding the automatic stay.  Whether the Redemption Amount is due and payable is a function of a triggering event (a Cause Event) and the passage of time (ten days), neither of which is affected by the automatic stay.[123]  As a matter of well-settled law, "[t]he automatic stay does not toll the mere running of time under a contract."  *See Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984); *see also In re C.W. Mining Co.*, 422 B.R. 746, 755 (B.A.P. 10th Cir. 2010), *aff'd*, 641 F.3d 1235 (10th Cir. 2011) ("[A]s a general rule, the automatic stay does not prevent the automatic termination of a contract.") (affirming grant of motion to extend time to assume or reject executory contracts and unexpired lease, where lease had not terminated automatically after bankruptcy case was filed), *aff'd, In re C.W. Mining Co.*, 641 F.3d 1235 (10th Cir. 2011).  Respondent's obligation to pay the Redemption Amount is thus unaffected by Company's inability to pay the Redemption Amount because of the stay.  In fact, that is the whole point of the Guaranty.

Any and all defenses Respondent has asserted to avoid paying the Guaranteed Obligations are meritless and should be rejected.

## III.     Respondent Owes Claimant Its Costs And Expenses Incurred In Connection With Enforcing the Guaranty

The Guaranty unambiguously requires Respondent to pay "all costs and expenses (including court costs and reasonable attorneys' fees) incurred by [Claimant] in the enforcement

---

[123] Sitomer Aff., Ex. 1 [JV Agreement] § 3.5; *id.* at 18 (definition of "Mandatory Redemption Date").

hereof or the preservation of [Claimant's] rights hereunder" if it failed to pay the Guaranteed

Obligations within 10 days after demand.[124]  Claimant demanded payment of the Guaranteed

Obligations on November 19, 2021, and Respondent has never paid them.

Claimant is therefore entitled to recover from Respondent its costs and expenses in

connection with enforcing its rights under the Guaranty.

## CONCLUSION

For the foregoing reasons, Claimant respectfully requests that Your Honor enter

judgment in favor of Claimant and against Respondent, and awarding Claimant:

(i) $189,248,400.09, an amount that includes the Guaranteed Obligations, comprising the Redemption Amount owed as of March 31, 2022, the Bankruptcy Fees and the Arbitration Fees billed as of March 31, 2022;

(ii) all future Bankruptcy Fees incurred in connection with the Bankruptcy until the Bankruptcy ceases;

(iii) all future Arbitration Fees incurred in connection with the Arbitration, which might include Claimant's efforts to enforce an arbitration award in the event that Claimant prevails;

(iv) the future accrued and unpaid Preferred Equity Return that will accrue, after June 30, 2022, at the Preferred Increased Return Rate until there is a Redemption in Full; and

(v) awarding Claimant all other amounts Your Honor deems just and proper.

Because items (ii), (iii) and (iv) above apply to amounts Respondent will owe in the

future, Claimant further respectfully requests that in the event a final judgment is awarded in its

favor, the judgment provides for a mechanism by which Claimant can submit future Bankruptcy

---

[124] Ex. 2 [Guaranty] §1.7.  New York courts regularly uphold such provisions.  *See, e.g.*, *Cargill Soluciones Empresariales, S.A. de C.V., SOFOM, ENR v. Farallon*, 146 A.D.3d 439, 441 (1st Dep't 2017) (holding that plaintiff may seek judgment under guaranty provision that "expressly provides that the guarantor will be liable for any expenses, including legal fees, incurred in [the guaranty's] enforcement…."); *NYSOS Assocs., LLC v. Ottomanelli*, 49 Misc. 3d 60, 62 (N.Y. App. Term. 2015) (upholding guaranty provision entitling landlord to recover fees in any action arising out of the guaranty).

Fees, Arbitration Fees, and any additional Preferred Equity Return amounts for payment

through the date of payment.

DATED:  March 31, 2022                          Respectfully submitted,

                                               KASOWITZ BENSON TORRES LLP

                                               By:  /s/ Mark P. Ressler
                                                    Mark P. Ressler
                                                    Paul M. O'Connor III
                                                    Jasen Fears
                                                    1633 Broadway
                                                    New York, New York 10019
                                                    Telephone: (212) 506-1700
                                                    mressler@kasowitz.com
                                                    poconnor@kasowitz.com
                                                    jfears@kasowitz.com

                                                    Henry B. Brownstein
                                                    1399 New York Ave., NW, Ste. 201
                                                    Washington, D.C. 20005
                                                    T 202.760.3400
                                                    hbrownstein@kasowitz.com

                                               *Attorneys for Claimant 245 Park Member LLC*

# EXHIBIT E

**JAMS ARBITRATION**
**NEW YORK, NEW YORK**
**_____**

**245 PARK MEMBER, LLC**

     **Claimant,**

        **and**                               **JAMS Ref. No. 5425000065**

**HNA GROUP (INTERNATIONAL)**
**COMPANY LIMITED,**

     **Respondent.**
**_____**

**Final Award**

1. <u>Parties and Counsel</u>:    The parties to this arbitration are identified in the caption and are represented as follows:

    <u>Counsel for Claimant:</u>

    Kasowitz Benson Torres LLP
    Mark P. Ressler
    Paul M. O'Connor III
    1633 Broadway
    New York, New York 10019
    Tel: (212) 506-1700
    Email: mressler@kasowitz.com
    Email: poconnor@kasowitz.com

    Henry B. Brownstein
    1399 New York Ave., NW, Ste. 201
    Washington, D.C., 20005
    Tel: (202) 760-3400
    Email: hbrownstein@kasowitz.com

    <u>Counsel for Respondent:</u>

    King & Wood Mallesons LLP
    Vincent Filardo, Jr.
    Aaron T. Wolfson
    500 Fifth Avenue, 50th Floor
    New York, New York 10110
    Tel: (212) 319-4755

Email: Vincent.filardo@us.kwm.com
Email: aaron.wolfson@us.kwm.com

2. Arbitrator:

Hon. L. Priscilla Hall, Ret.
JAMS
620 Eighth Avenue
34th Floor
New York, New York 10018
Tel.: (212) 607-2789
Fax: (212) 751-4099
Email: phall@jamsadr.com

3. JAMS Case Manager:

George Cuervos
JAMS
620 Eighth Avenue
34th Floor
New York, New York 10018
Tel.:  212 607-2789
Fax:  212 751-4099
Email: gcuervos@jamsadr.com
Place of Arbitration:  New York, New York via Zoom
Date of Final Award: April 30, 2022

THE UNDERSIGNED ARBITRATOR, having been designated in accordance with Section 5.4 Arbitration of the Amended and Restated Guaranty dated November 19, 2018, a Decision on Scheduling having been issued on March 21, 2022 and the Arbitrator having examined the submissions, proofs, pleadings, allegations of the parties as well as the numerous letters, exhibits and caselaw provided by counsel, finds, concludes and issues this Final Award as follows:

## I.   Introduction and Procedural Statement

This dispute arises out of the claim by 245 Park Member LLC, Claimant that HNA Group (International) Company Limited, Respondent, breached the Guaranty entered into by the

parties by failing to pay on demand more than $180 million. A demand for Arbitration with JAMS was filed on December 21,2021 and an "Answering Statement And Objections" on January 24, 2022. The Demand and Answer seek a determination of the claim.

The Arbitrator was selected as sole arbitrator pursuant to the arbitration provision contained in Section 5.4 of the Amended and Restated Guaranty. The Arbitrator was appointed on January 20, 2022, and the matter proceeded under the JAMS Streamlined Arbitration Rules and Procedures and 5.4 of the Guaranty. The arbitration and Guaranty are "governed by and construed in accordance with the substantive laws of the State of New York." (5.3 Governing Law of the Guaranty).

## II.   Decision on Scheduling

This Final Award follows my prior Decision on Scheduling dated March 22, 2022 ("Scheduling Decision").   That decision determined inter alia that the Guaranty provides that:

> (1) The parties agreed to an expedited arbitration process that included waiving discovery and an evidentiary hearing;

> (2) Each party shall submit its position on each matter in dispute to the arbitrator within seven business days following the appointment of the arbitrator;

> (3) The arbitrator shall consider only the materials submitted to her for resolution and issue a final non-appealable award within 30 days after submission

> (4) There was no time allocated for discovery or a hearing and no language in the Guaranty providing for either discovery or a hearing;

(5) Finally, the order directed the parties to file their submissions on the merits by March 21, 2022, seven business days from the date of the Order.

Decision was reserved "on the other arguments raised concerning the Respondent's alleged *in pari delicto* and fraud defenses, including whether the defenses were waived in the Guaranty, until further briefing on the merits." *Id.* at 14. The decision also held that, "at this time there will not be a hearing, but if "the submissions raise a question of fraud, [it will be] address[ed] after [a] review of the submissions." *Id.* at 12. Thus, while reserving judgment on the *in pari delicto* and fraud defenses, the Arbitrator declined Respondent's invitation to avoid the expedited procedures agreed to by the parties when they negotiated and subsequently executed the Guaranty which excluded the opportunity for discovery in this proceeding. As a result, each party was required, through its instant submission on the merits, to meet their respective burdens of proof -- Claimant on its claim on the guaranty, and Respondent on its pled affirmative defenses to said claim -- based on the materials each had, or could obtain, without the benefit of the discovery and hearing process.

## III.    Background

This arbitration arises in connection with disputes relating to a joint venture agreement and property management and leasing agreement concerning a commercial office tower at 245 Park Avenue in New York City. Claimant filed this arbitration seeking to enforce the terms of a Guaranty pursuant to which it claims it is entitled to the immediate payment of more than $180 million. *See* Demand for Arbitration ¶ 2. Claimant alleges that Respondent, one of the Guarantors, breached the Guaranty by failing to pay on demand certain obligations, which include the payment of obligations

of Respondent's affiliate, 245 Park JV LLC (the "Company"), pursuant to the Second

Amended and Restated Limited Liability Company Agreement of 245 Park JV LLC,

dated November 19, 2018 (the "JV Agreement"), entered into between Claimant and

HNA 245 Park Ave JV LLC ("HNA JV Member"). *See* Demand for Arbitration ¶¶ 2-3.

Claimant alleges that as consideration for a $148 million investment in the

Company, it negotiated and secured significant rights and protections in the JV

Agreement, including preferred quarterly distributions and guarantees of performance

which are set forth in the Guaranty. *Id.* ¶ 5. According to Claimant, the JV Agreement

provides the repayment of Claimant's investment (the "Redemption Amount") by a

date no later than June 30, 2022 ("Mandatory Redemption Date"), and the Respondent,

along with two of its affiliates, guaranteed the payment of the full amount of the

Redemption Amount in the Guaranty. *Id.* ¶ 6. The Guarantor's two affiliates are now in

bankruptcy. *Id.* ¶ 7.

Claimant alleges that the Company failed to make mandatory quarterly

distributions, which had "cascading effects under the JV Agreement, including the

acceleration of the Mandatory Redemption Date." *Id.* ¶ 8. In addition, the failure to pay

the Redemption Amount, once due, triggered additional consequences, including

certain "Forced Sale Rights" of Claimant. *Id.* ¶¶ 9-12. Claimant alleges that HNA JV

Member and affiliates devised a scheme to deprive it of its rights by among other

things, the Company's filing for bankruptcy on October 31, 2021, and making certain

unauthorized "major decisions" it was required to get approval from Claimant to make.

*Id.* ¶ 13. Claimant contends the bankruptcy filing accelerated the Mandatory

Redemption Date to November 10, 2021, and because the Company cannot pay in response to a demand for payment, triggered the Guaranty.

Respondent disputes Claimant's interpretation of events and specifically denies that the Company failed to make any mandatory quarterly distributions or that the bankruptcy filing, or any other actions, triggered the acceleration of the Mandatory Redemption Date. *See* Answering Statement and Objections at 3. In addition, Respondent argues that it is Claimant's own actions, or those of its affiliates, that led to the current dispute. *Id.* at 3-6. Respondent alleges defenses of fraud and *in pari delicto* asserting that "Claimant made material misrepresentations and omissions, both before and after entering into the JV Agreement and Guaranty, to wrongfully take control of the Property and obtain payment from Respondent under the Guaranty by encumbering the Company's cash flows through its intentional failure to secure a replacement tenant for [Major League Baseball], thereby triggering cascading events of default that would enable a forced sale of the Property to Claimant." Respondent's 3/10/22 Letter at 1-2.

## IV.    The Relevant Agreements

Three agreements, each of which are discussed briefly, were entered into by Claimant and Respondent and/or its affiliates, are directly relevant to this investment: (1) the Amended November 19, 2018, Joint Venture Agreement ("JVA"); (2) the November 18, 2018 Guaranty ("Guaranty"); and (3) the Property Management and Leasing Agreement ("Property Agreement").

### A.     The Guaranty

Claimant signed the Guaranty with three entities: (1) Respondent (HNA Group (International) Company Limited); (2) Respondent's affiliate HNA JV Member (with which it also signed the JVA); and (3) Respondent's affiliate HNA Group Co. Ltd.  While HNA JV Member and HNA Group Co. Ltd. both filed bankruptcy petitions on October 31, 2021, Respondent has not. As a result, Respondent remains jointly and severally liable for the full amount of the Guaranty, notwithstanding the bankruptcy filings of its affiliates.  *See* Guaranty ¶ 5.7.

### B.     November 19, 2018, Joint Venture Agreement

Claimant entered into the November 19, 2018, Second Amended and Restated Limited Liability Company Agreement of 245 Park JV LLC with only Respondent's affiliate HNA 245 Park Ave JV LLC ("HNA JV  Member").  As amended, the JVA provided, *inter alia*, that Claimant's consent was required for a list of 43 enumerated "Major Decisions."  JVA § 4.2.

Specifically, according to Claimant, under the Joint Venture Agreement, the parties agreed that Claimant's consent was required to carry out the 43 major decisions which included:

(1)     "effectuating capital expenditures not provided for in" an agreed-to budget;

(2)     approving the budget;

(3)     entering into "any contract pursuant to which the Company will incur an obligation in excess of $100,000 per year;"

(4)     "filing for bankruptcy";

(5)     "entering into 'any agreement; with any 'leasing agent, property manager . . . to render services for the Company or any Subsidiary,'";

(6)    "making any amendment or modification to this Agreement or the Certificate of Formation, or to the organizational documents of any Subsidiary," and

(7)    engaging "accountants . . . advisors, attorneys . . . or other professionals to render services for the Company or any of the Subsidiaries."

Claimant's Brief at 9-10; Sitomer Aff., Ex. 1 [JV Agreement] § 4.2; *id.* at 13-17 (definitions (a), (d), (p), (t), (z), (aa), (jj), (nn) and (oo) of "Major Decision").

Failure to obtain consent for these actions constituted a "Cause Event" under the Joint Venture Agreement.  JVA at 5-6 (emphasis added) ("Cause Event" means the occurrence of any of the following: . . . the Managing Member takes or causes any of the Companies to take an action that constitutes a Major Decision without the prior written approval of the Investor Member, which action has more than an immaterial effect on the Investor Member, the Company, any Subsidiary, the Property or any other Company Assets"); *id.* at 1 ("245 PARK MEMBER LLC, a Delaware limited liability company (the "Investor Member") . . . ."); Sitomer Aff., Ex. 1 [JV Agreement] at 6 (definition (b) of "Cause Event"); Claimant's Br. at 10.

 The occurrence of a "Cause Event," accelerates the date by which the Company must pay the Redemption Amount from June 30, 2022, to "ten (10) days following the occurrence of any "Cause Event."  *Id.* at 18; Sitomer Aff., Ex. 1 [JV Agreement] at 18 (definition of "Mandatory Redemption Date").

The Claimant explains in a footnote that:

"[t]he Company's failure to pay the full Redemption Amount by the accelerated Mandatory Redemption Date is a "Redemption Trigger Event," which provides additional protection to Claimant in connection with its investment. Among other things, a Redemption Trigger Event rearranges the payment waterfall such that Claimant receives all excess cash flows, not just the Mandatory Distribution amount, until the Redemption Amount is paid in full. Sitomer Aff.,

> Ex. 1 §§ 9.2(a), 9.2(b). Also upon a Redemption Trigger Event, Claimant 'is entitled to exclusive, complete and full operational control of the Property,' and HNA JV Member agreed 'to facilitate and cooperate with such immediate transfer of managerial and operational control . . . .' *Id.* § 11.5(f). And, Claimant has 'Forced Sale' rights that 'shall occur automatically,' and 'without the requirement of any action from either Member.' *Id.* § 11.4(a). As part of its Forced Sale rights, Claimant can, at its sole option, choose to buy either the Property, the Company's direct and indirect equity interests in the Subsidiaries, or HNA JV Member's interest in the Company. *Id.* §§ 11.4(a), 11.4(b)."

Claimant's Brief at 10 n.27.

As a result, according to Claimant, although the Redemption Amount -- *i.e.*, the approximate original investment of $148 million -- would have otherwise become due and payable approximately two months from now on June 30, 2022, if the "Redemption Trigger Event" is found to have occurred, the Claimant will obtain a panoply of rights it would otherwise not have, including "Forced Sale" rights.

It is uncontested that, in agreeing to this provision, Respondent was a sophisticated business entity represented by sophisticated attorneys throughout the negotiation process. Thus, this provision was assumedly a benefit of the bargain for Claimant, in exchange for the benefit of the bargain of Respondent of a substantial financial investment of $148 million.

### C.  The Property Management Agreement

The Property Management and Leasing Agreement ("Property Management Agreement") was entered into between Claimant's affiliate S.L. Green Management Corp.[1] and Respondent's affiliate,  245 Park Avenue Property who directly owns the Property.

---

[1]  Claimant identifies this entity as "SL Green Realty Corp." in its arbitration demand but S.L. Green Management Corp signed the Property Management Agreement and is referenced in Claimant's affidavits. *See* Property Management Agreement (recital ad signature line).

Although neither Claimant nor Respondent individually signed the Property Management Agreement, Respondent alleges that Claimant, through its subsidiary signatory to the agreement, took wrongful actions and inactions, to *inter alia*, "take control of the Property and obtain payment from Respondent under the Guaranty by encumbering the Company's cash flows." Respondent's 3/10/22 Letter at 1-2.

## V.     The Asserted Claim and Defenses Concerning Payment of the Guaranty

The claim on the Guaranty is set forth in a certain "JAMS Demand for Arbitration" dated December 21, 2021.  Respondent submitted "Answering Statement and Objections" on January 24, 2022.  In its demand for Arbitration Claimant seeks the "immediate payment of the Guaranteed Obligations from the Guarantor" based on the following :

(1)     The Guaranty is a valid, binding and enforceable contract;

(2)     The Guaranteed Obligations were triggered by the Cause Events outlined in the demand;

(3)     Claimant sent a demand for payment to the Guarantor on November 19, 2021;

(4)     Guarantor breached the Guaranty by failing to pay the Guaranteed Obligation on demand;

(5)     The Guarantor has expressly waived all rights and defenses under the Guaranty:

(6)     Claimant has performed all conditions, covenants and promises necessary to commence this arbitration;

(7)     Claimant has suffered substantial damages as a result of the Guarantor's breach of the Guaranty

Demand for Arbitration ¶¶ 18-24.

In its "Answering Statement and Objections," the Respondent Objects and argues that the

arbitration must be stayed pending the outcome of the Company's bankruptcy.

Respondent further enters a general denial of "each and every allegation of wrongful

conduct contained in the demand and denies that Claimant is entitled to recover damages

or attorney's fees in the amounts alleged or in any amount whatsoever from the

Respondent." Respondent further argues:

> (1)    that the Company made all required distributions under the JV
> Agreement;
>
> (2)    the bankruptcy is not a "Cause Event "under the JV Agreement; and
>
> (3)    Claimant caused its affiliate to materially breach the property management
> and leasing agreement in a fraudulent scheme to sabotage the Company and
> take over the property.

;Answering Statement and Objections at 3-6.

    The Respondent raises five affirmative defenses as follows:

(1)    The arbitration must be stayed pursuant to the United States Bankruptcy

Code;

(2)    The demand fails to state a claim upon which relief can be granted;

(3)    The claims are barred by the Doctrines of Waiver, Ratification and Estoppel;

(4)    The claims are barred by the Doctrine of Unclean Hands and fraud; and

(5)    The claims are barred by the absence of actual damages to Claimant caused
by Respondent

## VI.    Analysis

To prevail on its claim for "the immediate payment of the Guaranteed Obligations from the Guarantor", Claimant must prove the existence of the guaranty, the underlying debt and the guarantor's failure to perform under the guaranty.   *Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A., 'Rabobank Int'l,' N. Y. Branch v. Navarro*, 25 N.Y.3d 485, 492 (N.Y. 2015) (internal quotations and citations omitted).  VNB New York, LLC v Y.M. Intercontinental Gem Corp., 154 A.D.3d 903, 905 (2d Dep't. 2017) (affirming summary judgement enforcing "absolute and unconditional" guaranty where plaintiff proved a guaranty, the underlying debt and the guarantor's failure to perform under the guaranty").

 As part of its submissions Claimant has produced the Guaranty, the Second Amended and Restated Limited Liability Agreement of 245 JV LLC entered into between Claimant and HNA 245 Park JV LLC thereby establishing the existence of the Guaranty and proof of the underlying debt of $148 million.   Indeed, neither of these elements is challenged by the Respondent.  The third element requires the Claimant to establish that the Respondent has failed to perform under the Guaranty causing it injury.  It is this element that the Respondent contests.

To meet this third element the Claimant points to the "Guaranteed Obligations" under the Guaranty dated November 18, 2018, and the Joint Venture Agreement. The JVA recites 43 Major Decisions the Respondent is prohibited from making without the Claimants authorization. If the Respondent does so, a Cause Event is triggered which accelerates the Company's payment obligations to pay the Redemption Amount within ten days.  Three of the four Major Decisions Claimant submits were made without its authorization, are uncontested by the Respondent.

Case 1:22-cv-05136-JGK   Document 1-1   Filed 06/17/22   Page 192 of 229

The three uncontested Major Decisions" made by Respondent's subsidiaries without authorization by or for that matter knowledge of Claimant, and that as a result, violated the Joint Venture Agreement, are:

(1)     "Hiring Agents And Modifying Agreements". On October 29, 2021, the Debtors appointed two so-called "Independent Agents" for $20,000 a month each for the sole purpose of facilitating the Bankruptcy filing, thereby "engaging . . . professionals to render services for the Company [and] its Subsidiaries]," modifying the Joint Venture's organizational documents, and entering into contracts for more than $100,000 in compensation per year as set forth in definitions (t), (jj), (nn) and (oo) of Major Decision";[2]

(2)     "Hiring a Chief Restructuring Officer. On October 25, 2021, the Debtors hired a Chief Restructuring Officer, thereby "engaging . . . professionals to render services for the Company [and] its Subsidiaries" as set forth in definitions (nn) and (oo) of Major Decision; and[3]

(3)     "Hiring Lawyers. On or before October 17, 2021, the Debtors engaged White & Case as restructuring counsel, thereby "engaging . . . professionals to render services for the Company [and] its Subsidiaries" as set forth in definitions (nn) and (oo) of "Major Decision."53 See Ressler Aff., Ex. 2 at 20:12-21 (testifying that "debtor's representative" "from White & Case, Mr. Greg Pesce," first contacted him "October 17, [2021]")."[4]

Claimant's Br. at 16-17.

---

[2]     Sitomer Aff., Ex. 1 [JV Agreement] at 13 et seq. (Definition of Major Decision); Ressler Aff., Ex. 5 [MTD Transcript] at 70-71.

[3]     Sitomer Aff., Ex. 1 [JV Agreement] at 17; Ressler Aff., Ex. 5 [MTD Transcript] at 18:6-13.

[4]     Sitomer Aff., Ex. 1 [JV Agreement] at 17; Ressler Aff., Ex. 5 [MTD Transcript] at 19:10-14. Respondent also took several additional actions on October 31, 2021, including filing for bankruptcy.

The testimony by Moshin Y.Meghi, the Chief Restructuring officer of the Debtors, HNA JV Members, the Company and the HNA Subsidiaries, is telling. On cross examination, Mr Meghi testified as follow:

"Q: "And you were first approached in connection with this action on or around October 17th,(2021) do you recall that? "

A: "Yes"

Q: "And you were approached by an attorney at White and Case?"

A: "Correct."

Q: "correct? And then you were ultimately retained as the chief restructuring officer on October 25th?"

A: "Yes"

A short time later in that cross-examination the following exchange occurred.

Q: "So now I want to focus you in on that time period when you were first hired -- or first contacted about this, and before you were actually retained. So you testified that you were contacted on October 17th by White & Case, correct? "

A:" Yes. "

Q: "And you were told that this issue involved a real estate related matter, right? "

A: "Correct. "

Q: "And you were asked whether you had any conflicts with SL Green."

A: "Correct."

While contesting many other grounds concerning Claimant's claims of a breach of the JVA, Respondent fails to contest any of these three "Major Decisions" grounds as a material breach of the JVA. Moreover, Claimant argues, without response, that hiring White & Case, no later than October 17, 2021, breaches the JVA, and accelerates the Mandatory Redemption Date to no later than October 27, 2021 -- four days before the bankruptcy filing by Respondent's affiliates, Accordingly, these actions were "Major Decisions" under the JVA Agreement that were taken by Respondent without the consent of Claimant and accelerated the Mandatory Redemption Date.

### B. Respondent's Affirmative Defenses

Respondent asserts five affirmative defenses in response to Claimant's claim on the Guaranty:

(1)    The Arbitration must be stayed pursuant to the United States Bankruptcy Code;

(2)    The Demand fails to state a claim upon which relief can be granted;

(3)    The claims are barred by the Doctrines of Waiver, Ratification, and Estoppel;

(4)    The claims are barred by the Doctrine of Unclean Hands and Fraud; and

(5)    The claims are barred by the absence of actual damages to Claimant caused by Respondent.

Answering Statement and Objections at 6-7.

Respondent's Submissions on the Merits does not address its affirmative defenses of: (2) "The demand fails to state a claim upon which relief can be granted";[5] (3)

---

[5]    Respondent reframes this asserted defense as an additional articulation of its bankruptcy defense. Respondent's Br. at 19.

"the claims are barred by the doctrines of Waiver, Ratification, and Estoppel, and (5) the claims are barred by the absence of actual damages to Claimant caused by Respondent". Instead, it focuses its opposition on the affirmative defenses of (1) The Arbitration Must be Stayed pursuant to the United States Bankruptcy Code, Fraud and *in pari delicto* and on bankruptcy stay-related arguments.

Section 5.4 of the Guaranty, the Arbitration Clause, provides that the "arbitrator shall be bound by the provisions of this Guaranty and by Applicable Law and shall select the position proposed by a party for each disputed item (and no other position), which, in his or her opinion, would be consistent with applicable legal requirements…:." In conformance with the above stated requirement, the Arbitrator determines that the Respondent has failed to meet its burden of proof to establish that the Claimant has failed to state a claim upon which relief can be granted , that the Claimants claims are barred by the doctrines of Waiver, Ratification and Estoppel and the claims are barred by the absence of actual damages to Claimant caused by Respondent.

### C. Respondent Validly Waived its Fraud in the Inducement Defense Concerning All Pre-Execution Conduct

The New York Court of Appeals has approved broad waivers in guaranties, that contain language obligating the guarantor to payment without recourse to any defenses or counterclaims. Guaranties that are 'absolute and unconditional,' are typically enforceable. *Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A., 'Rabobank Int'l,' N.Y. Branch v. Navarro*, 25 N.Y.3d at 493 (collecting cases) ("Guaranties that contain language obligating the guarantor to payment without recourse to any defenses or counterclaims, i.e., guaranties that are 'absolute and unconditional,' have been consistently upheld by New

FILED: NEW YORK COUNTY CLERK 05/20/2022 08:24 PM
NYSCEF DOC. NO.

INDEX NO. 656421/2022
RECEIVED NYSCEF: 05/20/2022

Case 1:22-cv-05136-JGK   Document 1-1   Filed 06/17/22   Page 196 of 229

York courts"). Such enforceable waivers extend "even to claims of fraudulent inducement in the execution of the guaranty." *Id.*

The fundamental principle behind the New York Court of Appeals' embrace of enforceable "absolute and unconditional" waivers of all pre-execution claims is that failing to enforce "absolute and conditional" waivers would permit the defendant guarantor to escape accountability for *its own* prior *misrepresentation* to the claimant, that the guaranty was "absolute and unconditional." Thus, the New York Court of Appeals has held that, "[g]iven the substance of the guaranty, to permit defendants to assert that the bank induced them to sign 'would in effect condone defendants' own fraud in deliberately misrepresenting [their] true intention when putting their signatures to their 'absolute and unconditional' guarantee. In other words, because defendants had assured the banks that their guaranty to pay the loan was not subject to any defenses, they were bound to their promise." *Id.* (quoting *Citibank, N. A. v. Plapinger*, 66 N.Y.2d 90, 95 (N.Y. 1985); *Danann Realty Corp. v. Harris*, 5 NY2d 317, 323, (N.Y. 1959)) (internal citations omitted)).

Affirming this principle, the New York Court of Appeals opined that in *Plapinger that* it had rejected the need for specific disclaimers of reliance holding:

> that under the 'absolute and unconditional' language of the guaranty, defendants were foreclosed from asserting their fraud in the inducement defense. In reaching this conclusion the Court rejected the need for defendants' specific disclaimer of reliance on the banks' oral representations. Instead, the Court determined, quoting from the guaranty, that defendants agreed 'that the 'absolute and unconditional' nature of their guarantee was 'irrespective of (i) any lack of validity . . . of the . . . Loan Agreement . . . or any other agreement or instrument relating thereto,' or '(vii) any other circumstance which might otherwise constitute a defense' to the guarantee'

*Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A., 'Rabobank Int'l,' N.Y. Branch*, 25 N.Y.3d at 494. It further opined that in such instances, "[g]iven the substance of the

guaranty, to permit defendants to assert that the bank induced them to sign 'would in effect condone defendants' own fraud in 'deliberately misrepresenting [their] true intention' when putting their signatures to their 'absolute and unconditional' guarantee." *Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A., 'Rabobank Int'l,' N.Y. Branch*, 25 N.Y.3d at 494 (quoting *Danann Realty Corp. v Harris*, 5 NY2d 317, 323 (N.Y.1959)).

Applying this precedent to the guarantee before it, the *Cooperatieve* Court found the "defendant specifically agreed that his 'liability . . . under this Guaranty shall be absolute and unconditional irrespective of: (i) any lack of validity or enforceability of [the] agreement . . . ; . . . or (iv) any other circumstance which might otherwise constitute a defense available to, or a discharge of, the Seller . . . or a guarantor." *Id.* It reasoned, "[b]y its plain terms, in broad, sweeping and unequivocal language, the guaranty forecloses any challenge to the enforceability and validity of the documents which establish defendant's liability for payments arising under the purchase agreement, as well as to any other possible defense to his liability for the obligations of the . . . businesses." *Id.* Indeed, it noted that this was "the same language which foreclosed the defendants' fraud in the inducement defense in *Plapinger*." *Id.* at 494.

The transaction and Guaranty language found in the instant matter is strikingly similar are to those found in Plapinger and the Court of Appeals might have been describing the parties to this arbitration when it held,

> Following extended negotiations between sophisticated business people, what has been hammered out is a multimillion dollar personal guarantee proclaimed by defendants to be 'absolute and unconditional.' It is unrealistic in such circumstances to expect an express stipulation that defendants were not relying on a separate oral agreement to fund an additional multimillion dollar line of credit, when they themselves have denominated their obligation unconditional, and have reinforced that declaration by their agreement that the 'absolute and unconditional' nature of their guarantee was 'irrespective of

(i) any lack of validity * * * of the * * * Restated Loan Agreement * * * or any other agreement or instrument relating thereto', or '(vii) any other circumstance which might otherwise constitute a defense' to the guarantee.

*Citibank, N. A. v. Plapinger*, 66 N.Y.2d 90, 95 (N.Y. 1985); *see also Danann Realty Corp.*, 5 N.Y.2d at 323 ("If the language here used is not sufficient to estop a party from claiming that he entered the contract because of fraudulent representations, then no language can accomplish that purpose. To hold otherwise would be to say that it is impossible for two businessmen dealing at arm's length to agree that the buyer is not buying in reliance on any representations of the seller as to a particular fact.").

And the Second Circuit has held, relying on *Cooperatieve* and *Plapinger*:

"As to the Guaranty, 'broad, sweeping and unequivocal language' in an absolute and unconditional guaranty generally 'forecloses any challenge to the enforceability and validity of the documents which establish defendant's liability for payments arising under the [underlying] agreement, as well as to any other possible defense to his liability for the obligations."

*136 Field Point Circle Holding Co., LLC v. Invar Int'l Holding, Inc.*, 644 F. App'x 10, 12 (2d Cir. 2016); *see also Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 188 F.3d 31, 35 (2d Cir. 1999) ("Absolute and unconditional guaranties have in fact been found to preclude guarantors from asserting a broad range of defenses under New York law.").

The waivers in this matter track the language in *Cooperatieve*, *Plapinger*, and *136 Field Point* providing that the guaranty was:

(1)     made "unconditionally, absolutely and irrevocably";[6]

---

[6]     Guaranty § 1.2 ("Subject to the terms of this Section 1.2, each Guarantor hereby unconditionally, absolutely and irrevocably, as a primary obligor and not merely as a surety, guarantees to SLG the punctual and complete payment in full ( and not merely the collectability) of and shall pay or cause to be paid to SLG (i) the full amount of the Redemption Amount if, as and when the Redemption Amount becomes due and payable by 245 Park JV to SLG pursuant to the JV Agreement . . . .").

(2)    waived "irrevocably and unconditionally any common law, equitable or statutory or other rights" including 22 specifically enumerated rights and defenses; and [7]

(3)    with respect to "any [] circumstance which might in any manner or to any extent constitute a defense available to Guarantors"[8]

Claimant's Br. at 1; Guaranty §§ 1.2, 1.3(a), (c), 1.3(c)(xi).

The release further states in pertinent part: "the liability of Guarantors under this Guaranty shall not be affected, released, terminated, discharged or impaired, in whole or in part, by, and [Claimant] may proceed to exercise any right or remedy hereunder irrespective of, and Guarantors irrevocably and unconditionally waive any common law, equitable, statutory or other right which Guarantor might possess as a result of or in connection with, any or all of" 22 rights and defenses (the "Waived Rights and Defenses"). Guaranty § 1.3(c).

The 22 waivers of rights and defenses included:

(i)    "any lack of genuineness, regularity, validity, legality or enforceability, or violability of . . . any [] agreement or instrument relating to the Preferred Equity Interest";

(iii)   any renewal, extension, increase, modification, alteration or rearrangement of all or any part of . . . the JV Agreement;

---

[7]    Guaranty § 1.3(c) ("Each Guarantor hereby consents and agrees to each of the following, and agrees that the liability of Guarantors under this Guaranty shall not be affected, released, terminated, discharged or impaired, in whole or in part, by, and SLG may proceed to exercise any right or remedy hereunder irrespective of, and Guarantors irrevocably and unconditionally waive any common law, equitable, statutory or other rights which Guarantors might possess as a result of or in connection with, any or all of the following: . . . ."); *id.* § 1.3(a) ("Guarantors covenant and agree (i) that this is a guaranty of payment and not merely of collection and (ii) to fulfill and pay the Guaranteed Obligations, in each case, regardless of any law, statute, rule, regulation, decree or order now or hereafter in effect in any jurisdiction affecting or purporting to affect in any manner any of such terms or the rights or remedies of SLG with respect thereto.").

[8]    Guaranty § 1.3(c)(xi) ("[A]ny other circumstance which might in any manner or to any extent constitute a defense available to Guarantors, or vary the risk of Guarantors, or might otherwise constitute a legal or equitable discharge or defense available to a surety or guarantor, whether similar or dissimilar to the foregoing ( other than the defense of payment)."

(iv)    any change in the time . . . of payment of all or any portion of the Preferred Equity Investment or Preferred Return to Claimant;

(xi)    any [] circumstance which might in any manner or to any extent constitute a defense available to Guarantors . . . ;

(xiv)   the insolvency, bankruptcy, arrangement, adjustment, . . . or lack of power of [the Company or] HNA [JV] Member ;

(xv)    to the maximum extent permitted by applicable law, the invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations, the Preferred Equity Investment, the Preferred Return, the Redemption Fee, the JV Agreement . . . for any reason whatsoever, including without limitation . . . (E) [the Company] has valid defenses, claims or offsets (whether at law, in equity or by agreement) which render the Preferred Equity Investment, the Preferred Return or the Redemption Fee wholly or partially uncollectible from [the Company] . . . (G) the unenforceability of any remedies of [Claimant] under the JV Agreement . . .;

Claimant's Br. at 12; Guaranty § 1.3(c)(i), (iii), (iv), (xi), (xiv), (xv).

Indeed, the language in *Cooperatieve*, *Plapinger*, and *136 Field Point*, is all but "indistinguishable," from the language at issue in the guaranty here. *136 Field Point Circle Holding Co., LLC*, 644 F. App'x at 12-13 (holding "[t]his case is indistinguishable from" *Cooperatieve* and *Plapinger* where the guarantor "guaranteed 'absolutely, unconditionally and irrevocably . . . each and every one of the liabilities and obligations . . . under the [Lease]' and agreed that its obligations 'shall be absolute under any and all circumstances, without regard to the validity, regularity or enforceability of the [Lease].  These 'plain terms, in broad, sweeping and unequivocal language,' bound" [guarantor] to the obligations"); *Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A., 'Rabobank Int'l,' N.Y. Branch*, 25 N.Y.3d at 494 (guarantee waiver language in *Cooperatieve* was "the same

language which foreclosed the defendants' fraud in the inducement defense in *Plapinger*");

*see also Danann Realty Corp. v. Harris*, 5 N.Y.2d at 323.

Moreover, here, as in *Cooperatieve*, Respondent's argument concerning "collusion . . .

is ultimately based on a quintessential defense of fraud." *Id.* at 495. And here, just as in

*Cooperatieve*, "to accept [Respondent's fraud] argument, [I] would ignore th[e] Court's

admonition in *Plapinger*," and "in effect condone [Respondent's] own fraud in 'deliberately

misrepresenting [its] true intention' . . . when putting [its] signature[ ] to [his] 'absolute and

unconditional' guarantee.'" *Id.*

Simply put,  these precedents stand for the common sense proposition that, "a

guarantor cannot seek to benefit from the guarantor's *own fraudulent promise* that the

guaranty is 'absolute and unconditional.'" *Cooperatieve Centrale Raiffeisen-Boerenleenbank,

B.A., 'Rabobank Int'l,' N.Y. Branch*, 25 N.Y.3d at 495. "This is particularly true when all

parties to the guaranty are 'sophisticated business people' who have 'hammered out . . . a

multimillion dollar personal guarantee,'" as was the case here. *In re Nissan Litig*., No. 17-cv-

729, 2018 U.S. Dist. LEXIS 77488, at *19 (S.D.N.Y. May 8, 2018) (quoting *Plapinger*, 66

N.Y.2d at 95).

Accordingly, Respondent's defense of fraud in the inducement based on pre-

execution conduct was waived under the Guaranty.[9]

---

[9]     To the extent that the contractual agreements do not state that they are disclaiming reliance on
any, as described by Respondent, "scheme to take over the Property" by Claimant, that level of specificity
of disclaimer, of potential malfeasance by a contracting party is, to put it lightly, far more specific than is
necessary for the applicable exception to apply. *See Plapinger*, 66 N.Y.2d at 95 ("It is unrealistic in such
circumstances to expect an express stipulation that defendants were not relying on a separate oral
agreement to fund an additional multimillion dollar line of credit, when they themselves have
denominated their obligation unconditional . . . ."). Additionally, as argued by Claimant: (1) "[t]he
Guaranty states specifically that Claimant "made [no] representation, warranty or statement to any
Guarantor in order to induce any Guarantor to execute this Guaranty"; (2) "[t]he Management Agreement
likewise provides that [t]here are no representation, agreements, arrangements or understanding, oral or

### D. Respondent's Post-Execution Fraud and/or *In Pari Delicto* Defense May be Protected from Waiver

Critically, however, Respondent rests much of its merit's brief argument on the applicability of an exception to the above-described waivability doctrines. The potential exception, addressed in *Canterbury*, and noted in *Cooperatieve*, is "the proposition that an absolute and unconditional guaranty does not foreclose a guarantor's challenge that the creditor's *wrongful post-execution conduct* triggered the event that accelerates or causes the guarantor's liability." *Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A., 'Rabobank Int'l,' N.Y. Branch*, 25 N.Y.3d at 496 (emphasis added) (citing *Canterbury Realty & Equip. Corp. v. Poughkeepsie Sav. Bank*, 135 A.D.2d 102 (3d Dep't 1988); *see also Compagnie Financiere de Cic et de L'Union Europeenne*, 188 F.3d at 37 ("We can imagine circumstances in which such a process would allow a creditor to collude with a debtor, partake in a fraudulent transfer of the debtor's funds or otherwise loot the corporation so as to obtain payments from both the debtor and the guarantor while exposing the guarantor to an inflated risk of recovering nothing from the original borrower").

---

written, among the parties hereto relating to the management of the Property, which are not fully expressed." Claimant's Br. at 32; *Sitomer Aff., Ex. 2 [Guaranty] § 2.4.; Sitomer Aff., Ex. 6 [Management Agreement] § 23.* More importantly, Respondent's affiliate agreed in the JVA not "to assert any claim against [Claimant] . . . that relates to any action taken by the Property Manager or any action the Property Manager fails to take . . . ." *Sitomer Aff., Ex. 1 [JV Agreement] § 15.4(b).* Respondent, which argues herein that the conflict was obvious, was necessarily aware of the potential conflict. *See HSH Nordbank AG v. UBS AG*, 95 A.D.3d 185, 205–06 (1st Dep't 2012) (dismissing fraud claim because it was unreasonable for plaintiff to rely on representation concerning a contemplated alignment of interest in light of disclosures in deal documents). Indeed, all of the arguments Respondent makes that the identified conflict of interest was obvious, are the *same reasons* that the disclaimers and disclosures of the relationship were sufficiently precise to result in a waiver of any fraud claim, based on a potential conflict concerning the relationship between Claimant and its property managing affiliate corporation. The circumstances of a potential conflict, known to all parties, were the same at the time the agreements were signed, as they are today.

Thus, guidance from the New York Court of Appeals, while certainly unfriendly to the unenforceability of absolute and unconditional waivers in guarantees, does not absolutely foreclose Respondent's arguments as to non-waivability regarding *post-execution* conduct that intentionally *causes* the breach resulting in the violation of the JVA and the right to the enforce this guaranty.  *But see also ImagePoint, Inc. v. JPMorgan Chase Bank, Nat. Ass'n*, 27 F. Supp. 3d 494, 515 (S.D.N.Y. 2014) (quoting *Hilgendorff v. Hilgendorff*, 241 A.D.2d 481, 481-82 (2d Dep't 1997) (rejecting *in pari delicto* defense where defendant "points to no fraud or illegality in the contract between [defendant] and [plaintiff]" and holding  "New York law is clear that '[a]n agreement which is lawful on its face' . . . 'and which does not contemplate or necessarily entail unlawful conduct in its performance is enforceable by the promisee even though he engages in unlawful activity in the agreement's performance.'")).   Nonetheless, this defense must fail for the reasons discussed below.

### E.  Respondent's Post-Execution Fraud and/or In Pari Delicto Defense(s) Fail

#### 1.  Whether Styled as Post-Execution Fraud or *In Pari Delicto* Defense Respondent Has Failed to Meet its Burden of Proof on this Post-Execution Conduct Defense

Even if  the defenses were not waived, Respondent has failed to meet its burden on this affirmative defense of actually *proving* post-execution fraud and/or *in pari delicto* by a preponderance of the evidence.  According to Respondent, Claimant, post-execution, directed its affiliate Property Manager for the Property, to intentionally fail to find a replacement tenant for the MLB for the Property, with the purpose of bringing about the Respondent's breach of the Joint Venture Agreement.  Towards this end, it notes the

potential long-term benefit to Claimant of Respondent's or its affiliates' breach of the Joint

Venture Agreement, which would potentially, ultimately, give Claimant forced sale rights to

the Property.

But while this theory of self-interested post-execution conduct by Claimant is not an

*impossibility*, Respondent has failed to *prove* this affirmative defense is *more likely* than not.

*Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A., 'Rabobank Int'l,' N.Y. Branch.*, 25

N.Y.3d at 492 (after Claimant makes out a prima facie case "the burden shifts to the

defendant to establish, by admissible evidence, the existence of a triable issue with respect

to a bona fide defense"); *Kirschner v. KPMG LLP ("Kirschner III")*, 15 N.Y.3d 446, 459 n.3

(N.Y. 2010) ("in New York, in *pari delicto* is an affirmative defense"); Donovan v Rothman,

302 AD 2d 238 , 239 (N.Y. App Div. 2003) (plaintiffs claim against the hospital is barred by

the doctrine of  *in pari delicto*. Plaintiff were signatories to the allegedly illegal agreement)

When courts have approved the *in pari delicto* defense, a common element is the

presence of bad faith or intentionality. "The doctrine of *in pari delicto* mandates that the

courts will not intercede to resolve a dispute between two wrongdoers...where both

parties are equally culpable courts will not interpose in favour of either. The principle that

a wrongdoer should not profit from his own misconduct is so strong in New York that we

have said the defense applies even in difficult cases and should not be weakened by

exceptions".

The decisions Respondent rely on to support of its post-execution fraud or *in pari

delicto* defense generally require intentionality, or conduct demonstrating bad faith which

causes a breach.  *See, e.g., In re Futterman*, 602 B.R. 465, 480 (Bankr. S.D.N.Y. 2019)

(emphasis added) ("Of course, conduct does not amount to 'fraud' just because a guarantor

does not like the conductor or thinks that the conduct was unreasonable. *There must be proof of deliberate wrongdoing* — manipulation, collusion and/or deliberate misrepresentations — before public policy allows . . . to escape the waivers to which he agreed when he executed the Guaranty."); *Canterbury Realty & Equip. Corp. v. Poughkeepsie Sav. Bank*, 135 A.D.2d 102, 107 (3d Dep't 1988) (emphasis added) ("Thus, an issue of fact was presented as to whether the Bank *unfairly* brought about the occurrence of the very condition precedent (Canterbury's suspension of business) upon which it relied to accelerate the loan against the guarantors."); 6 Corbin, Contracts § 1265 at 52 ("There are cases, also, in which a promisee discharges the promisor from his contractual duty *by unjustly causing the happening of a condition of that duty*"); *Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A, 25 N.Y.3d at, 496,* (emphasis added) ("Thus, *Canterbury* stands for the proposition that an absolute and unconditional guaranty does not foreclose a guarantor's challenge that the creditor's *wrongful* post-execution conduct triggered the event that accelerates or causes the guarantor's liability.); *Cmty. Pres. Corp. v. Wadsworth Condos, LLC*, 2012 N.Y. Misc. LEXIS 6120, at *6 (Sup. Ct. 2012) ("A showing that plaintiff *wrongfully* caused defendants' default, moreover, may survive even a waiver of defenses.").

Nor is such a limitation on this doctrine surprising.   Unexpected events or innocent actions  (some of which are not unconvincingly argued by Claimant in their merit's brief *see* Claimant's Br. at 39) are not fraudulent and do not prove  *in  pari delicto* . In other words, that "a guarantor does not like the conductor or thinks that the conduct was unreasonable" cannot be enough to support this defense.  *In re Futterman*, 602 B.R. at 480.

In addition a principle of the defense  of *in pari delicto is the requirement of equal* culpability by the parties. *See Republic of Iraq v. ABB AG*, 768 F.3d 145, 160 (2d Cir. 2014)

("The doctrine of *in pari delicto*, a term meaning 'of equal fault,' reflects the principle that a plaintiff who has participated in wrongdoing equally with another person may not recover from that other person damages resulting from the wrongdoing . . . Not only must the plaintiff 'be an active, voluntary participant in the unlawful activity that is the subject of the suit,' but it is necessary that 'the degrees of fault [be] essentially indistinguishable or the plaintiff's responsibility [be] clearly greater.'"); *Dardashtian v. David Gitman*, No. 17-CV-432, 2021 U.S. Dist. LEXIS 29764, at *76 (S.D.N.Y. Feb. 16, 2021) ("Unlike the unclean hands doctrine, 'the *in pari delicto* doctrine . . . permits the 'defendant [to] escape liability' to the plaintiff based on the plaintiff's 'at least substantially equal responsibility *for the underlying illegality*.'").

It could be argued that the doctrine is  simply *inapplicable* here since the Respondent would have to show that it engaged in wrongdoing  *with* Claimant. *Dardashtian v. David Gitman*, No. 17-CV-4327, 2021 U.S. Dist. LEXIS 29764, at *76 (S.D.N.Y. Feb. 16, 2021) ("Plaintiffs who are truly *in pari delicto* are those who have themselves violated the law in cooperation with the defendant.").  Respondent does not assert that Claimant was "complicit *with*" Respondent "in any misconduct " but instead "accuse[s] [Claimant] of independent wrongdoing." *Id.* at 76 (emphasis added).  Thus, "the doctrine of *in pari delicto* therefore is inapt" for this additional reason. *Id.*; *see also LaSala v. UBS, AG*, 510 F. Supp. 2d 213, 245 (S.D.N.Y. 2007) (a "defense based upon the doctrine of *in pari delicto*" literally means "in equal fault").[10]

---

[10]     Nor does Respondent's reliance on cases discussing "circumstantial" evidence assist it on its merits submissions here.  Circumstantial evidence is direct evidence of a fact from which a person may reasonably infer the existence or nonexistence of another fact.   The rule in this state is "that inference may be based on inference, but that inference may not be based on conjecture, nor conjecture upon

Claimant states, and the Respondent has not contested, that there have been several property managers of the Property since 2016 when MLB announced it would not renew its lease.  Newmark Mark and Knight during the period 2017 to 2018, Cushman & Wakefield, Inc became the Property's leasing agent and Jones Lang LaSalle became the Property's property manager in September, 2018. Those firms also were unable to find a replacement tenant for MBL even before the Pandemic and the commercial real estate market space downturn in New York City.  (H. Stomer's Aff., Ex.1of Claimant's "Submission in Support of Demand for Payment Under Guaranty,  at 5, dated March 21, 2022. I note further that the Bankruptcy Court was being asked to  consider approving Newmark to replace SL Green as Property Manager.

Accordingly, because Respondent has failed to meet its evidentiary burden on the necessary intentional, bad faith, at least equal fault, and/or mutuality of fault element of its post-execution fraud and/or in *pari delicto* defense, this defense fails (to the extent it is not otherwise waived on other grounds set forth below).

There is no dispute that parties' arbitration provisions were agreed to, by these sophisticated parties, with sophisticated counsel, and judged to be in their respective best interests at the time. The Arbitrator has no authority rewrite their bargain  after the fact.

> ### 2.    Respondent Has Not Met Its Burden to Show Post-Execution Fraud by a Preponderance of the Evidence

"[T]he essential elements of a cause of action sounding in fraud are a misrepresentation or a material omission of fact which was false and known to be false by the defendant, made for the purpose of inducing the other party to rely upon it, justifiable

---

inference to prove a fact or to serve as the basis for an ultimate conclusion. Pollock v Rapid Indus, 113 ad2d 520 ( N.Y. App. Div. 1985)

reliance of the other party on the misrepresentation or material omission, and injury."

*Kanterakis v. Minos Realty I, LLC*, 40 Misc. 3d 1221(A), 977 N.Y.S.2d 667 (N.Y. Sup. Ct. 2013);

*Midland Bank, N.A. v. Idar Gem Distributors, Inc.,* 133 A.D.2d 525, 526 (4th Dep't 1987) ("A

false representation as to a material fact is necessary to sustain a claim for fraud.").

Here, Respondent, has not identified a "misrepresentation" or "material omission,"

which "was false and known to be false" and "made for the purpose of inducing the other

party," or any "justifiable reliance of the other party on the misrepresentation or material

omission Defendant."  The Claimant disclosed its relationship to its affiliate property

manager, or at a minimum, this relationship was known to Respondent via the Property

Management Agreement and JV Agreement.  *See* Sitomer Aff., Ex. 2 at 1 (third "WHEREAS"

clause), § 1.2 (guarantying payment of the Redemption Amount, "pursuant to the JV

Agreement."); Sitomer Aff., Ex. 1 [JV Agreement] § 15.4(b); Sitomer Aff., Ex. 2 [Guaranty] §

2.4.; Sitomer Aff., Ex. 6 [Management Agreement] § 23; *see also* Sitomer Aff., Ex. 2

[Guaranty] 1.6 ("Each Guarantor agrees to the provisions of the JV Agreement, and hereby

expressly waives notice of the following . . .); *Kanterakis v. Minos Realty I, LLC*, 977 N.Y.S.2d

667 (N.Y. Sup. Ct. 2013).

> **3.     The *In Pari Delicto* Defense Additionally Fails Because
> Respondent Never Pled the Defense of in *Pari Delicto* in Its
> Answer**

Finally, under New York law  a respondent is required to plead an affirmative

defense in its answer. Respondent did not plead the affirmative defense of *in pari delicto* in

its answer and the defense is waived.  *See GEOMC Co. v. Calmare Therapeutics Inc.,* 918 F.3d

92, 98 (2d Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis

added)); *Castaldi v. Syosset Cent. Sch. Dist.,* No. 2018-10967, 2022 WL 610027, at *2 (2d

Dep't Mar. 2, 2022) (affirmative defense not asserted in answer is waived).  Nor is the legal defense of *in pari delicto* (which Respondent it did not plead) identical to the equitable defense of unclean hands( which Respondent did actually plead).  *See Salameno v. Rawlings*, No. 19 CIV 4442, 2021 WL 1085521, at *17 n.10 (S.D.N.Y. Mar. 22, 2021) ("an equitable defense [of unclean hands] does not apply to claims that 'seek damages in an action at law'"); *City of Almaty v. Ablyazov*, No. 15-cv-5345, 2021 U.S. Dist. LEXIS 214752, at *4 (S.D.N.Y. Nov. 5, 2021) (internal quotation marks omitted) (defendant "did not raise this [*in pari delicto*] defense in its answer and the Court declined to exercise its discretion to overlook that waiver."); *Dardashtian v. David Gitman*, No. 17-CV-4327, 2021 U.S. Dist. LEXIS 29764, at *75-76 (S.D.N.Y. Feb. 16, 2021) (internal citations omitted) ("To the extent that [plaintiff's] claims are legal, not equitable, in nature, [defendant] contends that [plaintiff's] claims are barred by the doctrine of *in pari delicto*, which, [defendant] says, is used 'interchangeably' with unclean hands. That is not correct. 'Although the doctrines of unclean hands and *in pari delicto* are often mentioned in the same breath, they are 'distinct terms for ... distinct situations.'").  Respondent has not moved to amend its answer to  add this defense, and having failed to do so prior to this decision, cannot rely on an unpled defense.

### F.   Respondent's Bankruptcy Stay Arguments Fail

While asserting that the automatic bankruptcy stay imposed by 11 U.S.C. § 362(a) against a debtor in bankruptcy, stays any action or proceeding against it, Respondent concedes that Respondent is not a debtor with respect to which such automatic stay currently applies.

FILED: NEW YORK COUNTY CLERK 05/20/2022 08:24 PM
NYSCEF DOC. NO.

INDEX NO. 656421/2022

RECEIVED NYSCEF: 05/20/2022

Case 1:22-cv-05136-JGK   Document 1-1   Filed 06/17/22   Page 210 of 229

However, pointing to 11 U.S.C. § 105(a), Respondent argues that the bankruptcy court

*may* extend the stay to it, pursuant to 11 U.S.C. § 105(a). That argument does nothing to assist it here. That a bankruptcy court "may" extend the stay does not mean that it must do so, and Respondent has made no showing that the bankruptcy court has issued such an order staying this proceeding. Additionally, it is notable that the Respondent asserts its arguments here, instead of directly to the bankruptcy court that is empowered to extend the stay to this proceeding.

Ultimately, whether 11 U.S.C. § 105(a) would support extension of the automatic stay to this arbitration is a decision for, and a power granted to, the bankruptcy court. In any event, nothing prevents the Respondent from raising these same extension- of -stay arguments with the bankruptcy court after it receives this award but before the decision is judicially enforced through a judgment.

### G. Respondent's Argument that Bankruptcy Cannot Be a Cause Event Fails

Claimant establishes that on October 31, 2021, the Company filed for Bankruptcy, which under the JVA is a Major Decision, without Claimant's authorization, thereby incurring the obligation to pay the Redemption Amount no later than November 10, 2021), *see* Sitomer Aff., Ex. 1 [JV Agreement] at 5-6 (definition of "Cause Event"), at 18 (definition of "Mandatory Redemption Date," and the failure to pay upon ten days demand. *See* Ressler Aff., Ex. 1; Sitomer Aff. ¶ 27; *Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A., 'Rabobank Int'l,' N . Y . Branch v. Navarro*, 25 N.Y.3d at 492 ("Here, [Claimant] submitted a copy of the purchase agreement, the guaranty signed by defendant, as well

as proof of receivables due pursuant to the purchase agreement . . . .").  Claimant has met its

burden to show a Cause Event has occurred.


Respondent argues that Paragraph 14 of the Claimant's demand which states that "The filing of the Bankruptcy on October 31…. triggered numerous Cause Events…. that accelerated all of the Company's payment obligations" is "incorrect as a matter of federal bankruptcy law which renders any such clause unenforceable. Respondent then accurately recites Section 365 (e) (1) as follows:


"Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated   or modified at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on-

(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

(B) the commencement of a case under this title."

 "In other words,", continues the Respondent, "in an executory contract, 'no default may occur…and no reliance may be placed upon an alleged default where the only cause for default is the debtor's commencement of a bankruptcy case.'

Continued reading of Paragraph 14, reveals the Claimant is not relying on the default of the Company to pay the obligation. Rather, as Claimant states ,

"These Cause Events accelerated all of the Company's payment obligations to pay Claimant the Redemption Amount by no later than November 10, 2021, i.e. ten(10) days following the occurrence of any Cause Event . Yet the Company has not paid- and because of its Bankruptcy filing, cannot pay-the Redemption Amount. The Bankruptcy filing likewise prevents Claimant from exercising any of its "automatic" Forced Sale Rights."

Clearly the executory contract relevant to Bankruptcy Code Section 365 (e) (1)  in this matter is the Property Management Agreement, between SL Green and 245 Park Avenue Property.  Neither the Respondent nor the Claimant is a signatory to the Property Management Agreement although each has affiliates on their respective "sides".

The JVA may indeed be an executory contract but it is an agreement whose signatories are the Claimant and HNA 245 Park Ave JV LLC, an affiliate of Respondent, but not the Respondent itself.

The Guaranty is neither a lease nor an executory contract and the Claimant is not in Bankruptcy Court arguing that the Company is liable under Guaranty but rather is in arbitration seeking an Award against the Respondent.

The cases relied upon by Respondent do not contradict this finding. The debtor was in Bankruptcy Court seeking protection in In re Chauteaugay Corp., No. 92 CIV 7054 (PKL). Likewise, In Re Texaco, 73 B.R. 960 (Bankr. S.D.N.Y 1987) Texaco and two of its financial affiliates were also debtors seeking protection from their creditors in Bankruptcy Court. The creditors in  In re Bownetree,  sought to modify the debtor's mortgage, accelerate the loan and trigger the default rate of interest. Bownetree however was a debtor in Bankruptcy and the creditors subject to its authority. (In re Bownetree, LLC  No. 1-08-45854-DEM)

 The Respondent is not a debtor in bankruptcy court and is not seeking the protection of the bankruptcy.  It therefore does not fall under the Bankruptcy Code and cannot hide behind the executory contract of the Company, its affiliate.

## VII.    Damages

In Claimant's submission, it sets forth detailed calculations supporting the different subsets of damages claimed as part of the Redemption Amount.  Claimant alleges the following categories of damages totaling $184,557,377.25:

(1) the Net Preferred Equity Investment amount of $148,165,906.41;

(2) a Preferred Equity Return of $27,564,930.52; and

(3)  Make Whole Premium of $8,826,540.32

Respondent's only response on the question of damages is to assert that Claimant: "Claimant fails to provide any computation or explanation of the amount of damages (US $182,489,015) requested in its Demand, nor does it explain the US $14,660,166 difference between the Redemption Amount of US $167,828,849 and its alleged damages."[11]

---

[11]     Accordingly, there is no dispute between the parties with respect to the Redemption Amount of at least US $167,828,849.

Because Claimant has detailed the basis for its damages calculation, and Respondent offers no competing calculation of damages, I award Claimant all categories of damages sought for a total of $184,557,377.25.  *See* Sitomer Aff. ¶38-43.

## VIII.   Award of JAMS Fees and Disbursements and Reasonable Costs and Expenses

Pursuant to the parties' arbitration agreement contained within the Guaranty, with respect to this arbitration proceeding, "[t]he non-prevailing party in such arbitration shall pay all fees and disbursements due to JAMS and the arbitrator as well as the reasonable costs and expenses (including reasonable attorneys' fees and disbursements) of the prevailing party incurred in connection with such arbitration."  Guaranty ¶ 5.4.  I find that Claimant is the prevailing party and Respondent is the non-prevailing party in this arbitration. Accordingly, pursuant to the parties' arbitration agreement Respondent "shall pay: (1) "all fees and disbursements due to JAMS and the arbitrator"; and (2) "the reasonable costs and expenses (including reasonable attorneys' fees and disbursements)".

In support of their request for an award of costs and expenses for this arbitration proceeding, Claimant offers a combined total of the work done by Kasowitz Benson Torres LLP in connection with both this arbitration proceeding and the bankruptcy proceeding. I, independently find, based on the materials before me, represents reasonable fees and costs for this arbitration proceeding.

## IX.   <u>Award</u>

For reasons set forth above, an award is made in favor of Claimant for: (1) a redemption amount of $184,557,377.25; and (2) reasonable attorney's fees and costs of

$752,700.24. In addition, Respondent is ordered to pay all fees and disbursements due to

JAMS.


Dated: New York, NY
April 30, 2022

*L. Priscilla Hall*
Hon. L. Priscilla Hall (Ret.)
JAMS Arbitrator




I, Hon. L. Priscilla Hall (Ret.) do hereby affirm upon my oath as Arbitrator, that I am
the individual described in, and who executed, this instrument that is my
FINAL AWARD in this matter.


*L. Priscilla Hall*
Hon. L. Priscilla Hall (Ret.)


Dated: April 30, 2022
New York, New York

## PROOF OF SERVICE BY E-Mail

Re: 245 Park Member LLC vs. HNA Group (International) Company Limited
Reference No. 5425000065

I, Sutapa Katari, not a party to the within action, hereby declare that on  May 5, 2022, I served the

attached FINAL AWARD on the parties in the within action by electronic mail at New York, NEW YORK,

addressed as follows:

Henry Brownstein Esq.
Paul M. O'Connor III Esq.
Mark P. Ressler Esq.
Kasowitz Benson Torres LLP
1633 Broadway
New York, NY   10019-6799
Phone: 212-506-1700
hbrownstein@kasowitz.com
poconnor@kasowitz.com
mressler@kasowitz.com
   Parties Represented:
   245 Park Member LLC

Aaron T. Wolfson Esq.
Vincent Filardo, Jr. Esq.
Evan Zatorre Esq.
King & Wood Mallesons
500 Fifth Ave.
50th Fl.
New York, NY   10110
Phone: 212-319-4755
aaron.wolfson@us.kwm.com
vincent.filardo@us.kwm.com
evan.zatorre@us.kwm.com
   Parties Represented:
   HNA Group (International) Company Limited

Jasen Fears
Kasowitz Benson Torres LLP
2029 Century Park East
Suite 2000
Los Angeles, CA   90067
Phone: 424-288-7900
jfears@kasowitz.com
   Parties Represented:
   245 Park Member LLC

I declare under penalty of perjury the foregoing to be true and correct. Executed at New York, NEW

YORK on  May 5, 2022.

*/s/ Sutapa Katari*
Sutapa Katari
JAMS
SKatari@jamsadr.com

# EXHIBIT F

# STATEMENT



**Date**
**12/21/21 through 05/31/22**

Bill To: | **Henry Brownstein Esq.**
**Kasowitz Benson Torres LLP**
**1633 Broadway**
**New York NY 10019-6799**
**US**

| **Reference #:** | **5425000065 - Rep# 1** |
|---|---|
| Billing Specialist: | **Mindiola, Nicholaus** |
| Email: | **nmindiola@jamsadr.com** |
| Telephone: | **949-224-4626** |
| Employer ID: | **68-0542699** |

RE: **245 Park Member LLC vs. HNA Group (International) Company Limited**

Representing: **245 Park Member LLC**

Neutral(s): **Hon. Priscilla Hall, (Ret) Cyrus Dugger, Esq.**

Hearing Type: **ARBITRATION**

| Date / Time | Description | Hours | Rate/Hr. | Total Billed | Parties Billed | Your Share |
|---|---|---|---|---|---|---|
| | | | | Balance Forward: | | 0 |
| 12/22/21 | Non-Refundable Filing Fee | | | $1,750.00 | 1 | $1,750.00 |
| 2/17/22 | Priscilla Hall
Review Submissions from the parties . | 1.25 | $725.00 | $906.25 | 2 | $453.12 |
| 2/18/22 | Priscilla Hall
Reading, preparing and conducting conference call with counsel | 3.75 | $725.00 | $2,718.75 | 2 | $1,359.37 |
| 2/19/22 | Priscilla Hall
Reading letters from counsel | 1.50 | $725.00 | $1,087.50 | 2 | $543.75 |
| 2/21/22 | Priscilla Hall
Review Submissions from the parties.
Reading cases cited in letter briefs | 4.75 | $725.00 | $3,443.75 | 2 | $1,721.87 |
| 2/22/22 | Priscilla Hall
Review Submissions from the parties.
Reading cases cited in letter briefs. | 4.50 | $725.00 | $3,262.50 | 2 | $1,631.25 |
| 2/23/22 | Priscilla Hall
Review Submissions from the parties.
Reading cases cited by counsel in letter briefs | 5.00 | $725.00 | $3,625.00 | 2 | $1,812.50 |
| 2/24/22 | Priscilla Hall
Review Submissions from the parties.
Reading cases submitted in letter briefs. | 3.25 | $725.00 | $2,356.25 | 2 | $1,178.12 |
| 2/25/22 | Priscilla Hall
Review Submissions from the parties.
Reading cases cited in counsel and taking notes. | 4.70 | $725.00 | $3,407.50 | 2 | $1,703.75 |
| 2/26/22 | Priscilla Hall
Review Submissions from the parties.
Reading and note taking from cases cited by counsel. | 3.00 | $725.00 | $2,175.00 | 2 | $1,087.50 |

Unused Deposits will not be refunded until the conclusion of the case.
Statement total is based on the fee split agreed upon by all parties. If the case cancels or continues, fees are due per our cancellation and continuance policy. Please make checks payable to JAMS, Inc.

Standard mail:
**P.O. Box 845402**
**Los Angeles, CA 90084**

Overnight mail:
**18881 Von Karman Ave. Suite 350**
**Irvine, CA 92612**

# STATEMENT



**Date**
**12/21/21 through 05/31/22**

| Date / Time | Description | Hours | Rate/Hr. | Total Billed | Parties Billed | Your Share |
|---|---|---|---|---|---|---|
| 2/27/22 | Priscilla Hall<br>Review Submissions from the parties. Reading and note taking cases cited by counsel | 4.25 | $725.00 | $3,081.25 | 2 | $1,540.63 |
| 3/1/22 | Priscilla Hall<br>Review Submissions from the parties | 6.50 | $725.00 | $4,712.50 | 2 | $2,356.25 |
| 3/2/22 | Priscilla Hall<br>Review Submissions from the parties | 6.75 | $725.00 | $4,893.75 | 2 | $2,446.88 |
| 3/3/22 | Priscilla Hall<br>Review Submissions from the parties | 2.00 | $725.00 | $1,450.00 | 2 | $725.00 |
| 3/4/22 | Priscilla Hall<br>Review Submissions from the parties | 2.50 | $725.00 | $1,812.50 | 2 | $906.25 |
| 3/5/22 | Priscilla Hall<br>Review Submissions from the parties | 2.00 | $725.00 | $1,450.00 | 2 | $725.00 |
| 3/7/22 | | 0.50 | $305.00 | $152.50 | 2 | $76.25 |
| 3/11/22 | | 1.00 | $305.00 | $305.00 | 2 | $152.50 |
| 3/12/22 | | 7.25 | $305.00 | $2,211.26 | 2 | $1,105.63 |
| 3/24/22 | Priscilla Hall<br>Read letter from Respondent requesting extension of deadline for Submission | 1.00 | $725.00 | $725.00 | 2 | $362.50 |
| 3/25/22 | Priscilla Hall<br>Reviewed opposing letter from Claimant to Respondent's application for extension and prepared letter deciding the application. | 1.00 | $725.00 | $725.00 | 2 | $362.50 |
| 4/3/22 | Priscilla Hall<br>Review Submissions from the parties | 1.25 | $725.00 | $906.25 | 2 | $453.12 |
| 4/4/22 | Priscilla Hall<br>Review Submissions from the parties | 6.30 | $725.00 | $4,567.50 | 2 | $2,283.75 |
| 4/6/22 | Priscilla Hall<br>Review Submissions from the parties | 6.00 | $725.00 | $4,350.00 | 2 | $2,175.00 |
| 4/7/22 | Priscilla Hall<br>Review Submissions from the parties | 7.50 | $725.00 | $5,437.50 | 2 | $2,718.75 |
| 4/8/22 | Priscilla Hall<br>Review Submissions from the parties | 2.00 | $725.00 | $1,450.00 | 2 | $725.00 |
| 4/9/22 | Priscilla Hall<br>Review Submissions from the parties | 1.50 | $725.00 | $1,087.50 | 2 | $543.75 |
| 4/10/22 | Priscilla Hall<br>Review Submissions from the parties | 2.00 | $725.00 | $1,450.00 | 2 | $725.00 |
| 4/11/22 | Priscilla Hall<br>Review Submissions from the parties | 4.70 | $725.00 | $3,407.50 | 2 | $1,703.75 |
| 4/13/22 | Priscilla Hall<br>Review Submissions from the parties | 1.00 | $725.00 | $725.00 | 2 | $362.50 |

Unused Deposits will not be refunded until the conclusion of the case.
Statement total is based on the fee split agreed upon by all parties. If the case cancels or continues, fees are due per our cancellation and continuance policy. Please make checks payable to JAMS, Inc.

| Standard mail: | Overnight mail: |
|---|---|
| **P.O. Box 845402** | **18881 Von Karman Ave. Suite 350** |
| **Los Angeles, CA 90084** | **Irvine, CA 92612** |

# STATEMENT



<u>**Date**</u>

**12/21/21 through 05/31/22**

| Date / Time | Description | Hours | Rate/Hr. | Total Billed | Parties Billed | Your Share |
|---|---|---|---|---|---|---|
| 4/14/22 | Priscilla Hall<br>Review Submissions from the parties | 1.00 | $725.00 | $725.00 | 2 | $362.50 |
| 4/16/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.10 | $255.00 | $25.50 | 2 | $12.75 |
| 4/16/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.10 | $255.00 | $25.50 | 2 | $12.75 |
| 4/16/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.10 | $255.00 | $25.50 | 2 | $12.75 |
| 4/16/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.30 | $255.00 | $76.50 | 2 | $38.25 |
| 4/16/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.30 | $255.00 | $76.50 | 2 | $38.25 |
| 4/16/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.30 | $255.00 | $76.50 | 2 | $38.25 |
| 4/16/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.40 | $255.00 | $102.00 | 2 | $51.00 |
| 4/16/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.40 | $255.00 | $102.00 | 2 | $51.00 |
| 4/16/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.50 | $255.00 | $127.50 | 2 | $63.75 |
| 4/16/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.50 | $255.00 | $127.50 | 2 | $63.75 |
| 4/16/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.50 | $255.00 | $127.50 | 2 | $63.75 |
| 4/16/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.80 | $255.00 | $204.00 | 2 | $102.00 |
| 4/16/22 | Priscilla Hall<br>Review Submissions from the parties | 2.50 | $725.00 | $1,812.50 | 2 | $906.25 |
| 4/17/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.40 | $255.00 | $102.00 | 2 | $51.00 |
| 4/17/22 | Priscilla Hall<br>Review Submissions from the parties | 1.75 | $725.00 | $1,268.75 | 2 | $634.37 |
| 4/19/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.20 | $255.00 | $51.00 | 2 | $25.50 |
| 4/19/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.50 | $255.00 | $127.50 | 2 | $63.75 |
| 4/19/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.50 | $255.00 | $127.50 | 2 | $63.75 |
| 4/19/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.50 | $255.00 | $127.50 | 2 | $63.75 |
| 4/19/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.80 | $255.00 | $204.00 | 2 | $102.00 |

Unused Deposits will not be refunded until the conclusion of the case.

Statement total is based on the fee split agreed upon by all parties. If the case cancels or continues, fees are due per our cancellation and continuance policy. Please make checks payable to JAMS, Inc.

<u>Standard mail:</u>          <u>Overnight mail:</u>
**P.O. Box 845402**          **18881 Von Karman Ave. Suite 350**
**Los Angeles, CA 90084**          **Irvine, CA 92612**

# STATEMENT



<u>**Date**</u>

**12/21/21 through 05/31/22**

| Date / Time | Description | Hours | Rate/Hr. | Total Billed | Parties Billed | Your Share |
|---|---|---|---|---|---|---|
| 4/19/22 | Priscilla Hall<br>Review Submissions from the parties | 1.25 | $725.00 | $906.25 | 2 | $453.13 |
| 4/20/22 | Priscilla Hall<br>Review Submissions from the parties | 2.50 | $725.00 | $1,812.50 | 2 | $906.25 |
| 4/21/22 | Priscilla Hall<br>Review Submissions from the parties | 2.75 | $725.00 | $1,993.75 | 2 | $996.88 |
| 4/22/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.10 | $255.00 | $25.50 | 2 | $12.75 |
| 4/22/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.50 | $255.00 | $127.50 | 2 | $63.75 |
| 4/22/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.80 | $255.00 | $204.00 | 2 | $102.00 |
| 4/23/22 | Cyrus E. Dugger<br>Reading Research and Writing | 4.40 | $255.00 | $1,122.00 | 2 | $561.00 |
| 4/23/22 | Cyrus E. Dugger<br>Reading Research and Writing | 7.10 | $255.00 | $1,810.50 | 2 | $905.25 |
| 4/24/22 | Cyrus E. Dugger<br>Email correspondence | 0.20 | $255.00 | $51.00 | 2 | $25.50 |
| 4/25/22 | Cyrus E. Dugger<br>Reading Research and Writing | 1.20 | $255.00 | $306.00 | 2 | $153.00 |
| 4/25/22 | Priscilla Hall<br>Preparation of Award | 1.75 | $725.00 | $1,268.75 | 2 | $634.38 |
| 4/26/22 | Cyrus E. Dugger<br>Conference call with Judge Hall | 0.40 | $255.00 | $102.00 | 2 | $51.00 |
| 4/26/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.40 | $255.00 | $102.00 | 2 | $51.00 |
| 4/26/22 | Cyrus E. Dugger<br>Reading Research and Writing | 5.50 | $255.00 | $1,402.50 | 2 | $701.25 |
| 4/26/22 | Priscilla Hall<br>Preparation of Award | 4.00 | $725.00 | $2,900.00 | 2 | $1,450.00 |
| 4/27/22 | Cyrus E. Dugger<br>Conference call with Judge Hall | 0.40 | $255.00 | $102.00 | 2 | $51.00 |
| 4/27/22 | Cyrus E. Dugger<br>Reading Research and Writing | 2.90 | $255.00 | $739.50 | 2 | $369.75 |
| 4/27/22 | Priscilla Hall<br>Preparation of Award | 9.00 | $725.00 | $6,525.00 | 2 | $3,262.50 |
| 4/28/22 | Cyrus E. Dugger<br>Telephonic conference with Judge Hall | 0.10 | $255.00 | $25.50 | 2 | $12.75 |
| 4/28/22 | Cyrus E. Dugger<br>Email correspondence with Judge Hall | 0.50 | $255.00 | $127.50 | 2 | $63.75 |
| 4/28/22 | Cyrus E. Dugger<br>Reading, Research & Writing | 6.00 | $255.00 | $1,530.00 | 2 | $765.00 |

Unused Deposits will not be refunded until the conclusion of the case.
Statement total is based on the fee split agreed upon by all parties. If the case cancels or continues, fees are due per our cancellation and continuance policy. Please make checks payable to JAMS, Inc.

<u>Standard mail:</u>
**P.O. Box 845402**
Los Angeles, CA 90084

<u>Overnight mail:</u>
**18881 Von Karman Ave. Suite 350**
Irvine, CA 92612

# STATEMENT



**Date**
**12/21/21 through 05/31/22**

| Date / Time | Description | Hours | Rate/Hr. | Total Billed | Parties Billed | Your Share |
|---|---|---|---|---|---|---|
| 4/28/22 | Priscilla Hall<br>Preparation of Award | 3.50 | $725.00 | $2,537.50 | 2 | $1,268.75 |
| 4/29/22 | Cyrus E. Dugger<br>Telephonic conference with Judge Hall. | 0.20 | $255.00 | $51.00 | 2 | $25.50 |
| 4/29/22 | Cyrus E. Dugger<br>Telephonic conference with Judge Hall | 0.70 | $255.00 | $178.50 | 2 | $89.25 |
| 4/29/22 | Priscilla Hall<br>Preparation of Award | 13.50 | $725.00 | $9,787.50 | 2 | $4,893.75 |
| 4/30/22 | Cyrus E. Dugger<br>Telephonic conference with Judge Hall | 0.10 | $255.00 | $25.50 | 2 | $12.75 |
| 4/30/22 | Cyrus E. Dugger<br>Telephonic conference with Judge Hall | 0.20 | $255.00 | $51.00 | 2 | $25.50 |
| 4/30/22 | Cyrus E. Dugger<br>Reading Researching and Writing | 0.40 | $255.00 | $102.00 | 2 | $51.00 |
| 4/30/22 | Cyrus E. Dugger<br>Telephonic conference with Judge Hall | 1.00 | $255.00 | $255.00 | 2 | $127.50 |
| 4/30/22 | Priscilla Hall<br>Preparation of Award | 16.00 | $725.00 | $11,600.00 | 2 | $5,800.00 |
| 5/31/22 | Case Management Fee | | | | | $7,117.66 |
| | | | | Fees: | | $69,515.91 |
| | | | | Total: | | $69,515.91 |

**Payment Activity:**

| | | | |
|---|---|---|---|
| 12/24/21 | Check No. AMEX 2009<br>Paid By: Alan Capilupi | | ($1,750.00) |
| 1/20/22 | Check No. amex 2009<br>Paid By: Alan Capilupi | | ($4,096.50) |
| 3/30/22 | Check No. 054153<br>Paid By: SL GREEN MANAGEMENT LLC | | ($20,000.00) |
| | | Total Payments: | ($25,846.50) |
| | | Balance Due: | $43,669.41 |

Unused Deposits will not be refunded until the conclusion of the case.
Statement total is based on the fee split agreed upon by all parties. If the case cancels or continues, fees are due per our cancellation and continuance policy. Please make checks payable to JAMS, Inc.

Standard mail:                                                    Overnight mail:
**P.O. Box 845402**                                **18881 Von Karman Ave. Suite 350**
**Los Angeles, CA 90084**                                **Irvine, CA 92612**

# STATEMENT



**Date**
**12/21/21 through 05/31/22**

Bill To:      **Aaron Wolfson Esq.**
**King & Wood Mallesons**
**500 Fifth Ave.**
**50th Fl.**
**New York NY 10110**
**US**

| Reference #: | 5425000065 - Rep# 3 |
|---|---|
| Billing Specialist: | **Mindiola, Nicholaus** |
| Email: | **nmindiola@jamsadr.com** |
| Telephone: | **949-224-4626** |
| Employer ID: | **68-0542699** |

RE: **245 Park Member LLC vs. HNA Group (International) Company Limited**

Representing: **HNA Group (International) Company Limited**

Neutral(s):     **Hon. Priscilla Hall, (Ret)**
**Cyrus Dugger, Esq.**

Hearing Type: **ARBITRATION**

| Date / Time | Description | Hours | Rate/Hr. | Total Billed | Parties Billed | Your Share |
|---|---|---|---|---|---|---|
| | | | Balance Forward: | | | 0 |
| 2/17/22 | Priscilla Hall<br>Review Submissions from the parties . | 1.25 | $725.00 | $906.25 | 2 | $453.13 |
| 2/18/22 | Priscilla Hall<br>Reading, preparing and conducting conference call with counsel | 3.75 | $725.00 | $2,718.75 | 2 | $1,359.38 |
| 2/19/22 | Priscilla Hall<br>Reading letters from counsel | 1.50 | $725.00 | $1,087.50 | 2 | $543.75 |
| 2/21/22 | Priscilla Hall<br>Review Submissions from the parties.<br>Reading cases cited in letter briefs | 4.75 | $725.00 | $3,443.75 | 2 | $1,721.88 |
| 2/22/22 | Priscilla Hall<br>Review Submissions from the parties.<br>Reading cases cited in letter briefs. | 4.50 | $725.00 | $3,262.50 | 2 | $1,631.25 |
| 2/23/22 | Priscilla Hall<br>Review Submissions from the parties.<br>Reading cases cited by counsel in letter briefs | 5.00 | $725.00 | $3,625.00 | 2 | $1,812.50 |
| 2/24/22 | Priscilla Hall<br>Review Submissions from the parties.<br>Reading cases submitted in letter briefs. | 3.25 | $725.00 | $2,356.25 | 2 | $1,178.13 |
| 2/25/22 | Priscilla Hall<br>Review Submissions from the parties.<br>Reading cases cited in counsel and taking notes. | 4.70 | $725.00 | $3,407.50 | 2 | $1,703.75 |
| 2/26/22 | Priscilla Hall<br>Review Submissions from the parties.<br>Reading and note taking from cases cited by counsel. | 3.00 | $725.00 | $2,175.00 | 2 | $1,087.50 |

Unused Deposits will not be refunded until the conclusion of the case.
Statement total is based on the fee split agreed upon by all parties. If the case cancels or continues, fees are due per our cancellation and continuance policy. Please make checks payable to JAMS, Inc.

| Standard mail: | Overnight mail: |
|---|---|
| **P.O. Box 845402** | **18881 Von Karman Ave. Suite 350** |
| **Los Angeles, CA 90084** | **Irvine, CA 92612** |

# STATEMENT



<u>**Date**</u>

**12/21/21 through 05/31/22**

| Date / Time | Description | Hours | Rate/Hr. | Total Billed | Parties Billed | Your Share |
|---|---|---|---|---|---|---|
| 2/27/22 | Priscilla Hall<br>Review Submissions from the parties. Reading and note taking cases cited by counsel | 4.25 | $725.00 | $3,081.25 | 2 | $1,540.62 |
| 3/1/22 | Priscilla Hall<br>Review Submissions from the parties | 6.50 | $725.00 | $4,712.50 | 2 | $2,356.25 |
| 3/2/22 | Priscilla Hall<br>Review Submissions from the parties | 6.75 | $725.00 | $4,893.75 | 2 | $2,446.87 |
| 3/3/22 | Priscilla Hall<br>Review Submissions from the parties | 2.00 | $725.00 | $1,450.00 | 2 | $725.00 |
| 3/4/22 | Priscilla Hall<br>Review Submissions from the parties | 2.50 | $725.00 | $1,812.50 | 2 | $906.25 |
| 3/5/22 | Priscilla Hall<br>Review Submissions from the parties | 2.00 | $725.00 | $1,450.00 | 2 | $725.00 |
| 3/7/22 | | 0.50 | $305.00 | $152.50 | 2 | $76.25 |
| 3/11/22 | | 1.00 | $305.00 | $305.00 | 2 | $152.50 |
| 3/12/22 | | 7.25 | $305.00 | $2,211.26 | 2 | $1,105.63 |
| 3/24/22 | Priscilla Hall<br>Read letter from Respondent requesting extension of deadline for Submission | 1.00 | $725.00 | $725.00 | 2 | $362.50 |
| 3/25/22 | Priscilla Hall<br>Reviewed opposing letter from Claimant to Respondent's application for extension and prepared letter deciding the application. | 1.00 | $725.00 | $725.00 | 2 | $362.50 |
| 4/3/22 | Priscilla Hall<br>Review Submissions from the parties | 1.25 | $725.00 | $906.25 | 2 | $453.13 |
| 4/4/22 | Priscilla Hall<br>Review Submissions from the parties | 6.30 | $725.00 | $4,567.50 | 2 | $2,283.75 |
| 4/6/22 | Priscilla Hall<br>Review Submissions from the parties | 6.00 | $725.00 | $4,350.00 | 2 | $2,175.00 |
| 4/7/22 | Priscilla Hall<br>Review Submissions from the parties | 7.50 | $725.00 | $5,437.50 | 2 | $2,718.75 |
| 4/8/22 | Priscilla Hall<br>Review Submissions from the parties | 2.00 | $725.00 | $1,450.00 | 2 | $725.00 |
| 4/9/22 | Priscilla Hall<br>Review Submissions from the parties | 1.50 | $725.00 | $1,087.50 | 2 | $543.75 |
| 4/10/22 | Priscilla Hall<br>Review Submissions from the parties | 2.00 | $725.00 | $1,450.00 | 2 | $725.00 |
| 4/11/22 | Priscilla Hall<br>Review Submissions from the parties | 4.70 | $725.00 | $3,407.50 | 2 | $1,703.75 |
| 4/13/22 | Priscilla Hall<br>Review Submissions from the parties | 1.00 | $725.00 | $725.00 | 2 | $362.50 |

Unused Deposits will not be refunded until the conclusion of the case.
Statement total is based on the fee split agreed upon by all parties. If the case cancels or continues, fees are due per our cancellation and continuance policy. Please make checks payable to JAMS, Inc.

<u>Standard mail:</u>
**P.O. Box 845402**
**Los Angeles, CA 90084**

<u>Overnight mail:</u>
**18881 Von Karman Ave. Suite 350**
**Irvine, CA 92612**

# STATEMENT



**Date**

**12/21/21 through 05/31/22**

| Date / Time | Description | Hours | Rate/Hr. | Total Billed | Parties Billed | Your Share |
|---|---|---|---|---|---|---|
| 4/14/22 | Priscilla Hall<br>Review Submissions from the parties | 1.00 | $725.00 | $725.00 | 2 | $362.50 |
| 4/16/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.10 | $255.00 | $25.50 | 2 | $12.75 |
| 4/16/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.10 | $255.00 | $25.50 | 2 | $12.75 |
| 4/16/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.10 | $255.00 | $25.50 | 2 | $12.75 |
| 4/16/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.30 | $255.00 | $76.50 | 2 | $38.25 |
| 4/16/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.30 | $255.00 | $76.50 | 2 | $38.25 |
| 4/16/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.30 | $255.00 | $76.50 | 2 | $38.25 |
| 4/16/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.40 | $255.00 | $102.00 | 2 | $51.00 |
| 4/16/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.40 | $255.00 | $102.00 | 2 | $51.00 |
| 4/16/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.50 | $255.00 | $127.50 | 2 | $63.75 |
| 4/16/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.50 | $255.00 | $127.50 | 2 | $63.75 |
| 4/16/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.50 | $255.00 | $127.50 | 2 | $63.75 |
| 4/16/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.80 | $255.00 | $204.00 | 2 | $102.00 |
| 4/16/22 | Priscilla Hall<br>Review Submissions from the parties | 2.50 | $725.00 | $1,812.50 | 2 | $906.25 |
| 4/17/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.40 | $255.00 | $102.00 | 2 | $51.00 |
| 4/17/22 | Priscilla Hall<br>Review Submissions from the parties | 1.75 | $725.00 | $1,268.75 | 2 | $634.38 |
| 4/19/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.20 | $255.00 | $51.00 | 2 | $25.50 |
| 4/19/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.50 | $255.00 | $127.50 | 2 | $63.75 |
| 4/19/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.50 | $255.00 | $127.50 | 2 | $63.75 |
| 4/19/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.50 | $255.00 | $127.50 | 2 | $63.75 |
| 4/19/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.80 | $255.00 | $204.00 | 2 | $102.00 |

Unused Deposits will not be refunded until the conclusion of the case.
Statement total is based on the fee split agreed upon by all parties. If the case cancels or continues, fees are due per our cancellation and continuance policy. Please make checks payable to JAMS, Inc.

| Standard mail: | Overnight mail: |
|---|---|
| **P.O. Box 845402** | **18881 Von Karman Ave. Suite 350** |
| Los Angeles, CA 90084 | Irvine, CA 92612 |

# STATEMENT



**Date**
**12/21/21 through 05/31/22**

| Date / Time | Description | Hours | Rate/Hr. | Total Billed | Parties Billed | Your Share |
|---|---|---|---|---|---|---|
| 4/19/22 | Priscilla Hall<br>Review Submissions from the parties | 1.25 | $725.00 | $906.25 | 2 | $453.12 |
| 4/20/22 | Priscilla Hall<br>Review Submissions from the parties | 2.50 | $725.00 | $1,812.50 | 2 | $906.25 |
| 4/21/22 | Priscilla Hall<br>Review Submissions from the parties | 2.75 | $725.00 | $1,993.75 | 2 | $996.87 |
| 4/22/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.10 | $255.00 | $25.50 | 2 | $12.75 |
| 4/22/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.50 | $255.00 | $127.50 | 2 | $63.75 |
| 4/22/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.80 | $255.00 | $204.00 | 2 | $102.00 |
| 4/23/22 | Cyrus E. Dugger<br>Reading Research and Writing | 4.40 | $255.00 | $1,122.00 | 2 | $561.00 |
| 4/23/22 | Cyrus E. Dugger<br>Reading Research and Writing | 7.10 | $255.00 | $1,810.50 | 2 | $905.25 |
| 4/24/22 | Cyrus E. Dugger<br>Email correspondence | 0.20 | $255.00 | $51.00 | 2 | $25.50 |
| 4/25/22 | Cyrus E. Dugger<br>Reading Research and Writing | 1.20 | $255.00 | $306.00 | 2 | $153.00 |
| 4/25/22 | Priscilla Hall<br>Preparation of Award | 1.75 | $725.00 | $1,268.75 | 2 | $634.37 |
| 4/26/22 | Cyrus E. Dugger<br>Reading Research and Writing | 0.40 | $255.00 | $102.00 | 2 | $51.00 |
| 4/26/22 | Cyrus E. Dugger<br>Conference call with Judge Hall | 0.40 | $255.00 | $102.00 | 2 | $51.00 |
| 4/26/22 | Cyrus E. Dugger<br>Reading Research and Writing | 5.50 | $255.00 | $1,402.50 | 2 | $701.25 |
| 4/26/22 | Priscilla Hall<br>Preparation of Award | 4.00 | $725.00 | $2,900.00 | 2 | $1,450.00 |
| 4/27/22 | Cyrus E. Dugger<br>Conference call with Judge Hall | 0.40 | $255.00 | $102.00 | 2 | $51.00 |
| 4/27/22 | Cyrus E. Dugger<br>Reading Research and Writing | 2.90 | $255.00 | $739.50 | 2 | $369.75 |
| 4/27/22 | Priscilla Hall<br>Preparation of Award | 9.00 | $725.00 | $6,525.00 | 2 | $3,262.50 |
| 4/28/22 | Cyrus E. Dugger<br>Telephonic conference with Judge Hall | 0.10 | $255.00 | $25.50 | 2 | $12.75 |
| 4/28/22 | Cyrus E. Dugger<br>Email correspondence with Judge Hall | 0.50 | $255.00 | $127.50 | 2 | $63.75 |
| 4/28/22 | Cyrus E. Dugger<br>Reading, Research & Writing | 6.00 | $255.00 | $1,530.00 | 2 | $765.00 |

Unused Deposits will not be refunded until the conclusion of the case.
Statement total is based on the fee split agreed upon by all parties. If the case cancels or continues, fees are due per our
cancellation and continuance policy. Please make checks payable to JAMS, Inc.

| Standard mail: | Overnight mail: |
|---|---|
| **P.O. Box 845402** | **18881 Von Karman Ave. Suite 350** |
| **Los Angeles, CA 90084** | **Irvine, CA 92612** |

# STATEMENT



**Date**

**12/21/21 through 05/31/22**

| Date / Time | Description | Hours | Rate/Hr. | Total Billed | Parties Billed | Your Share |
|---|---|---|---|---|---|---|
| 4/28/22 | Priscilla Hall<br>Preparation of Award | 3.50 | $725.00 | $2,537.50 | 2 | $1,268.75 |
| 4/29/22 | Cyrus E. Dugger<br>Telephonic conference with Judge Hall. | 0.20 | $255.00 | $51.00 | 2 | $25.50 |
| 4/29/22 | Cyrus E. Dugger<br>Telephonic conference with Judge Hall | 0.70 | $255.00 | $178.50 | 2 | $89.25 |
| 4/29/22 | Priscilla Hall<br>Preparation of Award | 13.50 | $725.00 | $9,787.50 | 2 | $4,893.75 |
| 4/30/22 | Cyrus E. Dugger<br>Telephonic conference with Judge Hall | 0.10 | $255.00 | $25.50 | 2 | $12.75 |
| 4/30/22 | Cyrus E. Dugger<br>Telephonic conference with Judge Hall | 0.20 | $255.00 | $51.00 | 2 | $25.50 |
| 4/30/22 | Cyrus E. Dugger<br>Reading Researching and Writing | 0.40 | $255.00 | $102.00 | 2 | $51.00 |
| 4/30/22 | Cyrus E. Dugger<br>Telephonic conference with Judge Hall | 1.00 | $255.00 | $255.00 | 2 | $127.50 |
| 4/30/22 | Priscilla Hall<br>Preparation of Award | 16.00 | $725.00 | $11,600.00 | 2 | $5,800.00 |
| 5/31/22 | Case Management Fee | | | | | $7,117.67 |
| | | | | Fees: | | $67,765.93 |
| | | | | Total: | | $67,765.93 |

**Payment Activity:**

| | | |
|---|---|---|
| 1/31/22 | Check No. ach 3896<br>Paid By: King & Wood Mallesons | ($4,096.50) |
| 3/18/22 | Check No. WT<br>Paid By: HNA Group (International) Company Limited | ($30,499.23) |
| | Total Payments: | ($34,595.73) |
| | Balance Due: | $33,170.20 |

Unused Deposits will not be refunded until the conclusion of the case.
Statement total is based on the fee split agreed upon by all parties. If the case cancels or continues, fees are due per our cancellation and continuance policy. Please make checks payable to JAMS, Inc.

| Standard mail: | Overnight mail: |
|---|---|
| **P.O. Box 845402** | **18881 Von Karman Ave. Suite 350** |
| **Los Angeles, CA 90084** | **Irvine, CA 92612** |

# EXHIBIT G

# KASOWITZ BENSON TORRES LLP

1633 BROADWAY
NEW YORK, NEW YORK 10019
(212) 506-1700
FAX: (212) 506-1800

MARK P. RESSLER
DIRECT DIAL: (212) 506-1752
DIRECT FAX: (212) 835-5052
MRessler@kasowitz.com

ATLANTA
HOUSTON
LOS ANGELES
MIAMI
NEWARK
SAN FRANCISCO
SILICON VALLEY
WASHINGTON DC

May 18, 2022

<u>Via e-mail</u>

Vincent Filardo, Jr.
King & Wood Mallesons
500 Fifth Ave., 50th Floor
New York, NY 10010

     Re:    ***245 Park Member LLC v. HNA Group (International) Company Limited,***
          **JAMS Ref. No. 5425000065**

Dear Vincent:

     On behalf of 245 Park Member LLC and SL Green Realty Corp. ("SL Green"), we hereby demand that HNA Group (International) Company Limited ("HNA") tender payment in full to SL Green of the amounts due and owing to SL Green, totaling $185,412,763.60, pursuant to the Final Award issued in favor of SL Green, and against HNA, in the above-captioned arbitration by Hon. L. Priscilla Hall Ret., on May 5, 2022 (the "Final Award"). This sum includes all of the JAMS fees incurred by SL Green in connection with the arbitration, totaling $102,686.11, of which $33,170.20 were HNA's share of JAMS fees that HNA failed to pay and that SL Green paid to facilitate release of the Final Award. Please advise us by tomorrow, May 19, 2022, as to the date and method by which HNA will tender payment of the Final Award.

     SL Green reserves all rights and waives none.

                  Respectfully submitted,

                  Mark P. Ressler